1    Alan E. Wisotsky (SBN 68051)
     Jeffrey Held (SBN 106991)
2    LAW OFFICES OF ALAN E. WISOTSKY
     300 Esplanade Drive, Suite 1500
3    Oxnard, California 93036
     Tel:    (805) 278-0920
4    Fax:    (805) 278-0289
     E-mail: lawyers@wisotskylaw.com
5
     Attorneys for Defendants COUNTY OF
6    VENTURA, VENTURA COUNTY SHERIFF'S
     DEPARTMENT, and SHERIFF BOB BROOKS
7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   ESTHER BISELLI, and the ESTATE OF DANIEL T. HERNANDEZ, by and through his personal represen-tative ESTHER BISELLI; K.N.H. [name redacted], a minor, by and through her guardian and mother, AMBER RODRIGUEZ, | No. CV 09-8694 CAS (Ex) |
| | **NOTICE OF HEARING OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES, ON BEHALF OF DEFENDANTS COUNTY OF VENTURA, VENTURA COUNTY SHERIFF'S DEPARTMENT, AND SHERIFF BOB BROOKS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| Plaintiffs, | |
| v. | |
| COUNTY OF VENTURA; VENTURA COUNTY SHERIFF'S DEPARTMENT; SHERIFF BOB BROOKS; CALIFORNIA FORENSIC MEDICAL GROUP; FITHIAN TAYLOR, M.D.; DR. JOHN KORZELIUS; DR. MELVIN MYUNG JUNG; MARIA BAEZLIN; DOES 1 through 10, inclusive, | [Separately bound evidence volume, statement of uncontro-verted facts and conclusions of law, and proposed judgment lodged concurrently herewith] |
| Defendants. | Date:   January 31, 2011 Time: 10:00 a.m. Ctrm: 5 – 2nd Floor |

25    TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:

26        PLEASE TAKE NOTICE that on January 31, 2011, at 10:00 a.m., or as soon

27   thereafter as the matter may be called for hearing in Courtroom 5 of the above-entitled

28   court, located at 312 North Spring Street, Los Angeles, California, defendants

COUNTY OF VENTURA, VENTURA COUNTY SHERIFF'S DEPARTMENT, and SHERIFF BOB BROOKS will move the Honorable Christina A. Snyder, United States District Judge, for an order granting them summary judgment or, in the alternative, summary adjudication, in accordance with Federal Rule of Civil Procedure 56(b).

These defendants seek an order granting them summary judgment as to each of the four causes of action pled against them in the complaint for damages filed on December 2, 2009.   In the alternative, however, defendants seek partial summary judgment in favor of as many of the moving parties as to as many of the causes of action as the Court deems legally justified, such request being made in accordance with Federal Rule of Civil Procedure 56(b) and (d)(1) , (2).

This motion is based upon this notice of hearing of motion; the appended memorandum of points and authorities; the concurrently filed, separately bound evidence volume; the concurrently lodged proposed judgment; and the statement of uncontroverted facts and conclusions of law.

This motion is made following the conference of counsel in accordance with Central District Local Rule 7-3, which took place on August 27, 2010.  The exact text of this summary judgment notice and motion, as well as all supporting documents described in the preceding paragraph, were electronically transmitted and regular-mailed to both counsel for plaintiffs, Sonia Mercado and Mark Pachowicz, and co-defendant, Peter Bertling, on August 20, 2010, along with a prefiling cover letter identifying the entire transmission, as additional compliance with Central District Local Rule 7-3.

Dated: September ____, 2010          LAW OFFICES OF ALAN E. WISOTSKY


By:_____
     JEFFREY HELD
     Attorneys for Defendants,
     COUNTY OF VENTURA, VENTURA
     COUNTY SHERIFF'S DEPARTMENT,
     and SHERIFF BOB BROOKS

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . 1

I.      ENABLING AUTHORITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     OVERVIEW OF COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     THE   RECENTLY   PUBLISHED   NINTH
        CIRCUIT   DECISION   IN   *CLOUTHIER*
        NEGATES LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      THE    STATE-LAW    COUNTS    ARE
        LIKEWISE NOT VIABLE  . . . . . . . . . . . . . . . . . . . 18

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1

**TABLE OF AUTHORITIES**

2

**PAGE**

3

**FEDERAL CASES**

4
*Arbaugh v. Y&H Corp.*
    546 U.S. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5

*Barber v. City of Salem*
6     953 F.2d 232 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 *Clouthier v. County of Contra Costa*
    591 F.3d 1232 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12, 14

8

*Cook v. Monroe County*
9     402 F.3d 1092 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10 *Duvall v. County of Kitsap*
    260 F.3d 1124 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

11

12 *Estate of Cartwright v. City of Concord*
    856 F.2d 1437 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

13 *Frake v. City of Chicago*
    210 F.3d 779 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

14

15 *Gish v. Thomas*
    516 F.3d 952 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 *Manarite v. City of Springfield*
    957 F.2d 953 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17

