DAVID S. McLANE (No. 124952)
KAYE, McLANE & BEDNARSKI, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: dmclane@kmbllp.com

Attorneys for K.N.H. by and through
her guardian ad litem, Amber Rodriguez

BRIAN A. VOGEL (No. 167413)
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, CA 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
E-Mail: brian@bvogel.com

Attorney for Esther Biselli and the
Estate of Daniel T. Hernandez

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| ESTHER BISELLI AND THE ESTATE OF DANIEL T. HERNANDEZ, BY AND THROUGH HIS PERSONAL REPRESENTATIVE ESTHER BISELLI; K.N.H., [NAME REDACTED] A MINOR, BY AND THROUGH HER GUARDIAN AND MOTHER, AMBER RODRIGUEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF VENTURA, VENTURA COUNTY SHERIFFS DEPARTMENT; SHERIFF BOB BROOKS; CALIFORNIA FORENSIC MEDICAL GROUP; TAYLOR FITHIAN, M.D., Dr. JOHN KORZELIUS, Dr. MELVIN MYUNG JUNG, MARIA BAEZLIN, DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. CV 09-08694-CAS(Ex)<br><br>NOTICE OF MOTION AND MOTION FOR SPOLIATION SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION; DECLARATIONS AND EXHIBITS IN SUPPORT OF MOTION<br><br>[PROPOSED] ORDER FILED CONCURRENTLY HEREWITH<br><br>Date:        June 4, 2012<br>Time:        10:00 a.m.<br>Courtroom:  5<br><br>Action Filed: 11/25/2009<br>Trial Date: None yet assigned<br>Judge: Hon. Christina A. Snyder<br>Mag. Judge: Hon. Charles F. Eick |

///

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 4, 2012, at 10:00 a.m., before the Honorable Christina A. Snyder, Judge of the Central District of California, in Courtroom 5, United States District Court, 312 N. Spring Street, Los Angeles, California 90012, Plaintiffs will move the Court for an Order for evidentiary sanctions and/or other appropriate sanctions based on the spoliation of video recordings which would have depicted Daniel T. Hernandez's behavior and condition in the week preceding his death.

The grounds for this motion is that Defendant Ventura County Sheriff's Office destroyed and/or failed to preserve video recordings depicting the decedent in this case, Daniel T. Hernandez, during the week preceding his suicide at Ventura County Jail on February 16, 2009. Federal law imposes a duty to preserve critical evidence before litigation begins or before a discovery request. This duty requires a litigant to preserve what evidence it knows, or reasonably should know, will be critical in a pending action or one in the offing.  Additionally, the video recordings at issue in this motion were destroyed following an explicit discovery request for "[a]ll videotapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location at the time of the INCIDENT."

On May 1, 2012, Plaintiff's counsel requested to meet and confer with counsel for Defendant Ventura County Sheriff's Office as to the issues raised in this motion. On May 4, 2012, the parties discussed the matters raised in this motion but were unable to resolve the issues without the assistance of the Court.

///

///

///

///

///

2

1         This motion is based on this notice, the attached memorandum of points and

2    authorities, the declarations and exhibits filed herewith, the pleadings and papers on

3    file in this action, and such other oral and documentary evidence as may be allowed at

4    the hearing of this motion.

5

6                                       Respectfully submitted,

7                                       KAYE, McLANE & BEDNARSKI, LLP

8
     Dated: May 7, 2012            By  /s/ David S. McLane
9                                     DAVID S. McLANE

10                                    Attorney for Plaintiff
                                      K.N.H., A MINOR BY AND THROUGH
11                                    HER GUARDIAN AND MOTHER,
                                      AMBER RODRIGUEZ
12

13                                    LAW OFFICES OF BRIAN A. VOGEL, PC

14

15   Dated: May 7, 2012            By  /s/ Brian A. Vogel
16                                    BRIAN A. VOGEL

17                                    Attorney for Plaintiffs
                                      ESTHER BISELLI AND THE ESTATE OF
18                                    DANIEL T. HERNANDEZ

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    Factual Background and Content of Video Recordings . . . . . . . . . . . 3

       B.    Destruction of Videotape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       A.    Defendant Ventura County Sheriff's Department Had an
             Obligation to Preserve the Video Recordings at the Time
             They Were Destroyed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       B.    The Video Recordings Were Destroyed with a Culpable
             State of Mind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.    The Destroyed Evidence Was Relevant to Plaintiffs' Claims
             and Plaintiffs Were Prejudiced by the Destruction of the
             Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       D.    The Evidentiary Sanctions and Adverse Inference
             Instruction Requested by Plaintiff Are Appropriate in this Case . . . . . 18

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
  69 F.3d 337 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 18

*Baliotis v. McNeil*,
  870 F. Supp. 1285 (M.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Brady v. Maryland*,
  373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burge v. St. Tammany Parish Sheriff's Office*,
  2001 WL 845463 (E.D. La. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Burge v. St. Tammany Parish*,
  187 F.3d 452 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Campbell Indus. v. M/V Gemini*,
  619 F.2d 24 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*,
  133 F.R.D. 166 (D. Colo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Donato v. Fitzgibbons*,
  172 F.R.D. 75 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Farmer v. Brennan*,
  511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Glover v. BIC Corp.*,
  6 F.3d 1318 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Halaco Engineering Co. v. Costle*,
  843 F.2d 376 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

*In re Napster, Inc. Copyright Litigation*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . passim

*Kounelis v. Sherrer*,
  529 F. Supp. 2d 503 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 18

*Leon v. IDX Systems Corp.*,
  464 F.3d 951 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*McCann v. Mangialardi*,
  337 F.3d 782 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mosaid Technologies Inc. v. Samsung Electronics Co.*,
  348 F. Supp. 2d 332 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

*National Ass'n. of Radiation Survivors v. Turnage*,
  115 F.R.D. 543 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

*Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.*,
   692 F.2d 214 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Newsome v. McCabe*,
   319 F.3d 301 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Scott v Harris*,
   550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.*,
   982 F.2d 363 (9ᵗʰ Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Kitsap Physicians Serv.*,
   314 F.3d 995 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Wm. T. Thompson Co. v. General Nutrition Corp.*,
   593 F. Supp. 1443 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Zubulake v. UBS Warburg LLC* (*Zubulake I*),
   220 F.R.D. 212 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Zubulake v. UBS Warburg LLC* (*Zubulake II*),
   229 F.R.D. 422 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 1370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

iii

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff brings this motion to seek appropriate sanctions for the destruction and/or failure to preserve video recordings depicting the decedent in this case, Daniel T. Hernandez, in the week prior to his suicide. As a result of the failure of Defendant Ventura County Sheriff's Office ("VCSO") to preserve the video recordings, even after they were requested during discovery in this case, Plaintiffs have been deprived of invaluable evidence depicting the behavior and condition of the decedent in the days before his suicide.  With this evidence, the jury would have been able to assess whether the jail employees interacting with Mr. Hernandez would have known that he was in need of medical intervention for his serious mental health condition, critical evidence as to their state of mind in failing to provide such intervention. They would have seen his behavior, on video, without having to rely on after the fact characterizations, most of which coming from jail employees.  Now that the evidence is gone, all the jury has is the disputed testimony of witnesses; a dispute that inherently disadvantages Plaintiffs who must challenge the testimony of a number of law enforcement officials in positions of authority.

Plaintiffs seek the following sanctions:

> (1)   The exclusion during the remaining pre-trial motions and trial of this action of evidence presented by any Defendant[1] reflecting any testimony by VCSO employees or documentary evidence supplied by VCSO employees regarding any observations of Mr. Hernandez's behavior, statements and/or mental health condition during the period February 8, 2009 through February 16, 2009 or in general, except to the extent that those observations are explicitly recorded in contemporaneous

---

[1]   It was Defendant VCSO, an agency of Defendant County of Ventura, that had custody of the video recordings at issue in this motion and allowed or caused their destruction. Nevertheless, all defendants should be precluded from presenting the testimony and evidence supplied VCSO employees. Any other result would defeat the purpose of spoliation sanctions because it would allow other defendants to present the very same evidence that is subject to exclusion due to VCSO's actions. Further, if the evidence were valuable to the other defendants, they could have sought the video independently of Plaintiff's discovery request. This sanction would not, however, preclude the presentation of evidence by employees of Defendant California Forensic Medical Group ("CFMG"), if presented by CFMG.

documents;

(2) The exclusion during the remaining pre-trial motions and trial of this action of evidence presented by any Defendant reflecting any testimony by VCSO employees or documentary evidence supplied by VCSO employees regarding their opinions or interpretation of Mr. Hernandez's behavior, statements, and/or mental health condition during the period February 8, 2009 through February 16, 2009 or in general, any observations that were not explicitly recorded in contemporaneous documents, and any characterization of observations that were explicitly recorded in contemporaneous documents;

(3) The exclusion of any expert testimony offered by any defendant based on testimony by VCSO employees or documentary evidence supplied by VCSO employees to the extent that such evidence is excluded under requests (1) and (2) above;

(4) A curative jury instruction that because Defendant VCSO had an affirmative duty under the law to preserve video recordings of the decedent during the period February 8 through February 16, 2009, but rather allowed or caused the destruction of such video, the jury may find that, if the video were viewed, it would corroborate the Plaintiffs' evidence that Mr. Hernandez displayed signs and symptoms of his serious mental illness; and

(5) The exclusion of evidence offered by Defendant VCSO concerning the reasons for, or the circumstances surrounding, the destruction or failure to preserve the video recordings.

Plaintiffs bring this action for violations of Mr. Hernandez's civil rights under 42 U.S.C. § 1983 alleging claims of deliberate indifference to Mr. Hernandez's serious but treatable medical and mental health condition against individual medical provider Defendants Melvin Jung, John Korzelius, and Maria Baez, as well as supervisory liability claims and *Monell* claims for a policy and practice of deliberate indifference that was a moving force behind the violations in this case against Defendants Ventura County, VCSO, and supervisor Defendants Bob Brooks, Taylor Fithian, and John Korzelius. Plaintiffs also allege statutory violations under the Americans with Disabilities Act, the Rehabilitation Act, and the California Unruh Act for disability discrimination and failure to provide reasonable accommodations for Mr. Hernandez's mental illness by Defendant Ventura County and Defendant VCSO. Plaintiff further alleges state law claims of negligence and medical negligence against Defendants and violation of California Government § 845.6 against Defendant Baez.

## II.   BACKGROUND[2]

### A.   Factual Background and Content of Video Recordings

In April 2008, Daniel T. Hernandez was arrested and began a term of pretrial detention that would continue until his death by suicide on February 16, 2009. Mr. Hernandez was initially housed at Ventura County Jail where he was provided some medical care and monitoring by California Forensic Medical Group ("CFMG"), the company that contracts with the County of Ventura to provide such care. During the period April 2008 through August 2008, Mr. Hernandez was monitored periodically for his serious mental health condition and displayed signs of mental distress on numerous occasions. He was placed in a safety cell in relation to four separate incidents, including one period on safety precautions that lasted for six days. For each of these incidents, he was deemed to be a danger to self and/or risk of suicide. For three of the incidents, he was given involuntary emergency medication. In the Summer of 2008, Mr. Hernandez was evaluated for his competency to stand trial and for whether he should be placed under conservatorship. The competency evaluation by Dr. Jimenez resulted in the following conclusion:

> "Mr. Hernandez **is not** competent in that he is not presently able to understand the nature and purpose of the proceedings against him, and to conduct or assist in his own defense in a rational manner because of his acute and ongoing mental illness . . . . It **is** medically appropriate to treat this person's psychiatric condition with medication. This medication is likely to be effective. This person **does not** have the capacity to make decisions about such medication. If untreated with medication, this person probably **will** suffer serious harm to their physical or mental health. In consideration of this evaluation and in my professional opinion this person **is** a danger to others, and **is** a danger to self."

McLane Decl., Ex. A at 5 (emphasis in original). The conservatorship inquiry concluded with the following finding:

> "It is clear that the proposed conservatee has some psychiatric issues

---

[2]   The facts stated in this memorandum are based on counsel's review of the documents, depositions, and other discovery produced in this action as well as information provided by witnesses. Declaration of David S. McLane ("McLane Decl.") ¶ 2.

