Alan E. Wisotsky (SBN 68051)
Jeffrey Held (SBN 106991)
WISOTSKY, PROCTER & SHYER
300 Esplanade Drive, Suite 1500
Oxnard, California  93036
Tel:    (805) 278-0920
Fax:    (805) 278-0289
E-mail:  jheld@wps-law.net

Attorneys for Defendants COUNTY OF VENTURA, VENTURA COUNTY SHERIFF'S DEPARTMENT, and SHERIFF BOB BROOKS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTHER BISELLI, et al.,<br><br>         Plaintiffs,<br><br>     v.<br><br>COUNTY OF VENTURA, et al.,<br><br>         Defendants. | No. CV 09-8694 CAS (Ex)<br><br>**DEFENDANT COUNTY OF VENTURA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS; DECLARATIONS IN SUPPORT THEREOF**<br><br>Date:  June 4, 2012<br>Time:  10:00 a.m.<br>Ctrm:  5 |

Defendant COUNTY OF VENTURA submits the following memorandum of points and authorities and supporting declarations in opposition to the plaintiffs' motion for spoliation sanctions filed on May 7, 2012.

Dated:  May 18, 2012

                              WISOTSKY, PROCTER & SHYER


                              By    /s/
                                 JEFFREY HELD
                                 Attorneys for Defendants,
                                 COUNTY OF VENTURA, VENTURA
                                 COUNTY SHERIFF'S DEPARTMENT,
                                 and SHERIFF BOB BROOKS

## MEMORANDUM OF POINTS AND AUTHORITIES

On June 29, 2010, plaintiffs served a production demand consisting of 63 production classifications. At issue in this motion proceeding are the responses to classifications 55 and 62.

Production classification 55 sought:

> All videotapes of any security monitoring taken of the location of the INCIDENT during the time of the INCIDENT.

Production classification 62 sought:

> All videotapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location and at the time of the INCIDENT.

In this jail suicide case, the plaintiffs' decedent was housed in an area of the Ventura County Jail called segregated housing. Placement in this housing area means that the inmate is identified as potentially being at risk from other inmates; segregated housing inmates are housed one per cell rather than the customary two per cell in the general jail population. The plaintiffs' decedent, Daniel Tidoso Hernandez, was housed in segregated housing from October 31, 2008, through the time of his commission of suicide by hanging himself on February 16, 2010. Mr. Hernandez tore a strip of his bed sheet, hardened it, threaded it through an 8 mm air vent hole in the wall above his bed, somehow caused it to make a U-turn in the vent tube and come back out, and used it as an anchor point. He was found hanging during the hourly cell check, which occurred at approximately 4:53 p.m. on February 16, 2009.

The Ventura County Jail does not have any audiovisual monitoring of the interior of any inmate's cell in the entire facility, including having no camera in the cells of segregated housing inmates, such as Mr. Hernandez. Therefore, there was no camera or audio of the interior of Mr. Hernandez's cell either on the day of his commission of suicide or at any time.

Immediately adjacent to the segregated housing cells are enclosed structures which are termed "sallyports." The housing deputies and medical personnel attend to the inmates in segregated housing by entering the sallyport, and there is a pass-through opening between the sallyport and the inmate's cell. Just as there is no audiovisual of the interior of the cells, there is no audiovisual of the sallyports.

There is audiovisual taken by cameras in the hallway adjacent to the sallyports. There are recreational or relaxation areas in segregated housing called dayrooms. There is no audiovisual in the dayrooms, although they are picked up at poor angles by the cameras taking video of the segregated housing hallway.

