1    DAVID S. McLANE (No. 124952)
     KAYE, McLANE & BEDNARSKI, LLP
2    234 East Colorado Boulevard, Suite 230
     Pasadena, California 91101
3    Telephone: (626) 844-7660
     Facsimile: (626) 844-7670
4    E-Mail: dmclane@kmbllp.com

5    Attorneys for K.N.H. by and through
     her guardian ad litem, Amber Rodriguez
6
     BRIAN A. VOGEL (No. 167413)
7    THE LAW OFFICES OF BRIAN A. VOGEL, PC
     770 County Square Drive, Suite 104
8    Ventura, CA 93003
     Telephone: (805) 654-0400
9    Facsimile: (805) 654-0326
     E-Mail: brian@bvogel.com
10
     Attorney for Esther Biselli and the
11   Estate of Daniel T. Hernandez

12

13                 UNITED STATES DISTRICT COURT

14     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

15 | ESTHER BISELLI AND THE | ) | CASE NO. CV 09-08694-CAS(Ex) |
| ESTATE OF DANIEL T. | ) | |
| HERNANDEZ, BY AND | ) | |
| THROUGH HIS PERSONAL | ) | PLAINTIFFS' JOINT |
| REPRESENTATIVE ESTHER | ) | CONSOLIDATED OPPOSITION TO |
| BISELLI; K.N.H., [NAME | ) | DEFENDANTS' MOTIONS FOR |
| REDACTED] A MINOR, BY AND | ) | SUMMARY JUDGMENT |
| THROUGH HER GUARDIAN | ) | |
| AND MOTHER, AMBER | ) | [Filed concurrently with Plaintiffs' |
| RODRIGUEZ, | ) | Joint Statement of Additional Disputed |
| | ) | (and Undisputed) Material Facts, Joint |
| Plaintiffs, | ) | Statements of Genuine Issues in |
| | ) | Response to VCSD and CFMG |
| vs. | ) | Defendants' Statements of Undisputed |
| | ) | Facts, Objections to Evidence, and |
| COUNTY OF VENTURA, | ) | Supporting Documents] |
| VENTURA COUNTY SHERIFFS | ) | |
| DEPARTMENT; SHERIFF BOB | ) | Date:       June 4, 2012 |
| BROOKS; CALIFORNIA | ) | Time:      10:00 a.m. |
| FORENSIC MEDICAL GROUP; | ) | Courtroom:  5 |
| TAYLOR FITHIAN, M.D., Dr. | ) | |
| JOHN KORZELIUS, Dr. MARVIN | ) | |
| MYUNG JUNG, MARIA BAEZ, | ) | Action Filed: 11/25/2009 |
| DOES 1 through 10, inclusive, | ) | Trial Date: None yet assigned |
| | ) | Judge: Hon. Christina A. Snyder |
| Defendants. | ) | Mag. Judge: Hon. Charles F. Eick |
| | ) | |

1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs, by and through counsel of record, hereby jointly oppose the Motion for Summary Judgment or, in the Alternative, for Summary Adjudication of Issues, On Behalf of Defendants County of Ventura, Ventura County Sheriff's Department, and Sheriff Bob Brooks (Dkt. No. 30) ("VCSD Defendants' Motion") and the Motion for Summary Judgment of Defendants California Forensic Medical Group, Inc., Taylor Fithian, M.D., John Korzelius, M.D., Melvin Myung Jung, M.D., and Maria Baez, LVN[1] (Dkt No. 67) ("CFMG Defendants' Motion").

This Consolidated Opposition is based on the attached Memorandum of Points and Authorities, Plaintiffs' Joint Statement of Additional Material Disputed (and Undisputed) Facts; Plaintiffs' Joint Statement of Genuine Issues In Response to VCSD Defendants' Statement of Undisputed Facts; Plaintiffs' Joint Statement of Genuine Issues In Response to CFMG Defendants' Statement of Undisputed Facts; Plaintiffs' Legal Objections to Evidence in Support of Opposition to VCSD Motion for Summary Judgment; Plaintiffs' Legal Objections to Evidence in Support of Opposition to CFMG Motion for Summary Judgment, the declarations and exhibits filed herewith, the pleadings and papers on file in this action, and such other oral and documentary evidence as may be allowed at the hearing of this motion.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

Dated: May 21, 2012                    By  /s/ David S. McLane
                                          DAVID S. McLANE

---

[1] Although there is no uncertainty as to the Defendants in this action, Plaintiffs caused confusion at the outset of this case by misspelling the names of three of the individual CFMG Defendants. The Complaint lists "Fithian Taylor," "Melvin Myung Jung," and "Maria Baezlin" as defendants. The accurate names of these defendants are Taylor Fithian, Marvin Jung, and Maria Baez.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorney for Plaintiff
K.N.H., A MINOR BY AND THROUGH
HER GUARDIAN AND MOTHER,
AMBER RODRIGUEZ


LAW OFFICES OF BRIAN A. VOGEL, PC

Dated: May 21, 2012          By  /s/ Brian A. Vogel
                                 BRIAN A. VOGEL

Attorney for Plaintiffs
ESTHER BISELLI AND THE ESTATE OF
DANIEL T. HERNANDEZ

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.     Daniel Hernandez's Custodial and Medical History . . . . . . . . . . . . . . 3

              1.     2007 Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

              2.     2008-2009 Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                     a.     Initial arrest through transfer to Patton State Hospital . . . . 7

                     b.     Patton State Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                     c.     Transfer from Patton State Hospital through Suicide . . . 12

                            i.     Contact with CFMG Psychiatric Staff . . . . . . . . . 15

                            ii.    Contacts with VCSD and CFMG Medical Staff . . 16

                            iii.   The Week Prior to Mr. Hernandez's Suicide . . . . . 21

                            iv.    Suicide on February 16, 2009 . . . . . . . . . . . . . . . . 25

       B.     VCSD and CFMG Policies and Practices Pertaining to
              Mentally Ill Detainees and Detainees with Risk of Suicide . . . . . . . . 26

III.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       A.     Because VCSD and CFMG Defendants Have Not Carried
              Their Burden as the Moving Parties Both Motions Should
              Be Denied Without Reaching the Merits . . . . . . . . . . . . . . . . . . . . . . 30

              1.     Defendants' Failure to Cite Competent Evidence In
                     Support of Their Motions for Summary Judgment
                     Justifies Denial of the Motions . . . . . . . . . . . . . . . . . . . . . . . . 30

              2.     Although Both Motions Purport to Address All Claims
                     Against All Respective VCSD and CFMG Defendants,
                     Both Motions Fail to Argue Against Liability as to
                     Particular Claims and Particular Defendants . . . . . . . . . . . . . . 31

       B.     Legal Standard Applicable to Plaintiffs' Constitutional Claims . . . . . 32

       C.     CFMG Defendants' Motion for Summary Judgment
              Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.   VCSD Defendants' Motion for Summary Judgment
Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.   Constitutional Liability for Jail Suicides  . . . . . . . . . . . . . . . . . . 39

2.   Liability Under Title II of the Americans With
Disabilities Act and California Unruh Civil Rights Act . . . . . . . 45

3.   VCSD Defendants' Asserted Immunity under California
Government Code § 844.6(a)(2) for Negligence  . . . . . . . . . . . 48

4.   Supplemental Jurisdiction over Plaintiffs' State Law
Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bell v. Wolfish*,
441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bowring v. Godwin*,
551 F.2d 44 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brady v. Brown*,
51 F.3d 810 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Cabrales v. County of Los Angeles*,
864 F.2d 1454 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40, 42, 44

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*City of Canton v. Harris*,
489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Clouthier v. County of Contra Costa*,
591 F.3d 1232 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Coleman v. Wilson*,
912 F. Supp. 1282 & n.10 (E.D. Ca. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 44

*Conn v. City of Reno*,
591 F.3d 1081 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33, 37

*Dunlap v. Ass'n of Bay Area, Gov'ts*,
996 F. Supp. 962 (N.D.Cal.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Estate of Cartwright v. City of Concord*,
618 F. Supp. 722 (N.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Estate of Cartwright v. City of Concord*,
856 F.2d 1437 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Farmer v. Brennan*,
511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 44

*Finney v. Mabry*,
534 F. Supp. 1026 (E.D. Ark.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*George v. Sonoma County Sheriff's Department*,
Civ. No. 08-2675-EDL, 2011 WL 2975850 (N.D. Cal. July 22, 2011) . . . . . . . . . . 44

*Gibson v. County of Washoe*,
290 F.3d 1175 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 40, 44

*Grove v. De La Cruz*,

iii

407 F. Supp. 2d 1126 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 49

*Hagan v. California Forensic Medical Group*,
No. CIV. S-07-1095 LKK/DAD, 2009 WL 728465 (E.D. Cal. Mar. 5, 2009) . . . . . 43

*Hall v. Ryan*,
957 F.2d 402 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Hutchinson v. United States*,
838 F.2d 390 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Inmates v. Pierce*,
612 F.2d 754 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Jett v. Penner*,
439 F.3d 1091 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

*Jones v. Blanas*,
393 F.3d 918 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Long v. County of Los Angeles*,
442 F.3d 1178 (9th Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Martin v. Taft*,
222 F. Supp. 2d 940 (S.D. Ohio 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*McGuckin v. Smith*,
974 F.2d 1050(9th Cir.1991), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Mitchell v. Dupnik*,
75 F.3d 517 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Monell v. New York City Dep't of Soc. Servs.*,
436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Oregon Advocacy Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ramirez v. Ferguson*,
2011 WL 1157997 (W.D. Ark. Mar. 29, 2011) . . . . . . . . . . . . . . . . . . . . . . . 39, 44

*Sanders v. Douglas*,
565 F. Supp. 78 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Simmons v. Navajo County*,
609 F.3d 1011 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 45

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Soto v. City of Sacramento*,
567 F. Supp. 662 (E.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Stevenson v. Carroll*,
495 F.3d 62 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Streit v. County of Los Angeles*,
236 F.3d 552 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*,
739 F.2d 1434 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Walker v. Shanksy*,
28 F.3d 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Weinreich v. L.A. County Metropolitan Trasnp. Auth.*,
114 F.3d 976 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Wellman v. Faulkner*,
715 F. 2d 269 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Wereb v. Maui County*,
727 F. Supp. 2d 898 (D. Haw. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Woodward v. Correctional Med. Servs. of Ill.*,
368 F.3d 917 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Statutes**

28 U.S.C. § 1637(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

42 U.S.C. § 12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 45, 48

42 U.S.C. § 6010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

California Government Code § 844.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 48

California Government Code § 845.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 39, 48

California Penal Code § 1368 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**<u>Rules</u>**

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29, 30, 31

**<u>Regulations</u>**

28 C.F.R. § 35.130(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

28 CFR § 35.130(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

1

2   **MEMORANDUM OF POINTS AND AUTHORITIES**

3   ## I. INTRODUCTION

4       The Motions for Summary Judgment filed by the two sets of Defendants in this

5   case—the Ventura County Sheriffs Department Defendants ("VCSD Defendants")

6   and California Forensic Medical Group Defendants ("CFMG Defendants")—both

7   claim, without factual support, that the suicide of Daniel T. Hernandez on February

8   16, 2009 was a complete surprise and could not have been predicted. This position is

9   contradicted by the facts of this case, which both VCSD and CFMG defendants failed

10  to meaningfully address, and by the well established fact that the leading cause of

11  death of persons in custody nationwide is suicide. (SAMF 1)[2]

12      The U.S. Justice Department's Bureau of Justice Statistics (BJS) utilizes average

13  daily population to calculate mortality rates, including suicide rates. According to the

14  most recent available BJS data, the suicide rate in county jails throughout the country

15  during the period of 2000 through 2007 was 42 suicides per 100,000 inmates. (SAMF

16  1) From 2003 through February 2009, the Ventura County jail system sustained six

17  inmate suicides.  With an average daily population of 1,618 inmates, the resulting

18  suicide rate would be 53 suicides per 100,000 inmates. (SAMF 2) The rate of suicide

19  in the Ventura County jail system during this period was, therefore, higher than the

20  national average.[3] This fact was confirmed by an investigation of the Ventura County

21  2010-2011 civil Grand Jury that was prompted by two suicides in one year in the

22

23  ───────────────

24      [2] The evidence supporting Plaintiffs' opposition to Defendants' Motions for Summary
    Judgment is set forth in Plaintiffs' Joint Statement of Additional Disputed (and Undisputed) Facts,

25  filed herewith. For purposes of this Memorandum, Plaitiffs will use the acronym "SAMF" to refer to
    the paragraphs in the Joint Statement of Additional Facts.

26

27      [3] These statistics, which were provided by Plaintiffs' expert Lindsay Hayes, a nationally-
    recognized expert in the field of suicide prevention in correctional settings, demonstrate that the

28  VCSD's statement that the jail had "an extremely low incidence of inmate suicides," VCSD Mot. at
    9, was at best misleading, and at worst false.

Ventura County jail system.[4] (SAMF 3)

All of the literature on the subject of suicide in correctional settings confirms that isolation and mental illness are leading factors in suicides. Because persons who are intent on committing suicide may take affirmative steps to hide that intent from those who would intervene, suicides are not always preceded by overt warning signs or suicidal statements by the inmate. Accordingly, suicide prevention policies focus not only on responding to expressed suicidal ideation but also on mitigating the various risk factors for suicide. (SAMF 5) For this reason, constitutionally adequate suicide policies engage in ongoing screening, monitoring, and other preventative measures, particularly for inmates who have a higher risk of suicide, such as those with mental illness and a history of suicidal ideation and attempts.