18 *Memmer v. Marin County*
    169 F.3d 630 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

19 *Notrica v. Board of Supervisors*
    925 F.2d 1211 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

20

21 *Perez v. Oakland County*
    466 F.3d 416 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22 *Rellergert v. Cape Girardeau County*
    924 F.2d 794 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

23

24 *Simmons v. Navajo County*
    609 F.3d 1011 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 16, 18

25 *Toguchi v. Chung*
    391 F.3d 1051 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26

27 *Whitt v. Stephens County*
    529 F.3d 278 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28

iv

**<u>FEDERAL RULES</u>**

Federal Rules of Civil Procedure, Rule 56  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**<u>FEDERAL STATUTES</u>**

28 U.S.C. §1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**<u>STATE STATUTES</u>**

California Civil Code §51  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Government Code §844.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## ENABLING AUTHORITY

Summary judgment may be granted as to some or all movants and as to some or all causes of action.  Fed. R. Civ. P. 56(b) and  (d)(1) and (2).  Subdivision (d) provides that if summary judgment is not rendered as sought upon the whole action, the court "should, to the extent practicable, determine what material facts are not genuinely at issue."

In this action, there are three federal theories and four theories brought under California state law.  This Court may adjudicate pendent, ancillary, or supplemental claims, should they derive from a common nucleus of operative fact.  *Notrica v. Board of Supervisors*, 925 F.2d 1211, 1213 (9th Cir. 1991).  Typically, pendent claims are dismissed without prejudice upon dismissal of the federal claims; the Supreme Court decision in *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), may signal a change in this practice.  The Court held that when a district court dismisses for failure to state a federal cause of action, it generally retains dispositional discretion over any supplemental state-law claims.  28 U.S.C. §1367(c)(3) seems to leave it up to the district judge.

## II.

## OVERVIEW OF COMPLAINT

This action is a jail suicide case brought by the decedent pretrial detainee's mother and minor daughter.  The moving parties are the institutional custodial defendants, the County of Ventura, the Ventura County Sheriff's Department, and the Sheriff, Bob Brooks.  Defendants who are not parties to this motion are the jail's forensic medical contractor, California Forensic Medical Group; one of its owners, Taylor Fithian (incorrectly identified as Fithian Taylor); two of its doctors, John Korzelius and Melvin Jung; as well as one of its nurses, Maria Baez (incorrectly

/ / /

1

identified as "Baezlin," a misunderstanding on the part of plaintiffs' counsel based upon her medical record entry identifying herself as "Maria Baez, LVN").

There are seven causes of action. The first four are brought under federal statutes, and the remaining three are brought under California or common-law theories.

The first three causes of action are brought under the federal civil rights statute, 42 U.S.C. §1983. The first cause of action is brought under that statute against the medical defendants, specifically Drs. Korzelius and Yung and Nurse Baez. The second cause of action is brought under the federal civil rights statute against the County of Ventura and the Ventura County Sheriff's Department. The third cause of action is also brought under §1983 against Sheriff Brooks, Dr. Fithian, and Dr. Korzelius.

The fourth cause of action is brought under the Americans with Disabilities Act, 42 U.S.C. §12132. The defendants in that cause of action are the County of Ventura and the Ventura County Sheriff's Department.

The fifth cause of action is for alleged violation of California Government Code §845.6. The only defendant is Nurse Baez.

The sixth cause of action is for common-law negligence. All defendants are named in that claim.

The final cause of action is for alleged medical negligence against Drs. Korzelius and Jung as well as Nurse Baez.

The moving parties are therefore included in the second, third, fourth, and sixth causes of action. The factual accusations against moving parties, detailed with more specificity and source references below, essentially charge them with not having done enough to ferret out the suicidal tendencies of the decedent and not having enough effective policies to have stopped the decedent from killing himself.

The plaintiffs' decedent was taken into custody in April of 2008 (complaint, ¶ 16 — all references in this section are to the paragraphs of the complaint). Two

2

months later, on June 11, 2008, the decedent was transferred by court order to Patton State Hospital to undergo a mental health examination (¶ 17).

On October 30, 2008, Patton State Hospital found the decedent competent to stand trial and issued a certificate of mental competence under the state Penal Code (¶ 18).  Between November 5 and December 4, 2008, the decedent requested care for dental pain and food sickness.  During that same time frame, he occasionally did not take his medicine to combat his bipolar and schizophrenic conditions (¶ 20).

The state criminal court found the plaintiff competent to stand trial on November 26, 2008.  But beginning on December 4, 2008, the plaintiff experienced a variety of psychological deficiencies involving anxiety, depression, appetite loss, crying, and failing to eat (¶ 20).  Decedent's family members were turned away during visiting hours between November of 2008 and February 14, 2009 (¶ 22).