[and] . . . a history of violent behavior . . . . The proposed conservatee will not take any medications to alleviate his condition, and Dr. Jimenez states the proposed conservatee is a danger to self and others, requiring the need for a locked facility and medical treatment for the proposed conservatee. With the tendency for violent behavior and his refusal to take any medication, a conservatorship doesnot appear to be what would be in the best interest for the proposed conservatee. The proposed conservatee needs much more intensive intervention and depending on what the doctors state about his mental condition later, should be considered for a locked mental facility, where intensive treatment and supervision may take place."

McLane Decl., Ex. B at 8. Following these evaluations, and based on the recommendation of Dr. Jimenez, the Superior Court for the County of Ventura ordered that Mr. Hernandez be placed at Patton State Hospital for competency evaluation and restoration pursuant to California Penal Code § 1370.

Mr. Hernandez was treated at Patton State Hospital from August 28, 2008 through October 30, 2009, when he was returned to Ventura County Jail by order of the Court. Patton State Hospital recommended and the Court ordered that the VCSO maintain Mr. Hernandez on medication. McLane Decl., Ex. C.

When Mr. Hernandez returned to the care of CFMG, he was seen by Dr. Jung, the only regular psychiatrist on staff for Ventura County Jail, on November 3, 2008, and his prescription medication from Patton State Hospital was continued. In mid-November, however, Mr. Hernandez began to refuse his medication. On November 18, 2008, Dr. Jung discontinued Mr. Hernandez's prescription for medication based on Mr. Hernandez's refusal to take the medication. Dr. Jung did not observe or consult with Mr. Hernandez prior to discontinuing the medication. Mr. Hernandez was not seen by a member of CFMG's psychiatric staff[3] after Dr. Jung's initial visit on November 3, 2008. *See* McLane Decl. ¶ 11.

The records reflect, and Plaintiff intends to argue based on those records and expert testimony, that Mr. Hernandez decompensated after he stopped taking

---

[3]     The deposition testimony of witnesses in this action has established that there were three full time CFMG employees with specialized psychiatric or psychological training assigned to Ventura County Jail. At the time of Mr. Hernandez's pretrial detention in 2008 and 2009, those three employees were Dr. Jung and two nurses. McLane Decl. ¶ 11.

medication. He refused meals, defaced his cell wall with drawings, and engaged in non-responsive, anti-social conduct. This behavior escalated around February 11th and 12th, 2009, when Mr. Hernandez was described as visibly agitated, culminating in an altercation with the guards that resulted in his placement in an alternative environment on level II safety precautions for several hours before he was returned to his cell. McLane Decl., Exs. I, J. Although the jail incident reports for these incidents describe self-destructive and bizarre conduct by Mr. Hernandez—jumping off of the desk in his cell and hitting the window with his fist causing a guard to caution him that he would hurt himself, resisting guards who were trying to escort him to a family visit, and making out-of-place comments about "bulldogs"—and although Mr. Hernandez was known to have mental health issues because he was classified as a psych inmate, these incidents did not result in a referral for examination or treatment of Mr. Hernandez's mental illness by a member of CFMG's psych staff. *Id.* ¶ 12 & Ex. I. Instead, Mr. Hernandez was placed disciplinary isolation for over thirty days, meaning that he would be on lockdown 23 hours a day, would have the window on his cell door covered entirely so that he could not see out, and would not be able to see social visitors (family and friends). *Id.* ¶ 12. On February 16, 2009, having not been seen, much less treated, by a member of CFMG's psychiatric staff for over three months, Mr. Hernandez committed suicide.

The guards who were responsible for monitoring Mr. Hernandez's conduct have attempted to portray Mr. Hernandez's behavior as normal, describing him as just another aggressive inmate, and not someone who was displaying signs of distress related to his documented mental illness. This runs counter to reports from Mr. Hernandez's aunt, who was attempting to visit him on February 12, 2009, and from the pretrial detainees who were housed in the cells nearby Mr. Hernandez's cell.

Lydia Alaniz, Mr. Hernandez's aunt, saw Mr. Hernandez as he was being escorted to visit with her on or about February 12, 2009. Declaration of Lydia Alaniz ("Alaniz Decl.") ¶ 6. At that time, he appeared pale, thin, disheveled, and unhealthy.

1   *Id.* ¶ 7. Mr. Hernandez looked ghostly and did not appear to recognize Ms. Alaniz

2   through the window to the area where she was waiting. *Id.* While Ms. Alaniz was

3   watching, the deputies escorting Mr. Hernandez dragged him to the elevator and took

4   him away. *Id.* ¶ 6. Although she inquired about the situation, she was merely told that

5   the visit was cancelled. *Id.* ¶ 6. Ms. Alaniz attempted to visit again on February 14,

6   2009, but was turned away; she was not given any information about Mr. Hernandez's

7   condition or situation.  *Id.* ¶ 8. Ms. Alaniz had previously reported to persons at the

8   jail, in April of 2008, that she was concerned for Mr. Hernandez's safety because of

9   communications with him that led her to believe that he might .  *Id.* ¶ 4. This is

10  confirmed in a notation in Mr. Hernandez's medical file, dated April 16, 2008.

11  McLane Decl., Ex. K.

12      Jeremy Jackson, the pretrial detainee housed in the cell next to Mr. Hernandez,

13  has described behavior by Mr. Hernandez that indicates that he was in significant

14  mental distress. McLane Decl., Exs. D, E. Mr. Jackson said that Mr. Hernandez would

15  moan for hours in his cell. *Id.*, Ex. D. At other times he would scream and kick

16  something in his cell. *Id.*, Exs. D, E at 2. One of the things Mr. Jackson remembered

17  Mr. Hernandez yelling was "get away from me, Satan."  *Id.*, Ex. E at 2, 5. According

18  to Mr. Jackson, Mr. Hernandez got worse over time. *Id.* at 2. He talked to himself and

19  refused meals all the time. *Id.* In addition, Mr. Jackson remembered that one of the

20  guards found a torn towel that was traced back to Mr. Hernandez in the several days

21  before his death.  *Id.*, Exs. D, E at 2-3. The guard identified by Mr. Jackson has denied

22  knowing anything about such an incident.

23      In addition, the records produced by Defendant VCSO reflect that Mr.

24  Hernandez was given a "major clothing exchange" (which would include sheets and

25  towels) on February 14, 2009 and that there was a cell inspection performed in Mr.

26  Hernandez's housing unit on February 15, 2009. The video would reflect whether Mr.

27  Hernandez's cell was searched during that inspection, which would be relevant to the

28  question of whether Mr. Hernandez's activities were properly monitored or whether

1  the lack of monitoring gave him the opportunity to plan and carry out his suicide.