The production classifications at issue did not use the nomenclature used by the jail, so some interpretation was necessary. Production classification 55 was interpreted to be seeking any audiovisual taken of the interior of Mr. Hernandez's cell on the day of the commission of suicide, any audiovisual of the interior of the sallyport adjacent to Mr. Hernandez's cell, any audiovisual of the hallway adjacent to the sallyport, and any video of the dayroom. As explained, no audiovisual depicting the interior of Mr. Hernandez's cell or of the interior of the sallyport or of the dayroom ever existed, so it could not be produced. The jail did, as part of the investigation of Mr. Hernandez's death, preserve the audiovisual of the hallway on February 16, 2009, from 3:00 p.m. until 8:00 p.m. At approximately 4:53 p.m., it does show the deputy entering the sallyport; from words spoken, it is apparent that he had discovered Mr. Hernandez. The next several minutes of the video show numerous housing deputies and medical personnel responding.

Defendant supplied the audiovisual disc depicting the hallway corridor between 3:00 and 8:00 p.m., which it had already created on a disc, to plaintiffs' counsel on May 2, 2011, as acknowledged in the moving papers on page 8, line 28, and page 9, line 1. Therefore, production classification 55 was satisfied, and no harm is claimed to have stemmed from the provision of that disc.

/ / /

The motion therefore boils down to production classification 62. Allowing for the locations in the jail where recording devices are and are not located, and further allowing for nomenclature differences, production classification 62 is essentially seeking all audio-video recordings of the segregated housing hallway during the nine days preceding Mr. Hernandez's suicide.

A production demand requires a party to produce what it has or what is readily accessible to it without great difficulty. The Ventura County Jail never has kept, and does not keep, audiovisual recordings per se, generally. So what the production request wanted – the nine days of video of the segregated housing hallway – never existed and does not currently exist in any such form.

The County's response to the production demand was served on August 13, 2010. In addition to the response, there was a burden declaration attached to the response; the declarant was the jail's Legal Unit's administrative sergeant, Rob Davidson. It was explained that it would be extraordinarily burdensome to have a deputy sit at a computer console for a tremendous amount of time to capture and record an empty corridor with a deputy or nurse occasionally walking down it. The response to Request No. 62 states:

> This is an overly cumbersome request because the digital data required for a nine-day period, 24 hours per day, is immense. It would take an extraordinarily large number of digital video disks to capture this time frame. Defendant also points out that the video captures only a corridor near decedent's cell, not the cell, its interior, or activities within it.

Sgt. Davidson's burden declaration, addressing Request No. 62, states:

> 2. Production classification No. 62 would be extremely burdensome for the Ventura County Sheriff's Department to satisfy.

///

3

3. Production classification No. 62 requests "All video-tapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location and at the time of the INCIDENT."

4. The digital data required for a nine-day period, 24 hours per day, would be immense. It would take an extraordinarily large number of DVD's to capture this period.

5. The request would take well over 100 hours of scarce personnel time to locate, analyze, and copy onto DVD's.

6. The information which would be provided would be of little or no value because the video monitoring system captures only a corridor, not the interior of any cells or any activities occurring within a cell. Therefore, the Sheriff's Department would have to commit substantial personnel time simply to show people occasionally walking down a corridor. This has nothing whatsoever to do with the inmate's suicide. Daniel Hernandez hung himself within a cell, and there is no video available of Mr. Hernandez in his cell either before, during, or after his self-execution.

To further explain the burden involved in capturing the 216 hours at issue (9 days × 24 hours per day), defendant appends hereto the declaration of current administrative sergeant David Lareva. Sgt. Lareva states that, having read Sgt. Davidson's declaration about the extreme burden of locating and recording 216 hours (9 days × 24 hours per day) of the segregated housing hallway, he agrees that it would be an enormous undertaking. Sgt. Lareva states in paragraph 4:

/ / /

4

> It would take a deputy locating certain audiovisual footage (from the segregated housing hallway) for the requested time period. Once found, the deputy would need to record it in real time, hour by hour (so in other words, it would take a deputy out of deployment for 216 hours). The deputy would need to sit at the computer console continuously to remove and insert new DVD's repeatedly. Each DVD holds only a limited number of hours, requiring frequent changing. Substantially more disc space is required where there are multiple camera views and/or more movement. As per my predecessor's declaration, this project would take an extraordinarily large number of changed DVD's to capture the required period (and, as I explain below, all that would be shown is an often-empty hallway, because the interiors of the cells and the adjacent sallyport structures are not shown).