In this case, the evidence produced in discovery shows that Daniel Hernandez was a victim of Defendants' systematic and longstanding deliberate indifference to the serious medical and mental health needs of acutely mentally ill and isolated inmates who are at the greatest risk of committing suicide in custody.  Mr. Hernandez's serious mental health condition went *entirely untreated* by Defendants in the three months preceding his suicide, despite Mr. Hernandez's increasing signs of mental and emotional distress and extensive history of suicidal ideation and danger to self. Defendants' acts, omissions, and policies were in violation of their constitutional duty to provide adequate medical and mental health care for Mr. Hernandez who could not care for himself and who was cut of from family members who could have intervened on his behalf.  Defendants are therefore liable for this constitutional violation and related statutory and common law violations.

## II.  FACTUAL BACKGROUND

Daniel T. Hernandez was twenty-eight years old when he committed suicide on

_____

[4] Suicides at the Ventura County Jail are self-investigated by the jail administrative staff and the Major Crimes Unit in the Sheriffs' Department.  During his tenure as Sheriff, Defendant Bob Brooks never requested the assistance of an outside agency to investigate a jail suicide. (SAMF 4)

February 16, 2009 at Ventura County Pre-Trial Detention Facility ("VCTPDF"). (SAMF 6) He was in the custody of the Ventura County Sheriff's Department ("VCSD"), whose employees operate the jail, and the California Forensic Medical Group ("CFMG"), which provides medical services to the pretrial detainees at the jail pursuant to a contract with the County of Ventura.[5] (SAMF 6)  Mr. Hernandez had been in custody as a pretrial detainee since his arrest on April 12, 2008. He was housed at the VCPTDF from April 12, 2008 through August 28, 2008 and again from October 30, 2008 through February 16, 2009.[6] In the interim, he was committed to Patton State Hospital for competency restoration.[7] (SAMF 7)

**A.      Daniel Hernandez's Custodial and Medical History**

As described in more detail below, when Mr. Hernandez returned from Patton State Hospital on October 30, 2008, he was well known in the jail, both to the custody staff and the CFMG staff, for his extensively documented serious mental health condition and history of incidents which resulted in safety-cell placements. By that time, the list of jail incident reports for Daniel Hernandez, which was stored in the Ventura County Integrated Justice Information System, ("VCIJIS"), the computerized data system utilized by VCSD, contained at least fifteen (15) references to jail incident

---

[5]For purposes of this memorandum, Plaintiffs will refer to VCSD employees as "custody staff" and to CFMG employees as "CFMG staff" which includes both "CFMG medical staff" and "CFMG psychiatric staff." During the relevant period of this lawsuit, there were three regular CFMG employees who comprised the CFMG psychiatric staff: Defendant Dr. Marvin Jung, a licensed psychiatrist, and two nurses who had some specialized training in mental health issues. In 2007, the two nurses were Nurse Linda Moskowitz and Nurse Jose Nunez; in 2008-2009, the two nurses were Nurse Linda Moskowitz and Nurse Diane Rodelander. (SAMF 9)

[6]  From January 22, 2007 through August 8, 2007, Mr. Hernandez was a pretrial detainee at a different Ventura County Sheriff's Department facility with CFMG-provided medical services, called "Todd Road;" he was not in VCSD custody between August 2007 and April 2008. Prior to January 2007, Mr. Hernandez had served a period of incarceration at Kern Valley State Prison. (SAMF 7)

[7] Defendants have carefully portrayed the Patton State Hospital confinement as a mere competency *evaluation*, disregarding the fact, discussed *infra* at p. 34:10-25, that a court found Mr. Hernandez to be incompetent *prior* to his commitment to Patton State Hospital. (SAMF 12)

reports with "Medical - Suicidal ..." as the "incident type." The same list contained at least nine (9) references to "safety cell" or "safety precautions." (SAMF 14) This list was available to all deputies at all times. (SAMF 14)

Mr. Hernandez's classification at the VCPTDF, as relevant here, began on January 23, 2007, when Mr. Hernandez was classified as a "psychiatric" inmate by the custody staff and was ordered to be housed "until further notice" in the "Administrative Segregation Unit" ("Ad Seg"). (SAMF 15) Mr. Hernandez was given a green armband, (indicating Ad Seg housing), with a yellow "tracer" (indicating psychiatric inmate). (SAMF 16) He wore the armband at all times and it immediately informed any staff member—custody or CFMG—who came into contact with Mr. Hernandez that he was housed in Ad Seg and had one or more mental health conditions. (SAMF 16)

At the VCPTDF, Ad Seg was a housing unit on the second level of the jail, next to the "Special Housing Unit" (a.k.a. medical unit), that was reserved for the pretrial detainees at the jail needing the highest level of security. (SAMF 19) Ad Seg is a housing unit for inmates who must be segregated from other inmates for their own protection and safety or for the protection and safety of other inmates and includes active gang members, obvious homosexuals, transsexuals, or other targets of sexual assault, extremely violent inmates, members of law enforcement, or other prominent members of the community. (SAMF 20) Ad Seg inmates are locked in their cells 23 hours a day with little interaction with other inmates. (SAMF 20) During his 2007 and 2008-2009 detentions, Mr. Hernandez did not have roommates and was rarely able to communicate face-to-face with other pretrial detainees. (SAMF 21) Thus, his daily contact with other persons was extremely limited by virtue of his housing classification.

## 1.     2007 Detention

Mr. Hernandez' January 23, 2007 classification, (Ad Seg and Psychiatric), which persisted until his death in February 2009, was based on a judgment by the

custody staff that his assaultive and delusional behavior while in custody "was consistent with that of a psychiatric inmate." (SAMF 22) Around the same time, Mr. Hernandez filled out a medical evaluation form in which he stated that his "past mental health problems" were "depression" and "suicide attempts." (SAMF 23) He reported on the same form that he attempted to hurt himself one and a half weeks prior to his arrest by taking pills and that he was currently suffering from depression. (SAMF 23) This form, and the information regarding Mr. Hernandez's classification as a psychiatric inmate due to his assaultive and delusional behavior, were given to the CFMG psychiatric staff, who then evaluated Mr. Hernandez. (SAMF 23)

On January 22 and 23, 2007, Mr. Hernandez was seen by Defendant Dr. Marvin Jung, the only psychiatric doctor assigned to Ventura County Jail during the relevant period of this lawsuit, a psychiatric nurse, and several other CFMG staff members. (SAMF 24)  Defendant Dr. Jung testified that he was the person at VCPTDF that was responsible for providing mental health care to all of the detainees, including Mr. Hernandez. (SAMF 10) Defendant Dr. Jung acknowledged that it was his responsibility to treat inmate patients as if they were private citizens and agreed that in some sense it was even more important for Dr. Jung to provide mental health care services because the inmates had nowhere else to go. (SAMF 10)

At the time he was evaluated on January 22 and 23, 2007, Mr. Hernandez was housed in a safety cell on safety precautions due to an altercation with the custody staff. (SAMF 24) He told the psychiatric nurse that he was depressed and afraid of others. He further told the nurse that he had "thought about suicide [and] tried it about one week ago [by overdosing] on Tylenol and Advil [-] 42 tablets." (SAMF 25) Mr. Hernandez told Defendant Jung that he had been treated for depression during his last incarceration. (SAMF 25) Following the evaluations, Defendant Dr. Jung prescribed Mr. Hernandez an anti-depressant and two major tranquilizers. (SAMF 26) Defendant Dr. Jung testified that the tranquilizers he prescribed for Mr. Hernandez would be prescribed for someone with "schizophrenia or major mood disorder with disruptive

behavior." (SAMF 26)

Between January 23, 2007 and his release from custody on August 8, 2007, Mr. Hernandez was placed on safety precautions[8] in a safety cell on four additional occasions (SAMF 27), as follows:

- On February 7, 2007, Mr. Hernandez told a CFMG nurse, "I have been hearing voices x 1 week now. The medicine I am offered here isn't helping with the voices, they tell me to hurt myself and others by cutting with whatever I can find," and was placed on level II safety precautions. He told Defendant Jung later that day that he was "hearing a demon's voice telling him to hurt self and others. No urgency or plan to hurt self or others but the fact that he hears low threatening voices bothered him."[9] Dr. Jung adjusted Mr. Hernandez's medication and discontinued safety precautions. (SAMF 29)

- On May 22, 2007, Mr. Hernandez engaged in a major altercation with members of the custody staff that resulted in a referral to CFMG staff that was interpreted by Defendant Jung two days later as "acute agitation." Although Mr. Hernandez expressed a desire for psychiatric medication immediately after the incident, he told Dr. Jung on May 24, 2007 that he didn't need psychiatric medication. Dr. Jung's plan was "observation," and Mr. Hernandez was observed on level II or III safety precautions for the next two and a half weeks. (SAMF 30)

- On June 9, 2007, while still housed on level II or III safety precautions, Mr. Hernandez told a custody staff member that he wanted to "kill" himself and stated that he planned on hanging himself with his sheets.[10] When asked why, Mr. Hernandez stated that "the demons and voices in my head told me to." Mr. Hernandez was upgraded to level I safety precautions and was scheduled for a "psych evaluation." While on level I safety precautions, Mr.

---

[8] Pursuant to the safety cell policy at the VCPTDF, inmates could be placed on three levels of safety precautions if considered to be a danger to themselves or others. (SAMF 28) Level I safety precautions is the maximum level of precautions: an inmate is placed in a safety cell with a safety smock and monitored in 15 minute intervals. For Level II safety precautions, an inmate is placed in a special housing cell with restricted clothing ("jail blues") and monitored in 30 minute intervals. Inmates on level III safety precautions are housed in a special housing cell and monitored at 60 minute intervals but otherwise enjoy full privileges. For all three levels, and depending on the level, various items—such as razors, pencils, clothing, bedding, etc.—are removed from the inmate's possession. (SAMF 28)

[9] It can be inferred that Mr. Hernandez was experiencing the same voices at the time of his suicide because he was overheard yelling at Satan to get out of his cell. (SAMF 73, 77) At that time, he was not being monitored by CFMG psychiatric staff and the custody staff did not refer him for treatment, despite his clearly disturbed conduct.

[10] This turned out to be prophetic as Mr. Hernandez did eventually use torn linens to hang himself.

Hernandez denied being suicidal but admitted to hearing voices daily and having a long history of voices telling him to harm himself. Mr. Hernandez also stated, "if I get my meds, I'll be ok." On June 9, 2007, Defendant Jung prescribed medication by phone. On June 11, 2007, Mr. Hernandez was taken off all safety precautions by CFMG psychiatric nurse Moskowitz, a decision that was approved by Dr. Jung. Dr. Jung testified that he would have reviewed the notes in Mr. Hernandez's medical file reflecting his suicidal statements and history of hearing voices. There is no evidence that Dr. Jung evaluated Mr. Hernandez while on level I safety precautions or in relation to the prescription of medication on June 9, 2007. (SAMF 31)

- On July 27 and 28, 2007, Mr. Hernandez was evaluated by CFMG nurses for refusing meals, being out of contact with his family, and possible suicidal ideation. Mr. Hernandez appeared gaunt and stated that "he has not and cannot call his family" although the custody staff confirmed that Mr. Hernandez had telephone privileges. A CFMG nurse wrote that Mr. Hernandez "does not appear reluctant, but unable to participate in normal conversation." On July 28, 2007, Mr. Hernandez told a CFMG psychiatric nurse, "there is something inside of me that is going to drive me to hurt myself and I don't want to let that happen" and expressed paranoia by stating "they can get in through my window." Defendant Jung ordered Mr. Hernandez to be placed on level I safety precautions and discontinued safety precautions on July 29, 2007. (SAMF 33)

- On July 30, 2007, Defendant Jung evaluated Mr. Hernandez and observed signs of depression. When Defendant Jung asked Mr. Hernandez about suicidal intent, Mr. Hernandez was vague and ambivalent. As a result of this evaluation, Defendant Jung placed Mr. Hernandez on level III safety precautions. Mr. Hernandez was thereafter evaluated by Defendant Jung or a psych nurse every day from July 31 through August 7, 2007, with Defendant Jung personally observing Mr. Hernandez on six occasions. On August 8, 2007, Mr. Hernandez was released from custody. A CFMG psychiatric nurse filled out a form stating that Mr. Hernandez "need[ed] immediate attention" upon release. (SAMF 33)

Thus, during his 2007 period of detention, which lasted approximately six and a half months, Mr. Hernandez frequently expressed suicidal ideation, informed custody staff and CFMG staff that he heard voices who told him to harm himself, stated that he planned on hanging himself with his sheets, and spent over one month on safety precautions for observation. In addition, Mr. Hernandez frequently refused meals and/or refused his psychiatric medication, actions that often coincided with his expressions of suicidal ideation. (SAMF 34)

### 2.      2008-2009 Detention

#### a.      Initial arrest through transfer to Patton State Hospital

Mr. Hernandez returned to VCSD custody on April 12, 2008. (SAMF 7) During his intake health screening by a custody deputy, Mr. Hernandez denied psychiatric

problems, denied ever thinking of ending his life, and denied current suicidal ideation. (SAMF 35) The first two responses were, of course, directly contrary to Mr. Hernandez's documented CFMG medical history; however, these denials were not uncommon for Mr. Hernandez who frequently denied having mental health issues or needing psychiatric medication. (SAMF 35) In this regard, Mr. Hernandez was not atypical, as persons with certain serious mental health conditions often deny having a problem and refuse medication.  (SAMF 36)

On April 16, 2008, CFMG psychiatric nurse Rodelander received a phone call from Mr. Hernandez's aunt who reported that Mr. Hernandez was "very suicidal" and had made a statement to another family member about ending his life. Nurse Rodelander spoke with Mr. Hernandez, who denied suicidal ideation. (SAMF 37) Although Mr. Hernandez (a) was examined by a CFMG medical nurse during the intake procedure (to evaluate injuries from having been tazed in the field); (b) was seen by Nurse Rodelander on April 16, 2008 regarding possible suicidal ideation; (c) was a known psychiatric patient with a history of serious mental health problems, suicidal ideation, and tendencies to self-harm; and (d) had taken medications for his serious mental health conditions in the past, he was not evaluated by Defendant Dr. Jung upon admission to the jail or prescribed medication. (SAMF 26-35, 37, 38)