On February 16, 2009, at 4:35 p.m., the plaintiff was found hanging in a segregated housing cell (¶ 27).  He had no pulse, was cyanotic, and his skin was cold and clammy to the touch.  He had a pronounced hematoma at the base of his neck.  The next day, the medical examiner determined that he died of asphyxia by hanging (¶ 27).

The second cause of action charges a number of institutional omissions.  Defendants allegedly had an unconstitutional practice or policy of not providing continuity of care, access to medical care, and treatment to inmates who were mentally ill or suicidal.   Defendants allegedly failed to supervise, train, or take corrective measures regarding the contract forensic provider to ensure appropriate communication and information transpiring between the medical and custodial staff (¶ 39).

The third claim for relief accuses Sheriff Brooks of failing to properly train and supervise custodial staff in the taking of immediate measures in regard to a mentally incompetent inmate such as the plaintiffs' decedent (¶ 43).  The employees failed to properly classify, house, and monitor prisoners suffering from mental health disabilities.  These individuals were denied medical and mental health attention (¶ 44).

3

The entity decision-makers allegedly failed to supervise the medical services for pretrial detainees, allowed the facility to suffer from overcrowding, and permitted inadequate staffing, especially of medical personnel. They failed to properly classify, house, or monitor prisoners suffering from mental health disabilities and failed to provide care or access to medical or mental health to inmates who had serious but treatable medical and mental health conditions (¶ 45).

The Sheriff is accused, in paragraph 46, of failing to train, supervise, and instruct deputies, jailers, nurses, physicians, and physician's assistants to be sure that they did not violate anyone's federal constitutional and statutory rights. He failed to ensure that the detainees would receive continuity of care and access to specialized medical care when indicated. He did not ensure that detainees with mental illnesses were not punished for manifesting their mental illnesses (¶ 46a).

Sheriff Brooks allegedly failed to objectively investigate the use of cruel and unusual punishment and in-custody deaths or injuries. He failed to provide medical care and attention to injured or ill detainees (¶ 46b).

A number of other failures are indicated in the succeeding (and frequently misnumbered) paragraphs. Pages 13 through 15 describe additional failures and omissions on the part of the Sheriff, such as failure to periodically monitor detainees' medical condition and failure to periodically monitor the adequacy of medical staffing.

The fourth cause of action sues for alleged violations of the Americans with Disabilities Act and the California Unruh Civil Rights Act. Paragraphs 57 through 59 describe the failures and omissions of which the defendants are accused. These involved failing to provide services and accommodations to the plaintiffs' decedent involving access to programs and services of state-designated mental health hospitals or county facilities. Alleged inappropriate housing, monitoring, and classification are also alleged.

Finally, the sixth cause of action is for general negligence against all defen-

4

1   dants.  It alleges that the delay and denial of medical attention and access to mental

2   health care caused plaintiff to kill himself.  The defendants failed to make a prompt

3   and appropriate referral and failed to seek care and treatment for decedent.

4                                                 **III.**

5                               <u>**STATEMENT OF FACTS**</u>

6           Separately submitted is the moving parties' evidence in support of this motion;

7   it consists of the declaration of Sgt. Rob Davidson.  Sgt. Davidson is the legal liaison

8   officer for the Ventura County Sheriff's Department and is knowledgeable concerning

9   Mr. Hernandez's incarceration.

10          The statement of uncontroverted facts, lodged concurrently with this motion,

11  summarizes Sgt. Davidson's declaration and gives the specific source authority

12  references from it in support of those facts.  What follows below is a simplified

13  compendium of those relevant facts drawn from Sgt. Davidson's declaration.

14          The incarceration in question occurred between October 30, 2008, when the

15  plaintiffs' decedent was returned to the Ventura County Sheriff's Department's

16  Pretrial Detention Facility from Patton State Mental Hospital, until February 16, 2009,

17  when the decedent executed himself by hanging.  The Ventura Superior Court sent the

18  plaintiffs' decedent to Patton State Hospital under the auspices of California Penal

19  Code §1368 in order to ascertain his ability to stand trial in a criminal matter he was

20  facing.  Patton State Mental Hospital returned Mr. Hernandez to the Ventura County

21  Jail.  Patton State Hospital certified the plaintiffs' decedent as mentally competent to

22  stand trial.   Neither Patton nor any other mental health professional ever said

23  otherwise during the relevant 106-day incarceration.

24          The plaintiffs' decedent never indicated any desire or intent to end his life.

25  Mr. Hernandez never said or wrote anything indicating that he no longer wanted to

26  live or that he had a plan or inclination to commit suicide.

27  / / /

28          Quite to the contrary, Mr. Hernandez actually twice denied ever contemplating

1   ending his life.  The first of these occasions occurred on October 30, 2008.  Every

2   matriculating inmate is given an intake health screening questionnaire by a custody

3   deputy.  In this case, Deputy Karen Hanson gave the intake health screening question-

4   naire to plaintiffs' decedent upon his return to the Ventura County Jail.  Question 11

5   of the form requires the deputy to ask, "Have you ever thought of ending your life and

6   do you feel that way now?  Daniel Hernandez signed the intake health screening

7   questionnaire, corroborating Deputy Hanson's indication that he responded to both

8   parts of Question 11 by saying "no."