2        There was no video camera in Mr. Hernandez's cell, but there were several

3  cameras in the hallway outside of Mr. Hernandez's cell that would have captured all

4  of his movements to the dayroom across the hall from his cell or to the visiting room.

5  In addition, Mr. Hernandez was placed in a cell in the Men's property/release area on

6  February 12, 2012. He may have been captured on other cameras while being

7  transported to and from that cell or even while in that cell.

8        The video destroyed by Defendant VCSO would have shown Mr. Hernandez's

9  behavior during the altercation with the guards on February 12, 2009, which occurred

10  in the hallway. McLane Decl., Ex. I at 5. The video would also have shown his

11  appearance and conduct on other days when he was taken out of his cell. Furthermore,

12  the video could have corroborated Mr. Jackson's statements regarding the torn towel

13  and could have shown what was found in Mr. Hernandez's cell either during the major

14  clothing exchange or during the cell inspection. Such information would have been

15  extremely valuable to Plaintiff's case against Defendants for their deliberate

16  indifference to his serious mental illness and risk of suicide.

17  **B.**　　**Destruction of Videotape**

18        On June 29, 2010, Plaintiff K.N.H. served her First Demand for Inspection and

19  Production of Documents and Things to the County of Ventura. McLane Decl. ¶ 7. In

20  that discovery request, plaintiff sought video recordings from the Ventura County

21  Jail's surveillance system that showed Daniel Hernandez, the decedent in this case,

22  during the last week of his life. Defendant responded on August 13, 2010. *Id.*

23  Plaintiff's requests and defendant's responses are set forth below:

24      Request for Production No. 55: All videotapes of any security monitoring

25  taken of the location of the INCIDENT during the time of the INCIDENT.

26      Response to Request No. 55: Defendant will provide such documents, in short order.

27

28      Request for Production No. 62: All videotapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location at the

time of the INCIDENT.

> Response to Request No. 62: This is an overly cumbersome request because the digital data required for a nine-day period, 24 hours per day, is immense. It would take an extraordinarily large number of digital video disks to capture this time frame. Defendant also points out that the video captures only a corridor near decedent's cell, not the cell, its interior, or activities within it.

McLane Decl., Ex. F at 20-22.

Defendant's failure to produce video recordings was not addressed until after the substitution of counsel for Plaintiffs in late 2010. McLane Decl. ¶¶ 8-9. On April 11, 2011, Plaintiffs sent a meet and confer letter regarding Defendant Ventura County's responses to Plaintiff K.N.H.'s requests for documents, which included an objection regarding Defendant's responses to requests numbered 55 and 62. *Id.* ¶ 9. Specifically, Plaintiffs stated:

> Plaintiffs have yet to receive any video recordings of the area of the INCIDENT as promised by Defendant in response to Request No. 55. Please produce such video immediately. Further, Plaintiff's Request No. 62 for recordings of any video surveillance of Mr. Hernandez and his housing location in the week preceding his death seeks the production of materials highly relevant to Plaintiff's claims. Even if the surveillance video only captures the area outside Mr. Hernandez's cell, such video would show the amount of oversight and care Mr. Hernandez received in the week preceding his death and whether or not deputies responded appropriately to his suicide. Further, the video would presumably capture the incidents on February 11 and 12, 2009 which resulted in the imposition of discipline on Mr. Hernandez, which may have exacerbated his psychological condition. To the extent that Mr. Hernandez was moved to different locations which have greater video surveillance, the video would also record Mr. Hernandez's appearance and condition in the week before his death. All told, such video is extremely important to Plaintiff's case. As such, "the burden or expense of the proposed discovery" *does not* "outweigh[] its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). Further, to the extent that Defendants believe that this production classification is overly burdensome, as stated in their response to Request No. 62, the appropriate course of action is to seek a protective order from the Court. *Id.* at 26(c). In an effort to resolve this matter and obtain the relevant video in as short a time period as possible, Plaintiff is willing to discuss what modifications to Request No. 62 would effectively limit the costs of production for Defendants, while still providing sufficient discovery material to Plaintiffs.

McLane Decl., Ex. G at 21.

In response to this letter, on May 2, 2011, Defendant County produced the

video recording referenced in Defendant's response to Request No. 55, the recording

that was to be provided "in short order" after August 13, 2010. McLane Decl., Ex. G

at 15. With regard to Request No. 62, Defendant stated:

> The jail does not videotape the interior of the segregated housing cells, so no such videotape exists. The corridor adjoining segregated housing is videotaped, but the jail does not keep video beyond two years. So no videotape of the segregated housing corridor exists for the time period surrounding the decedent's suicide except for the videotape of the day of the suicide, which was preserved because of the suicide.

*Id.*

By letter dated July 11, 2011, Plaintiffs objected to the destruction of evidence

requested in the course of this litigation, which should have been preserved, at the

very least, following Plaintiff's Requests, and notified Defendant County that Plaintiff

would consider seeking sanctions for the failure to preserve materials requested in

discovery. McLane Decl., Ex. G at 10. Based on defense counsel's representation that

the requested video was destroyed in or around February 2011 (two years after the

incident), Plaintiff did not pursue the matter further at that time.

On August 23, 2011, Plaintiffs took the deposition of the Ventura County

Sheriff's Office, through representative Sergeant Robert Davidson, pursuant to

Federal Rule of Civil Procedure 30(b)(6). Sergeant Davidson testified that he and a

co-worker were responsible for working with counsel to respond to Plaintiff's

discovery requests in this case. McLane Decl., Ex. H at 235:8-235:15. At the time and

up until March 2011, Sergeant Davidson was employed by VCSO as the "legal

sergeant," meaning the person at the jail assigned to coordinate litigation inquiries. *Id.*

at 18:3-19:2. When Sergeant Davidson left the position in March of 2011, it was his

impression that the video was still in existence. *Id.* at 237:21-238:9. He admitted,

however, that he did not put a litigation hold on the video to ensure its preservation.

*Id.* Based on this testimony, counsel conferred and Plaintiff's counsel agreed to

identify the times when Mr. Hernandez was out of his cell, and therefore would be

depicted on video. McLane Decl. ¶ 10.