Rather than acting with reasonable promptness to address this issue if it were truly important to them, the plaintiffs waited eight months to do anything at all. Instead of pursuing any one of a number of avenues which would have reasonably addressed the issue, plaintiffs did nothing for an extremely long period of time; they simply waited. They could have brought the matter to the attention of the magistrate judge via a motion to compel. They could have reformulated the request to address a much narrower time frame (either unilaterally or during a prefiling conference with defense counsel), or they could have at least served a demand to preserve evidence. A demand to produce is different from a demand to preserve and imposes no preservation obligation.

It was not until April 11, 2011, that plaintiffs finally acted on this issue raised by production classification 62. On that date, one of the attorneys for the plaintiffs

5

mailed a prefiling conference letter to defense counsel addressing the issue of production classification 62.

Having never filed a motion to compel, plaintiffs seek to cure their omission by now filing a motion for drastic evidentiary sanctions and jury instructions against the defendants. By waiting those eight months without taking any action whatsoever to enforce this request to comply with production classification 62, irreparable prejudice occurred, because the video footage was automatically recycled and therefore erased pursuant to jail practice after the expiration of two years. The hallway audiovisual footage was therefore destroyed between February 8, 2011, and February 15, 2011.

It is true that federal law, unlike state law, does not prescribe time limits within which to bring motions to compel discovery. But the concept of having some reasonable period of time within which to raise discovery issues is a sound one and provides a good persuasive analogy. Under California law, a motion to compel would have had to have been brought within 45 days of the service of the response, plus five days for mailing. Code Civ. Proc. §2031.310(c) ("Unless notice of this motion [to compel further response to a production demand] is given within 45 days of the service of the response, … the demanding party waives any right to compel a further response to the demand"). Certainly, this federal court is not bound in any way by state law, but the California statute does offer a helpful guideline by way of persuasive authority to show that motions to compel production need to be brought within a reasonable amount of time lest the subject matter of the production demand be destroyed with the further passage of time, as occurred in this instance.

Whenever anything of significance occurs regarding any inmate, whether in segregated housing or otherwise, the deputies write a detailed report, called a jail incident report. There were several jail incident reports written concerning Daniel Hernandez in the couple of weeks leading up to his suicide. All of these have been provided to plaintiffs' counsel during discovery and have formed the basis of many depositions. If anything of significance had occurred with respect to Mr. Hernandez

6

in the days leading up to his suicide, the jail incident reports would corroborate its existence. If any significant event involving any inmate, including Mr. Hernandez, had occurred, it would not only have been the subject of a jail incident report, it would also have been immediately transferred to a DVD and preserved. Pursuant to jail policy, significant events which occur in areas covered by cameras and microphones, such as the segregated housing hallway, are promptly recorded onto computer files or transferred to DVD's and maintained indefinitely for future reference. It is therefore not possible that there was some significant behavior by the decedent which occurred in the segregated housing hallway which went unpreserved on video.

The principal focus of the present motion is that there was some significant behavioral anomaly by the plaintiffs' decedent which would aid the plaintiffs' case but that that audiovisual footage went unpreserved. But that could not occur pursuant to jail policy, as can be demonstrated by the principal focus of the motion, which is that a scuffle between deputies and the plaintiffs' decedent occurred on February 12, 2009.