From April 14, 2008 to May 3, 2008, Mr. Hernandez was housed in the medical unit of the jail. (SAMF 39) Two days later he was rehoused to Ad Seg.  After this placement, Mr. Hernandez engaged in conduct that resulted in the first of four safety cell placements during this period of detention (SAMF 39, 41), as follows:

- On May 5, 2008, custody staff called CFMG psychiatric nurse Moskowitz to attend to Mr. Hernandez. Nurse Moskowitz wrote, "Called by custody. Patient not responding. Appears upset and is crying with long snot ropes hanging from face and makes no effort to wipe self. Refused breakfast. I observed him sitting on his bunk with head hanging down between his legs quietly screaming and weeping. Appears as described by custody. Does not respond to verbal commands or raps on the door. Appears internally focused and very tense. Rule out [i.e. assess possible] psychotic state." Defendant Dr. Jung was present and observed Mr. Hernandez's conduct. Mr. Hernandez was considered to be a danger to himself. Nurse Moskowitz consulted with Defendant Jung who ordered that Mr. Hernandez be given involuntary

medication[11] to calm him down (a "cocktail" that included an antipsychotic, a tranquilizer, and an antihistimine) and placed on level I safety precautions. Defendant Jung evaluated Mr. Hernandez later that same day, diagnosed him with a mood disorder with psychotic features, and ordered "close observation." The next day, Defendant Jung assessed Mr. Hernandez again, who denied he had done anything unusual on May 5th and denied that he had been crying and screaming, contrary to the custody and CFMG staff observations. Defendant Jung discontinued safety precautions. (SAMF 41)

• On June 21, 2008, Mr. Hernandez was removed from his cell in Ad Seg for a visit by custody staff. While he was being shackled, Mr. Hernandez "tensed up, clinched his fists and was visibly agitated." He refused to reply to questions or to explain to the custody staff what his problem was. Due to his agitated state, the custody staff canceled Mr. Hernandez's visit and took him to special housing where he was placed on level 1 safety precautions by CFMG psychiatric nurse Moskowitz pursuant to instructions from Defendant Jung based on his "severe agitation and danger to self and others." Nurse Moskowitz stated that Mr. Hernandez "continue[d] to struggle and fight and growl like an animal" after he was brought in to special housing and remained non-responsive to questions. Mr. Hernandez was given involuntary medication (the same cocktail as on May 5th) based on a verbal order from a CFMG medical doctor. Nurse Moskowitz evaluated Mr. Hernandez again on June 22, 2008, and recommended that safety precautions be discontinued, which was then ordered by Defendant Dr. Jung without his observing Mr. Hernandez.[12] (SAMF 42)

• On June 30, 2008, Mr. Hernandez was observed by custody staff to be lying rigid in his bed with his fists clenched and had clear liquid coming from his mouth. "He did not respond to verbal commands or to painful stimuli (sternal rub) . . . and he smelt of urine." Based on this "bizarre behavior and danger to self," Mr. Hernandez was placed on level 1 safety precautions by Defendant Jung who ordered the administration of involuntary medication on June 30, and again on July 3. On July 1, 2008, Mr. Hernandez was downgraded to level 3 safety precautions. He was evaluated by Defendant

---

[11] Defendants' policy for the involuntary administration of psychotropic medication states that "involuntary psychotropic medications will only be given when a psychiatric emergency exists." (SAMF 40) The policy defines a psychiatric emergency as "a situation in which action to impose treatment over the inmate's objection is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impractical to first gain consent." (SAMF 40) Thus, it can be inferred that when Mr. Hernandez was administered involuntary psychotropic medication on May 5—and later on June 21, and June 30—it was based on a determination that he was having a psychiatric emergency and that the medication was necessary for the preservation of life or to prevent serious bodily harm. (SAMF 40)

[12] This incident is particularly significant because it bears striking similarity to an incident which occurred on February 12, 2009—four days prior to Mr. Hernandez's suicide—and caused him to be placed on safety precautions, but did not result in any referral to or monitoring by the CFMG staff. (SAMF 98-99, 110-12) The failure to consult with the CFMG staff in relation to the February 12, 2009 incident and the removal of Mr. Hernandez from safety precautions without notifying CFMG staff violated the standard of care for suicide prevention policies and contributed to Mr. Hernandez's suicide. (SAMF 112)

Jung on July 1, 2, and 3, 2008. Defendant Jung ordered close observation and the offering of medication (which was refused). On July 3, 2008, Defendant Dr. Jung once again authorized involuntary medication. Mr. Hernandez was thereafter evaluated by CFMG psychiatric nurses Rodelander and Moskowitz on a daily basis until he was removed from safety precautions on July 6, 2008 by Defendant Jung. (SAMF 43)

- On August 9, 2008, Mr. Hernandez was observed yelling all morning by custody staff. He created a disturbance in his cell by banging on his door with his feet and screaming for several minutes. He refused to respond to directions by the custody staff. He was thereafter placed on safety precautions level 1 by the custody staff "because he was in danger of harming himself by kicking the door." He was removed from safety precautions by custody staff later the same day. Although Mr. Hernandez was monitored by CFMG medical staff, those staff members did not notify or consult with CFMG psychiatric staff. (SAMF 44)

Thus, for three of the four incidents between April 14, 2008 to May 3, 2008, Mr. Hernandez was given involuntary emergency medication. For most of the incidents, Mr. Hernandez displayed signs of aggression in relation to his psychiatric symptoms and was openly hostile to the CFMG staff. He refused to talk to Defendant Jung on several occasions, and he called nurse Moskowitz a "bitch" and told her to "shut up." He similarly used profanity against Nurse Rodelander. (SAMF 45) In addition, Mr. Hernandez often refused to eat or drink and consistently refused medication. He refused to respond to questions and refused to allow his vital signs to be taken. At times, he yelled intermittently. Other times, he was observed talking to himself or to an imaginary person. (SAMF 45) Based on this record, Mr. Hernandez was clearly a *very* difficult patient.

In the Summer of 2008, Mr. Hernandez was evaluated for his competency to stand trial and for whether he should be placed under conservatorship. (SAMF 11) The competency evaluation by Dr. David Jimenez resulted in the following conclusion:

Mr. Hernandez is not competent in that he is not presently able to understand the nature and purpose of the proceedings against him, and to conduct or assist in his own defense in a rational manner because of his acute and ongoing mental illness . . . . It is medically appropriate to treat this person's psychiatric condition with medication. This medication is likely to be effective. This person does not have the capacity to make decisions about such medication. If untreated with medication, this person probably will suffer serious harm to their physical or mental health. In consideration of this evaluation and in my professional opinion

this person is a danger to others, and is a danger to self. [McLane Decl., Ex. 16 at 5].

The conservatorship inquiry concluded with the following finding:

It is clear that the proposed conservatee has some psychiatric issues [and] . . . a history of violent behavior . . . . The proposed conservatee will not take any medications to alleviate his condition, and Dr. Jimenez states the proposed conservatee is a danger to self and others, requiring the need for a locked facility and medical treatment for the proposed conservatee. With the tendency for violent behavior and his refusal to take any medication, a conservatorship does not appear to be what would be in the best interest for the proposed conservatee. The proposed conservatee needs much more intensive intervention and depending on what the doctors state about his mental condition later, should be considered for a locked mental facility, where intensive treatment and supervision may take place. [McLane Decl., Ex. 15 at 8].

Following these evaluations, and based on the recommendation of Dr. Jimenez, the Superior Court for the County of Ventura ordered that Mr. Hernandez be placed at Patton State Hospital for competency evaluation and restoration pursuant to California Penal Code § 1368. (SAMF 12)

### b.   Patton State Hospital

Mr. Hernandez was treated at Patton State Hospital ("PSH") from August 28, 2008 through October 30, 2008. (SAMF 13) Upon admission he was evaluated by multiple medical professionals as part of an integrated assessment, including several nurses, a psychiatrist, a psychologist, a rehabilitation therapist, and a social worker. (SAMF 46) It was immediately observed that Mr. Hernandez demonstrated "a severe lack of insight into his current [mental] condition." (SAMF 46) He denied ever being under psychiatric care, denied any medical problems, denied taking psychiatric medication, and denied prior suicidal attempts and ideation. (SAMF 46) The PSH psychiatrist provided the following summary:

During the Psychiatric Evaluation today, the patient did not bring too much information, only that he was guarded, inappropriate smiling, poor historian, very irrelevant, tangential. He was observed to be internally preoccupied and talking and mumbling to himself. He was observed looking from one arm to another arm and talking something that I could not understand. He was internally preoccupied and also very secretive. When I asked him about the charges, he said, 'I'd rather not talk about it,' so he was guarded. [McLane Decl., Ex. 120 at P0560].

Based on the integrated assessment, PSH mental health professionals diagnosed

11

Mr. Hernandez as having a psychotic disorder and possible "features of Schizophrenia, Paranoid Type, based on his high anxiety level, extreme guardedness, and refusal to acknowledge any elements of mental illness in his life, though he has been treated with medications in the past . . . and exhibits odd changes in behavior at times." (SAMF 47) Mr. Hernandez was placed on a "Wellness and Recovery Plan" for restoration of competency which included: (1) weekly meetings with the psychiatrist; (2) weekly meetings with a case manager/counselor regarding compliance with PSH treatment procedures; (3) weekly meetings with psychiatric nurses to discuss competency issues; and (4) daily monitoring and treatment of his mental illness and psychotic symptoms.  In addition, Mr. Hernandez participated in numerous group activities on a daily basis. Finally, Mr. Hernandez was prescribed Zyprexa, a psychotropic medication used to treat schizophrenia, bipolar disorder, and other psychotic conditions. Mr. Hernandez was required to take the medication, either voluntarily or involuntarily, on a daily basis. (SAMF 48)

On October 23, 2008, PSH informed the criminal court that Mr. Hernandez was competent, at that time, to stand trial, and Mr. Hernandez was returned to VCJ, by order of the court, on October 30, 2008. (SAMF 49) Patton State Hospital recommended and the Court ordered that the Sheriff's Department maintain Mr. Hernandez on the medication prescribed by PSH, Zyprexa. (SAMF 49)

### c.    Transfer from Patton State Hospital through Suicide

Upon his return to the Ventura County Pre-Trial Detention Facility on October 30, 2008, Mr. Hernandez again went through the health intake screening process. (SAMF 50) The custody staff received a court order dated November 6, 2008 to maintain Mr. Hernandez on medication, and CFMG staff received a nursing discharge summary from PSH.  (SAMF 51-52) The nursing discharge summary listed Mr. Hernandez's medications (Zyprexa), his PSH diagnosis (Psychotic Disorder NOS [not otherwise specified]), and described his physical and mental condition upon discharge. (SAMF 51) There is no evidence of any communication between the custody staff and

12

the CFMG staff as the proper level of care for Mr. Hernandez or steps to be taken to ensure that his mental health condition remained stable. The evidence indicates that the custody staff did not notify the CFMG staff that the court ordered that Mr. Hernandez be maintained on psychotropic medication. (SAMF 52)

Upon returning to the jail, Mr. Hernandez was evaluated by the custody staff and by the CFMG staff, resulting in three completed forms: (1) an Intake Health Screening (custody staff); (2) a nursing assessment of psychiatric and suicidal inmate (CFMG staff); and (3) a reception housing clearance form (custody staff / CFMG staff).[13] (SAMF 50) Similar to responses given in April 2008, Mr. Hernandez again denied both present and previous suicidal behavior and mental illness. (SAMF 50) Mr. Hernandez falsely reported that he did not have any mental health problems and that he had never attempted suicide. (SAMF 50; *see* SAMF 23-33, 37, 41-45) In the nursing assessment, Mr. Hernandez was described as having intermittent eye contact, having disorganized thoughts, responding to internal stimuli, being internally pre-occupied, smiling to himself, and mumbling to himself.[14] (SAMF 50) Rather than

---

[13]  VCSD Defendants have highlighted the first and third forms, dated October 30, 2008 and November 3, 2008 respectively, as evidence that the custody staff had no idea that Mr. Hernandez was suicidal on February 16, 2009. VCSD Mot. at 5:24-7:4. At the same time, Defendants have asserted, during discovery, that Mr. Hernandez's extensive history of suicidal ideation and safety cell placements prior to October 30, 2008, which were listed in the jail's computerized records and accessible by all custody staff (SAMF 14), were irrelevant to his risk of suicide on February 16, 2009. This view is untenable factually and legally. If anything, the intake forms from the October 30th-November 3rd period, which were proven false by the jail's own records, demonstrate that the jail should have known not to rely on Mr. Hernandez's own statements regarding his lack of suicidality. Regardless, the forms in no way prove that Defendants were unaware of Mr. Hernandez's risk of suicide.

[14]  The expert declaration of Dr. Paster presented by the CFMG Defendants, in addition to glossing over the details of the psychiatrically significant events in 2007 and 2008, described *supra* at pp. 6:5 - 7:18 and 8:24 - 10:10, selectively reports the information on this nursing assessment form. Instead of noting the handwritten information on the form (described above in text), Dr. Paster chose to emphasize that Mr. Hernandez "was alert and oriented and did not appear tearful, depressed, or to have a flat affect. He denied hallucinations or delusions. He did not come across as angry or hostile and was labile." Paster Decl. ¶ 26. Reading Dr. Paster's summary without looking at the form would give the false impression that no unusual or psychiatrically significant behavior was

proving that Mr. Hernandez had no suicidal tendencies or mental illness, these forms confirmed the opinion of the PSH mental health professionals that Mr. Hernandez was an extremely poor historian and had a "severe lack of insight" into his own mental health needs. (*See* SAMF 46). This same conclusion was obvious to CFMG and VCSD staff because they were aware of his extensive history of placement on safety precautions, acknowledged mental health problems, and bizarre behavior.