9        The plaintiffs' decedent again said that he had no inclination to harm himself,

10  this time in the inmate reception center form which he completed on November 2,

11  2008.  The inmate reception center is a process adopted several years ago by the

12  Ventura County Jail.  Inmates who have recently arrived at the facility are closely

13  monitored during their first few days of incarceration to see if they will adapt

14  satisfactorily to jail life or whether any special handling or treatment options are

15  necessary.

16       During the inmate reception center phase of their incarceration, new arrivals are

17  closely monitored by jail staff.  At the conclusion of the 72-hour inmate reception

18  center process, each inmate, in his own hand, completes a form consisting of five

19  questions.  The form is then reviewed and signed by jail medical staff.

20       The first question on the form is "What are your current mental health

21  problems?"  Plaintiffs' decedent wrote in his own hand, "None."

22       The third question asks the inmate for the dates on which he tried to hurt

23  himself.  Mr. Hernandez wrote, "Never."

24       The fourth question asks, "How did you try to hurt yourself?"  The decedent

25  wrote, "Don't."

26  / / /

27  / / /

28       The fifth question in the inmate reception clearance form is "Do you have any

problems which need immediate attention that you have not made us aware of?" Mr. Hernandez wrote, "No."

Mr. Hernandez signed and dated the inmate reception clearance form on November 2, 2008.

A jail psychiatrist, Dr. Jung, reviewed and signed the plaintiffs' decedent's inmate reception clearance form on November 3, 2008.  Among the psychiatrist's treatment and processing options were that Mr. Hernandez, or any inmate completing the form, could remain in the reception center with psychiatric follow-up, be moved to a special housing unit, or be placed in the general jail population.  Dr. Jung chose the latter alternative by writing, "Cleared to house out of reception housing."

Not only did plaintiffs' decedent never say or write anything indicating that he wanted to harm himself during the subject incarceration, he never did anything to significantly injure himself, nor did he attempt to take his life before the February 16, 2009, hanging.  His self-execution by hanging came as a complete surprise to custody staff.

Part of the jail's inmate safety protocol is to have numerous safety checks. Custody staff checks on the safety of inmates a minimum of one time per hour.  These safety checks are specifically for the purpose of looking into each cell to make sure that no inmate is ill, behaving violently, or in any sort of danger.  The safety checks must be, and are, electronically recorded by the deputy's placing an electronic wand against a corresponding contact affixed to the cell walls.  A review of the cell check database found that in the week preceding the plaintiffs' decedent's suicide, custody staff completed the required cell checks.  There were 187 recorded cell checks of the decedent in the week preceding his hanging himself.

Cell checks are not the only way that custody staff monitors the well-being of inmates.  The custody staff observes inmates many times on a daily basis.  These visits are not intended for the sole purpose of checking on inmates' well-being and are not logged or recorded but, rather, to fill an intended purpose.  None of these methods of

7

custody staff watching inmates to make sure that they were safe indicated any problem with the plaintiffs' decedent's well-being; there is a complete absence of any written report about him trying to harm himself.

From a structural standpoint, the Sheriff's Department has implemented physical plant construction steps to reduce the ability of inmates in the Pretrial Detention Facility to harm themselves inside their cells.  Construction design has limited protrusions from walls which could be used to hang oneself.  These physical plant modifications have maximized the presence of rounded or molded surfaces, which make it more difficult to fasten any self-extinction ligature.  Designers have gone so far as to modify towel hooks to immediately cant if a heavy load is placed upon them.

The jail cell in which plaintiffs' decedent was housed at the time of his suicide was designed in such a way that the only available anchor points were the tiny holes of an air vent.  The air vent is located above the sink-commode fixture in the jail cell.  The air vent is a metal latticework structure comprised of some 140 8 mm holes arranged evenly in seven rows of 20 each.

When jail facility management conducted its investigation into the suicide of plaintiffs' decedent, it was surprised to see the mechanism by which he had accomplished his own death.  Mr. Hernandez had managed to tear a thin, uniform strip of bed sheet, approximately 4 mm in width, and thread it through the latticework grille.  Considering that Mr. Hernandez had no access to scissors or any sharp object, his ability to uniformly tear the bed sheet into a perfect strip was itself unusual.

Mr. Hernandez then had to harden and fit the bed sheet, a pliable piece of fabric, through a tiny air vent hole.  More amazingly, he had to find a way to cause the strip of bed sheet to reverse course once it was inside the air vent in order to make it come back out another tiny air vent hole.

/ / /

The metal construction of the vent would seemingly slice through the narrow,

8

thin fabric when exposed to the weight of an adult male.  One would have thought that the thin strip of sheet would have been cut through by the weight of Mr. Hernandez.