Following the deposition, Plaintiff's counsel painstakingly reviewed the

documents to create a list of those times when Mr. Hernandez would have been captured on video. McLane Decl. ¶ 10 & Ex. G at 4-6. Plaintiff sent this list in a letter to Defendant Ventura County on September 6, 2011. *Id.*, Ex. G at 2-6. In response, Defendants provided a letter confirming that the video requested by Plaintiff had been purged after two years, contrary to the testimony of Sergeant Davidson on behalf of the County. *Id.*, Ex. G at 1.

Although the County considered it to be "pretty clear that [Plaintiff] was asking for [videotape showing Daniel Hernandez and his housing location]," as of the request propounded in June 2010, McLane Decl., Ex. H at 237:16-237:17, the video was nevertheless destroyed, severely prejudicing Plaintiff's case.

## III.   ARGUMENT

The district court has the inherent authority to impose sanctions based on the spoliation of relevant evidence, including evidentiary sanctions and adverse inference instructions. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).

Federal law imposes a duty to preserve evidence before litigation begins or before a discovery request. This duty requires a litigant to preserve what it knows, or reasonably should know, will be relevant evidence in a pending action or one in the offing. *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455–56 (C.D. Cal.1984). "Spoliation is the 'destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Zubulake v. UBS Warburg LLC* (*Zubulake II*), 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). When a party intentionally or negligently breaches its duty to preserve potentially discoverable evidence, it constitutes spoliation and results in sanctions. *Id.* at 431; *see also Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 519 (D.N.J. 2008); *In re Napster*, 462 F. Supp. 2d at 1070.

Once the duty to preserve attaches, a litigant or potential litigant "is required to *suspend any existing policies* related to deleting or destroying files and preserve all relevant documents related to the litigation." *In re Napster*, 462 F. Supp. 2d at 1070 (emphasis added). "The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials." *National Ass'n. of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987). Because the preservation of relevant evidence is an affirmative duty, it is no defense for a litigant to claim that the destruction was inadvertent or the result of longstanding, impartial policies. *In re Napster*, 462 F. Supp. 2d at 1070; *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 168, 170 (D. Colo. 1990).

The duty to preserve evidence is implied from public policy: "Destruction of evidence cannot be countenanced in a judicial system whose goal is to find the truth through honest and orderly production of evidence under established discovery rules." *Computer Assocs. Int'l*, 133 F.R.D. at 170. Because spoliation "threatens the integrity of the court," spoliation sanctions serve three essential purposes:

> Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be.

*Mosaid Technologies Inc. v. Samsung Electronics Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).

In accordance with the above policy, "a finding of 'bad faith' or 'evil motive' is not a prerequisite to imposition of sanctions for destruction of evidence." *Baliotis v. McNeil*, 870 F. Supp. 1285, 1291 (M.D. Pa. 1994) (citing *Unigard*, 982 F.2d at 369); *see also Glover*, 6 F.3d at 1329; *In re Napster*, 462 F. Supp. 2d at 1070, 1077-78. Rather, in cases where the duty to preserve has been violated, the conduct is deemed, at the very least, negligent, giving rise to sanctions. *Zubulake v. UBS Warburg LLC* (*Zubulake I*), 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("Once the duty to preserve

attaches, any destruction of documents is, at a minimum, negligent.") In cases where the party was on specific notice of the relevance of the evidence to impending litigation and the duty to preserve the evidence, the subsequent destruction of the evidence can be considered gross negligence, recklessness, or willful destruction. *Id.*; *In re Napster*, 462 F. Supp. 2d at 1070, 1078; *Computer Assocs. Int'l*, 133 F.R.D. at 169. Such a state of mind gives rise to sanctions such as preclusion of evidence at trial, the granting of an adverse inference instruction, and even default judgment. *In re Napster*, 462 F. Supp. 2d at 1070, 1077-78; *Computer Assocs. Int'l*, 133 F.R.D. at 169.

In more extreme cases, where the destruction of evidence is based on willfulness, fault, or bad faith, a court has inherent authority to order dismissal of the action or default judgment as a sanction for the conduct. *See Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (dismissal proper where conduct sanctioned is based on willfulness, fault, or bad faith); *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (destruction of computer files by the plaintiff alleging, *inter alia*, violations of the anti-retaliation provision of the False Claims Act); *Wm. T. Thompson Co. v General Nutrition Corp.*, 593 F. Supp. 1443, 1156 (CD Cal. 1984) (approving striking answer and entering default as a sanction for destruction of books and computer files central to an anti-trust action); *Computer Assocs. Int'l*, 133 FRD at 169-70 (defendant's wilful destruction of source code for defendant's program supported a default sanction). In this context, wilfulness exists where the party that destroyed the evidence had some notice that the evidence was potentially relevant to the litigation before it was destroyed. *Leon*, 464 F.3d at 959 ("A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)); *Computer Assocs. Int'l*, 133 F.R.D. at 169 (finding that a party's failure to suspend automatic policy of deleting computer code after filing of lawsuit and discovery request constituted intentional and willful destruction, justifying default

judgment sanction).

Although Plaintiffs believe that the destruction of the video recordings of Daniel Hernandez during the week of February 8 through February 16 was willful and reckless, inasmuch as the recordings were explicitly requested in discovery prior to their destruction, *see Computer Assocs. Int'l*, 133 FRD at 169, Plaintiff is not seeking a default judgment as to any of Plaintiffs' claims. Instead, Plaintiffs are seeking two other types of spoliation sanctions: the exclusion of evidence offered by the defense on the issue of Mr. Hernandez's mental and/or physical condition during the week prior to his suicide and an adverse inference instruction that the evidence destroyed by Defendant VCSO would likely have been favorable to the Plaintiff. *See supra* at pages 1-2.

### A.    Defendant Ventura County Sheriff's Department Had an Obligation to Preserve the Video Recordings at the Time They Were Destroyed

The suicide at issue in this case occurred in February 2009. This case was filed in December 2009, alleging claims regarding Defendants' failure to treat Mr. Hernandez's serious mental illness and deliberate indifference to Mr. Hernandez's need for treatment and risk of suicide. Even before the filing of the lawsuit, Defendants recognized the fact that Mr. Hernandez's suicide exposed them to litigation, because steps were immediately taken, within the department, to investigate and document the circumstances surrounding Mr. Hernandez's death. At the point when the possibility of litigation became obvious, Defendants were under an obligation to preserve what they knew or reasonably should have known would be relevant evidence. The relevance of video recordings of the decedent in the week prior to his death should have been obvious to Defendants.