The motion submits a declaration of a relative of the decedent named Lydia Alaniz. Ms. Alaniz declares that she saw a scuffle between the deputies and Daniel Hernandez on February 12, 2009. Leaving aside the fact that Ms. Alaniz could not possibly have seen that scuffle, because it occurred in the segregated housing hallway where no civilian visitor would ever be allowed, it was captured and preserved on video. A visitor is seated in a small cubicle on one side of a wall and would have to be able to see around several corners and walls to see into the segregated housing corridor where the inmates live. Therefore, she could not possibly have seen the February 12, 2009, scuffle between Daniel Hernandez and the custody deputies. While she could have seen a scuffle in the limited area immediately behind the cubicle where the inmate would sit, Mr. Hernandez was never brought to that area because, after the scuffle, he was taken back to his cell.

But the fact that Ms. Alaniz could not have seen what she claims to have seen is irrelevant to this motion proceeding. The point that the motion is making is that a scuffle occurred on February 12, 2009. It did in fact occur, and it occurred in the segregated housing hallway. Because it occurred in an area with audiovisual coverage, it was promptly transferred to a computer file and a DVD for future reference.

But plaintiffs never made a demand for any video of the February 12, 2009, scuffle between Mr. Hernandez and the custody deputies, nor did they ever make any production demand for any video depicting all contacts between Mr. Hernandez and jail personnel, nor did they seek any audiovisual recordings described in jail incident reports concerning Daniel Hernandez. The February 12, 2009, scuffle exists and is being produced now to the plaintiffs' attorneys. The appended declaration of defense counsel corroborates the production of the February 12, 2009, audiovisual recording of the use of force involving inmate Daniel Hernandez to plaintiffs' counsel, Brian Vogel and Caitlin Weisberg.

Because it will not be convenient for the Court to view the recording, although it certainly can be produced if the Court wishes, it is summarized here. It does not depict anything remotely significant to Mr. Hernandez's decision to take his own life four and a half days later. He does not say anything indicative of harming himself, hanging himself, taking his own life, or having no desire to live. The camera angle in the segregated housing corridor is not positioned so that very much can be seen anyway; the plaintiffs' decedent is out of camera view during the incident, and only the sudden movement of the deputies can be seen. The voices are muffled and indistinct. The only word that can really be heard from the plaintiffs' decedent is the word "bulldog," which was a nonsensical term which he frequently used.

What plaintiffs have brought in the guise of this motion is really a very belated motion to compel discovery. A motion for evidentiary sanctions and highly charged jury instructions are not substitutes for a timely discovery motion. A production

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

1 classification is neither a motion to compel discovery nor a motion to preserve evidence.

The motion is entirely concerned with what would be hundreds of hours of an empty hallway with people occasionally walking down it. The only audiovisual footage would have depicted a hallway. No cameras or microphones exist within the interior of the decedent's cell or the interior of the adjacent sallyport structure.

Plaintiffs have made some issue in this motion proceeding of a deputy, Chad Anderson, having found a torn towel in the dayroom of segregated housing several days before the decedent's suicide. Nothing concerning the towel issue would be visible from the hallway audiovisual in segregated housing anyway. There would be nothing depicted about the interior of the cells or the sallyport where Deputy Anderson would have stood. There would be no audio of the interior of the cells or of the sallyport, either.

The plaintiffs' argument about the towel is quite circuitous and disconnected. That argument appears to go something like this: Deputy Anderson found a torn towel in the dayroom of segregated housing several days before plaintiffs' decedent's suicide. Thereafter, he may have spoken with Mr. Hernandez about whether he tore a towel, but Mr. Hernandez denied having torn a towel. Deputy Anderson, the argument goes, should have asked to see Mr. Hernandez's towel to verify that it was not in fact torn, and if it was torn, he should have searched Mr. Hernandez's cell on a frequent basis, because he was purportedly placed on notice by a torn towel that Mr. Hernandez might tear something else, like a bed sheet. He should have searched Mr. Hernandez's cell frequently for an indeterminate number of days thereafter to make sure that nothing else, like a bed sheet, was torn.