One week after Mr. Hernandez's return to the VCPTDF, on November 6, 2008, the VCPTDF was served with an order from the criminal court which ordered the Ventura County Sheriff to maintain Mr. Hernandez on medication as recommended by PSH. (SAMF 52) This order was received by the VCPTDF, but there is no evidence that the order was forwarded by custody staff to CFMG. (SAMF 52) Although the representative for the county claimed in his deposition that there was a purported procedure in place for delivering such orders to CFMG, deponents for both CFMG and VCSD agreed that the order was not delivered to CFMG. Moreover, the county's current assertion that such court orders were given to CFMG is directly contradicted by Defendant Dr. Jung's testimony that he had "[n]ever seen documents like [the Hernandez court order] before." As the only psychiatrist at the jail, he would be the only person who would need to be shown court orders such as the one in this case. (SAMF 53). Regardless, even if it had been delivered, deponents for both CFMG and VCSD testified that the order was meaningless and would be disregarded. (SAMF 52) Neither custody nor CFMG staff considered the violation of a court order regarding the medical treatment of a detainee cause for concern. (SAMF 52) Indeed, the VCSD Defendants have gone so far as to call the court order "superfluous and redundant."(SAMF 52)

In any event, the record is clear that Defendant Dr. Jung never received the court order to maintain Mr. Hernandez on the Zyprexa medication prescribed by PSH,

---

observed during the nursing assessment, an impression that is refuted by the records.

1   and, as a result, was not aware of his legal obligation with respect to Mr. Hernandez's

2   treatment. (SAMF 52)

3          **i.**     **Contact with CFMG Psychiatric Staff**

4      Mr. Hernandez was seen by Defendant Jung on November 3, 2008. (SAMF 54)

5   Aside from the basic awareness that PSH prescribed Zyprexa, there is no evidence that

6   Defendant Jung reviewed Mr. Hernandez's medical records or sought information

7   from PSH regarding their diagnosis and treatment of Mr. Hernandez.  (SAMF 54) Dr.

8   Jung testified that he probably did look up Mr. Hernandez's charges, however,

9   because, according to him, "usually looking at the charges you can have a lot of

10   understanding about the person." (SAMF 54)

11      Nevertheless, as of November 3, 2008, Defendant Jung was personally aware of

12   Mr. Hernandez's extensive history of psychotic behavior at VCJ; he knew that Mr.

13   Hernandez had expressed suicidal ideation in the past and had reported attempting

14   suicide in the past; he had diagnosed Mr. Hernandez as having a mood disorder; he

15   had made statements to the conservatorship evaluator in July 2008 that he did not

16   think that Mr. Hernandez's behavior was "an act" and that "something [was] wrong

17   [with him];" he was personally aware that Mr. Hernandez was deemed incompetent to

18   stand trial and spent two months at Patton State Hospital for restoration of

19   competency; he reviewed documents showing that PSH diagnosed Mr. Hernandez as

20   having a psychotic disorder (a more serious condition than a mood disorder); and he

21   knew that PSH had maintained Mr. Hernandez on anti-psychotic medication and

22   recommended that the medication be continued. (SAMF 55)

23      Despite all of this information, Defendant Jung decided, based on Mr.

24   Hernandez's comments on November 3, 2008, that Mr. Hernandez was "transparently

25   manipulative." (SAMF 56) Defendant Jung disagreed with the diagnosis made by PSH

26   and relied instead on his own judgment that Mr. Hernandez had an anti-social

27   personality disorder based upon his charges, (robbery and possession of a deadly

28   weapon), and a nonspecific mood disorder. (SAMF 56) Aside from continuing Mr.

Hernandez's Zyprexa prescription, Defendant Jung did not order any further treatment or monitoring. November 3, 2008 was the last time that Mr. Hernandez was seen by a member of CFMG's psychiatric staff. (SAMF 57)

On November 14, 2008, after approximately 10 days of compliance with medication, Mr. Hernandez began to refuse his medication. (SAMF 58) On November 18, 2008, Defendant Jung discontinued Mr. Hernandez's Zyprexa prescription based on Mr. Hernandez's refusal to take the medication. (SAMF 58) Defendant Jung did not observe or consult with Mr. Hernandez or review Mr. Hernandez's medical records in connection with his decision to discontinue the Zyprexa prescription. (SAMF 58) Defendant Jung did not schedule any follow-up appointment with Mr. Hernandez with either himself or any another CFMG staff member. (SAMF 59) Defendant Jung did not craft a new treatment plan in light of the discontinuation of medication and did not schedule any follow-up treatment or monitoring. (SAMF 59) As of November 18, 2008, there was no individualized treatment plan for Mr. Hernandez, a patient with a significant history of mental illness. (SAMF 59) This was a serious violation of CFMG policy, California regulations, and the national standard of care for the provision of mental health services in custodial settings. (SAMF 59)

Furthermore, no action was taken by CFMG staff (or custody staff) to notify the Court, Patton State Hospital, or anyone else when Mr. Hernandez's prescription for psychotropic medication was discontinued, threatening his competency. (SAMF 60) No one, including Defendant Dr. Jung, notified custody staff that Mr. Hernandez would need greater supervision and/or a change in his housing classification. (SAMF 60) As of November 18, 2008, the only approach to Mr. Hernandez's untreated serious mental illness was to continue his highly-restrictive, isolating housing. (SAMF 60)

### ii.   Contacts with VCSD and CFMG Medical Staff

Following his seventy-two hour intake period, Mr. Hernandez was again housed in Ad Seg. (SAMF 62, 63) Both guards and inmates refer to the Ad Seg Unit as "The

Dungeon" because it is darker than many of the other units in the jail.  Ad Seg inmates are generally locked down 23 hours a day.  (SAMF 63) Despite this extremely restrictive regimen, Ad Seg inmates are also subject to "disciplinary isolation" if they receive a "Major" write-up for disobeying jail rules. (SAMF 64)

Without medication, Mr. Hernandez began to decompensate, as evidenced by a series of incidents documented in "Jail Incident Reports," descriptions of his bizarre behavior by fellow inmates, and, quite possibly, videotape of the Ad Seg unit that was later destroyed.[15]  (SAMF 65) These incidents often resulted in discipline, most notably, "disciplinary isolation." (SAMF 65)

"Disciplinary isolation," as it was imposed on Daniel Hernandez at various points during the period October 30, 2008 through February 16, 2009, meant that Daniel Hernandez was not allowed to use the "dayroom," the "rec yard" [on the roof], nor was he allowed to receive visits from family and friends.  He was also not allowed "commissary." (SAMF 66) Thus, during this period of time, disciplinary isolation at the VCPTDF meant lockdown virtually 24 hours a day, with no visits, no commissary and a piece of paper over the cell window, so that he could not look out, and the jail staff could not look into the cell unless they lifted the piece of paper. (SAMF 67)  The purpose of placing the piece of paper over the cell window was to remove the benefit of allowing the inmate to see out of that window.  In other words, it was for punishment.[16] (SAMF 68)

The VCPTDF disciplinary isolation logs indicate that Mr. Hernandez was on disciplinary isolation for three distinct periods after he returned from Patton:

---

[15] In this regard, Plaintiffs' Motion for Spoliation Sanctions (Dkt. No. 68) is relevant to the existence of disputed issues of material fact. Plaintiffs assert that the video would have corroborated the documentary and testimonial evidence of Mr. Hernandez's decompensation.

[16] VCSD Defendants, through counsel, have taken great pains to assert that administrative segregation and "disciplinary isolation" were not "isolating" in nature, contrary to common sense and the title of the discipline itself. Weisberg Decl. ¶ 9 & Ex. E. This absurd position further reflects the deliberate indifference that the VCSD Defendants showed to the likely impact of Mr. Hernandez's housing on his mental health condition and risk of suicide.

December 19 – 23, 2008; January 6 - 12, 2009; and February 13, 2009 until the date of his death, February 16, 2009.(SAMF 69) At the time of Mr. Hernandez's death and from his perspective, last period of disciplinary isolation was scheduled to continue for another month until March 16, 2009. (SAMF 69) Even when he was not on disciplinary isolation, the Daily Activity Log for Mr. Hernandez indicates that he was not given an opportunity to leave his cell for dayroom or rec yard time on an additional 21 days between October 30, 2008 and February 16, 2009 (not including days in which the Log reflects that he refused dayroom or rec yard time). (SAMF 70)

Jeremy Jackson, the pretrial detainee housed in the cell next to Mr. Hernandez, has described behavior by Mr. Hernandez that indicates that he was in significant mental distress. (SAMF 71)  Mr. Jackson said that Mr. Hernandez would moan for hours in his cell.  At other times he would scream and kick something in his cell. (SAMF 71) Mr. Jackson said that a little bit before Mr. Hernandez committed suicide, he recalled hearing a real loud, deep thud and sounds like Mr. Hernandez was kicking the wall, the floor, and the roof. (SAMF 71) Mr. Jackson said it echoed through the whole dungeon and that guards from downstairs in booking would come up and yell at him and tell him that they could hear it all the way down there. (SAMF 71)

When Mr. Jackson learned that Mr. Hernandez had committed suicide, Mr. Jackson assumed that he had hung himself on the sprinkler with the towel that he tore in the dayroom.  Mr. Jackson thought back to some of loud noises that he heard and figured that must have been Mr. Hernandez kicking the sprinkler on the roof of the cell to loosen it (so that he could tie something to it). (SAMF 72) One of the things Mr. Jackson remembered Mr. Hernandez yelling was "get away from me, Satan." (SAMF 73) According to Mr. Jackson, Mr. Hernandez got worse over time.  He talked to himself and refused meals all the time. (SAMF 74)

Inmate Rudy Negrete, who occupied the cell on the other side of Jeremy Jackson's cell from Mr. Hernandez, recalled several conversations with Mr. Hernandez on the roof a couple of months before his suicide in which Mr. Hernandez

stated that he did not want to be around anymore. (SAMF 75) Mr. Negrete took this to mean that Mr. Hernandez was depressed and did not want to live anymore.  In one conversation, Mr. Hernandez explicitly said "I'd rather kill myself." (SAMF 75) Mr. Negrete reported this statement to a civilian named "George," who routinely came to the VCPDC to engage in Bible Study with the inmates. (SAMF 76)

Mr. Negrete also heard loud noises emanating from Mr. Hernandez's cell during the last week of his life basically all day and most of the night. (SAMF 77) He was barking (like a dog) and screaming for Satan to get out of his cell.  Mr. Hernandez would scream AAAAHHHHHHHH! And Mr. Negrete could hear him talking to himself.  (SAMF 77)   He would sometimes stop for 20 or 30 minutes at a time and then resume. (SAMF 77) Mr. Negrete testified that it "was known" that Mr. Hernandez had problems. Further, Mr. Negrete remembered one time when a deputy exclaimed, about Hernandez, "Man, that guy's really out of it over there. Is he like that all day long?"(SAMF 78)

Both Mr. Negrete and Mr. Jackson stated that Mr. Hernandez was so loud that the guards could easily hear him screaming and banging against his cell. Mr. Jackson testified that Mr. Hernandez was so loud that guards from other floors would respond to him. (SAMF 79)

After Mr. Hernandez's return from Patton and his initial visits with Dr. Jung, documentary evidence of Mr. Hernandez's bizarre behavior begins on November 18, 2008 when he refused his breakfast and lunch. (SAMF 80) Although he informed a deputy that he was not on a hunger strike, nursing staff was advised of his meal refusals. (SAMF 80) He again refused meals during December 3, 2008, and indicated at that time he was on a hunger strike due to grievances he needed to make related to not being allowed to receive mail, contact his family on the phone, and not being able to talk to his lawyer.  (SAMF 81) This hunger strike continued at least through December 7, 2008. (SAMF 81)

On or around December 11, 2008, Mr. Hernandez submitted a grievance

requesting that his classification (and housing) be changed. (SAMF 18) Although the copy of the grievance produced by VCSD Defendants is very difficult to read, it is possible to make out the following fragments: "I would like my green [band?] changed to orange . . . rehoused with the . . . I may leave ad seg." (SAMF 18) At the time, Mr. Hernandez had a green armband denoting that he was housed in Ad Seg. (SAMF 16, 18) Orange bands were used for protective custody detainees. (SAMF 18) Mr. Hernandez's request was denied by custody staff because "although the incident you are referring to occurred over a year ago, it resulted in injuries to yourself." (SAMF 18)

On December 14th, Mr. Hernandez was found in his cell with "the right side of the entire wall" covered in pencil graffiti. (SAMF 82) He received both loss of privileges, (which includes no visits or commissary), as well as 5 days of disciplinary isolation from December 19 - 23, 2008. (SAMF 82) Mr. Hernandez again refused all meals during December 18, 19, and 20, 2008. (SAMF 83) On January 2, 2009, he was charged with theft for removing a handball from the roof of the jail during recreation and received loss of privileges, as well as 7 days of disciplinary isolation from January 6- 12, 2009. (SAMF 84) Mr. Hernandez again refused a meal on January 16, 2009. (SAMF 85)

On January 17, 2009, Mr. Hernandez attempted to bite a nurse while being examined. (SAMF 86) After being observed unresponsive, CFMG Nurse Alcaraz noted: "Inmate lying on stomach, Ammonia inh[alant] popped, placed under inmate's nose; inmate holds breath and tries to bite me." (SAMF 86) On January 24, 26, 30, and 31, 2009, Mr. Hernandez continued to refuse meals. (SAMF 87)