It is further surprising that a thin, frayed strip of cotton used by Mr. Hernandez to tie around his neck was capable of holding the weight of an adult man.

The Ventura County Jail (Pretrial Detention Facility) has had an extremely low incidence of inmate suicides.  In the six-year time frame between 2004 and 2009, only six inmates, including the plaintiffs' decedent, committed suicide while in custody. As a percentage of total inmates booked during that six-year time frame, the number of inmate suicides is less than one tenth of one percent.

In the 30 days before his suicide, the only unusual behavior by plaintiffs' decedent is that he was occasionally aggressive toward others, but never toward himself.  On January 17, 2009, he attempted to bite a jail nurse who was trying to examine him.

On February 11, 2009, a custody deputy heard loud noises emanating from the area of the decedent's cell.  The deputy saw the plaintiffs' decedent jumping from a table in the cell to the ground.  The deputy asked why he was doing that, and the decedent responded with an angry obscenity. The deputy instructed him to stop.  The inmate assumed a fighting stance toward the deputy, profanely inviting him to fight. The decedent then banged on the glass window of his cell several times.  The deputy told him that he was going to receive a disciplinary writeup for disrespectful behavior, to which the decedent responded with another angry obscenity.  The deputy told him that if he continued to create a disturbance, he would be pepper-sprayed.

On February 12, 2009, the decedent was told that he was going to be moved for a visit. Security precautions require that inmates be waist-chained when being moved. As two deputies were applying the waist chains, the decedent tried to head-butt one of the deputies.  The inmate was placed in what is called an alternative environment cell.  This is a stimulus-free location in a low-traffic area of the jail facility, which helps the inmate calm down. While in that cell, the inmate is checked every half hour

9

1    by custody staff in order to ensure his well-being.

2         The decedent also declined meals periodically during the relevant incarceration.

3    None of these meal refusals were ever accompanied by any stated intent to commit

4    suicide or hurt himself.

5         On one occasion, he stated that he was simply not hungry.  Soon after that, he

6    eagerly accepted his meals.

7         On another occasion (November 18, 2008), he denied to jail staff that he was

8    on a hunger strike.

9         Most often, the decedent linked his meal refusals to objectives designed to

10   enhance his existence, rather than terminate it.  The decedent most commonly linked

11   his meal refusals to his stated goal of increasing contact with and receiving discovery

12   from his criminal defense attorney.  On another occasion, he said that his meal refusal

13   was to protest issues involving the court system and discipline.

14        Sgt. Davidson stepped in to address the decedent's central concern which was

15   motivating most of his meal refusals.  Sgt. Davidson personally corresponded with

16   him concerning his public defender's failure to speak with him with sufficient

17   frequency. Sgt. Davidson personally phoned the decedent's criminal defense attorney,

18   leaving a message asking her to contact the decedent at his request.

19   **IV.**

20   **THE RECENTLY PUBLISHED NINTH CIRCUIT**

21   **DECISION IN *CLOUTHIER* NEGATES LIABILITY**

22        The Ninth Circuit addressed pretrial detainee suicides in *Estate of Cartwright*

23   *v. City of Concord*, 856 F.2d 1437 (9th Cir. 1988), and again in *Clouthier v. County*

24   *of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010).  In each instance, the Ninth Circuit

25   determined that the custodial defendants violated no constitutional rights in failing to

26   prevent the detainee's suicide and that the municipality could not be held separately

27   liable on the basis of any of its policies, customs, and practices.  Although not a

28   suicide case, the Ninth Circuit came to an essentially similar conclusion under the

10

1   same standards in *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004), where it was
2   determined that jail medical staff was not subjectively deliberately indifferent to the
3   prisoner's medical needs, even though the chief jail physician negligently failed to
4   realize that the inmate had probably consumed illegal narcotics while in custody.
5   Recently, in *Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010), a case brought
6   by the parents of a pretrial detainee who committed suicide while in custody, the
7   Court of Appeals held that the plaintiffs failed to establish deliberate indifference.

8       Sister circuit authority is replete with examples of non-liability for jail suicides.
9   Examples include: *Gish v. Thomas*, 516 F.3d 952 (11th Cir. 2008); *Cook v. Monroe*
10   *County*, 402 F.3d 1092 (11th Cir. 2005); *Whitt v. Stephens County*, 529 F.3d 278 (5th
11   Cir. 2008); *Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006); *Frake v. City of*
12   *Chicago*, 210 F.3d 779 (7th Cir. 2000); *Barber v. City of Salem*, 953 F.2d 232 (6th
13   Cir. 1992); *Manarite v. City of Springfield*, 957 F.2d 953 (1st Cir. 1992); and
14   *Rellergert v. Cape Girardeau County*, 924 F.2d 794 (8th Cir. 1991).