Regardless of what was obvious, Plaintiffs specifically requested video recordings of Mr. Hernandez from February 8, 2009 through February 16, 2009. Defendant acknowledged the meaning of the request by objecting on the basis of burdensomeness—clearly demonstrating an understanding that Plaintiff was requesting review of hours of video, only some of which would have captured Mr.

13

Hernandez's activities. Further, in his deposition, the representative for the County admitted that it was "pretty clear" what Plaintiff was requesting. McLane Decl., Ex. H at 237:16-237:17. On this record, Defendants clearly had an obligation to preserve the requested evidence pending the outcome of the litigation, including a duty to deactivate whatever automatic purging policies would have endangered the evidence. *In re Napster*, 462 F. Supp. 2d at 1070; *Computer Assocs. Int'l*, 133 FRD at 168-70.

### B.   The Video Recordings Were Destroyed with a Culpable State of Mind

As set forth *supra* at pages 10-12, a culpable state of mind exists in this case because the destruction of relevant evidence occurred after the initiation of litigation *and* after a specific request that the materials be produced. This is a sufficient basis for the imposition of the sanctions requested by Plaintiffs. *In re Napster*, 462 F. Supp. 2d at 1070, 1078; *Zubalake*, 220 F.R.D. at 220; *Leon*, 464 F.3d at 959; *Computer Assocs. Int'l*, 133 FRD at 169.

In addition, the significance of the video recordings requested by Plaintiffs during discovery was set forth in the Complaint, filed in December 2009, which specifically described Mr. Hernandez's appearance and condition in February 2009, and in particular during the incident on February 12, as relevant facts underlying Plaintiffs' claims. *See* Complaint ¶¶ 21, 23-24. Thus, it has been clear from the outset of this litigation that Mr. Hernandez's behavior, appearance, and conduct—not just on the day of his death, but in the weeks and months leading up to his death—were significant issues in this litigation.

Further, there can be no doubt that video recordings depicting that information would be critical evidence for Plaintiffs' claims. After all, it is well established by common sense and legal precedent that video recordings are powerful evidence and that the recollection of witnesses and even contemporaneous statements by witnesses are no substitute for direct evidence of the events in question. *Scott v Harris,* 550 U.S. 372, 380 (2007) (holding that audio and video evidence has the ultimate power to

foreclose any contrary version of events, justifying summary judgment in favor of defendants in a civil rights case even where there was disputed testimony of what occurred); *Kounelis*, 529 F. Supp. 2d at 519, 521 (holding that it was an abuse of discretion for magistrate judge to deny spoliation sanctions where defendant police officers failed to preserve video recording of a contested excessive force incident because of the high degree of relevance of an objective video recording vis à vis interested party testimony).

Moreover, Defendants are sophisticated litigants who are aware of their obligation to preserve relevant evidence. Defendant VCSO is a law enforcement agency and, as such, is keenly aware of the duty to preserve evidence in the context of litigation. Indeed, it is common knowledge in law enforcement that in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Police officers nationwide know that they can held liable for *Brady* violations.[4]

That the evidence was destroyed by an entity intimately aware of the importance of preserving evidence is indicative of bad faith. *See Donato v. Fitzgibbons*, 172 F.R.D. 75, 80 (S.D.N.Y. 1997). As explained in *Donato*:

> The failure of defendant Orangetown to safeguard this evidence is even more egregious because the Orangetown Police Department is, or should be, in the business of insuring that evidence is handled properly. This is not a situation where an organization unaccustomed to the requirements of maintaining chain of custody and retaining important evidence has

---

[4] *See, e.g.*, *Burge v. St. Tammany Parish*, 187 F.3d 452, 478-80 (5th Cir. 1999) (affirming district court's denial of deputy's motion for summary judgment asserting qualified immunity for Brady violations which led to a trial resulting in a jury verdict for plaintiff and $ 4,075,000 in damages against deputy at trial, *see Burge v. St. Tammany Parish Sheriff's Office*, 2001 WL 845463, at *1 (E.D. La. 2001)); *see also McCann v. Mangialardi*, 337 F.3d 782, 787 (7th Cir. 2003) (recognizing due process claim against police officers for suppression of exculpatory evidence, even outside of *Brady* context); *Newsome v. McCabe*, 319 F.3d 301, 302-03 (7th Cir. 2003) (noting jury award of $15 million in damages for suppression of evidence).

15

> failed to preserve and protect items relevant to litigation. Rather, the town of Orangetown, through its Police Department, is experienced, and has procedures in place, with regard to retaining and safeguarding evidence. There is no excuse for their failure in this instance.

*Id.* at 80 (internal citation omitted). The court further noted that "[i]f the property had been connected with a criminal case being prosecuted by the County with the assistance of the Police Department, I am certain that it would not have been handled so cavalierly." *Id.* Similarly, Defendant VCSO was aware of the relevance of the evidence, aware of their duty to preserve the evidence, and could easily have taken steps to preserve the evidence. Their failure to do so is likewise inexcusable.

Thus, Defendant's claim that the destruction occurred pursuant to VCSO's impartial policy of purging video recordings every two years—even if it were a legitimate basis to avoid sanctions, which it is not under *In re Napster*, 462 F. Supp. 2d at 1070 and *Computer Assocs. Int'l*, 133 FRD at 168, 170—must be regarded with skepticism in light of their knowledge at the time the video was requested. Ultimately, in light of Plaintiffs' repeated requests for the video, Defendant's failure to resolve questions raised by Plaintiff regarding the requested video, and Sergeant Davidson's testimony that the video existed in March 2011—after it would have been purged pursuant to policy—there is no reason to credit Defendant's assertion that the destruction of the video in question occurred because of the policy. All that is known is that Plaintiff requested the video prior to the two year deadline, that Defendants received and understood Plaintiff's request as demonstrated by Sgt. Davidson's testimony on behalf of the VCSO, and that Defendants have not produced the video, claiming that it no longer exists. Based on these facts, the destruction of the evidence should be characterized as willful or, at a minimum, grossly negligent and reckless.