This disconnected reasoning is extremely attenuated. Further, inmates frequently tear material, including towels, for various reasons completely unassociated with suicide. Inmates sometimes make "ratlines" for passing items from cell to cell. They sometimes tear materials to fashion cleaning rags for their cells.

9

1 They occasionally tear sheets or towels to place over air vents to stop the flow of air
2 to control the temperature.  None of these reasons have anything to do with killing
3 themselves.  Nor is the frequency or duration of the cell searches to find the towels
4 specified.

5       Finally, the motion ignores all of the massive amount of evidence which the
6 plaintiffs have accumulated during the several years of discovery in this litigation:
7 numerous jail incident reports and suicide investigation narrative reports; video of the
8 hour and 53 minutes before the suicide and several hours after the suicide; video of
9 the February 12, 2009, incident with which the motion claims it is primarily
10 concerned; and dozens of photographs of the interior of the plaintiffs' decedent's cell.
11 Plaintiffs have taken dozens and dozens of depositions of custody deputies, medical
12 personnel, court administrators, and inmates in segregated housing whose cells
13 adjoined that of the decedent.  None of this evidence has produced any indication
14 whatsoever that Mr. Hernandez was contemplating harming himself, hanging himself,
15 or taking his own life.

16       For these reasons, it is respectfully requested that the Court deny the motion for
17 imposition of evidentiary sanctions and issuance of jury instructions now pending
18 before it.

20       Dated:  May 18, 2012

21                                     WISOTSKY, PROCTER & SHYER

23                                     By     /s/
24                                         JEFFREY HELD
                                        Attorneys for Defendants,
25                                         COUNTY OF VENTURA, VENTURA
                                        COUNTY SHERIFF'S DEPARTMENT,
26                                         and SHERIFF BOB BROOKS

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

# DECLARATION OF JEFFREY HELD

I, Jeffrey Held, declare:

1. I make this declaration based upon information which is personally known to me. If called as a witness to testify to the information contained in this declaration, I would competently and accurately testify to it under penalty of perjury of the laws of the United States of America.

2. I am an attorney in the law offices of Wisotsky, Procter & Shyer (formerly the Law Offices of Alan E. Wisotsky). I have been, continuously since the inception of this litigation, the attorney for the custodial defendants – that is, the Ventura County Sheriff's Office (formerly known as the Ventura County Sheriff's Department) and the County of Ventura.

3. On June 29, 2010, plaintiffs (through their former counsel, Mark Pachowicz's office) served a production demand consisting of 63 production classifications.

4. Production classification 55 sought "All videotapes of any security monitoring taken of the location of the INCIDENT during the time of the INCIDENT."

5. Production classification 62 sought "All videotapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location and at the time of the INCIDENT."

6. In this jail suicide case, the plaintiffs' decedent was housed in an area of the Ventura County Jail called segregated housing. Placement in this housing area means that the inmate is identified as potentially being at risk from other inmates. Segregated housing inmates are housed one per cell, rather than the customary two per cell in the general jail population.

/ / /

/ / /

11

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

7. The plaintiffs' decedent, Daniel Tidoso Hernandez, was housed in segregated housing from October 31, 2008, through the time of his commission of suicide by hanging himself on February 16, 2010.

8. Evidence and discovery in the litigation have shown that Mr. Hernandez tore a strip of his bed sheet, hardened it, threaded it through an 8 mm air vent hole in the wall above his bed and sink, somehow caused it to make a U-turn in the vent shaft and come back out, and then used it as an anchor point to tie the bed sheet, functioning as a ligature. He was found hanging, dead, during the hourly cell check, which occurred at approximately 4:53 p.m. on February 16, 2009.

9. The Ventura County Jail does not have any audiovisual monitoring of the interior of any inmate's cell in the entire facility, including having no camera and no microphone in the cells of any inmates in segregated housing, such as Mr. Hernandez. Therefore, there was no camera or audio of the interior of Mr. Hernandez's cell either on the day of his commission of suicide or at any time.