For many of the meal refusals, the custody staff referred Mr. Hernandez to Defendant Maria Baez, a nurse employed by CFMG during the relevant period of this lawsuit. (SAMF 88) Defendant Nurse Baez knew that Mr. Hernandez was a psychiatric patient and was housed in Ad Seg. (SAMF 89) Defendant Nurse Baez interacted with Mr. Hernandez in July of 2008, during the period when he was

determined to be incompetent and acutely mentally ill, and witnessed his refusal of psychotropic medication. (SAMF 90) Further, Nurse Baez had prior experience with patients who stopped eating because they were depressed and wanted to die. (SAMF 91) Those patients were referred to a psychiatric doctor who talked to them or placed them on medications, which helped. (SAMF 91)

Despite this experience, and although the CFMG policy required Ms. Baez to refer Mr. Hernandez to the mental health staff based on his meal refusals, she never referred him to the CFMG psychiatric staff or discussed him with the CFMG psychiatric staff. (SAMF 92) There was even a notation on the hunger strike monitoring log to remind CFMG staff to "notify [the doctor] if [inmate] currently being treated" and to "line psych services at start of strike." (SAMF 92) Nevertheless, Defendant Nurse Baez took no action. (SAMF 93)

Ms. Baez acknowledged that someone who is mentally ill is more likely to commit suicide. (SAMF 94) She was aware of the link between meal refusals and depression. (SAMF 91) Defendant Nurse Baez was also aware of the incident on January 17, 2009 during which Mr. Hernandez exhibited bizarre behavior and attempted to bite another nurse. (SAMF 86, 95) Although Ms. Baez saw Mr. Hernandez after the January 17th incident for another meal refusal on January 31, 2009, she still did not refer him to the CFMG psychiatric staff. (SAMF 95)

### iii.      The Week Prior to Mr. Hernandez's Suicide

In the week before his death, Mr. Hernandez's bizarre and self-destructive behavior escalated, resulting in two incidents with guards, a self-inflicted injury to his hands, discovery of torn linens, and placement on level II safety precautions. (SAMF 96) Nevertheless, Mr. Hernandez was not referred for treatment of his mental illness. (SAMF 96)

On February 11, 2009, Mr. Hernandez was observed by Deputy Eisenhard jumping from the table to the floor in his cell. (SAMF 97) When instructed to stop, Mr. Hernandez became verbally abusive, "took a fighting stance," challenged the

deputy to come in and "do something about it," and then repeatedly punched the glass window in his cell with both of his hands. (SAMF 97) Photos taken after Mr. Hernandez's death show partially-healed, but significant wounds on Mr. Hernandez's knuckles consistent with the behavior described on February 11, 2009. (SAMF 97)

The following day, on February 12, 2009, Mr. Hernandez was being shackled and belly-chained in preparation for a visit. (SAMF 98) Deputy Koenig testified that after Mr. Hernandez was handcuffed and taken into the hallway, he said, "You know what they say about the bulldog," and then took a step towards Eisenhard. (SAMF 98) Eisenhard reported that Mr. Hernandez turned towards him and asked "What did you say about the bull dogs the other day?" (SAMF 98) Shortly thereafter, Mr. Hernandez began to walk toward Eisenhard and, "fearing that inmate Hernandez would attempt to headbutt me," I grabbed him. . . and turned him towards the wall." Mr. Hernandez was then taken to the ground by Deputies Koenig and Eisenhard. (SAMF 99)

Lydia Alaniz, Mr. Hernandez's aunt, apparently witnessed the aftermath of the incident.  She was trying to visit Mr. Hernandez on or about February 12, 2009. (SAMF 100) At that time, he appeared pale, thin, disheveled, and unhealthy. (SAMF 101) Mr. Hernandez looked ghostly and did not appear to recognize Ms. Alaniz through the window to the area where she was waiting. (SAMF 102) While Ms. Alaniz was watching, the deputies escorting Mr. Hernandez dragged him to the elevator and took him away. (SAMF 102) Although she inquired about the situation, she was merely told that the visit was cancelled. (SAMF 103) Ms. Alaniz attempted to visit again on February 14, 2009, but was turned away; she was not given any information about Mr. Hernandez's condition or situation. (SAMF 104)

Ad Seg inmate Rudy Negrete apparently witnessed the incident as well. (SAMF 105) He was inside the dayroom, (across the hall from Mr. Hernandez's cell), a few days before his suicide, when he heard [deputies] call Hernandez to go out for a visit. (SAMF 105) After Mr. Hernandez was handcuffed, he was pulled out to the main hallway facing the wall, where "they would shackle you and belly chain you."

(SAMF 106)  Mr. Negrete testified that, "During that time, [Eisenhard], I believe was his name, I can't recall the other ones, they must have told Hernandez something and I guess he reacted to it. (SAMF 107) And he did a sudden move, like turned towards them (indicating), and the next thing you know he gets slammed on the floor and they're on top of him." (SAMF 107) After additional guards arrived, "They took him downstairs.  I believe it was to Booking and Release, where they would take you for a time-out, what they called a time-out, which they would leave you sometimes there for hours in a single cell." (SAMF 108)

According to Sergeant Davidson, Mr. Hernandez was transferred to an "alternative environment relocation" cell due to his behavior. (SAMF 109) The "alternative environment cell is in a low-traffic area of the jail facility, allowing an inmate a quiet, stimulus-free location where he could calm down and collect his thoughts. (SAMF 109) While in this cell, inmates are checked every 30 minutes by custody staff in order to ensure their well-being." (SAMF 109)

According to the Inmate Monitoring Log, Mr. Hernandez was transferred to this alternative environment cell on February 12, 2009, at 4:00 p.m., and placed on "Safety Precaution Level II," requiring observation at 30-minute intervals. (SAMF 110) Mr. Hernandez remained on this safety precaution level status for approximately 4 hours and was removed from the cell at approximately 7:57 p.m. and returned to his administrative segregation cell. (SAMF 111) Mr. Hernandez was not assessed nor referred for assessment by mental health staff. (SAMF 112) It further appears that the VCPTDF decision to remove Mr. Hernandez from this safety status level was made without consultation with CFMG mental health staff. The failure to notify medical staff was "clearly below the standard of care" for the administration of safety precautions. (SAMF 112) On February 13, 2009, Mr. Hernandez was informed that he would be on "disciplinary isolation" from February 13, 2009 through March 16, 2009 and that he would not be allowed visits or commissary from February 13, 2009 through April 4, 2009. (SAMF 113)

A few days before his suicide, both inmates Negrete and Jackson recalled an incident in which Deputy Anderson found a torn towel in the dayroom.  (SAMF 114) Mr. Hernandez was apparently the last inmate in the dayroom before the towel was discovered. (SAMF 115) Mr. Hernandez's immediate neighbor, Jeremy Jackson recalls that Deputy Anderson questioned Mr. Hernandez about the towel and asked whether it was his towel and further ordered Mr. Hernandez, "Show me your towel." (SAMF 115) Mr. Jackson did not hear Hernandez's reply but heard Anderson say "Well, obviously, this is yours.  You don't have a towel and this towel is tor[n] in the dayroom and it was in the trash. . . Where's the rest of it?"  (SAMF 115) Jackson did not hear Mr. Hernandez's response.  Rudy Negrete testified that both he and Jeremy Jackson had to show Deputy Anderson their towels before he then asked Mr. Hernandez to see his towel. (SAMF 116) Mr. Hernandez did not have a towel to show, according to Negrete, because Mr. Hernandez was the last one to be in that dayroom, and the torn towel was his. (SAMF 116)

In addition, the records produced by Defendant VCSD reflect that Mr. Hernandez was given a "major clothing exchange" (which would include sheets and towels) on February 14, 2009, which tends to corroborate the incident described by Mr. Jackson and Mr. Negrete. (SAMF 117) The records further reflect that there was a cell inspection performed in Mr. Hernandez's housing unit on February 15, 2009. (SAMF 117) Fellow Ad Seg inmates Rudy Negrete and Jeremy Jackson both testified that their cells and the cells of several other inmates were searched, but Daniel Hernandez's cell was not searched. (SAMF 118)

The following day, on February 16, 2009, both Jeremy Jackson and Rudy Negrete heard Mr. Hernandez singing a song by the Red Hot Chili Peppers called "Under the Bridge."  (SAMF 119) He was singing it loud enough for the whole Seg [Ad Seg] to hear.  (SAMF 120) The lyrics included: "Take me to the place I love, Take me all the way. I don't ever want to feel like I did that day," and he would repeat it over and over and keep singing it. (SAMF 121)

### vi.     Suicide on February 16, 2009

In the afternoon of February 16, 2009, while Mr. Hernandez was on disciplinary isolation, with a piece of paper covering his cell door window so deputies walking by could not see in, Mr. Hernandez committed suicide. He was discovered at approximately 4:39 p.m. by Deputy Valdez. (SAMF 122) The medical examiner performed an autopsy and determined the cause of death to be asphyxia by hanging, the manner of death to be suicide, and the "contributing" circumstance to be "major psychotic disorder." (SAMF 122)

Although jail policy required inmates housed in administrative segregation to be observed at 60-minute intervals, Mr. Hernandez's cell scan log[17] shows that approximately 90 minutes elapsed between Deputy Valdez's penultimate cell check and his discovery of Mr. Hernandez's suicide. (SAMF 123-24) Furthermore, there is evidence in the record which suggests that Deputy Valdez's 90 minute check was deficient such that Mr. Hernandez was not observed during a period of at least two and a half hours. (SAMF 125)

Inmate Negrete testified that he had been on disciplinary isolation in Ad Seg several times, and he recalled that some guards would routinely lift the paper covering the window to look in during cell checks, while other guards would not. (SAMF 125) Negrete identified Valdez as one those individuals that wouldn't really lift the paper as he should. (SAMF 125) Furthermore, inmate Jeremy Jackson testified that he was in the dayroom across the hall from Mr. Hernandez's cell on February 16, 2009, from 3-4 p.m. (SAMF 127) He actually watched Deputy Valdez perform the cell scan and specifically recalls that Deputy Valdez did not lift up the paper and look into Mr.

---

[17] Cell checks are recorded electronically by the custody staff. As deputies walk through a housing unit, they touch a baton to a electronic square on each cell door, establishing the time they were at that cell doing the check. If an inmate is on disciplinary isolation, with a piece of paper covering the cell window, the guard is supposed to lift the paper to observe the inmate and ensure his safety. The electronic system, of course, does not verify that the deputies actually lift up the paper and look in the cells. (SAMF 123)

Hernandez's cell. (SAMF 127) This cell scan occurred at 3:01 p.m. (SAMF 127)
Therefore, according to this evidence, Mr. Hernandez was not personally observed by
Deputy Valdez from, at least, 2:05 p.m. to the time of his death two and a half hours
later. (SAMF 128) Given the evidence of Deputy Valdez's practice of not lifting the
paper during cell checks, it is possible that Mr. Hernandez was not observed for many
hours prior to his suicide. (SAMF 128-29) This period of uninterrupted seclusion gave
Mr. Hernandez the opportunity to commit suicide.

Mr. Hernandez used strips of bedsheets to fashion a noose, which he attached to
the ventilation grate above the toilet in his cell. (SAMF 131) Although VCSD
Defendants have made much out of Mr. Hernandez's purported creativity, jail records
show that a similar suicide attempt was made in November 2008 in the segregated
housing unit. (SAMF 131) Furthermore, contrary to the vague assertion in Sgt.
Davidson's declaration that the jail instituted "construction design precautionary
measures which limit" anchors for ligatures, the holes of the vent in Mr. Hernandez's
cell were larger than acceptable national standards for suicide prevention. (SAMF
131)

**B.** **VCSD and CFMG Policies and Practices Pertaining to Mentally Ill
Detainees and Detainees with Risk of Suicide**

During the relevant period of this lawsuit, January 2007 through February 16,
2009, jail operations proceeded according to the following policies and practices.
Although long, this is not an exhaustive list of the policies and practices that are
alleged in this case to have been deficient. These are merely the primary examples for
purposes of Defendants' motions for summary judgment.  As noted *infra* at p. 11-28,
the County is legally liable under § 1983 for both VCSD and CFMG policies.