15   The Ninth Circuit has most recently addressed the jail suicide of a pretrial
16   detainee in *Clouthier, supra,* 591 F.2d 1232. The liability of the individual defendants
17   is analyzed separately from the liability of any entity defendants. The *Clouthier*
18   court's discussion of individual defendant liability occurs between 1241 and 1249.
19   There are no individual defendants among these moving parties (Sheriff Brooks had
20   no involvement with the plaintiffs' decedent whatsoever and is sued exclusively as the
21   decision-maker for the Sheriff's Department).

22   The *Clouthier* court's discussion of entity liability occurs between 1249 and
23   1254. The difference between the *Clouthier* case and the present case is that in the
24   reported decision, there was indisputable evidence that the decedent was definitely
25   suicidal before he took his own life, versus the present case, where the evidence is
26   overwhelming that there were no indications of suicidal ideation by these plaintiffs'
27   decedent. For this reason, the present case does not even rise to the threshold of
28   analytical consideration because there is really nothing to analyze. Therefore, the

legal tests are a poor fit, because they are more designed for a case in which the inmate was truly suicidal, a predicate analytical fact which is utterly absent from the present matrix.

In *Clouthier,* all of the events in question occurred in a relatively compressed time frame of about five days, between July 26, 2005, and August 1, 2005. In *Clouthier*, the decedent had an argument with his father, became violent, destroyed a china cabinet, and jumped through a plate glass window. He suffered severe bleeding. Even from the moment he was placed in the ambulance, he began extremely self-destructive actions, such as slamming his head against the side of the ambulance multiple times. In the hospital, he refused to have his wounds sutured. When he completed the intake health screening questionnaire, the *Clouthier* decedent told a mental health evaluator at the jail on several occasions that he was suicidal. He said that he wanted to be unconscious for the rest of his life. The health official described the decedent as despondent, hopeless, and suicidal, and she also wrote that he was "one of the most suicidal inmates I've ever seen." Her notes further stated that he had made numerous past suicide attempts, including one incident two months earlier requiring hospitalization after he slashed his wrists.

Regarding the claim against the county, the plaintiffs failed to adduce sufficient evidence to create a genuine issue of material fact to survive summary judgment. Whether the decedent's death was due to a longstanding custom or practice, an "act of omission" which amounted to deliberate indifference, or actions which the county adopted as policy when it failed to discipline its employees was unproven. There was little doubt that the plaintiffs did identify a series of missteps and miscommunications which led to the decedent's transfer to the general jail population even though he was suicidal. 591 F.3d at 1252. Yet the plaintiffs pointed to no evidence which would allow a reasonable jury to conclude that the county had caused the improper transfer through deliberate omissions or the implementation of longstanding practices or customs. *Id*. Accordingly, the plaintiffs in *Clouthier* did not adduce evidence to

12

1   create a triable issue of material fact on the crucial issues for county liability.  *Id*. at
2   1252-1253.

3        There was no evidence that the county had a longstanding custom or practice
4   of moving pretrial detainees from observation cells into the general jail population
5   without mental health staff consultation or contrary to its recommendations.  Nor was
6   there evidence of a longstanding custom or practice of miscommunication between
7   mental health staff and custodial staff.  Nor was there any evidence that the county
8   was on actual or constructive notice that deficiencies in the implementation of any
9   policy would likely result in a constitutional violation.

10        Nothing in the record indicated that improper transfers of suicidal inmates
11   happen so frequently that the need for corrective measures must have been plainly
12   obvious to the entity policymakers.  591 F.3d at 1251-1252.  In a six-year period
13   preceding the plaintiff's suicide, only six inmates succeeded in committing suicide out
14   of 175,000 inmates processed at the county's detention facility.  *Id*. at 1252.

15        The plaintiffs submitted a declaration of an expert who expressed the opinion
16   that mental health staff and custodial staff did not share their records and did not work
17   as a team.  He stated that that disconnect was purposely indifferent to the mental
18   health needs of pretrial detainees.  But such conclusory assertions were insufficient
19   to avoid summary judgment.  The key question was whether the alleged disconnect
20   was so obvious and the inadequacy so likely to result in the violation of constitutional
21   rights that the policymakers of the local government could reasonably have been said
22   to have been deliberately indifferent to the problem.  But there was no material
23   evidence on the county's knowledge or the obviousness of the problem.

24        The county also produced evidence to show that it was not deliberately
25   indifferent to the needs of mentally ill pretrial detainees.  The county had reasonable
26   and well-established written policies for handling detainee mental health needs.

27        The plaintiffs claimed that the suicide could have been avoided if mental health
28   staffers had made more frequent observations of their decedent.  But this is precisely

13

1  the argument against which the United States Supreme Court has cautioned.  591 F.3d
2  at 1253.