**C.    The Destroyed Evidence Was Relevant to Plaintiffs' Claims and Plaintiffs Were Prejudiced by the Destruction of the Evidence**

In this case, the parties dispute, among other issues, whether Mr. Hernandez's need for medical treatment for his serious mental illness was obvious, such that it can be inferred that Defendants were deliberately indifferent to Plaintiff's constitutional

rights. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.") Clearly, evidence regarding Mr. Hernandez's conduct and demeanor preceding his death is invaluable evidence regarding what was obvious to Defendants when they failed to provide him treatment and monitoring. Indeed, in responding to Plaintiffs' request, defendants did not object on the basis of relevance but rather on the burdensomeness of the request, which Plaintiff offered to mitigate.

Although prejudice is not a prerequisite to the imposition of spoliation sanctions, *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 382 (9th Cir. 1988), it is a significant factor in this case. A party "suffers prejudice if the [destruction of evidence] impair[s] the [party]'s ability to go to trial or threaten[s] to interfere with the rightful decision of the case." *See Anheuser-Busch*, 69 F.3d at 353-54 (internal quotations omitted). The prejudice flowing from the loss of the video recordings requested by Plaintiff is manifest. Video recordings showing Mr. Hernandez in the condition described by Plaintiff's witnesses—thin, sick, disheveled, disoriented, raving, talking to himself, and showing a disregard for his own safety—would be powerful evidence that his need for medical and psychological care was obvious.

Moreover, the destruction of the video recordings has *particularly* prejudiced Plaintiffs. The parties' disputed evidence as to Mr. Hernandez's conduct and demeanor in the weeks and months preceding his suicide comes from the testimony of witnesses. In the contest between witnesses, however, Plaintiff is at a distinct disadvantage. One of Plaintiff's witnesses, Mr. Hernandez's aunt, saw Mr. Hernandez through glass for a relatively brief period. The others, Mr. Hernandez's pretrial detainee neighbors, have been convicted of serious felonies, which Defendants will no doubt use to impeach their testimony. And, of course, Mr. Hernandez himself is not

available to provide his account of what occurred.  In contrast, Defendants witnesses are law enforcement officers who have extensive experience testifying in court and more often than not enjoy the benefit of the doubt from jurors. *See Kounelis*, 529 F. Supp. 2d at 519, 521 (recognizing that Plaintiff was irreparably prejudiced by destruction of video recording because it forced him to rely on his own testimony, "thus putting the word of a convicted felon against the collective testimony of the prison authorities"). The video recordings in question would have provided impartial, objective, and indisputable evidence of Mr. Hernandez's conduct and demeanor which could have been used to rebut Defendant's testimony.

In this regard, Defendants cannot take refuge in the argument that the video would have supported their version of the events. Such an inference is contrary to their failure to preserve the video, even if it was accidental. *Anheuser-Busch*, 69 F.3d at 354; *Donato*, 172 F.R.D. at 80. Further, where "the relevance and resulting prejudice from destruction of [evidence] cannot be clearly ascertained because the [evidence] no longer exists . . . the culpable party can hardly assert any presumption of irrelevance as to the destroyed [evidence]." *National Ass'n of Radiation Survivors*, 115 F.R.D. at 557 (internal quotations omitted).

**D.   The Evidentiary Sanctions and Adverse Inference Instruction Requested by Plaintiff Are Appropriate in this Case**

Ultimately, exclusion of evidence is an appropriate sanction when spoliation deprives a party of an opportunity to inspect the evidence, resulting in some prejudice. *See Unigard*, 982 F.2d at 368; *In re Napster*, 462 F. Supp. 2d at 1077-78.  Defendant VCSO's destruction of the video recordings at issue prevents Plaintiff from effectively rebutting the testimony of Defendant VCSO's witnesses, both as to Mr. Hernandez's behavior during the week prior to his death and in general.[5]  Excluding Defendants'

---

[5] Although Plaintiff's request for video was limited to the period February 8 through February 16, 2009, the behavior and appearance of Mr. Hernandez captured on that video could have been used to impeach generalized statements by VCSO employees regarding whether or not Mr. Hernandez's behavior was "normal" or that he was not showing any signs of his mental illness.

unreliable and biased evidence of Mr. Hernandez's conduct and demeanor helps to level the evidentiary playing field and serves to deter similar destruction in the future.

Similarly, an adverse inference instruction is appropriate for evidentiary, prophylactic, and punitive reasons. *Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217-18 (1st Cir. 1982); *Mosaid*, 348 F. Supp. 2d at 335. Even assuming that the destruction of evidence was inadvertent, the adverse inference instruction serves to deter litigants from treating relevant evidence so carelessly. Such deterrence is essential to the truth-seeking purpose of litigation. An adverse jury instruction, combined with exclusion of evidence, is necessary in this case to offset the risk that evidence proving liability was lost.

In *Unigard Security Insurance Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363 (9th Cir. 1992), Unigard, the insurer of a large boat, brought subrogation claims against Lakewood Engineering, the manufacturer of an electric space heater that Unigard thought was responsible for the fire that destroyed the vessel. Unigard's claims were dismissed at summary judgment after the district court excluded Unigard's expert witness and other evidence from the boat and heater as a sanction for its having destroyed the heater and the remains of the boat before filing suit. *Id.* at 365.

The Ninth Circuit upheld the sanction as part of a district court's inherent powers of the "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. Within this discretion lies the power . . . to exclude testimony of witnesses whose use at trial . . . would unfairly prejudice an opposing party." *Id.* at 368 (citing *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)). *Unigard* confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party. *Id.* at 368 n.2 (citing *Halaco Eng'g*, 843 F.2d at 380). In affirming the district court's findings that "Lakewood is precluded from gaining expert testimony related to whether the heater caused the fire," and that "plaintiff's destruction of key

evidence renders a full defense impossible," *Unigard* held that "allowing Unigard to introduce the testimony of its experts would unfairly prejudice Lakewood and thus preclude the court's ability to conduct a fair trial." *Id.* at 368. Moreover, the court rejected Unigard's argument that an adverse instruction standing alone would have been sufficient stating:

> Unigard's destruction of evidence was not in dispute; it precluded Lakewood from any opportunity to inspect the evidence; and it rendered unreliable virtually all of the evidence that a finder of fact could potentially consider. Given these factors, it was within the district court's discretion to determine that a rebuttable presumption against Unigard would have been insufficient to cure the prejudice arising in the context of this case.

*Id.* at 369.