10. Immediately adjacent to the segregated housing cells are enclosed structures which are termed "sallyports." The housing deputies and medical personnel attended the inmates in segregated housing by entering the sallyport. There is a pass-through opening between the sallyport and the inmate's cell. Just as there is no audiovisual of the interior of any of the cells, including the inmate cells in segregated housing, there is (and was) no audiovisual of the interior of the sallyports.

11. There is audiovisual taken by cameras and microphones in the hallway adjacent to the sallyports in segregated housing (although I am phrasing many of the statements in this declaration in the present tense for narrative purposes, all of these statements were likewise true at all times in the past, including at the time of Daniel Hernandez's suicide).

12. There are recreational or relaxation areas in segregated housing called dayrooms. But there is no audiovisual in the dayrooms themselves, although the

/ / /

12

1  dayrooms in segregated housing are picked up at poor angles by the cameras taking
2  video of the segregated housing hallway.

3      13.     The production classifications at issue did not use the nomenclature used
4  by the jail, so some interpretation was necessary. Production classification 55 was
5  interpreted to be seeking any audiovisual taken of the interior of Mr. Hernandez's cell
6  on the day of the commission of his suicide, any audiovisual of the interior of the
7  sallyport adjacent to Mr. Hernandez's cell, any audiovisual of the hallway adjacent to
8  the sallyport, and any video of the dayroom. As explained, no audiovisual depicting
9  the interior of Mr. Hernandez's cell or the interior of the sallyport or of the dayrooms,
10 per se, ever existed, so it could not be produced.

11     14.     But the jail did preserve the audiovisual of the hallway on February 16,
12 2009, from 3:00 p.m. until 8:00 p.m. as part of the investigation of Mr. Hernandez's
13 death. At approximately 4:53 p.m., it does show the deputy entering the sallyport.
14 From words spoken, it is apparent that he had discovered Mr. Hernandez. The next
15 several minutes of that video show numerous housing deputies and medical personnel
16 responding.

17     15.     I supplied the audiovisual disc depicting the hallway of segregated
18 housing between 3:00 and 8:00 p.m., which had already been created on a disc, to
19 plaintiffs' counsel on May 2, 2011. Therefore, production classification 55 was
20 satisfied, and no harm is claimed to have stemmed from the provision of that disc.

21     16.     The motion therefore boils down to production classification 62.
22 Allowing for the locations in the Ventura County Jail where recording devices are *not*
23 located, and further allowing for nomenclature differences, production classification
24 62 seeks all audiovisual recordings of the segregated housing hallway during the nine
25 days preceding Mr. Hernandez's suicide.

26     17.     The Ventura County Jail has never kept, and does not now keep, audio-
27 visual recordings per se, generally. So what the production request wanted – the nine
28 / / /

13

1 days of video of the segregated housing hallway – never existed and does not 2 currently exist in any such form.

3     18.    My office served the County's response to the subject production 4 demand on August 13, 2010. In addition to the response, there was a burden 5 declaration attached which was that of the jail's Legal Unit's administrative sergeant, 6 Rob Davidson.

7     19.    Sgt. Davidson's declaration explained that it would be extraordinarily 8 burdensome to have a deputy sit at a computer console for a tremendous amount of 9 time to capture and record an empty corridor with a deputy or nurse occasionally 10 walking down it.

11     20.    The response to Request No. 62 states:

> This is an overly cumbersome request because the digital data required for a nine-day period, 24 hours per day, is immense. It would take an extraordinarily large number of digital video disks to capture this time frame. Defendant also points out that the video captures only a corridor near decedent's cell, not the cell, its interior, or activities within it.

19     21.    Sgt. Davidson's burden declaration, addressing production classification 20 62, states:

> 2. Production classification No. 62 would be extremely burdensome for the Ventura County Sheriff's Department to satisfy.
>
> 3. Production classification No. 62 requests "All video-tapes or circuit T.V. screening from February 8, 2009 through February 16, 2009 of any security monitoring taken of Daniel T. Hernandez and his housing location and at the time of the INCIDENT."