- Aside from notifying the jail if a detainee should be classified as a
psychiatric inmate, CFMG staff had no involvement in decisions regarding
an inmate's classification or regular housing location. CFMG psychiatric
staff were not asked and did not advise custody staff regarding whether a
housing placement, such as administrative segregation, was contra-indicated
for a mental health patient due to his mental illness. The custody staff made,
not the CFMG staff, the decision as to whether an inmate was a primary or

secondary psychiatric classification which affected the treatment provided to the detainee. (SAMF 132)

- CFMG staff were not involved in decisions regarding the imposition of discipline on detainees with mental health conditions. Prior to the imposition of discipline, CFMG staff were not asked and did not advise custody staff regarding (a) whether a detainee's actions giving rise to discipline were related to his mental health condition or (b) whether discipline, or any particular form of discipline, would be contra-indicated for a mental health patient due to his mental illness. (SAMF 133)

- CFMG staff were not required to and did not regularly check on the physical or mental welfare of inmates housed in administrative segregation. VCSD did not require such checks. After Mr. Hernandez's death, CFMG changed this policy/practice so that CFMG staff now check on administrative segregation inmates three times per week. (SAMF 134)

- CFMG staff were not required to and did not regularly check on the physical or mental welfare of inmates with mental health conditions, unless those inmates were taking prescription medications, had been given a primary psychiatric classification by the jail, or diagnosed with schizophrenia. VCSD did not require such checks. At some point, CFMG changed this policy/practice so that CFMG staff now checks on detainees who are classified as psychiatric inmates by the jail. (SAMF 135)

- CFMG staff were not required to and had a standard practice of not following-up on detainees after the discontinuation of psychotropic medication. (SAMF 136)

- VCSD had no policy addressing the handling of court orders relating to the mental health treatment of detainees, either with regard to delivery to CFMG or with regard to reporting violations of the order to the court. (SAMF 137)

- Although CFMG produced a written policy regarding evaluation of inmates on disciplinary isolation, CFMG staff did not, in fact, check on the physical or mental welfare of detainees on disciplinary isolation in administrative segregation, in part because they were not informed by custody staff when an inmate was placed on disciplinary isolation in administrative segregation. Accordingly, VCSD/CFMG practice was that inmates on disciplinary isolation in administrative segregation were not monitored by CFMG staff. (SAMF 138)

- CFMG staff did not share any information with custody staff regarding a pretrial detainee's mental health condition, diagnosis, treatment, or medication and did not advise custody staff regarding proper monitoring of a pretrial detainee based on his mental health condition. This policy/practice was defended by both CFMG and VCSD Defendants during discovery on the basis of the pretrial detainee's privacy rights with regard to medical information; however, there was no alternative policy/practice which addressed the problem of mentally ill detainees being monitored exclusively by custody staff who were entirely ignorant of the detainees' mental health condition and needs. (SAMF 139)

- CFMG had an official practice of not creating individualized treatment plans for detainees with mental health conditions, in violation of written CFMG

27

policy, California regulations, and national standards for the provision of mental health services in custodial settings. (SAMF 140)

- CFMG staff were not trained regarding jail disciplinary procedures such that they were unfamiliar with the types of discipline were imposed on inmates with mental health conditions, and therefore could not evaluate whether such discipline was deleterious to the mental health of those inmates. CFMG staff were also not trained regarding other essential jail policies and information that prevented them from providing effective monitoring and treatment to mentally ill detainees. (SAMF 141)

- Suicide prevention training provided to VCSD and CFMG personnel "was grossly inadequate and well below the standard of care." (SAMF 142)

- Both VCSD and CFMG suicide prevention policies and procedures were grossly inadequate and below the standard of care for suicide prevention and other related areas because they failed to establish adequate procedures for screening and monitoring. (SAMF 143)

- VCSD had an official policy whereby safety precautions initiated by custody staff would not require a referral to CFMG psychiatric staff and could be terminated without consultation by CFMG psychiatric staff. This policy was clearly below the standard of care. (SAMF 144)

- VCSD's written cell scan policy required only 60 minute checks in Administrative Segregation (and the more extreme disciplinary isolation). Title 15 and national correctional standards for suicide prevention require 30-minute checks. Furthermore, the County had an official policy of not performing 60 minute checks but rather permitting checks to vary between 20 minutes and 100 minutes. Thus, the ninety minute lapse between Deputy Valdez's cell checks immediately prior to Mr. Hernandez's suicide was done pursuant to policy. (SAMF 145)

- The holes in the ventilation grate in Mr. Hernandez's cell did not comply with industry standards, including California Corrections Standards Authority's Minimum Standards for Local Detention Facilities-Title 24, Section 13-102(c)(6). (SAMF 146)

Several of these policies and practices individually, and certainly the combination of these policies and practices, resulted in Mr. Hernandez receiving absolutely no treatment for his serious mental health condition in the approximately three months prior to his suicide and grossly insufficient monitoring. These policies and practices contributed to Mr. Hernandez's death. Hayes Decl. ¶¶ 19-23, 37; Metzner Decl. ¶¶ 46-48.

### III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is granted only if "there is no genuine dispute as to any material fact [such that] the movant is entitled to

28

judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when reviewing a grant of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment." *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1129 (C.D. Cal. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). For summary judgment, neither party may rely on conclusory statements in a declaration or affidavit. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990) ("The object of [Rule 56's affidavit requirement] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Rather, the moving party must establish, through competent evidence, that there is no disputed issue of material fact, justifying judgment as a matter of law.

"Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim." *Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (citation omitted); *see also Soto v. City of Sacramento*, 567 F. Supp. 662, 668 (E.D. Cal. 1983) ("[R]elevant issues relating to the mental state of a person, since always a matter of inferences, are peculiarly decisions for the jury and are rarely, if ever, susceptible to resolution on summary judgment."); *accord Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2009), *vacated on other grounds* 658. F.3d 897 (2011). If the

nonmoving plaintiff presents evidence regarding the culpable mental state of a defendant, that defendant "cannot succeed on summary judgment based simply on his own assertions of his mental state." *Wereb v. Maui County*, 727 F. Supp. 2d 898, 916 (D. Haw. 2010).

# V.  ARGUMENT

**A.  Because VCSD and CFMG Defendants Have Not Carried Their Burden as the Moving Parties Both Motions Should Be Denied Without Reaching the Merits**

**1.  Defendants' Failure to Cite Competent Evidence In Support of Their Motions for Summary Judgment Justifies Denial of the Motions**

For the reasons stated in the Objections to Evidence filed herewith, the VCSD and CFMG Defendants' Separate Statements of Undisputed Facts, which rely entirely on the Declarations of Sgt. Davidson and Dr. Paster, respectively, fail to comply with the requirements of Federal Rule of Civil Procedure 56(e). *See* Sanders v. Douglas, 565 F. Supp. 78, 80 (9th Cir. 1983) (For purposes of summary judgment "[a]n affidavit containing ultimate facts or conclusions of law" must be disregarded under Rule 56(e); such legal conclusions "are totally ineffectual, and are not to be given any consideration or weight whatsoever."); *see also Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

A defendant's filing of a bare-bones motion for summary judgment, supported by a conclusory non-percipient declaration and little or no record evidence does not satisfy the Rule 56 standard. Moreover, allowing such a practice would cause undue hardship to non-moving parties who would be required, regardless of the thinness of the moving papers, to give defendants a roadmap to the evidence and theories to be used at trial. The Court is only required to consider the materials cited by the parties in ruling on Defendants' motions. Fed. R. Civ. P. 56(c)(3).

Because Defendants' self-serving, non-percipient declarations, which

whitewash and fail to cite the record evidence in this case, do not provide a basis for granting summary judgment, the court should issue an order denying Defendants' motions in their entirety under Federal Rule of Civil Procedure 56(e)(4).

> **2.     Although Both Motions Purport to Address All Claims Against All Respective VCSD and CFMG Defendants, Both Motions Fail to Argue Against Liability as to Particular Claims and Particular Defendants.**

The VCSD Defendants' motion focuses almost exclusively on the lack of deliberate indifference *to the risk of suicide* and, even in addressing Plaintiffs' other claims under the ADA, California Unruh Act, and common-law negligence, focuses on the absence of deliberate indifference.[18] *See* VCSD Mot. at 10:22-11:7, 15:1-9, 16:2-13, 18:2-4, 18:21-19:1. The VCSD Defendants' motion does not address deliberate indifference *to Mr. Hernandez's serious mental health condition* which required treatment, a significant omission. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1460-61 (9th Cir. 1988). Similarly, the VCSD Defendants' motion does not address whether Mr. Hernandez's confinement to administrative segregation and disciplinary isolation, in light of his serious mental illness and competency issues, violated his substantive and procedural due process right to conditions of confinement that are reasonably related to the nature and purpose of his detention, not excessive in relation to the jail's stated justification, and not punitive. *See Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979); *Stevenson v. Carroll*, 495 F.3d 62, 67-69 (3d Cir. 2007); *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004); *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996); *Walker v. Shanksy*, 28 F.3d 666. 672-73 (7th Cir. 1994). The motion gives short shrift to Plaintiff's disability discrimination, negligence, and other statutory and common law claims. VCSD Mot. at 17:8-19:8.

Thus, the VCSD Defendants' motion altogether fails to address the gravamen of

---

[18]   VCSD Defendants' assertion that they are immune as to Plaintiffs' negligence claim under California Government Code § 844.6(a)(2), the only legal argument unrelated to deliberate indifference, is addressed *infra* at p. 48:5-15.

1  Plaintiffs' constitutional claims, and only cursorily addresses particular elements of

2  other claims. Even if the Court determines that the VCSD Defendants are entitled to

3  summary judgment on the question of deliberate indifference to suicide risk, which

4  Plaintiffs argue is not warranted in this case, the VCSD defendants have raised no

5  separate basis, aside from the asserted immunity to Plaintiff's negligence claim, for

6  granting their motion for summary judgment as to any VCSD Defendant or any other

7  constitutional claim against the VCSD Defendants.

8      Similarly, the CFMG Defendants' motion is entirely limited to the argument

9  that CFMG Defendants' treatment of Mr. Hernandez did not violate the standard of

10 care, pursuant to the opinion of their expert, Dr. David Paster, and therefore was

11 neither negligent nor deliberately indifferent. *See* CFMG Mot. at 8:20-27, 10:13-28.

12 The motion does not address the liability of Defendants Jung, Baez, Fithian,

13 Korzelius, and CFMG separately. *See id.* Likewise, the motion does not address

14 Plaintiffs' Third Claim for supervisory liability and Fifth Claim for Defendant Baez's

15 violation of California Government Code § 845.6. To the extent that the Court

16 determines that a genuine dispute of material fact exists as to whether or not the

17 CFMG Defendants' treatment of Mr. Hernandez violated the standard of care, there is

18 no other basis to grant CFMG Defendants' motion.

19     In this Opposition, Plaintiffs have undertaken to address the arguments that

20 Defendants raised in their motions, which, for the reasons set forth below, are

21 meritless. Plaintiffs have not addressed all of the many reasons why their claims are

22 legally and factually viable as to all elements of all claims against all Defendants.

23 Such issues are not raised in Defendants' motions, and Defendants are not entitled to

24 send up a test balloon and lie in wait to attack Plaintiffs' alternative claims in their

25 reply briefs.

26 **B.    Legal Standard Applicable to Plaintiffs' Constitutional Claims**

27     The essence of the VCSD Defendants' motion is that the *employees of the jail*,

28 were not, *on February 16, 2009*, deliberately indifferent to Mr. Hernandez's *risk of*

*suicide*. The essence of the CFMG Defendants' motion is that the Defendant medical providers abided by the standard of care and, therefore, were not deliberately indifferent, or even negligent. Both motions focus exclusively on the mental state of Defendants and do not attack any of the other elements underlying Plaintiffs' claims. Accordingly, this Opposition focuses on the facts—disputed or undisputed—which establish Defendants' deliberate indifference to Mr. Hernandez's serious mental health condition and risk of suicide.

Pretrial detainees have a right to constitutionally adequate medical care while in custody under the Due Process Clause of the Fourteenth Amendment. *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2009), *vacated on other grounds* 658. F.3d 897 (2011). "With regard to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.'" *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation omitted). The "duty to provide medical care encompasses detainees' psychiatric needs." *Id.*

At the outset, it bears noting that there is a disputed issue of fact as to whether Mr. Hernandez was incompetent to stand trial at the time of his death, meaning that the legal standard applicable in this case is disputed. The Ninth Circuit has distinguished between mentally ill pretrial detainees, whose due process claims are analyzed under the deliberate indifference standard, and pretrial detainees whose incompetency renders them unfit for trial. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243-1244 (9th Cir. 2010); *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004) ("[The Ninth Circuit] has held . . . that the Eighth Amendment's 'deliberate indifference' standard of culpability does not apply in the context of an incapacitated criminal defendant's Fourteenth Amendment challenge to conditions of confinement"). Because, "[i]ncapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment," the determination of whether

an incapacitated pretrial detainee's rights have been violated, depends on a balancing of the detainee's "liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state." *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003).

Without specifically addressing this standard, both sets of Defendants have been careful to assert, incorrectly, that Mr. Hernandez was committed to Patton State Hospital to *evaluate* his competency, rather than *restore* his competency. (VCSD SF 2-4; CFMG SF 5). The record shows that Mr. Hernandez's competency was evaluated in the summer of 2008 by Dr. Jimenez. Dr. Jimenez interviewed Mr. Hernandez as to his understanding of the nature of the criminal proceedings against him and the reason for his incarceration. Dr. Jimenez also reviewed Mr. Hernandez's mental health history. From those sources of information, and based on Mr. Hernandez's acute and ongoing mental illness which was observed by Dr. Jimenez and depicted in Mr. Hernandez's CFMG medical records, Dr. Jimenez determined that Mr. Hernandez was not competent to stand trial, was a danger to himself and others, and likely required medication to restore and maintain competency. Based on Dr. Jimenez's finding, the Superior Court found Mr. Hernandez incompetent and ordered that he be placed at Patton State Hospital for treatment and competency restoration. The court authorized the administration of involuntary psychotropic medication to treat Mr. Hernandez.

Mr. Hernandez received medication and treatment at Patton State Hospital that was appropriate for his mental illness and incompetency. After two months of treatment and medication, Patton State Hospital certified that he was, at that time, competent to stand trial. The certification noted that "a speedy trial is important for maintenance of trial competency," indicating that Mr. Hernandez's competency was not a permanent state but rather could lapse over time, which, according to Dr. Jimenez's evaluation and the PSH treatment plan, would be likely without treatment and medication. Pursuant to the certification by PSH, the Court ordered Mr. Hernandez to be returned to VCSD custody and ordered that he be "maintain[ed] . . .

1   on medication as recommended by Patton State Hospital."