3       The plaintiffs also argued that the county was liable for the constitutional torts
4  of its employees because it ratified them.  This ratification was said to have occurred
5  by failing to discipline the employees who violated the decedent's constitutional
6  rights.  But this was insufficient to create a triable issue of fact.  There was no
7  conscious, affirmative choice to approve any actions and adopt them as official policy.
8  *Id*.  To hold municipalities liable under §1983 whenever policymakers fail to overrule
9  the unconstitutional discretionary acts of subordinates would simply smuggle
10  respondeat superior liability into §1983 law, creating an end run around *Monell*.  *Id.*

11       In every instance where a person has had his or her constitutional rights violated
12  by a municipal employee, a §1983 plaintiff will be able to point to something which
13  the municipality could have done to prevent the unfortunate incident.  591 F.3d at
14  1253-1254.  But where the inmate's suicide was not due to a longstanding custom or
15  practice of the municipality, an omission which amounted to deliberate indifference
16  or actions which the county adopted as policy when it failed to discipline, then
17  holding the county liable for the missteps of its employee would amount to de facto
18  respondeat superior liability.  *Id*. at 1254.

19       In the earlier Ninth Circuit decision involving the suicide of a pretrial detainee,
20  *Estate of Cartwright v. City of Concord*, it was held that city jail employees did not
21  violate the constitutional rights of a pretrial detainee in failing to prevent him from
22  committing suicide.  Evidence showed that the jailers overheard the pretrial detainee
23  speaking of suicide.  The jailers mistakenly believed that the decedent was continuing
24  a joke which his companion had started earlier in the evening.  None of his other
25  statements gave them any reason to believe that he needed suicide prevention care.

26       In another Ninth Circuit decision involving the suicide of a pretrial detainee,
27  *Simmons v. Navajo County*, summary judgment was affirmed.  There was no evidence
28  to indicate that any jail personnel knew that the pretrial detainee who committed

14

suicide was in any substantial danger of killing himself. Such knowledge would be required to demonstrate the deliberate indifference to such a risk which would violate the Fourteenth Amendment. Although the jail nurse was aware that the pretrial detainee had previously attempted to take his own life, suffered from depression, and was at some risk of making another attempt on his life, over a month had passed since his last suicide attempt. By all accounts he was doing better since that.

The Ninth Circuit explained that "To proceed to trial, the Simmonses must adduce evidence raising a triable issue that Nurse Jones knew Jasper was in substantial danger of killing himself yet deliberately ignored such risk." Even though he was sulky at times, "he seemed like an average teenager to her as far as his behavior." Not only were her own interactions with the detainee unremarkable, but "she also had no reason to believe from the treatment notes of the social worker and psychiatric nurse practitioner . . . that Jasper was on the brink of killing himself." 609 F.3d at 1018.

Nor did a decision to keep him on suicide watch create an inference of subjective awareness that he was in substantial danger. The Ninth Circuit wrote:

> There is no indication that in the hours before Jasper's suicide, Nurse Jones observed suicidal actions, heard statements of a suicidal nature, or witnessed other evidence of Jasper's suicidal intent that would have alerted her to Jasper's impending suicidal crisis. . . . ¶ In short, this is not a case where a jail official knew a pretrial detainee was actively suicidal but failed to ensure that precautionary measures were undertaken . . . or unilaterally halted such measures despite a belief that he was not yet out of the woods . . . . While Nurse Jones believed Jasper was at some risk of suicide warranting continuing precautions, there is no evidence that she was subjectively aware that Jasper was actively suicidal at the time she left her shift.

15

609 F.3d at 1018-1019.

The Ninth Circuit further rejected the existence of deliberate indifference based upon failure to ensure that the detainee had daily evaluations pursuant to the suicide prevention policy.  In the absence of an occurring suicidal crisis, there was no indication of any serious risk of harm.

Finally, the plaintiffs contended that the failure to retrieve the detainee's used gauze from dressings was deliberately indifferent.  Medical personnel knew that he had accumulated gauze from his dressings, and it was their practice to dispose of it in a waste disposal cart.  Still, no reasonable juror could conclude that there was conscious disregard of an excessive risk to inmate safety.

The *Simmons* court stated, "However, deliberate indifference is a high legal standard.  A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment."  609 F.3d at 1019.

The *Simmons* court castigated the practice of looking through a hindsight lens tinged with sympathy attending the tragic death of a human being.  Quoting from the *Rellergert* decision cited earlier in this brief, the Ninth Circuit in *Simmons* stated, "Once a suicide has been accomplished in spite of preventive measures, it is all too easy to point out the flaws of failure."  609 F.3d at 1020.  Even though a jury might reasonably conclude that a custodial official acted imprudently, wrongly, or negligently by failing to check on the detainee more frequently and failing to conduct a thorough cell search, the question for resolution in the federal civil rights claim is not whether the jail official did all that he could have done, but whether he did all that the Constitution required of him.   Absent evidence that the custodial official knew that the pretrial detainee was currently suicidal, summary judgment is required.
/ / /

The *Simmons* court addressed liability under §1983 for alleged failure to train or supervise.  To survive summary judgment, the plaintiffs need evidence that the supervisorial jail personnel, including the sheriff, themselves individually acted or

failed to act unconstitutionally — it is not enough that a subordinate acted uncon-stitutionally.  The district court in that case properly awarded summary judgment to the sheriff and other managerial personnel at the jail.