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (S.D.N.Y. 1997) is also instructive. In that case, the defendants, a city police department and its police officers, were involved in a automobile collision, and critical evidence of liability—the headlights of the police vehicle which would reveal whether they were on or off at the time of the collision—was destroyed by the police officers responsible for preserving them. *Id.* at 77. The court noted that the circumstances of the destruction of evidence reflected the fact that "the Police Department had no incentive to safeguard the property because they, and one of their officers, were the ones being accused of wrongdoing." Although there was a history of bad faith discovery practices in the case, the court's determination of bad faith in the destruction of the headlights focused on the Defendants' failure to take the simple precautionary step of placing a litigation hold on the evidence and Defendants extensive familiarity with the importance of preserving evidence in criminal cases.

Accordingly, the court ruled that sanctions were appropriate to serve "two purposes—remediation and punishment." *Id.* at 81. It explained that "[t]he remedial purpose of the sanction serves to place the prejudiced party in the same position with regard to its ability to prove its case as it would have been in if the evidence had not been destroyed." *Id.* at 82. It also found that the punitive purpose both deters parties

from destruction of relevant evidence and directly punishes the party responsible for

spoliation stating:

> The law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrong.

*Id.* In applying those two purposes, the *Donato* court ruled that appropriate sanctions were:

(1) to "preclude defendant town of Orangetown from submitting any expert testimony whatsoever about the state of the headlights after the accident;

(2) to preclude a police detective "from testifying about his observations of the headlights and any conclusions he drew;"

(3) to inform the jury that "the headlights cannot be definitively examined by experts for purposes of this trial, because although the headlights were removed from the police vehicle for purposes of examination after the accident, the town of Orangetown Police Department failed to safeguard the headlights, and destroyed them;"

(4) to instruct the jury that they "may conclude, but do not have to conclude, that the destruction of the headlights was in bad faith, and that such destruction was done because an examination may have concluded that the headlights were, in fact, off at the time of the accident;"

(5) to permit the plaintiffs "to present expert testimony to the effect that an examination could have been conducted which would have led to a conclusion about whether the headlights were on or off at the time of the accident;"

(6) to preclude the police department from offering any evidence "about the reasons for the destruction of evidence, or the circumstances surrounding such destruction;" and,

(7) to award plaintiffs costs for all the time expended in seeking to resolve the issue of the destroyed evidence.

*Id.* at 84.

Finally, in *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006), the plaintiffs moved for sanctions, including default judgment, evidentiary sanctions, an adverse inference instruction, and monetary sanctions based on emails that were automatically deleted by one of the defendant companies ("Hummer") as a result of the company's document retention policy. The company defended the deletion of e-mails by arguing, *inter alia*, that it did not have a duty to preserve the

emails when they were deleted and that the e-mails were deleted inadvertently due to the company's impartial document retention policy.  The court rejected those arguments, ruling that the duty to preserve persisted even after the first lawsuit against the company was terminated (because further litigation was probable) and that the company could not avoid sanctions because the e-mails were deleted under a neutral retention policy. In this regard, the court stated:

> Once Hummer's duty to preserve took effect in June 2000, Hummer was required to suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation. . . . Therefore, even if Hummer's "long standing policies" included deleting emails, Hummer was required to cease deleting emails once the duty to preserve attached in [June] 2000. Since Hummer acknowledges that it did not cease its document policy, the court may impose sanctions for Hummer's deletion of documents.

*Id.* at 1070.

Based on this spoliation finding, the Court ruled that, while default judgment was too harsh a sanction, the company's failure to preserve e-mails—which the court found to be gross negligence—warranted the imposition of evidentiary sanctions (the exclusion of certain evidence offered by the company) and the giving of an adverse inference instruction.[6] The same result, at minimum, is warranted here.

## IV.   CONCLUSION

For all the foregoing reasons, and based on the law and facts recited herein which support the finding that Defendants County of Ventura and Ventura County Sheriff's Office, with gross negligence and/or willfulness, permitted the destruction of valuable evidence requested by Plaintiff, Plaintiff respectfully requests that the Court impose the following sanctions:

> (1)   the exclusion during the remaining pre-trial motions and trial of this action of evidence presented by any Defendant reflecting any testimony by VCSO employees or documentary evidence supplied by VCSO employees regarding any *observations* of Mr. Hernandez's behavior, statements and/or mental health condition during the period February 8, 2009 through February 16, 2009 or in general, except to the extent that those observations are explicitly recorded in contemporaneous

---

[6]The court also awarded monetary sanctions, which Plaintiffs are not seeking in this case.

documents;

(2)   the exclusion during the remaining pre-trial motions and trial of this action of evidence presented by any Defendant reflecting any testimony by VCSO employees or documentary evidence supplied by VCSO employees regarding their *opinions* or *interpretation* of Mr. Hernandez's behavior, statements, and/or mental health condition during the period February 8, 2009 through February 16, 2009 or in general, any *observations* that were not explicitly recorded in contemporaneous documents, and any *characterization* of observations that were explicitly recorded in contemporaneous documents;

(3)   the exclusion of any expert testimony offered by any defendant based on testimony by VCSO employees or documentary evidence supplied by VCSO employees to the extent that such evidence is excluded under requests (1) and (2) above;

(4)   a curative jury instruction that because Defendant VCSO had an affirmative duty under the law to preserve video recordings of the decedent during the period February 8 through February 16, 2009, but rather allowed or caused the destruction of such video, the jury may find that, if the video were viewed, it would corroborate the Plaintiffs' evidence that Mr. Hernandez displayed signs and symptoms of his serious mental illness; and

(5)   the exclusion of evidence offered by Defendant VCSO concerning the reasons for, or the circumstances surrounding, the destruction or failure to preserve the video recordings.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

Dated: May 7, 2012                  By  /s/ *David S. McLane*
                                             DAVID S. McLANE

                                             Attorney for Plaintiff
                                             K.N.H., A MINOR BY AND THROUGH
                                             HER GUARDIAN AND MOTHER,
                                             AMBER RODRIGUEZ

                                             LAW OFFICES OF BRIAN A. VOGEL, PC

Dated: May 7, 2012                  By  /s/ *Brian A. Vogel*
                                             BRIAN A. VOGEL

                                             Attorney for Plaintiffs
                                             ESTHER BISELLI AND THE ESTATE OF
                                             DANIEL T. HERNANDEZ