14

      4.      The digital data required for a nine-day period, 24 hours per day, would be immense. It would take an extraordinarily large number of DVD's to capture this period.

      5.      The request would take well over 100 hours of scarce personnel time to locate, analyze, and copy onto DVD's.

      6.      The information which would be provided would be of little or no value because the video monitoring system captures only a corridor, not the interior of any cells or any activities occurring within a cell. Therefore, the Sheriff's Department would have to commit substantial personnel time simply to show people occasionally walking down a corridor. This has nothing whatsoever to do with the inmate's suicide. Daniel Hernandez hung himself within a cell, and there is no video available of Mr. Hernandez in his cell either before, during, or after his self-execution.

22.    Rather than acting with reasonable promptness to address this issue if it were truly important to them, the plaintiffs waited eight months to do anything at all. Instead of pursuing any one of a number of avenues which would have reasonably addressed the issue, plaintiffs did nothing for an extremely long period of time; they simply waited. Plaintiffs could have brought the matter to the attention of the magistrate judge via a motion to compel. They could have reformulated the request to address a much narrower time frame (either unilaterally or during a prefiling conference), or they could have at least served a demand to preserve evidence.

23.    But it was not until April 11, 2011, that plaintiffs finally acted on this issue raised by production classification 62. On that date, one of the attorneys for the

15

plaintiffs mailed a prefiling conference letter to me addressing the issue of production classification 62.

24.   By waiting those eight months without taking any action to enforce the request to comply with production classification 62, irreparable prejudice occurred, because the video footage was automatically recycled and therefore erased pursuant to jail practice. Audiovisual recordings of hallways in the jail are erased on a two-year cycle (except for any significant events, such as uses of force, which are immediately transferred to computer files and/or discs).

25.   The hallway audiovisual footage was therefore destroyed at the two-year automatic interval by the Ventura County Jail between the dates of February 8, 2011, and February 15, 2011.

26.   Whenever anything of significance occurs regarding any inmate, whether in segregated housing or otherwise, the deputies write a detailed report, called a jail incident report. There were several jail incident reports written concerning Daniel Hernandez in the couple of weeks leading up to his suicide. All of these have been provided to plaintiffs' counsel during discovery and have formed the basis of many depositions.

27.   If anything of significance had occurred with respect to Mr. Hernandez in the days leading up to his suicide, the jail incident reports would corroborate its existence. If any significant event involving any inmate, including Mr. Hernandez, had occurred, it would not only have been the subject of a jail incident report, it would also have been immediately transferred to a computer file or DVD, or both, and preserved. Pursuant to Ventura County Jail policy, significant events which occur in areas covered by cameras and microphones, such as the segregated housing hallway, are promptly recorded onto computer files or transferred to DVD's and maintained indefinitely for future reference. It is therefore not possible that some significant behavior by Daniel T. Hernandez which occurred in the segregated housing hallway went unpreserved on audiovisual.

28. The principal focus of the motion is that an event occurred in the segregated housing hallway on February 12, 2009, in which deputies scuffled with Mr. Hernandez. In fact, a scuffle did occur on that date between deputies and Mr. Hernandez. Because it occurred in an area with audiovisual coverage – the segregated housing hallway – it was promptly transferred to a computer file and a DVD for future reference. Due to the camera angle, however, it is not actually possible to see Mr. Hernandez in the February 12, 2009, video. Two of the deputies are visible moving rapidly forward, but Mr. Hernandez is not captured by the camera. The microphones do capture his voice, but it is muffled and indistinct. He can be heard to say the word "bulldog," which was a nonsensical term which he frequently used.