2       The evidence presented by Plaintiffs reflects that Mr. Hernandez received *no*
3   *treatment or medication* for his serious mental health condition after November 18,
4   2008 and through his death on February 16, 2009. The evidence presented by
5   Plaintiffs further reflects that the housing of Mr. Hernandez in administrative
6   segregation and placing him disciplinary isolation was inappropriate for, and would
7   have negatively impacted, his mental health condition. Pursuant to established
8   practice, these housing and discipline decisions were made by the jail without input
9   from the CFMG staff. Finally, the evidence presented by Plaintiffs shows that Mr.
10  Hernandez was engaging in the same type of behavior that he displayed in the
11  Summer of 2008 when he was found to be incompetent to stand trial, in particular:
12  refusing meals, refusing treatment, engaging in aggressive and bizarre conduct,
13  yelling in his cell, and causing harm to himself.  Having proven himself, by virtue of
14  his incompetency, to be in need of a higher level of intervention and treatment, similar
15  to the kind provided by Patton State Hospital, Defendants cannot hide behind the
16  deliberate indifference standard by essentially arguing that he was cured as of October
17  30, 2008, and no longer needed treatment to maintain his competency.

18      Because Defendants had a constitutional and court-ordered duty to provide
19  treatment to Mr. Hernandez that would maintain his competency, and because
20  Defendants could have no legitimate interest in failing to provide *any* psychiatric
21  treatment, Plaintiffs need not even address the question of deliberate indifference.
22  Nevertheless, because the evidence presented by Plaintiffs and the reasonable
23  inferences drawn therefrom do establish a genuine issue as to Defendants' deliberate
24  indifference to Plaintiffs' serious mental health needs and risk of suicide, Plaintiffs do
25  not rely exclusively on the argument that a different standard applies.

26      Under the deliberate indifference standard, a defendant is liable where he
27  "fail[s] to respond to a prisoner's pain or possible medical [or psychiatric] need" or

28

35

other risk of harm to the prisoner.[19] *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc). Indifference to a serious medical need "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059 (quoting *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir.1988)). Indifference to a risk of suicide exists where a defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Although Defendants are correct to point out that the *Farmer* standard includes both an objective and a subjective requirement, they disregard the fact that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations omitted).

Importantly, the obviousness of the harm to be averted *does not depend* on the inmate asking for help or identifying the harm. *Farmer*, 511 U.S. at 848. In *Farmer*, the Supreme Court reversed the district court's summary judgment ruling because it "may have placed decisive weight on [plaintiff's] failure to notify [defendants] of a risk of harm." *Id.* Thus, even though the plaintiff did not express concern about his

---

[19] Defendants do not appear to dispute that Mr. Hernandez had a "serious medical need," which exists where "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). In any event, it is well recognized in the case law that Mr. Hernandez's mental illness qualifies as a serious medical need. *Wellman v. Faulkner*, 715 F. 2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.'. . .Maintenance on long term psychotropic medications enables patients to avoid the unnecessary suffering of acute episodes of mental illness. Without such care, repeated acute episodes can be predicted."); *Inmates v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *Finney v. Mabry*, 534 F. Supp. 1026, 1037 (E.D. Ark.1982)).

own safety, the guards may have had the requisite knowledge of substantial risk of serious harm (attack and rape) by virtue of the plaintiff's feminine appearance and demeanor (he was a transsexual), their knowledge of the prevalence of rape and violence in the facility, and their statements concerning the security risk posed by the plaintiff. Finally, as noted in the standard of review section, whether or not a substantial risk of serious harm exists and whether or not a defendant knew of that risk are both fact-bound questions that are, in many cases, inappropriate for resolution at the summary judgment stage. *See Conn*, 591 F.3d at 1098.

## C.     CFMG Defendants' Motion for Summary Judgment Should Be Denied

In essence, CFMG Defendants argue that the individual medical providers were not deliberately indifferent, or negligent, because their expert says so.[20] CFMG Mot. at 8:20-27, 10:13-22. Accordingly, and as admitted in the motion, all Plaintiffs have to do to defeat CFMG Defendants' motion is present "countervailing evidence from a competent expert [as to the] standard of care." CFMG Mot. at 10:25-27. Plaintiffs have submitted with this motion the declarations of Dr. Metzner, a medical expert specializing in the provision of mental health services in correctional facilities, and Mr. Hayes, an expert in suicide prevention in correctional facilities. These experts declare that the treatment of Mr. Hernandez, and more particularly, the failure to treat Mr. Hernandez, by CFMG medical providers *did violate the standard of care*, as well as various policies and regulations. *See* Metzner Decl. ¶¶ 45-48; Hayes Decl. ¶¶ 19, 21-22, 30. Since that is the only basis presented by CFMG Defendants for summary judgment, their motion should be denied.

Although not necessary due to the insufficiency of Defendants' Motion, which does not even address the four individual CFMG Defendants separately, *see* CFMG

---

[20] CFMG Defendants' expert's opinion that "there is no indication in the records that these care providers at any time were deliberately indifferent to a serious medical need of Mr. Hernandez," Paster Decl. ¶ 43, is conclusory, unsupported, and violates the fact-finding province of the jury. As such, it is not worthy of consideration by the Court. *See supra* at pp. 30:10 - 31:7.

1    Mot. at 8:20-27, 10:13-22, Plaintiffs note that there is ample evidence in the record
2    that CFMG Defendants Dr. Jung and Nurse Baez were deliberately indifferent to Mr.
3    Hernandez's serious mental health needs and risk of suicide.[21] Stated briefly,
4    Defendant Dr. Jung was well aware of Mr. Hernandez's psychotic diagnosis, suicidal
5    tendencies, and need for mental health treatment. Defendant Dr. Jung was personally
6    involved in multiple instances in which Mr. Hernandez was placed on safety
7    precautions for being a danger to himself. He was personally apprised of Mr.
8    Hernandez's prior suicidal statements and suicide attempt. On three separate occasions
9    in 2008, Defendant Dr. Jung authorized the administration of emergent involuntary
10   medication, an extreme measure which is only done when "immediately necessary for
11   the preservation of life or the prevention of serious bodily harm to the inmate or
12   others." Despite this knowledge, Defendant Dr. Jung discontinued all treatment when
13   Mr. Hernandez refused his psychotropic medication and permitted Mr. Hernandez to
14   be housed, untreated, in the most extreme isolation in the jail. After the
15   discontinuation of psychotropic medication, Dr. Jung *did nothing* to protect Mr.
16   Hernandez from the consequences of his untreated mental health condition and high
17   suicide risk factors. As of November 18, 2008, Mr. Hernandez had *no* treatment plan,
18   *no* medication, and *no* monitoring by persons familiar with his mental health needs.
19          Plaintiffs in this case have also presented evidence that, after November 18,
20   2008, Defendant Nurse Baez failed to take steps to provide needed mental health care
21   to Mr. Hernandez, despite her knowledge of the circumstances that made his meal
22   refusals a significant indicator of his mental state and possible depression. Further Ms.
23   Baez knew of Mr. Hernandez's psychiatric problems and was aware of his isolation in

24

25          [21] CFMG Defendants Korzelius and Fithian are sued in their supervisory capacity under 42
     U.S.C. § 1983 in Plaintiff's Third Claim for relief. *See, e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1207 (9th
26   Cir. 2011). CFMG Defendants do not address, much less challenge, this claim in their brief.
     Accordingly, Plaintiffs have not presented facts in this brief relating to supervisory liability against
27   these defendants. Plaintiffs also sued Defendant Korzelius in the First Claim for Relief. Based on
     discovery in this action, Plaintiffs no longer intend to pursue liability against Defendant Korzelius
28   under the First Claim for Relief.

administrative segregation and his bizarre conduct on January 17, 2009. She also was aware of his behavior in July of 2008, during the period when he was determined to be incompetent and acutely mentally ill, and witnessed his refusal of psychotropic medication. These facts were obvious and should have caused Defendant Nurse Baez to take the simple step of referring Mr. Hernandez to the CFMG psychiatric staff.[22] Moreover, Ms. Baez's failure to refer Mr. Hernandez to the CFMG psychiatric staff, which occurred on multiple occasions, is even more suspect because it violated explicit CFMG policy, which was written on the very log that she filled out for Mr. Hernandez when she monitored his meal refusals. This is ample evidence of deliberate indifference, particularly at the summary judgment stage.

Accordingly, as in other cases where defendants, particularly mental health professionals, know that an inmate needs mental health treatment and fail to take steps to provide such treatment, a jury could find that Defendants Dr. Jung and Nurse Baez were deliberately indifferent to Mr. Hernandez's serious mental illness. *See Clouthier*, 591 F.3d at 1245 (reversing summary judgment for mental health staff member because she knew of the decedent's "depressive, suicidal condition and need for mental health treatment" and did not take steps to prevent "the risk of harm that he faced if denied medical treatment."); *see also Hall v. Ryan*, 957 F.2d 402, 405-406 (7th Cir. 1992); *Ramirez v. Ferguson*, 2011 WL 1157997, at *18-21 (W.D. Ark. Mar. 29, 2011).

**D.    VCSD Defendants' Motion for Summary Judgment Should Be Denied**

### 1.    Constitutional Liability for Jail Suicides

The VCSD Defendants' motion appears to suggest that inmate suicides never,

---

[22] Nurse Baez is also sued in Plaintiffs' Fifth Claim for violating California Government Code § 845.6, which imposes liability where the employee "knows or has reason to know that [a] prisoner is in need of immediate medical care, and he fails to take reasonable action to summon such medical care." *Id.*; *see Jett v. Penner*, 439 F.3d 1091, 1098-99 (9th Cir. 2006). CFMG Defendants do not address, much less challenge, this claim in their brief. Accordingly, Plaintiffs have not presented legal arguments relating to Nurse Baez's liability under Government Code § 845.6.

or hardly ever, give rise to liability under 42 U.S.C. § 1983. VCSD Mot. at 10:22-
11:14 ("In each instance [of addressing pretrial detainee suicides] the Ninth Circuit
determined that the custodial defendants violated no constitutional rights in failing to
prevent the detainee's suicide. . . Sister circuit authority is replete with examples of
non-liability for jail suicides.") This, of course, is not the case. Suicide is recognized
to be the leading cause of death in custodial settings, Hayes Decl. ¶ 23, and jails are
liable when policies and practices demonstrate deliberate indifference to an inmates'
serious mental health needs and risk of suicide. *See Woodward v. Correctional Med.
Servs. of* Ill., 368 F.3d 917, 927-28 (7th Cir. 2004) (systematic policy failures by
contracted medical services provider in county jail with regard to suicide prevention
gave rise to county liability under *Monell*); *Gibson v. County of Washoe*, 290 F.3d
1175, 1187 (9th Cir. 2002) (holding county liable for policy which delayed medical
care for inmates who were combative and uncooperative, which resulted in death of
mentally ill patient who was denied medical care); *Cabrales v. County of Los Angeles*,
864 F.2d 1454, 1460-61 (9th Cir. 1988) (holding county of Los Angeles liable for
medical understaffing of jail that contributed to mentally ill detainee's lack of
treatment and subsequent suicide).

VCSD Defendants assert in a cursory and unsupported fashion, through the
Declaration of Sergeant Davidson, that the jail has taken adequate institutional steps to
respond to the risk of suicide in general and that Mr. Hernandez was not "truly
suicidal" and did not present any "indications of suicidal ideation." VCSD Mot. at
7:16-9:9, 11:25-27, 12:1-3. Based on these assertions, VCSD Defendants argue that
"the present case does not even rise to the threshold of analytical consideration
because there is really nothing to analyze." *Id.* at 11:27-28. As demonstrated in § II,
*supra*, and in Plaintiffs' Joint Statement of Genuine Issues in Response to VCSD
Defendants' Statement of Undisputed Facts, the facts relied upon by VCSD
Defendants to support summary judgment are, in fact, highly disputed. Accordingly,
on the record before the court, Defendants motion should be denied.

1    Because VCSD Defendants explicitly decline to address the facts of this

2  particular case, Defendants' main argument is that three Ninth Circuit opinions

3  preclude liability: *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir.

4  2010); *Simmons v. Navajo County*, 609 F.3d 1011 (9th Cir. 2010); *Estate of*

5  *Cartwright v. City of Concord*, 856 F.2d 1437 (9th Cir. 1988).  A review of these

6  cases demonstrates that each is easily distinguishable from the instant case or actually

7  supports liability in this case. Furthermore, courts have repeatedly recognized that

8  deliberate indifference risk of harm is a totality of the circumstances, fact-bound

9  inquiry that is different in every case. Given this fact, Defendant's strategy of pointing

10  to three non-liability cases without explaining why they are relevant to the facts of this

11  case, is entirely unavailing.

12    In *Cartwright*, an arrestee who was unknown to the police committed suicide on

13  the night of his arrest. The only evidence showing any liability was the fact that the

14  decedent joked about suicide with his fellow arrestee. *Estate of Cartwright v. City of*

15  *Concord*, 618 F. Supp. 722, 728 (N.D. Cal. 1985).  After a three week bench trial,

16  during which "every available witness was produced . . . [and] every piece of possible

17  evidence on behalf of plaintiffs was brought to bear," the district court ruled that

18  plaintiffs had not met their burden of proving that the jailers were even negligent to

19  the risk of suicide. *Id.* at 724-25, 727-28. Further, the defendants presented evidence at

20  trial that the municipality had extensive training programs and adequate written

21  policies and procedures that complied with contemporary standards. *Id.* at 731-32. The

22  decedent did not have any known mental health problems or history of suicide risk, *id.*

23  at 725-26, 728, and plaintiff apparently presented no meaningful evidence that the

24  policies, practices, or training were deficient, *id.* at 731-32. Thus, the holding of

25  *Cartwright*, particularly in light of the fact that the case involved a full trial on the

26  merits, is worlds apart from this case and is entirely irrelevant.