The plaintiffs also asserted a §1983 claim against the county, the board of supervisors, and the sheriff.  The Ninth Circuit stated,  "Because we hold that there was no underlying constitutional violation, the Simmonses cannot maintain a claim for municipal liability."  609 F.3d at 1021.

The plaintiffs in *Simmons* raised an ADA issue, as do the present plaintiffs.  It was contended that decedent's depression was a disability under the Americans with Disabilities Act and the jail failed to accommodate his disability by denying him access to outdoor recreation and by failing to place him in a more appropriate facility.

Assuming without deciding that the *Simmons* decedent's depression was an ADA-recognized disability, the exclusion from outdoor recreation had nothing to do with his depression.  He was deprived of outdoor recreation even before his placement on suicide watch.   The restriction was a legitimate effort to protect him from self-harm, not to cause him depression.  All inmates on suicide watch were so restricted.

The ADA prohibits discrimination because of disability, not inadequate treatment for the disability.  The Act is not violated by a jail's simply failing to attend to the medical needs of a disabled prisoner; the ADA does not create a remedy for medical malpractice.

Instead, the ADA is directed toward intentional, invidious mistreatment because of the disability.  *Memmer v. Marin County*, 169 F.3d 630 (9th Cir. 1999). The plaintiff bears the burden of establishing an ADA violation, including the existence of specific reasonable accommodations which defendant failed to provide.  169 F.3d at 633.  If the ADA suit is for monetary damages, as is the present suit, the plaintiff must demonstrate intentional discrimination.  *Id.*

Although *Memmer* left open the question of whether intentional discrimination can be established only by proving discriminatory animus or whether deliberate

17

1   indifference would be sufficient, the Ninth Circuit later decided that issue in *Duvall*

2   *v. County of Kitsap*, 260 F.3d 1124 (2001).  That case stands for the proposition that

3   objective deliberate indifference is the conduct fault standard for an ADA damages

4   action.

5      In the present case, the plaintiffs cannot satisfy either the *Simmons* showing or

6   the *Memmer* showing to establish an ADA violation.  There is no indication that the

7   decedent was treated badly and in a different way because of his disability.  Nor is

8   there any indication that there was deliberate indifference toward his medical needs.

9   That analysis is identical to the analysis for a §1983 violation, utilizing the same

10  standard as against the entity defendants discussed in the previous portion of this brief.

11                                      **V.**

12                       **THE STATE-LAW COUNTS ARE LIKEWISE NOT**

13                       **VIABLE**

14     The plaintiffs assert a number of state-law theories.  Part of the fourth claim is

15  an alleged violation of the California Unruh Act.  The sixth cause of action is for

16  negligence.

17     The negligence cause of action is precluded by California Government Code

18  §844.6(a)(2).  That statute provides that a public entity is not liable for any injury to

19  a prisoner.  Section 844.6 is asserted as the 19th affirmative defense in these moving

20  parties' answer, on page 16, line 4.

21     The reference to the state Unruh Civil Rights Act must be a reference to

22  California Civil Code §51(a), which provides, "This section shall be known, and may

23  be cited, as the Unruh Civil Rights Act."  It provides for equal accommodations and

24  advantages in all business establishments regardless of membership in a protected

25  classification.  It is an equal access and equal treatment statute; it references the

26  Americans with Disabilities Act in subdivision (f).

27     The analysis here is identical to the discussion of the Ninth Circuit in the

28  *Simmons* case, where the Ninth Circuit rejected application of the ADA to a jail

18

1    suicide case.  The Ninth Circuit explained that no different or worse treatment was

2    accorded the pretrial detainee who committed suicide by reason of his depression.  No

3    denial of any privilege was because of his mental status or depression but, rather, due

4    to a jail policy restricting the activities of inmates on suicide watch.

5         Similarly, plaintiffs' decedent in this matter was not treated differently because

6    of any mental or medical condition.  He never intimated any suicidal ideation.  There-

7    fore, there is no ADA cause of action and, correlatively, no Unruh Civil Rights Act

8    violation.

9                                          **VI.**

10                                    **CONCLUSION**

11        For the foregoing reasons and authorities, it is respectfully requested that the

12   Court grant this summary judgment motion in favor of moving party defendants

13   County of Ventura, Ventura County Sheriff's Department, and Sheriff Bob Brooks.

14

15        Dated:  September ____, 2010

16                                          LAW OFFICES OF ALAN E. WISOTSKY

17

18                              By:_____
                                   JEFFREY HELD
19                                 Attorneys for Defendants,
                                   COUNTY OF VENTURA, VENTURA
20                                 COUNTY SHERIFF'S DEPARTMENT,
                                   and SHERIFF BOB BROOKS
21

22

23

24

25

26

27

28

                                          19