29. But the plaintiffs never made a demand for any audiovisual of the February 12, 2009, scuffle between Mr. Hernandez and the custody deputies, nor did they ever make any production demand for any video depicting all contacts between Mr. Hernandez and jail personnel, nor did plaintiffs seek any audiovisual described in any jail incident reports about Daniel Hernandez.

30. The February 12, 2009, scuffle exists as preserved on an audiovisual disc. The disc was produced to plaintiffs' attorneys, Brian Vogel and Caitlin Weisberg, by overnight mail on May 14, 2012.

31. Because it will not be convenient for the Court to view the recording of the February 12, 2009, incident in the segregated housing corridor, although it certainly can be produced for the Court to view if it wishes to do so, the following summary synthesizes the depiction. The disc does not depict anything remotely significant to Mr. Hernandez's decision to take his own life four and a half days later. The events depicted in the recording of February 12, 2009, occurred at 4:12 p.m. Mr. Hernandez does not say anything indicative of harming himself, hanging himself, killing himself, or of having no desire to live. The camera angle in the segregated housing corridor is not positioned so that very much can be seen. The plaintiffs'

decedent is out of camera view during the incident. Only the sudden movement forward of two deputies can be seen. Their voices are muffled and indistinct. The only word which can really be heard is from the plaintiffs' decedent as he says the word "bulldog."

32. One can tell from the audiovisual recording provided of the day of the suicide from 3:00 p.m. to 8:00 p.m. that the sound quality of the monitoring system is poor and the voices are muffled. One cannot see the speakers, and the camera angle does not show the interior of the cell or the entrance area which leads to the cell.

33. Plaintiffs have made an issue of the discovery by a housing deputy, Chad Anderson, of a torn towel in the dayroom of segregated housing several days before the decedent's suicide. But nothing concerning the towel issue would be visible from the only audiovisual which exists in segregated housing, which is of the hallway. There would be no audiovisual of the interior of any of the cells, including that of Mr. Hernandez, or of the sallyport where Deputy Anderson would have stood while speaking with Mr. Hernandez. There would be no audio of the interior of the cells or of the sallyport.

34. Plaintiffs' argument about the towel is logically flawed in any event. It appears to go something like this: Deputy Anderson found a torn towel in the dayroom of segregated housing several days before plaintiffs' decedent's suicide. Thereafter, Deputy Anderson may have spoken with Mr. Hernandez about whether he tore a towel, but Mr. Hernandez apparently denied having torn a towel. Deputy Anderson, the argument continues, should have asked to see Mr. Hernandez's towel to verify that it was in fact not torn. If it was torn, plaintiffs contend, Deputy Anderson should have searched Mr. Hernandez's cell on a frequent basis, because he was purportedly placed on notice by a torn towel that Mr. Hernandez might tear something else, like a bed sheet. He should have searched Mr. Hernandez's cell frequently for an indeterminate number of days, the argument goes, to make sure that nothing else, like a bed sheet, was torn.

18

35. The motion ignores all of the massive amount of evidence which the plaintiffs accumulated during several years of extremely intense discovery in this litigation. They have numerous jail incident reports. They have the suicide investigation narrative reports. They have video of the hour and 53 minutes before the suicide, plus several hours after the suicide. They have the video of the February 12, 2009, incident with which the motion claims it is primarily concerned. The plaintiffs have dozens of photographs of the interior of the decedent's cell taken in the immediate aftermath of the discovery of his suicide during the investigation of it. Plaintiffs have taken dozens and dozens of depositions of custody deputies, the Sheriff himself, medical personnel, court administrators, and inmates in segregated housing whose cells adjoined that of the decedent. But none of this evidence ever produced any indication that Mr. Hernandez gave the slightest indication that he was contemplating harming himself, hanging himself, or taking his own life.

36. Attached hereto is an authentic copy of Sgt. Davidson's declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 18, 2012, at Oxnard, California.

                                       /s/
                                  JEFFREY HELD