27    Both *Simmons* and *Clouthier* are cases in which the jail *actually responded* to

28  the decedent's mental health needs and risk of suicide but were nevertheless

unsuccessful in averting the detainee's suicide. *Simmons*, 609 F.3d 1014-16; *Clouthier*, 591 F.3d at 1237-40. The argument in those cases was that the response, although apparently made in good faith, was insufficient in preventing the suicide and reflected deliberate indifference. In this case, the evidence shows that Defendants did nothing to address Mr. Hernandez's serious mental illness and risk of suicide and, to the contrary, exacerbated his risk of suicide. In neither *Simmons* nor *Clouthier* did the plaintiffs argue that the failure to treat the detainee's mental illness was the result of affirmative policies/practices or that the official suicide prevention policies were flawed. *Simmons*, 609 F.3d at 1020-21; *Clouthier*, 591 F.3d at 1250. By all appearances, the *Monell* evidence presented *in those cases* was relatively weak and/or flawed. *Simmons*, 609 F.3d at 1020-21; *Clouthier*, 591 F.3d at 1251-53. In this case, Plaintiffs do present significant evidence of deliberately indifferent policies and practices, supported by expert opinions. Accordingly, *Simmons* and *Clouthier* are inapposite.

It is worth noting with regard to the issue of *Monell* liability, that in this case, unlike in *Clouthier*, *see* 591 F.3d at 1252, it is the moving parties' declarations that are conclusory and insufficient, particularly when compared to the declarations of Plaintiffs' experts. Plaintiffs' declarants are nationally recognized experts in issues relating to correctional mental health care and suicide. *See* Hayes Decl. ¶¶ 2-6 & Ex. A; Metzner Decl. ¶¶ 2-8 & Ex. A. They have reviewed the record in this case and have identified glaring deficiencies in the official VCSD and CFMG policies and practices which, in Mr. Hernandez's case, contributed to his suicide. *See Cabrales*, 864 F.2d at 1460 (affirming district court's reliance on the plaintiffs's expert affidavits in denying summary judgment as to the county's alleged policy of medical understaffing).

Although VCSD Defendants point out correctly that the plaintiffs in *Clouthier*, *Simmons*, and *Cartwright* failed to establish *Monell* liability, they make no effort to show why those holdings have any relevance to this case, based on the facts of this case. Accordingly, VCSD Defendants' motion should be denied as to Plaintiffs'

constitutional claims.

Even if the Court were to entertain VCSD Defendants' motion, despite their reliance on disputed facts, their failure to identify relevant facts, and their failure to apply the facts to the law, there is ample caselaw to support the existence of a genuine issue as to deliberate indifference in the circumstances presented by this case.

In *Clouthier*, the Ninth Circuit reiterated the three ways of establishing entity liability under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and *City of Canton v. Harris*, 849 U.S. 378 (1989): (1) affirmative policies and practices; (2) failure to train or institute policies where the need for such training and policies is so obvious as to constitute deliberate indifference; and (3) commission or ratification of the tort by an official with final policy-making authority. The County is liable for both VCSD and CFMG policies. *Streit v. County of Los Angeles*, 236 F.3d 552, 555-56 (9th Cir. 2001) (county and sheriff's department liable under *Monell* for policies relating to detainees); *Hagan v. California Forensic Medical Group*, No. CIV. S-07-1095 LKK/DAD, 2009 WL 728465, at *7 (E.D. Cal. Mar. 5, 2009) (rejecting county's argument that it was not liable for constitutional violations by contracted medical provider's employees and policies). Where policies relating to medical treatment are at issue in a case, a "county's policy of hiring trained medical professionals does not insulate it from municipal liability." *Long v. County of Los Angeles*, 442 F.3d 1178, 1182-83, 1188-89 (9th Cir.2006) (finding questions of fact as to whether the "[c]ounty failed adequately to train jail medical staff to document patients' conditions and to monitor and assess the need for patients to be transferred to a facility with a higher level of medical care").

In this case, Plaintiffs have presented substantial evidence that the treatment of Mr. Hernandez violated not only the defendants' own policies and procedures but also violated clearly established constitutional and statutory standards, and the constitutional tort in this case was "the result of [] longstanding practice[s] or custom[s] which constitute the standard operating procedure of the local government

entity." *Price v. Sery*, 513.F.3d 962, 966 (9th Cir. 2008); *see, e.g.*, *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (holding county liable for policy which delayed medical care for inmates who were combative and uncooperative, which resulted in death of mentally ill patient who was denied medical care); *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1460-61 (9th Cir. 1988) (holding County of Los Angeles's practice of medical understaffing at the jail contributed to mentally ill detainee's lack of treatment and subsequent suicide, giving rise to liability). Plaintiffs' evidence also shows that the constitutional tort in this case was the result of obviously inadequate policies and training with regard to mental health care and suicide prevention. *See George v. Sonoma County Sheriff's Department*, Civ. No. 08-2675-EDL, 2011 WL 2975850, at *7-8 (N.D. Cal. July 22, 2011) (holding that the medical center's absence of policies and training on discharge procedures for inmates was obviously deficient and deliberately indifferent); *Ramirez v. Ferguson*, 2011 WL 1157997 (W.D. Ark. Mar. 29, 2011) (finding that correctional officer defendants were liable for a "woeful" failure to train on the handling of inmates with mental health needs).

To illustrate the significance of the unconstitutional policies alleged by Plaintiffs, the policy failures in this case amounted to violations of the "six basic, essentially common sense, components of a *minimally* adequate prison mental health care delivery system," including the requirements of "a treatment program that involves *more than segregation* and close supervision" and "a basic program to identify, *treat, and supervise* inmates at risk for suicide." *Coleman v. Wilson*, 912 F. Supp. 1282, 1298-99 & n.10 (E.D. Ca. 1995) (emphasis added). As noted by the *Coleman* court, where the evidence establishes objective failures in these constitutional minima, "defendants [can] not plausibly persist in claiming lack of awareness." *Id.* at 1299 (citing *Framer*, 511 U.S. at 846 n.9).

//

//

1

### 2.   Liability Under Title II of the Americans With Disabilities Act and California Unruh Civil Rights Act

2

3

Relying again on *Simmons*, and disregarding the allegations in Plaintiffs'

4

complaint which put the VCSD Defendants on notice of the substance of Plaintiffs'

5

ADA claim, *see* Complaint ¶¶ 52-58, the VCSD Defendants argue that the same result

6

as in *Simmons* (dismissal) necessarily obtains here for Plaintiff's ADA and Unruh[23]

7

claims. VCSD Mot. at 17:8-10. As with their § 1983 arguments, VCSD Defendants

8

fail apply *Simmons* to the facts of this case.

9

Under Title II of the ADA, "no qualified individual with a disability shall, by

10

reason of such disability, be excluded from participation in or be denied the benefits

11

of the services, programs, or activities of a public entity, or be subjected to

12

discrimination by any such entity." 42 U.S.C. § 12132. The implementing regulations

13

for the ADA state that "[a] public entity shall make reasonable modifications in

14

policies, practices, or procedures when the modifications are necessary to avoid

15

discrimination on the basis of disability, unless the public entity can demonstrate that

16

making the modifications would fundamentally alter the nature of the services,

17

program, or activity." 28 C.F.R. § 35.130(b)(7); *see Weinreich v. L.A. County*

18

*Metropolitan Trasnp. Auth.*, 114 F.3d 976 (9th Cir. 1997). The regulations further

19

provide that "[a] public entity shall administer services ... in the most integrated

20

setting appropriate to the needs of qualified individuals with disabilities." 28 CFR §

21

35.130(d).

22

"A disability discrimination claim may be brought either on the theory that

23

defendant failed to make reasonable accommodations or on a more conventional

24

disparate treatment theory, or both. This is because the ADA not only protects against

25

disparate treatment, it also creates an affirmative duty in some circumstances to

26

provide special, *preferred treatment*, or 'reasonable accommodation.' " *Dunlap v.*

27

28

---

[23] VCSD Defendants' motion does not separately address Plaintiff's Unruh claim, merely stating that the analysis was the same as the analysis in *Simmons* with regard to the ADA.

*Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D.Cal.1998). Furthermore, under Supreme Court precedent, "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

In *Olmstead*, the Court addressed the institutionalization of mentally ill persons, and held that the ADA discrimination provision was violated where an integrated placement was appropriate. The Court emphasized that, in enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities" and that "discrimination against individuals with disabilities persists in such critical areas as institutionalization." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588 (1999). The Court noted that the integration and reasonable-modification regulations cited above reflected the determination that unnecessary segregation of persons with disabilities constitutes a form of discrimination prohibited by the ADA. *Id.* at 596-97.

In reaching this result, the Court rejected the state's arguments that the mentally ill individuals "encountered no discrimination 'by reason of' their disabilities because they were not denied [an alternative] placement on account of those disabilities [and] were [not] subjected to 'discrimination' . . . , because "'discrimination' necessarily requires uneven treatment of similarly situated individuals," and [plaintiffs] had identified no comparison class, i.e., no similarly situated individuals given preferential treatment." *Id.* at 598. Instead, the Court was "satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.* The comprehensive view of the ADA was reflected in similar statutory provisions, such as the provision of the Developmentally Disabled Assistance and Bill of Rights Act that recommended that "[t]he treatment, services, and habilitation for a person with developmental disabilities . . . should be provided in the setting that is least restrictive of the person's personal liberty." *Id.* at 599 (citing 42 U.S.C. § 6010).

In this case, Plaintiffs' evidence reflects that Mr. Hernandez was classified by

the jail to be housed in Ad Seg, the most restrictive area of the jail, based on conduct that was specifically linked to his mental illness. This decision was made without input from the mental health staff at the jail, and persisted despite clear indications that segregation housing was adverse to his mental health condition. Furthermore, Mr. Hernandez specifically contested his classification and housing in December 2008 by filing a grievance, which was denied by custody staff. By that point, Mr. Hernandez had proven that he could be housed in more integrated environments without posing a security risk, because he was housed in the medical unit for several weeks in 2008 and was housed in a non-lockdown unit at Patton State Hospital for several months.  Mr. Hernandez's housing in Ad Seg deprived him of the supervision and treatment that was available to detainees housed in the medical unit and the area of the jail reserved for psychiatric patients.

Furthermore, in late 2008 and early 2009, Mr. Hernandez was punished for conduct that, again, was known to be related to his serious mental illness. The punishment was imposed without input from the mental health staff and without regard for the detrimental effect the further segregation and isolation would have on Mr. Hernandez's mental health condition. The approach that was taken to Mr. Hernandez's mental health condition—throwing him in a hole instead of providing him treatment—is *exactly* the kind of retrograde disability discrimination that the ADA was enacted to prevent. *See Martin v. Taft*, 222 F. Supp. 2d 940, 965-66 (S.D. Ohio 2002) (summarizing history of treatment of mentally disabled persons prior to ADA). The intentional segregation and punishment of Mr. Hernandez was done with full knowledge of his mental health condition, previous incapacity, and suicidal tendencies. The segregation and punishment were imposed because of his mentally ill behavior and without consultation with competent mental health providers. Under the policies of the jail, the segregation necessarily resulted in insufficient medical treatment. This is more than enough to raise a genuine issue as to disability discrimination under the ADA.

### 3. VCSD Defendants' Asserted Immunity under California Government Code § 844.6(a)(2) for Negligence

Although California Government Code § 844.6(a)(2) provides immunity for public entities for personal injuries suffered by prisoners and the County itself may be immune under this statute on the negligence claim, California Government Code § 844.6(d) allows for liability against public employees who cause injury, therefore, Plaintiff's state law claims for Plaintiff's injuries against the public employees should stand. Furthermore, the public entities had a mandatory duty under California Government Code § 845.6 to summon medical care for inmates whom they knew, or had reason to know, required immediate medical care, outside of the immunity set forth in § 844.6(a)(2). Therefore, Plaintiffs' cause of action for violations of California Government Code § 845.6 should also survive summary adjudication.

### 4. Supplemental Jurisdiction over Plaintiffs' State Law Claims

VCSD Defendants argue that if the Court grants summary adjudication as to Plaintiffs' federal claims, it should not exercise supplemental jurisdiction over Plaintiffs' state law claims. Although under 28 U.S.C. § 1637(c)(3), the Court may decline to exercise supplemental jurisdiction where the district court has dismissed all claims over which it has original jurisdiction, this would not be appropriate in this case. Pendent jurisdiction is proper here because the federal claims against the VCSD Defendants, to wit, claims under 42 U.S.C. § 1983 and 42 U.S.C. § 12132, are sufficiently substantial. *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995) ("The ultimate lack of merit of the federal claim does not mean that pendent jurisdiction cannot attach; the federal claim must be "absolutely devoid of merit or obviously frivolous" to divest the court of pendent jurisdiction. ")

Furthermore, the federal and state claims are based upon a common nucleus of facts surrounding the suicide of Mr. Hernandez. In the event the Court determines the VCSD Defendants' Motion should be granted as to the federal claims but not the state claims, the Court should choose to retain jurisdiction over the state claims because the

factors of economy, convenience, fairness, and comity weigh in favor of retention.; *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1131 (C.D. Cal. 2005).

## VI.  CONCLUSION

For all the foregoing reasons, Plaintiffs' respectfully request that the Court deny VCSD Defendants' and CFMG Defendants' Motions for Summary Judgment.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

Dated: May 21, 2012          By  /s/ *David S. McLane*
                             DAVID S. McLANE

                             Attorney for Plaintiff
                             K.N.H., A MINOR BY AND THROUGH
                             HER GUARDIAN AND MOTHER,
                             AMBER RODRIGUEZ


                             LAW OFFICES OF BRIAN A. VOGEL, PC

Dated: May 21, 2012          By  /s/ *Brian A. Vogel*
                             BRIAN A. VOGEL

                             Attorney for Plaintiffs
                             ESTHER BISELLI AND THE ESTATE OF
                             DANIEL T. HERNANDEZ