# EXHIBIT A

1              UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                  WESTERN DIVISION

3

4
    ESTHER BISELLI AND THE ESTATE    )
5   OF DANIEL T. HERNANDEZ, BY AND   )
    THROUGH HIS PERSONAL             )
6   REPRESENTATIVE ESTHER BISELLI;   )
    K.N.H., [NAME REDACTED] A MINOR,)
7   BY AND THROUGH HER GUARDIAN AND  )
    MOTHER, AMBER RODRIGUEZ,         )
8                                    )
           PLAINTIFFS,               )
9                                    ) CASE NO.
            VS.                      ) CV 09-08694-CAS(Ex)
10                                   )
    COUNTY OF VENTURA, VENTURA       )
11  COUNTY SHERIFFS DEPARTMENT;      )
    SHERIFF BOB BROOKS; CALIFORNIA   )
12  FORENSIC MEDICAL GROUP;          )
    TAYLOR FITHIAN, M.D., DR. JOHN   )
13  KORZELIUS, DR. MELVIN MYUNG      )
    JUNG, MARIA BAEZLIN, DOES 1      )
14  THROUGH 10, INCLUSIVE,           )
                                     )
15         DEFENDANTS.               )
    _____)
16

17

18

19              DEPOSITION OF BRIAN ADAMS

20                 FRIDAY, MAY 4, 2012

21

22

23  FILE NO.  7850-A

24  REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

25

```
 1      Q      No known opposition.
 2             Now, turning to Page 7, this concerns your
 3      interview with Dr. Jung; is that correct?
 4      A      Yes.
 5      Q      Is this the face-to-face interview we were
 6      talking about?
 7      A      Yes.
 8      Q      And in this interview did Dr. Jung indicate
 9      that Mr. Hernandez had erratic and bizarre behavior?
10      A      Yes.
11      Q      And he also said he had it since last year.
12      A      That was Dr. Jung's comment.
13      Q      And he reports his impressions that the
14      proposed conservatee has some antisocial personality
15      behaviors, and continued saying the symptoms are
16      atypical for any particular diagnosis but feels the
17      proposed conservatee may have some sort of mood
18      disorder --
19      A      Yes.
20      Q      -- is that what he told you?
21             Do you recall anything else he said about his
22      mental state?
23      A      No.
24             MR. SHLENS:  I apologize.  You're referring to
25      beyond what's just charted here already in the notes?
```

```
 1            MR. McLANE:  Right.

 2            MR. SHLENS:  Okay.

 3            MR. McLANE:  Anything else besides in their

 4    conversation on July 8th besides what's indicated in

 5    this report.

 6            MR. SHLENS:  Thank you.

 7    BY MR. McLANE:

 8       Q    Now, when you saw Mr. Hernandez, did you agree

 9    with Dr. Jung's assessment?

10            MR. SHLENS:  Lacks foundation.

11            MR. McCORMICK:  Join.

12            MR. SHLENS:  You can still answer.

13            THE WITNESS:  Okay.  When we go in to do our

14    investigations, we are not there to diagnose; therefore,

15    on all of our cases we do not diagnose.  We simply put

16    down what previous doctors have stated or previous

17    mental health professionals have stated because to do an

18    accurate diagnosis we're requiring much more time and

19    other things that we do not do.

20    BY MR. McLANE:

21       Q    Do you believe that with your experience as

22    a -- with your Masters in psychology and your doctorate

23    in education, that you could do these sorts of

24    diagnoses?

25       A    Well, it would be out of my scope with my
```

1    doctorate.  But with my Masters in counseling psychology

2    we are able to diagnose.

3        Q    Based on your Masters did you observe signs of

4    mental illness from Mr. Hernandez when you met with him?

5        A    The best I could do would be to state that

6    there appeared to be something wrong.  But other than

7    that, it would be out of my scope because I didn't do

8    enough to make a diagnosis.

9        Q    Okay.  Dr. Jung also stated he had prescribed

10   two milligrams of Risperdal for the proposed conservatee

11   but he refused to take the medications.

12       A    That was his report.

13       Q    Okay.  That was his verbal report to you,

14   right?

15       A    Yes.

16       Q    And Dr. Jung explained after the proposed

17   conservatee calms down, he either denies the behavior or

18   is completely nonresponsive, so he's unable to make any

19   type of diagnosis because proposed conservatee will not

20   talk to him.

21            Is that what Dr. Jung told you?

22       A    Yes.

23       Q    And he concluded that he -- that Dr. Jung does

24   not think the proposed conservatee's behavior is an act

25   and stated something is wrong.

```
 1              Is that what he told you?

 2       A     Yes.

 3       Q     And then on the next page, Page 8, in your

 4   investigation did you learn that there had been a

 5   competency proceeding in this criminal case?

 6       A     Yes.

 7       Q     And did you learn in your investigation that he

 8   is found to be incompetent to stand trial?

 9       A     Yes.

10       Q     How did that factor into your evaluations as to

11   whether or not he should have a proposed

12   conservatorship?

13              MR. HELD:  Objection.  Argumentative.  The

14   question assumes that the event did, in fact, factor

15   into the witness's evaluation at all.

16   BY MR. McLANE:

17       Q     You can answer the question.

18       A     Could you state the question again.

19       Q     I just said how did it factor in to your

20   determination one way or another as to whether he should

21   have -- he should have a conservatorship?

22              MR. HELD:  Objection.  Argumentative, lacks

23   foundation.

24              THE WITNESS:  It did to a small extent because

25   it appeared that he had problems at the time.  He was
```

# EXHIBIT B

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                  WESTERN DIVISION

3

4

   ESTHER BISELLI AND THE ESTATE   )
5  OF DANIEL T. HERNANDEZ, BY AND )
   THROUGH HIS PERSONAL          )
6  REPRESENTATIVE ESTHER BISELLI; )
   K.N.H., [NAME REDACTED] A MINOR,)
7  BY AND THROUGH HER GUARDIAN AND )
   MOTHER, AMBER RODRIGUEZ,      )
8                          )
            PLAINTIFFS,      )
9                       )  CASE NO.
           VS.          )  CV 09-08694-CAS(Ex)
10                     )
   COUNTY OF VENTURA, VENTURA    )
11  COUNTY SHERIFFS DEPARTMENT;   )
   SHERIFF BOB BROOKS; CALIFORNIA )
12  FORENSIC MEDICAL GROUP;       )
   TAYLOR FITHIAN, M.D., DR. JOHN  )
13  KORZELIUS, DR. MELVIN MYUNG    )
   JUNG, MARIA BAEZLIN, DOES 1    )
14  THROUGH 10, INCLUSIVE,       )
                          )
15          DEFENDANTS.      )
   _____)
16

17

18

19          DEPOSITION OF CHAD ANDERSON

20           FRIDAY, MARCH 9, 2012

21

22  FILE NO.  5057

23  REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

24

25

```
 1   how it gets offered?  I assume that you approach the

 2   door and you say something.  If you could just describe

 3   for us how the cleaning cart gets offered to an

 4   individual inmate.

 5       A    Okay.  We go to each cell and ask each inmate

 6   if they want the cleaning cart.  If they want it, then

 7   we put it by their door cell -- cell door and then they

 8   use it and then pass it back out.

 9       Q    Okay.  Did you generally actually go to the

10   inmate's cell door to ask them this, or did you

11   communicate with them in some other way, or both?

12       A    Well, there's no certain way you have to do it.

13   You can do it at the cell door or you can do it through

14   the speaker system.

15       Q    Okay.  And would you often use the speaker

16   system to communicate with inmates regarding the

17   cleaning cart?

18       A    No.  I do it when I would go do cell checks.

19       Q    Okay.

20       A    So I would do it at each door.

21       Q    Okay.  And how would you speak to the inmates?

22   Through the feeding slot?  Through the window?  Did you

23   open the door?

24       A    Through the window.

25       Q    Okay.  And there were times when the windows of
```

```
 1    a particular inmate would be covered with a piece of

 2    paper; is that right?

 3        A    Yes.

 4        Q    Could you describe the circumstances when that

 5    happens and how that happens.

 6        A    Yeah.  When an inmate is placed on discipline,

 7    we put a piece of paper over the window.

 8        Q    Okay.  And what kinds of things does an inmate

 9    have to do to get the piece of paper put over their

10    window?

11        A    Well, there's many things.  Usually it's a

12    major writeup.

13        Q    Okay.  And what kinds of things result in a

14    major writeup?

15        A    There could be a lot of things.  Disrespect to

16    staff.  They have contraband in their cell.  Or there's

17    many other -- there's a lot of -- if they don't follow

18    the jail rule book and it's a major violation, then they

19    get issued a major writeup.

20        Q    Okay.  And what kinds of contraband have you

21    generally found in your experience which has resulted in

22    discipline in your own experience?

23        A    Contraband, like if somebody has too many --

24    like too much jail issued clothing in their cell.

25        Q    Okay.
```

1     A    Or if they're -- if they take supplies from the

2  cleaning cart and don't pass them back through.  They

3  hide them in their cell.

4     Q    Okay.  Anything else?

5     A    There's many other -- I don't know.  Just any

6  violation of the jail rule book that they shouldn't have

7  in their cell.  If they buy deodorant from the

8  commissary and they remove the label off of it, they're

9  removing it from its original intended use.  So that's

10  contraband.

11     Q    Okay.  And so when you encounter things like

12  that, generally they're given a major, correct, a major

13  writeup?

14     A    Sometimes.

15     Q    And they're given discipline.  Besides putting

16  the paper over the cell, is there some other punishments

17  that are administered?

18     A    Yeah.  They lose visiting and commissary.

19     Q    Okay.  And phone calls?

20     A    They lose personal phone calls, yes.  But they

21  could still call their attorney.  I've had people on

22  discipline ask to use the phone to call their attorney,

23  and so, yeah, they lose personal phone calls.

24     Q    Okay.  And what's the purpose of putting the

25  paper over the window, if you know?  Why is that --

```
 1      Q     Could you just describe the circumstances that
 2   you recall in your own experience where you didn't write
 3   them up for tearing their towel?
 4      A     Maybe if somebody had a cellmate that maybe
 5   urinated on the floor and they didn't want to use their
 6   towel to clean it up, then that's something where I
 7   understand they don't want to use their towel.
 8      Q     Okay.  Any other times that you can recall that
 9   you might not have written them up for that?
10      A     If somebody maybe is using a -- their torn
11   piece to clean the day room, they were going into the
12   day room and they were going to use the exercise
13   equipment after another inmate had used it before them,
14   or use the toilet in the day room and they wanted to use
15   the torn towel to clean, that might be another instance.
16      Q     Are you familiar with rat lines?
17      A     Yes.
18      Q     What's a rat line?
19      A     A rat line is a tool that inmates use to pass
20   things to one another.
21      Q     Okay.  Describe the tool.
22      A     Somebody will take maybe a bar of soap and put
23   a hole in the bar of soap and attach elastic from their
24   waistband that they've removed from their pants or they
25   could use a torn towel for that.  And then they slide it
```

```
 1    under the door to the next cell and the next cell puts

 2    something on the rat line to pass back and then the

 3    inmate that initiated the rat line will pull it back to

 4    his cell.

 5        Q    Okay.  And generally a rat line would be kind

 6    of a rope or a long thin piece of material that would

 7    fit under the door, correct?

 8        A    Yes.

 9        Q    And generally is that contraband?

10        A    Yes.

11        Q    So generally if anyone is making rat lines or

12    long rope like devices from whatever they have in the

13    jail, is that always contraband?

14        A    Yes.

15        Q    Okay.  I'd like you to turn to Exhibit 29, if

16    you would.  I'm going to go back to cell scans for just

17    a minute.

18             Do you recognize Exhibit 29, just the type of

19    document that it is?

20        A    No.

21        Q    Have you ever seen a document like that?

22        A    No.

23        Q    Okay.  It appears that Exhibit 29 is a Cell

24    Scan Log for the week February 9 through February 16,

25    2009; is that right?
```

# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


ESTHER BISELLI AND THE ESTATE       )
OF DANIEL T. HERNANDEZ, BY AND      )
THROUGH HIS PERSONAL                )
REPRESENTATIVE ESTHER BISELLI;      )
K.N.H., [NAME REDACTED] A MINOR,    )
BY AND THROUGH HER GUARDIAN AND     )
MOTHER, AMBER RODRIGUEZ,            )
                                    )
          PLAINTIFFS,               )
                                    ) CASE NO.
          VS.                       ) CV 09-08694-CAS(Ex)
                                    )
COUNTY OF VENTURA, VENTURA          )
COUNTY SHERIFFS DEPARTMENT;         )
SHERIFF BOB BROOKS; CALIFORNIA      )
FORENSIC MEDICAL GROUP;             )
TAYLOR FITHIAN, M.D., DR. JOHN      )
KORZELIUS, DR. MELVIN MYUNG         )
JUNG, MARIA BAEZLIN, DOES 1         )
THROUGH 10, INCLUSIVE,              )
                                    )
          DEFENDANTS.               )
                                    )
_____


DEPOSITION OF MARIA BAEZ, L.V.N.

THURSDAY, SEPTEMBER 15, 2011


FILE NO.   110915KAE1

REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

1      Q      Where is Vista Del Mar located?

2      A      I believe it's in Ventura.

3      Q      Ventura.  You said you did a rotation with

4  psychological or psychiatric patients.  What did you do

5  there?

6      A      We go and observe what the workers do.  Through

7  the school we were not allowed to put hands on because

8  it was a very private area, so we just went and

9  observed.

10     Q      How long did you observe?

11     A      For a week doing the hours.

12     Q      How many hours?

13     A      Excuse me?

14     Q      You said a week?

15     A      One week.

16     Q      40 hours?

17     A      We can say 40 hours.  They were eight hours.

18     Q      Okay.  Now, while you were at Twin Pines, did

19  you interact with any patient who later committed

20  suicide?

21     A      Well, they didn't directly tell you "I'm going

22  to do that," but sometimes the elderly, they go through

23  sad episodes, like depression.  So they stop eating and

24  they tell you, you know, "I'm done."

25     Q      "I'm done"?

26

1       A     "I'm done."  They stop eating.  They stop

2    eating and they want to die.  And sometimes they go

3    through that and sometimes they don't.  We have the

4    psych doctors talk to them.  They start them on

5    medications --

6              MR. BERTLING:  Maria, his question was whether

7    when you were at Vista Del Mar, did any of those

8    patients commit suicide.

9              THE WITNESS:  No.

10             MR. BERTLING:  Okay.

11             THE WITNESS:  Did you ask me Vista Del Mar?

12   BY MR. McLANE:

13      Q    No.  I just indicated at -- it wasn't Vista Del

14   Mar.  I was talking about Twin Pines.

15             MR. BERTLING:  Oh, I'm sorry.  Okay.

16   BY MR. McLANE:

17      Q    Or Acacia.  At Twin Pines or Acacia, did any of

18   your patients commit suicide that you're aware of?

19      A    No.  Not like that.

20      Q    But you did indicate that some of the patients

21   went through sad episodes, they stopped eating, and did

22   they tell you that "I'm done"?

23      A    No.

24      Q    Or it's just something you sensed?

25      A    No.  Sometimes they tell you that.  Sometimes

                                                          27

1   sometimes you see them, or sometimes they die in their

2   sleep.  Who knows.

3       Q    Did you see anyone at Twin Pines or Acacia who

4   actually did harm to themselves by using a noose or a

5   knife or some kind of weapon that they used to actually

6   end their life?

7       A    No.

8       Q    And you said that when you saw these people go

9   through these sad episodes, you would have the

10  psychological doctor look at them?

11      A    Yes.

12      Q    And what would that involve?  How would you get

13  a psychological doctor involved?

14      A    We'd call our primary doctor.  And then he's

15  the one that refers them to the psych doctor.

16      Q    And you saw that happen on occasion?

17      A    Yes.

18      Q    And did you ever see a psychological doctor

19  talk to any of the patients?

20          MR. BERTLING:  You're talking about at Twin

21  Pines?

22  BY MR. McLANE:

23      Q    At Twin Pines or Acacia.

24      A    Yes.

25      Q    We're not talking about --

29

1      A    No.

2      Q    You did sometimes?

3      A    Yes.

4      Q    Did that seem to help the patients sometimes?

5      A    Yes.

6      Q    Talking to a psychological doctor who would

7   counsel them?

8      A    Yes.

9      Q    And try to get them to eat?

10      A    Yes.

11      Q    So you said as part of getting your licensed

12   vocational degree, you took -- did a one-week rotation

13   with doing a psychological rotation at Vista Del Mar.

14           Did you take any psychological -- did you take

15   any educational courses in psychology to get your LVN?

16      A    Yes.   There was some hours in the class in the

17   LVN course.

18      Q    Was it part of one class?

19      A    It was one class.

20      Q    So you took one class?

21      A    Yes.

22      Q    Can you describe the educational content of

23   that class, if you can remember, or no?

24      A    I don't remember.

25      Q    You don't remember?

30

1      Q    -- to become a registered nurse?

2      A    No.

3      Q    Now, you also said that you went through a

4   rotation for the psych nurse.  What does the psych nurse

5   do, based on your knowledge?

6      A    They --

7      Q    I'm, again, referring to 2008, 2009.

8      A    At that time they usually answer suicidal

9   calls.  They do rotation of psych inmates in Special

10  Housing.

11     Q    Okay.  They answer the suicidal calls?

12     A    Yes.

13     Q    Is that when the deputy calls them over to

14  respond?

15     A    Yes.

16     Q    Okay.  And you also mentioned daily rotations

17  in the Special Housing.  What is the Special Housing?

18     A    That's the medical unit, the most -- the

19  medical units that we have, they are more ill than the

20  Levels 1 and 2.

21     Q    Are you talking about the safety cells?

22     A    Safety cells in the Special Housing area.

23     Q    Now, is there Special Housing separate and

24  apart from the safety cells, or is that all part of the

25  same thing?

                                                           42

1    A    They're a part of the safety cells.

2    Q    Okay.  Is that a separate part of the jail, the

3    Special Housing section?

4    A    No.  It's in the medical side.

5    Q    The medical side.  So there's --

6    A    The Level 2.

7    Q    By Level 2 --

8    A    Floor Level 2.

9    Q    Floor 2?

10   A    Yes.

11   Q    Okay.

12   A    So Floor 3 and 4, there's Levels 3, normal

13   people, they're up there.  More normal that they can be

14   on their own upstairs.

15   Q    Okay.  And in the Special Housing unit, are you

16   saying that that's where they keep people with

17   psychological problems?

18   A    They keep everything.

19   Q    Medical?  Psychological?

20   A    Yes.

21   Q    Okay.  But there are psychiatric patients that

22   are housed in different locations throughout the jail,

23   right?

24   A    Yes.

25   Q    Like Mr. Hernandez had a P on his inmate label

43

```
 1    or whatever.  And so he was -- did you know he was a

 2    psychiatric patient?

 3         A    Yes.

 4         Q    But he was housed in Administrative

 5    Segregation, correct?

 6         A    Yes.

 7         Q    As far as you know?

 8         A    Yes.

 9         Q    What does the resource nurse do?

10         A    Resource nurse is in charge of doing diabetics,

11    doing the treatments, taking their blood pressure,

12    changing dressings, providing -- like if they need a

13    sling or something, we are the ones that go get them

14    from property or get whatever they need.

15         Q    Oh, are you a resource nurse at the hospital?

16         A    Yes.

17         Q    Have you been a resource nurse there the whole

18    time you worked there?

19         A    I think in 2008, because when I started I was

20    doing pill call most of the time.  In 2007.

21             MS. WEISBERG:  Just to interrupt, I think you

22    misspoke and said "hospital."  I think you were

23    referring to the "main jail."

24             MR. McLANE:  Main jail.  I'm sorry.

25             MS. WEISBERG:  And is that what your answer was
```

                                                          44

1    Sorry.

2              MR. BERTLING:  Don't think out loud, Maria.

3              MR. McLANE:   Think to yourself.

4              MR. BERTLING:  If you need to look at records,

5    feel free to do that.

6              THE WITNESS:  Can I look at something?

7    BY MR. McLANE:

8         Q    Yes.  If something would -- what do you want to

9    look at?

10        A    The chart.

11        Q    The chart?  Well, let me see --

12        A    For that question.

13        Q    Okay.  You know, it's ten to 11:00.  Do you

14   want to review the chart for a couple minutes?

15             Let's take a break and she can review the

16   chart.

17             MR. BERTLING:  Why don't we come back at 11:00.

18                      (Recess taken.)

19             MR. BERTLING:  Back on the record.

20   BY MR. McLANE:

21        Q    Now, when we took a break so you could look at

22   some documents to refresh -- look at the

23   medical/psychological file from CFMG to refresh your

24   recollection as to any conversations with -- in 2008,

25   beginning of 2009 with Nurse Rodelander, Linda Moskowitz

                                                        61

1  and Dr. Jung, you asked to look at some documents.

2          Did any documents refresh your recollection as

3  to any particular conversations about Daniel Hernandez?

4      A    Yeah.   They helped me.

5      Q    That helped you?

6      A    Yes.

7      Q    Okay.   Let's mark it as Plaintiffs' 62.

8              (Deposition Exhibit No. 62

9              was marked for identification.)

10  BY MR. McLANE:

11      Q    Can you identify Plaintiffs' 62, Ms. Baez.

12  You're going to work off that.   It's not in that big

13  binder.

14          Do you recognize this -- those two are the same

15  documents, by the way.

16      A    Okay.

17      Q    One copy is for Mr. Bertling.

18          Do you recognize Plaintiffs' 62?

19      A    Yes.

20      Q    Is that your Hunger Strike Log that you kept

21  for Daniel Hernandez?

22      A    Yes.

23      Q    Okay.   Now, you're saying this document

24  refreshed your recollection about conversations about

25  Daniel Hernandez with Ms. Rodelander, Ms. Moskowitz or

62

1   Dr. Jung.

2       A    Yes.

3       Q    Tell us about that conversation or

4   conversations.

5           MR. BERTLING:  Well, I think it lacks

6   foundation that it refreshes her recollection that she

7   did have conversations as opposed to she did not.

8           Go ahead --

9   BY MR. McLANE:

10      Q    It refreshes your recollection that you did not

11  have conversations?

12      A    I did not.

13      Q    So you never talked to those three individuals

14  about Mr. Hernandez while he was on the hunger strike or

15  at any other time?

16      A    During the hunger strike, no.

17      Q    Okay.  Now, you were there in 2007.  I know

18  that Mr. Hernandez was there for a period of time in

19  2007.

20          Do you remember Mr. Hernandez from 2007?

21      A    2007, no.

22      Q    Did you have any interaction with Mr. Hernandez

23  in 2007?

24      A    No.

25      Q    Okay.  Then we'll focus in on 2008.  And you

                                                        63

1    never had any conversations with anyone about

2    Mr. Hernandez in 2007 that you can recall?

3        A    No.

4        Q    In 2008, we talked about the hunger strike and

5    having conversations.  I just need to clarify this.  Are

6    you saying that you didn't have any conversations

7    whatsoever at any time with Ms. Moskowitz,

8    Ms. Rodelander and Dr. Jung concerning Daniel Hernandez

9    at any time?

10            MR. BERTLING:  Or do you just not recall?

11   BY MR. McLANE:

12       Q    Or you don't recall any conversations?

13       A    I don't recall.

14       Q    Any conversations at any time?

15       A    During that.

16       Q    Well, at any time.

17       A    At any time, no.

18       Q    After he was deceased, did you have any

19   conversations with Dr. Jung, Linda Moskowitz or

20   Nurse Rodelander after?

21       A    After, no.

22       Q    No conversations at any time that you can

23   recall?

24       A    No.

25       Q    Did you talk with -- can you recall any

                                                        64

1      Q    Did you review any other documents in

2   preparation for this deposition?

3           MR. BERTLING:  He also wants to know if you

4   looked at any of the other medical records to see if

5   you -- he needs to know what records you looked at in

6   this file, because he's entitled to know whether there's

7   any other records with your initials or signature on

8   here, other than what's Exhibit 62.

9           Do you remember seeing any other records in

10  this file about him?

11  BY MR. McLANE:

12      Q    With your signature or initials that are

13  something that you reviewed in preparation for this

14  deposition.

15      A    The vital signs in 2008.

16          MR. BERTLING:  Was there any other

17  documentation?

18          THE WITNESS:  This is mine.

19  BY MR. McLANE:

20      Q    These are the vital signs in 2008?

21      A    No.  This is about the hunger strike.

22          MR. BERTLING:  Why don't you find the vital

23  signs document you're referring to.  He's entitled to

24  know all the documents that you looked at to prepare for

25  your deposition.

76

```
 1          So the other document that we're looking at is
 2  a note of July 11th, 2008.  It's called "Treatment
 3  Procedure."  And there's also another one for July 12th,
 4  2008.
 5          And is there any other documents that you can
 6  recall reviewing?
 7          THE WITNESS:  I think that's it.
 8  BY MR. McLANE:
 9     Q    Can you pull those two documents out.
10          MR. BERTLING:  Go ahead and look at it.
11          So this would be the incarceration before the
12  gentleman was sent to Patton?
13          MR. McLANE:  Right.  Okay.
14          Can I pull these two documents out?
15          MR. BERTLING:  Yeah.  Let me do it and we can
16  get copies made.  Did you also need a copy of that?
17          MR. McLANE:  Yes.
18          MS. WEISBERG:  No.  We don't need a copy of
19  that.
20          MR. McLANE:  Oh, we have a copy of this.  I'll
21  give this back to you.
22          MR. BERTLING:  Can we go off the record for
23  just a moment.
24              (Discussion held off the record.)
25  \\\
```

77

Personal Court Reporters · San Fernando Valley · (818) 988-1900 · Santa Barbara · (805) 966-0177 · Ventura · (805) 654-1058

```
 1        A     Yes.  It's not normal.

 2        Q     What about an inmate who's talking to himself?

 3              MR. BERTLING:  It's an incomplete hypothetical.

 4   Are you asking her what she would do?

 5              MR. McLANE:  Yes.

 6              MR. BERTLING:  If she's called to evaluate

 7   somebody and she notices that he's talking to himself?

 8              MR. McLANE:  Yes.

 9              MR. BERTLING:  What would you do?  Again, it's

10   an incomplete hypothetical the way it's framed, but if

11   you can answer the question the way it's asked of you,

12   please give him a response.

13   BY MR. McLANE:

14        Q     Would you consider that abnormal?

15        A     Talking to yourself, sometimes we do it.

16        Q     Okay.

17        A     It's a little bit abnormal, but sometimes you

18   talk to yourself to refresh yourself "I got to do this."

19        Q     Well, if he's talking to himself about people

20   coming from outside his cell --

21        A     That's hearing other voices, yeah.

22        Q     That's more what I was talking about.

23        A     Okay.

24        Q     Now, a person who's mentally ill, you would

25   agree is more likely to commit suicide?
```

                                                              103

1      A     Yes.

2      Q     Now, Daniel Hernandez was diagnosed as

3   psychotic.  Do you recall that, that he had a

4   psychiatric label?

5          MR. BERTLING:   There's a difference between

6   being diagnosed as psychotic and having a psychiatric

7   label.

8          MR. McLANE:   Okay.  I'll withdraw the question.

9   BY MR. McLANE:

10     Q     Okay.  Do you recall Daniel Hernandez having a

11  psych label?

12     A     I don't recall that.

13     Q     You don't recall his classification.  Do you

14  recall him being a psych -- he was in Administrative

15  Segregation.  You recall that, right?

16     A     Yes.

17     Q     Do you recall that he was a psych patient in

18  the Administrative Segregation unit?

19          MR. BERTLING:   Well, it lacks foundation that

20  he was a psych patient in administrative psych.

21          But if you have recollection, he's entitled to

22  the information.

23          THE WITNESS:   Yes.  He was a psych patient.

24  BY MR. McLANE:

25     Q     So you told us that someone who -- now, to get

104

1    a psych patient designation, how do you understand

2    someone, you know, in the jail getting that sort of

3    label?

4         A    Because he was on medications.

5         Q    Was he on psych medications?

6         A    He was sometimes.

7         Q    And you recall that he sometimes would take his

8    medications and sometimes not take his medications,

9    correct?

10        A    I never administrate medications to him.

11        Q    But you're aware he was on psych medications?

12        A    Yes.

13        Q    Which would mean he has some sort of

14   psychological problem?

15        A    Yes.

16        Q    Were you aware of what his psychological issues

17   were or problems?

18        A    No.

19        Q    So you told us that someone who was mentally

20   ill would be more likely to commit suicide.   So

21   Daniel Hernandez, if he was mentally ill, would be more

22   likely to commit suicide?

23        A    Yes.

24        Q    You'd agree also that you told us about people

25   being in isolation may be more likely to commit suicide.

105

1      Q      And what did you say there?

2      A      "Inmate started to have meals, breakfast and

3    lunch."

4      Q      Okay.  So that's why that isn't filled out?

5      A      Yes.

6      Q      And I see 1/16/09, but nothing filled out here.

7    Do you know what that signifies or indicates?

8      A      No.

9      Q      Okay.  Let's turn to the first page.  And it's

10   your signature at the bottom for both January 31st, 2009

11   and February 1st, 2009; is that correct?

12     A      Yes.

13     Q      And what did you say for January 31st, 2009?

14     A      "Inmate refused three meals today and refused

15   nursing staff."

16     Q      What does that mean?

17     A      That means that he refused to eat, but he

18   refused to see nursing.  Like to see nursing staff.

19   That means me.

20     Q      Now, I see that these -- nothing is circled or

21   checked or no vital signs are taken.  Is it because

22   you're saying he refused, you couldn't fill out the

23   form, basically?

24     A      Yes.

25     Q      Okay.  Now, did you refer him to any sort of

                                                            155

```
 1   further treatment by the doctor or the psych staff as a
 2   result of his refusal on January 31st?
 3        A    No.
 4        Q    Would that have been indicated on this form
 5   what you did or somewhere else?
 6        A    It would be in the form.
 7        Q    This form (indicating)?
 8        A    Referrals?
 9        Q    Right.
10        A    We usually write them if he needs it, so that
11   means it wasn't done.
12        Q    So you determined he didn't need to --
13        A    He didn't need to.
14        Q    That was your determination, or did you consult
15   with the doctor about it?
16        A    No, I didn't.
17        Q    Okay.  But you didn't see him, correct?
18        A    No.  He refused.
19        Q    So how would you -- my question is if you
20   didn't see him, how would you know whether he should be
21   referred to maybe a psychiatrist or a medical doctor?
22        A    Because he was -- for one day we usually don't
23   refer them.
24        Q    Okay.  Now, prior -- prior to January 31st,
25   2009, were you aware of Mr. Hernandez's status at all
```

                                                        156

```
 1      A    Yes.

 2      Q    Looking at the page before, the first page of

 3   68, you see this note at the bottom.  January 17th, 2009

 4   regarding Mr. Hernandez.

 5           Do you know whose writing it is at the bottom

 6   of the page?

 7           MR. BERTLING:  Do you know who wrote this note?

 8   The 2230.

 9   BY MR. McLANE:

10      Q    1/17/09, do you know who wrote this?

11      A    Jennifer.

12      Q    Give me the last name.  Jennifer...?

13      A    Alcaraz, A-l-c-a-r-z (sic).

14      Q    What is her -- does she still work at CFMG?

15      A    Yes.

16      Q    And what's her job position in 2009,

17   January 17th?

18      A    She was a resource nurse at that time.

19      Q    Similar position to yours, correct?

20      A    Yes.

21      Q    Same position as yours?

22      A    Same position.

23      Q    Okay.  It says here that "Inmate laying on

24   stomach.  Ammonia inh popped, placed under inmate's

25   nose, inmate holds breath and tries to bite me."
```

                                                             165

```
1              Did Ms. Alcaraz talk to you about this
2    incident?
3        A    She did.
4        Q    Okay.  Well, tell me about it.  Did you witness
5    it?
6        A    No.
7        Q    Did she show you any particular injury?
8              MR. BERTLING:  Lacks foundation there was an
9    injury.
10   BY MR. McLANE:
11       Q    If there was an injury.  It says tries to bite
12   her.  I'm trying to figure out did he bite her or just
13   tried to bite her, or what did she say about it?  I'm
14   sorry.  Let me strike that.
15             You said you discussed it.  What did she tell
16   you about it?
17       A    Same thing that she wrote in here.  The same
18   thing she told me.
19       Q    Well --
20             MR. BERTLING:  Just so we're clear, this would
21   have been on January 18th that she spoke to you.
22             MR. McLANE:  Or January 17th.
23             MR. BERTLING:  Do you remember?
24             THE WITNESS:  I don't recall if it was the next
25   day or when.
```

166

```
 1            MR. BERTLING:  Okay.
 2    BY MR. McLANE:
 3        Q    Because this is at 2230, which would be 10:30,
 4    correct?
 5        A    Nighttime.
 6        Q    Nighttime.  And you worked the morning shift.
 7    I believe that's why Mr. Bertling asked you about
 8    January 18th.
 9            Would it have been January 18th?
10        A    I don't recall if it was the next day.
11        Q    Now, you said she told you the same thing.
12    "Same" is kind of vague.  Can you tell me in your own
13    words what you recall her telling you.
14        A    I remember that she told me that he was trying
15    to bite the ammonia and he woke up and he was
16    (unintelligible).
17        Q    He was trying to pop the ammonia?
18        A    It's ammonia to wake him up.  That's what she
19    means.
20        Q    The note before says, "Called Seg housing,
21    inmate laying on bed being unresponsive per deputy."
22            So was this -- was Nurse Alcaraz trying to give
23    him ammonia under his nose to wake him up, or what is
24    that?
25        A    To find out if he was like passed out or what.
```

167

```
 1   So with the ammonia --

 2        Q    Is that like smelling salts, the ammonia?

 3        A    Alcohol, yeah.

 4        Q    Like if a football player is knocked out on the

 5   field, they might give him this ammonia to --

 6        A    To wake him up.

 7        Q    -- to wake him up?  Now I know what it is.

 8             So is that standard for an inmate if he's

 9   like -- might be unconscious in his room, that the nurse

10   would try to do this type of intervention?

11             MR. BERTLING:  Objection.  Incomplete

12   hypothetical, calls for speculation.

13             But if you know, he's entitled to a response.

14             THE WITNESS:  No.  That's what she told me.

15   BY MR. McLANE:

16        Q    You kind of demonstrated that he went like

17   opened the mouth.  Did she tell you whether he actually

18   bit her or not, or just that she felt he tried to bite

19   her?

20        A    She said he tried.

21        Q    So she didn't say that he actually bit her?

22        A    No.

23        Q    Okay.  Now, above that there's an entry and a

24   signature.  I'm pointing to the middle entry on the

25   page.
```

168

# EXHIBIT D

1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
2                      WESTERN DIVISION

3

4

    ESTHER BISELLI AND THE ESTATE    )
5   OF DANIEL T. HERNANDEZ, BY AND    )
    THROUGH HIS PERSONAL              )
6   REPRESENTATIVE ESTHER BISELLI;    )
    K.N.H., [NAME REDACTED] A MINOR,  )
7   BY AND THROUGH HER GUARDIAN AND   )
    MOTHER, AMBER RODRIGUEZ,          )
8                                     )
            PLAINTIFFS,               )
9                                     )  CASE NO.
            VS.                       )  CV 09-08694-CAS(Ex)
10                                    )
    COUNTY OF VENTURA, VENTURA        )
11  COUNTY SHERIFFS DEPARTMENT;       )
    SHERIFF BOB BROOKS; CALIFORNIA    )
12  FORENSIC MEDICAL GROUP;           )
    TAYLOR FITHIAN, M.D., DR. JOHN    )
13  KORZELIUS, DR. MELVIN MYUNG       )
    JUNG, MARIA BAEZLIN, DOES 1       )
14  THROUGH 10, INCLUSIVE,            )
                                      )
15          DEFENDANTS.               )
                                      )
16  ———————————————————————————————————

17

18

19          DEPOSITION OF SHERIFF ROBERT BROOKS

20              MONDAY, MARCH 26, 2012

21

22

23  FILE NO.  5058

24  REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

25

```
 1   staff or CFMG would be notified of that?

 2           MR. HELD:  Objection.  Vague and ambiguous,

 3   incomplete hypothetical, lack of foundation.

 4           MR. SHLENS:  I join.

 5           THE WITNESS:  Not specifically.

 6   BY MR. VOGEL:

 7       Q    Okay.  If you look at the next sentence, it

 8   tells us the Ventura County Behavioral Health Department

 9   does not participate in the evaluation of suicides and

10   attempted suicides in the county jail.  And that the

11   Ventura County Behavioral Health Department supports

12   quarterly quality assurance reviews of the California

13   Forensic Medical Group.

14           But in terms of the evaluation of suicides and

15   attempted suicides within the county jail, can you tell

16   us how your department investigated those kinds of

17   incidents during the year 2009?

18           MR. HELD:  Objection.  Overbroad, vague and

19   ambiguous.

20           THE WITNESS:  No.

21   BY MR. VOGEL:

22       Q    In terms of the responsibility for

23   investigating a jail suicide in the year 2009, do you

24   know which departments or agencies were responsible for

25   that in 2009?
```

```
 1            Do you agree with that finding, that there

 2    could be a false perception as to the integrity of the

 3    investigative process and its findings?

 4            MR. HELD:  Objection.  Calls for speculation,

 5    vague and ambiguous, argumentative.

 6            THE WITNESS:  But my answer would be that I

 7    can't answer to what would be a perception on the basis

 8    of our activities.  We base it on the effectiveness of

 9    finding the truth in the most expeditious manner.

10    BY MR. VOGEL:

11       Q    Okay.  And generally the Major Crimes Unit is

12    required to prepare a written report as to a jail

13    suicide death it investigates, correct?

14       A    Yes.

15       Q    During your tenure as sheriff, do you recall

16    ever asking for the assistance of an outside agency to

17    investigate the inmate suicide?

18       A    No.

19       Q    I'd like to talk a little bit about the jail

20    suicides that were discussed in this particular

21    document.  And in particular if you take a look at

22    Page 3, FA-06 -- FI -- let's begin -- I'm sorry -- that

23    ends up being a comparison.

24            FI-05 on Page 10.

25            MR. HELD:  I'm sorry, Brian.  One more time?
```

```
 1   understood it.

 2        Q     You told us that you had not reviewed CFMG's

 3   policies and procedures prior to the approval of the

 4   contract.  But do you know whether or not your Sheriffs'

 5   Department sworn personnel had access to those

 6   particular policies and procedures as they went about

 7   their duties?

 8        A     I don't know.

 9        Q     And do you know whether or under what

10   circumstances the sworn jail deputies had access to any

11   of the jail medical records or psych records of a

12   particular inmate?

13        A     No.  There are protections for medical records,

14   so they didn't have access to everything that medical

15   staff did.

16        Q     So generally when an issue arose that required

17   review of medical or psychiatric records, the deputies

18   would refer those to the CFMG personnel?

19        A     Yes.

20        Q     Now with respect to discipline of an inmate,

21   are inmate disciplinary decisions made by sworn sheriff

22   deputy personnel?

23        A     Yes.

24        Q     And do psych staff or CFMG have any input to

25   impose discipline upon an inmate?
```

```
 1      A    No.  They can be consulted if there are medical
 2  or psychiatric side issues.
 3      Q    Ultimately the decision to impose discipline
 4  rests with the sworn personnel, correct?
 5      A    Yes.
 6      Q    And I assume that the decision to remove an
 7  inmate from discipline is also the responsibility of
 8  sworn personnel, correct?
 9      A    Yes.
10      Q    And do CFMG or psych staff have any
11  decision-making authority as to whether or not to remove
12  a person from discipline?
13           MR. SHLENS:  That's vague.
14  BY MR. VOGEL:
15      Q    If you could just tell us your understanding of
16  what role the CFMG personnel --
17      A    Once again, they can be consulted or they can
18  recommend.
19      Q    Okay.  But ultimately the decision to remove a
20  person from discipline rests solely with sworn Sheriffs'
21  Department personnel?
22      A    Yes.
23      Q    And none of the independent contractors at CFMG
24  are sworn Sheriffs' Department personnel.  Is that fair
25  to say?
```

```
 1        A    Yes.

 2        Q    Fair -- is that accurate?

 3        A    Correct.

 4             MR. SHLENS:  Nice catch.

 5   BY MR. VOGEL:

 6        Q    Generally, your sworn jail -- your sworn

 7   deputies at the jail are not psychologists, correct?

 8        A    Correct.

 9        Q    And so decision making with respect to

10   diagnoses or treatment of mental disorders would be

11   referred to CFMG; is that right?

12        A    Yes.

13        Q    And with respect to inmates who are on

14   discipline, were you aware of any policy that required

15   CFMG personnel to consult with psychiatric patients who

16   are also on discipline?

17             MR. SHLENS:  Can you read back the question,

18   please.

19                       (Record read.)

20             THE WITNESS:  I don't know.

21   BY MR. VOGEL:

22        Q    Okay.  My understanding is that if sworn

23   deputies observed psychiatric conditions or indicators

24   of suicide, that they would refer those kinds of

25   situations to the psych nurse or other appropriate CFMG
```

# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

ESTHER BISELLI AND THE ESTATE )
OF DANIEL T. HERNANDEZ, BY AND )
THROUGH HIS PERSONAL )
REPRESENTATIVE ESTHER BISELLI; )
K.N.H., [NAME REDACTED] A MINOR,)
BY AND THROUGH HER GUARDIAN AND )
MOTHER, AMBER RODRIGUEZ, )
 )
 )
   PLAINTIFFS, )
 )CASE NO.
    VS. )CV 09-08694-CAS(Ex)
 )
COUNTY OF VENTURA, VENTURA )
COUNTY SHERIFFS DEPARTMENT; )
SHERIFF BOB BROOKS; CALIFORNIA )
FORENSIC MEDICAL GROUP; )
TAYLOR FITHIAN, M.D., DR. JOHN )
KORZELIUS, DR. MELVIN MYUNG )
JUNG, MARIA BAEZLIN, DOES 1 )
THROUGH 10, INCLUSIVE, )
 )
   DEFENDANTS. )
————————————————————)

DEPOSITION OF PERSON MOST KNOWLEDGEABLE FROM VENTURA

COUNTY SHERIFFS DEPARTMENT, ROBERT DAVIDSON

TUESDAY, AUGUST 23, 2011

FILE NO.  110823KAE

REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

1          MR. SHLENS:   Thank you.

2                    (Recess taken.)

3    BY MR. McLANE:

4          Q    Now, do you go by Officer Davidson?

5          A    You can call me Rob.

6          Q    Mr. Davidson?

7          A    Sergeant Davidson.

8          Q    Sergeant?

9          A    Sergeant is a title.  Mr. Davidson, Rob,

10   whatever would make this...

11         Q    Go faster.

12         A    I was going to say work more efficiently.

13         Q    So, Sergeant Davidson, we were talking at the

14   break about information sharing between CFMG -- and just

15   for the record, CFMG, I believe, stands for California

16   Forensic Medical Group; is that correct?

17         A    Yes.

18         Q    And they are the -- they have a contract with

19   the Ventura County Sheriff's Department to provide

20   healthcare services within the jail; is that right?

21         A    That is correct.

22         Q    And you were talking about before, and I just

23   want to make clear, so no jail personnel, including you

24   or the watch commander, can actually look at the CFMG

25   medical records?

                                                          38

1    we're there.

2        Q    Yeah.  I think that helps.

3             Now, CFMG is not -- their employees in the jail

4    are not jail employees; is that correct?

5        A    That is -- that is correct.  They are not.

6        Q    They are not jail employees.  They're

7    independent contractors; is that correct?

8        A    I don't know their employment relationship with

9    CFMG.  I just know they are not county employees.

10       Q    Okay.  And the jail staff doesn't direct CFMG

11   employees on how they provide healthcare services to the

12   inmates; is that right?

13       A    That is right.

14       Q    I think we're there now.

15       A    Okay.

16       Q    I'm going to mark as Exhibit 52 the CFMG

17   contract.

18                  (Deposition Exhibit No. 52

19                   was marked for identification.)

20   BY MR. McLANE:

21       Q    Now, there's Bates stamp numbers at the bottom

22   of the page on the right side.

23       A    Right.

24       Q    If you could turn to Page 1563, it's the bottom

25   right.  Do you see that?

                                                          52

1        A     Uh-huh.

2        Q     The date of the contract at the top of the page

3    says July 2006 and the term is five years.

4              Have you ever seen a CFMG Ventura County jail

5    contract?

6        A     Yes, I have.

7              MR. SHLENS:  Can we take a quick break.  I'm

8    sorry.

9                   (Discussion held off the record.)

10             MR. SHLENS:  I went off the record because this

11   Exhibit No. 52 includes CFMG contract with numbers and

12   dollar amounts included.  And typically if we ever

13   produced these, those amounts are redacted because they

14   are confidential business information and there is a

15   privilege to that information associated with the

16   business aspect of this.

17             So what I've discussed off the record with

18   counsel, and all counsel have agreed to, is that we

19   would stipulate here and now that this not be

20   disseminated outside the confines of this lawsuit.

21   Plaintiff counsel has requested this be allowed to be

22   used in this lawsuit, and we are agreeable to that.  But

23   I ask that it not be disseminated outside the lawsuit,

24   experts involved in this lawsuit or witnesses involved

25   in this lawsuit.  Any experts that are provided with

                                                          53

1   for everyone to see.

2       Q    What policy number is that?

3       A    No.  It's not a policy.   There are policies

4   that interplay with it that have to do with levels of

5   monitoring.

6       Q    Safety cells?

7       A    Yes.  Safety cell.

8       Q    I've seen the safety cell policy and I've seen

9   the suicide attempt policy.  What you do when someone --

10      A    Right.

11      Q    -- has a suicide attempt.

12           I'm trying to figure out, okay, you're saying

13   there's this third -- what kind -- can you describe this

14   document, what it is?

15      A    Well, it's a program.  Where the underlying

16   document is I don't know because the program has been in

17   existence long enough that it runs really without having

18   to sort of refer to the one, two, threes anymore.   What

19   I'm referring to is our Inmate Reception Center.   That

20   can be also referred to as our Suicide Prevention

21   Program.

22      Q    Okay.  Describe that program and what you mean

23   by it.  It's something that occurs when a person first

24   comes into the jail?

25      A    Yes.

                                                        62

1      Q     Describe it.

2      A     Yes.  So what happens is an inmate comes into

3  the jail and they typically come in through our booking

4  process.  During that process several things are vetted

5  out.  They're asked a number of questions on an Inmate

6  Health Screening Form.  That form touches on suicidality

7  and thoughts of suicide, things of that nature.

8          And so those questions, along with other

9  questions having to do with physical health, mental

10  stability, things of that nature, are all asked at that

11  time.

12          That inmate then continues through our booking

13  process.  While that inmate is down there, depending on

14  the way they have answered those questions, a booking

15  nurse comes in at some point during that process.  If

16  the answers to some of these questions are acute enough,

17  then a nurse might respond immediately.

18          For instance, if an inmate -- this is just an

19  example -- says "I have hypertension" or "I have high

20  blood pressure," that is something that would require

21  the nurse to respond to immediately.  Or if they say "I

22  have" -- "I take an obscene number of medications," a

23  nurse might respond immediately to immediately evaluate

24  this person and decide if they can be safely and

25  adequately housed in our booking area.

63

1          So that's our first area where we are trying to

2     identify inmates who, either because of medical or

3     mental problems, need a different level of -- a

4     different level of monitoring within our facility.

5          If nothing they say kind of pops them up to

6     that level there, they continue through our booking

7     process.  And if after the booking process we decide

8     they're staying in our facility, then they are sent up

9     to what we call our Inmate Reception Center.

10         And our Inmate Reception Center is a 72-hour

11    program where inmates are kept in a specific area with

12    other inmates, and they are monitored by the same

13    employees.  So we keep the same employees working the

14    same area.  They have all been trained in crisis

15    intervention techniques, things of that nature.

16         And this area is designed for us to be able to

17    monitor them more closely, to have staff who --

18    consistent staff who can be aware of mood changes, of

19    activities, of interaction, that type of stuff.  And for

20    72 hours they're monitored in that way.  And psych staff

21    comes in and out of the area as well.

22         At the end of that period of time, the inmate

23    will self fill out a form that will answer -- I think

24    it's four -- I have to pull the form to look.  But

25    answers a series of questions about their mental health

64

1    history and intentions.  And then that form is then

2    reviewed by our medical staff, our housing staff, et

3    cetera.  And depending on the answers they can be

4    reclassified to a psych inmate, they can be housed

5    normally because the -- after all of this evaluation it

6    seems that they will be fine.  They don't pose any

7    greater risk than any other inmate.  A determination in

8    essence is made.

9         Q    If someone is classified as a psych inmate,

10   what does that mean?

11        A    That means they would be housed in an area with

12   similar inmates, and then the psych staff comes through

13   that area a little more often.  It alerts our staff that

14   there might be some issues there, so be aware.  It lets

15   everyone know that there could be some mental health

16   issues with respect to a particular inmate.

17        Q    So anyone with a psych P designation, where are

18   they housed?

19        A    I couldn't tell you right now.  But just B2,

20   just to choose an area of the jail, they would go to a

21   specific area of the jail that's been designated housing

22   for them.

23        Q    Daniel Hernandez was in Administrative

24   Segregation, you would agree, the whole time he was

25   there, 2008, 2009?

65

1       A     Uh-huh.

2       Q     He was also designated as a -- he had a P

3   designation, psychiatric designation.   But he was housed

4   in Administrative Segregation.

5             How do you explain that?

6       A     Okay.

7       Q     He wasn't housed with other psych patients.   He

8   was housed in Administrative Segregation.

9       A     Right.   So classification is done -- the

10  process of classification is for the security of the

11  facility.   When you have an inmate who has multiple

12  classification requirements, a person who needs to be

13  kept administratively apart from other inmates, an

14  inmate who has to be a two-deputy move because of

15  threats or potential threats of violence, when you have

16  an inmate who has been deemed administratively

17  segregated because maybe the nature of the crime is

18  complex enough or his past -- I'm not saying this is

19  Mr. Hernandez, but his past ability to manipulate staff

20  is well-known.   Those things will move an inmate to this

21  other area of our jail, the Administrative Segregation

22  area.

23            Within that area, you can have any number of

24  inmates, psych, protective custody, Ad Seg, any number

25  of them, they are housed together but in individual

                                                        66

1   cells so that their safety is insured, but also our

2   ability -- their ability to interface with the general

3   population is controlled or more controlled by us.

4        So that's how a psych inmate could end up in

5   that area and that's very common.

6   Q    Well, you talked about -- let's say they're not

7   Administrative Segregation designated but they're

8   psychological or psychiatric designated, you said those

9   people went to a different area.  What area do those

10  people go to?

11  A    It's just a normal housing area.  It's not

12  different in physical appearance attributes or anything

13  like that.  It's simply an area of the jail that we have

14  designated for psych inmates, because if you don't move

15  them together, you end up with -- we're just using psych

16  inmates.  It's sort of a bad example just because of the

17  societal implication, but you don't want psych inmates

18  spread all over your jail.  You could have problems.

19       One, staff isn't always readily able to

20  recognize who they're dealing with.  Two, inmates may

21  take advantage of them or they may try to take advantage

22  of other inmates.  It could go either way.  So by

23  keeping them in one area, you're able to program them.

24       When I say "program," I mean give them access

25  to day room programs, have group counseling, things of

                                                          67

1    that.  It's much more easy to provide service if you

2    keep that population together.  So that's what I'm

3    saying.

4         Q    Okay.  Now, you said the suicide -- you were

5    describing the Suicide Prevention Plan and you were

6    talking about they go through the 72-hour period where

7    they're observed to determine whether -- I would assume

8    to determine whether there's suicidal tendency or any

9    sort of self reporting of suicidal tendencies; is that

10   correct?

11        A    Absolutely.

12        Q    So after that, describe the Suicide Prevention

13   Plan after they're in their various designations.

14        A    Well --

15        Q    What happens?

16        A    Well, the other component of the program is

17   more of a physical plant component.  It's sort of an

18   ongoing progress -- ongoing job where we are constantly

19   reviewing our physical plant in an attempt make the most

20   attractive areas of -- or mechanisms of suicide less

21   available to inmates.

22             And this has taken over the years many forms.

23   Something as simple as our towel hooks.  The towel hooks

24   are now hinged, so if you put too much weight on it it

25   simply cants down so it will not hold weight.

68

1    Q    Because you have sick call outlines, right?

2    A    Uh-huh.  We have emergency buzzers.  They have

3  cellmates.  We have inmate -- we have deputies walking

4  through every hour.  So the design of the jail itself is

5  an interactive jail.  It's not a you shut the doors and

6  come back eight hours later and see who's still there.

7  There's a constant flow of information, of products,

8  toilet paper, mail, newspapers, commissary deliveries

9  constantly in and out of these housing areas, so that

10  these people have constant -- "constant" is a relative

11  term, but they have frequent contact with people in

12  order to avail them of whatever they might have in terms

13  of needs.

14    Q    Now, is there -- but is there -- after the

15  72-hour initial observation, is there any policies in

16  place for further observation other than just the

17  deputies observing the inmates in their various

18  locations, such as Administrative Segregation?

19    A    If there is, I'm not aware of it.

20    Q    Okay.  Now, is there any policies or procedures

21  in place that you're aware of for CFMG -- okay.  The

22  deputies are not trained medical personnel; is that

23  correct?

24    A    That's correct.

25    Q    They're not psychiatrists, psychologists or any

70

1    individuals trained with expertise in mental health; is

2    that right?

3        A    That's correct.

4        Q    Okay.  So you rely on CFMG to provide

5    psychological and psychiatric services to the inmates;

6    is that right?

7        A    That is correct.

8        Q    Is there any policies or procedures in place

9    that you're aware of requiring CFMG to routinely go into

10   Administrative Segregation to check on the inmates on a

11   routine basis during the year 2008, 2009?

12            MR. SHLENS:  Lacks foundation.

13            THE WITNESS:  I'm not aware.

14   BY MR. McLANE:

15       Q    You're not aware of any policies requiring them

16   to routinely check in on the inmates, is that correct,

17   during 2008, 2009?  I'm asking for your awareness.

18       A    I'm saying I'm not aware that there is or is

19   not.

20       Q    Okay.  What you're familiar with are the

21   policies of the Ventura County jail; is that correct?

22       A    Yes.

23       Q    And you have not seen any policy effective

24   during the year 2008, 2009 requiring CFMG psychiatric

25   personnel to routinely go through Administrative

71

1    Segregation to check in on the inmates; is that correct?

2       A    Yeah.   I'm not aware of that.

3       Q    You're not aware of any requirement of

4    requiring CFMG personnel to routinely check in on

5    inmates in other sections of the hospital, just general

6    population sections; is that right?

7            MR. SHLENS:   You said "hospital."

8            MR. McLANE:   I'm sorry.   Strike the question.

9            MR. SHLENS:   He made a face, so I figured that

10   was it.

11           MR. McLANE:   Strike the question.   I apologize.

12   BY MR. McLANE:

13      Q    Any policy or -- Ventura County policy or

14   procedure, are you aware of any policy or procedure

15   requiring Ventura -- CFMG personnel to routinely check

16   in on inmates in general population?

17           MR. HELD:   Could I ask for a clarification?

18           MR. McLANE:   Sure.

19           MR. HELD:   You mean sheriff's policy?

20           MR. McLANE:   Sheriff's policy.   At the CFMG

21   deposition we'll ask about CFMG policies.   I'm asking

22   about sheriff policies.

23           THE WITNESS:   I'm not aware of them.

24   BY MR. McLANE:

25      Q    I'm not talking about -- I know there's a

72

1  safety cell procedure and policy, and obviously when

2  someone is placed in a safety cell they're observed by

3  psychiatric personnel; is that right?

4      A    Yes.

5      Q    And there's a procedure for that once they're

6  put in there; is that correct?

7      A    Yes.  My understanding you're asking generally.

8      Q    I'm asking generally.  I segregated out the

9  safety cell.

10     A    Yes.

11     Q    So we're clear on that.

12          Off the record.

13              (Discussion held off the record.)

14 BY MR. McLANE:

15     Q    So if an inmate is in Administrative

16 Segregation and he doesn't call out for medical care or

17 something, and the deputy is not trained to -- in

18 psychological or psychiatric services and doesn't notice

19 anything, and there's no routine checks on that inmate,

20 how -- if that inmate has some suicidal tendencies, how

21 is that going to be determined by the jail staff?

22          MR. HELD:  I object as asked and answered.

23 BY MR. McLANE:

24     Q    If you can answer the question.

25     A    Well, I think the question is a little over

73

1  simplified.  Just because CFMG staff in your question

2  isn't required to do these mandatory checks, doesn't

3  mean that they aren't already going through for pill

4  call -- that our jail deputies aren't going through,

5  that the chaplains aren't going through.

6       I mean, there are so many people that move

7  their way through these cells, that if there is an

8  indicator of something, it very well could be noticed by

9  any number of people.

10     Q   I understand that.

11         MR. HELD:  Let him finish.

12  BY MR. McLANE:

13     Q   You're right.  Go ahead.  I apologize.  Go

14  ahead.

15     A   And not to inflate the ability of a deputy any

16  more than what it is, but they do receive crisis

17  intervention training, which is, granted, an

18  introductory training into certain things that a person

19  would look for for a person in crisis.

20         So there are some things that can be looked for

21  that would be indicators.  That doesn't mean that

22  everything will be seen, but it certainly -- I think

23  that's a more complete answer than maybe what you were

24  saying.

25     Q   Okay.

74

1     A    I felt like your question suggested that the

2  only person walking through is a deputy, if they

3  don't -- if CFMG isn't required to go through.  But

4  that's not true.  They're going through for any number

5  of others.

6     Q    Well, let's look at Daniel Hernandez.  You're

7  aware that he was refusing medication as of November

8  18th, 2008, correct?

9     A    Correct.

10    Q    He was no longer on the pill line, correct?

11    A    He was no longer -- no.  We still had pill call

12  nurses that would attempt to give him his medication.

13  Just because he refuses doesn't mean they stopped

14  showing up to see him.

15    Q    Well, they stopped as of November 18th, didn't

16  they?  There were attempts made prior to November 18th,

17  but after that there were no further attempts.  In fact,

18  Dr. Jung discontinued medication for Mr. Hernandez as of

19  November 18th, correct?

20    A    He may have done that.  But until the doctor --

21  I'm not being argumentative.

22    Q    No.

23    A    I'm saying until the doctor makes the order

24  that nurse will continue to make the opportunity

25  available to the inmate.  It's up to them to refuse.

75

1    Once the doctor withdraws the pill, the prescription,

2    then clearly, yes, they would stop going.

3        Q    Just one moment.  I'm going to mark as

4    Exhibit 53 a document that was produced in discovery.

5                    (Deposition Exhibit No. 53

6                    was marked for identification.)

7    BY MR. McLANE:

8        Q    Do you recognize this document?

9        A    Yes, I do.

10       Q    Did you prepare it?

11       A    No, I did not.

12       Q    Do you know who prepared it?

13       A    My belief would be Nicoletta Weeks.

14       Q    Okay.  This document indicates that medication

15   was discontinued November 18th, 2008, correct?

16       A    Yes.

17       Q    And so he would no longer be visited by someone

18   to receive medication after that date, correct?

19       A    Correct.

20       Q    You don't see any other entries, medications

21   continued or anything like that?

22       A    No.  I see other entries that he was seen by

23   medical staff for other things, but not for medicine.

24   You're correct.

25       Q    Okay.  And the other visits later on are about

                                                            76

1    refusals to eat -- I see various entries.  Do you see

2    those entries?

3        A    Yes.

4        Q    So those were visits by a nurse trying to get

5    him to eat; is that correct?

6        A    Either trying to get him to eat or monitoring

7    his vital signs and well-being as a result of his not

8    eating.

9        Q    Okay.  And he was on disciplinary isolation at

10   the time of his suicide, correct?

11       A    Correct.

12       Q    So that means he had a paper covering his cell,

13   so he couldn't see out of his cell; is that right?

14       A    That's correct.

15       Q    That's a form of punishment for committing

16   various disciplinary infractions, correct?

17       A    Yes.

18       Q    And I believe, if you could look at Exhibit 24

19   here, this is the disciplinary log for Mr. Hernandez.

20            Do you see Exhibit 24?

21       A    I do.

22       Q    And the first page indicates he was on

23   disciplinary isolation from December 19th through

24   December 23rd; is that right?

25       A    Yes.

77

1     Q   So that's where an inmate engages in maybe

2  aggressive or assaultive behavior towards a deputy so a

3  deputy will harm him, correct?

4     A   That's misstating it slightly.  Suicide by cop

5  typically happens on the streets.  So to say an inmate

6  assaults a staff member --

7     Q   No.  I'm taking an example from the streets,

8  where that can happen on the streets.

9         MR. HELD:  Wait.  That's not a question.

10  That's a comment.  I'm just making an example from the

11  street.  Whatever you said, that's a comment, not a

12  question.

13  BY MR. McLANE:

14     Q   So the question is you've heard the term

15  suicide by cop on the street, correct?

16     A   Yes.

17     Q   And that's basically where an inmate -- not an

18  inmate.  A person on the street acts aggressively

19  towards a police officer so the police officer will harm

20  him in some way, correct?

21     A   Yes.

22     Q   Now, isn't it possible that can happen in a

23  jail setting?

24         MR. HELD:  Objection.  Lack of foundation.  It

25  would call for the witness to speculate.

117

1  BY MR. McLANE:

2      Q    You can answer the question.

3          MR. SHLENS:  I think it's also an incomplete

4  hypothetical as phrased.  I may be wrong.  May call for

5  expert opinion testimony.

6          THE WITNESS:  The potential for suicide by cop

7  certainly could exist in a jail setting.  With the

8  information you provided, I don't know the nature of the

9  assaultive behavior.  It would have to be a high degree.

10  I don't know if I could quantify that.  There's a lot of

11  tentacles to that.  But could suicide by cop happen in a

12  jail setting?  Yes.

13  BY MR. McLANE:

14      Q    Now, because you said in your declaration that

15  you labeled these incidents of conduct by Daniel

16  Hernandez as assaultive behavior.  That's just your

17  opinion, correct, your lay opinion, characterizing those

18  events, correct?

19          MR. HELD:  I object, because you've already

20  examined the witness and he has a certain degree of

21  expertise in penology, so I think the question

22  mischaracterizes his expertise and on that basis I'm

23  objecting.

24  BY MR. McLANE:

25      Q    Okay.  You can answer the question.

                                                    118

1   of Daniel Hernandez?

2        A    They would not have typically.  Once he

3   returned to the court with a certification, their

4   involvement is done unless any further involvement by

5   the court is ordered.

6        Q    Now, are you aware of any medical --

7   psychiatric or psychological evaluation completed by

8   CFMG upon his return to --

9        A    I apologize.

10       Q    No.

11            -- upon his return to Ventura County jail?

12       A    I know there is a process.  I know that there

13   is interaction.  I can't characterize it.  I wasn't

14   involved and don't know the -- I haven't seen the

15   records, so I can't really comment beyond the fact I

16   know they become aware of these inmates returning and

17   psych staff does something.

18       Q    Well, when he returned he went through inmate

19   reception and he was medically cleared to Administrative

20   Segregation, correct?

21       A    Correct.

22       Q    We went over the records that indicated that --

23   I believe it's this Exhibit 53, that -- if you could

24   turn to that.  You have it before you.  It indicates on

25   November 18th medication was discontinued, correct?

                                                        130

1    BY MR. McLANE:

2        Q    Now, going back to Exhibit 53, it says

3    November 18th medication was discontinued.  Have you

4    seen any document or any record, Ventura County jail

5    or anything you've seen from CFMG, to the extent

6    you've seen anything from CFMG, indicating that

7    Daniel Hernandez went back on medication?

8        A    No.

9        Q    Was he ever taken, based on your review of the

10   records, to a hospital so he could be forcibly

11   medicated?

12       A    Absolutely not.

13       Q    And was the court, Superior Court, ever

14   notified that he was no longer taking medications?

15       A    I don't believe so.

16       Q    And you're aware that there was a court order

17   requiring him to be -- to be medicated?  You saw that

18   order, correct?

19       A    A court order ordering that a person be

20   medicated versus --

21       Q    Well, I'll pull out the document.

22       A    I don't want to say better question, but I

23   think I need a better question.

24       Q    I'll strike that and we'll refer to the

25   document.

                                                    144

1           If you could turn to Exhibit 18, this is the --

2   the first page is the competency -- Mental Competency

3   Order that you referred to in your declaration, correct?

4       A    Yes.

5       Q    If you turn to second page, can you look at

6   that document for a minute, review it to yourself.

7       A    Okay.

8       Q    Have you seen this document before?

9       A    No.

10      Q    This document is an order from Judge Clark.  Do

11  you know who Judge Clark is?

12      A    I do.

13      Q    And in the third paragraph where it says, "The

14  Ventura County Sheriff is ordered to maintain the

15  defendant on medication as recommended by Patton State

16  Hospital."

17          Do you see that?

18      A    I do.

19      Q    It says -- there's also on the next page, if

20  you look at it, it was personally served on sheriffs

21  transportation via Room 101 sheriffs civil.

22          Do you know that?

23      A    Yes, I do.

24      Q    What address is that, sheriffs transportation

25  via Room 101?  Is that the address that orders are sent

                                                    145

1   to?

2       A    Yes.  It's 800 South Victoria.  It's the main

3   government center.

4       Q    Okay.  So can you tell us the policy at Ventura

5   County jail in processing court orders?  How they're

6   generally processed.

7       A    Certainly.  An order such as this -- first and

8   foremost this order, I don't believe this order says

9   that we are allowed to force medication whatsoever.  To

10  maintain a person on medication versus compelling them

11  to take them are two different things.

12          I don't pretend to be an attorney for a moment,

13  especially in a room with five of them, but my reading

14  of this and my experience in the Legal unit, that would

15  not allow us to compel medication.  We would seek county

16  counsel's assistance in getting clarification for that.

17          That being said, how we handle court orders,

18  they are received by our sheriff's civil division which

19  is Room 101.  Sheriff's civil division will then

20  disburse court orders to the appropriate department or

21  agency within the Sheriff's Department for action.

22      Q    Now, an order dealing with medication, would

23  that typically be sent to you as the legal sergeant?

24      A    It would be sent to the jail, not necessarily

25  to me.

146

1      Q    Well, what's the process in funneling an order

2   such as this through the sheriff's -- through the jail

3   so it gets to the right people to address what the court

4   is saying here?

5      A    What it would do is it would go to

6   Transportation who is physically responsible for moving

7   the inmate.  They would then take the order with them

8   and when they dropped the inmate off at the jail, this

9   order would then be handed over to the jail along with

10   the inmate.

11         When this is seen, then that would be delivered

12   to the administration of the jail as well as the CFMG

13   component, so that they could maintain the medications

14   that have been ordered by Patton State Hospital.

15      Q    Okay.  Now, you're saying that if there was an

16   issue as to whether an inmate is refusing to take it,

17   you're saying you guys can't force the medication, you'd

18   go to county counsel.  Do you know whether that happened

19   in this case?

20      A    It did not.

21      Q    Why would you say that?

22         MR. HELD:  I'm going to object that the witness

23   answered that question.  He's told you that an order to

24   maintain is not the same as an order to forcibly

25   medicate, and I say now and for the record that his

147

1   legal ascertainment is 100-percent correct under both

2   the ninth circuit decision in Kulas versus CSO Valdez

3   and the United States Supreme Court decision in

4   Washington versus Harper.

5          Forcibly medicating on the strength of a vague

6   order like this to maintain is a constitutional

7   violation.  So his answer has been given.  It's correct,

8   and I'd request that you move on from this point.

9   BY MR. McLANE:

10     Q    No.  I'm not going to move on.  I'm asking you

11  what happened with this order.  You're saying typically

12  if this order was -- something such as this, that you'd

13  seek clarification from county counsel.

14         And I asked you whether you sought

15  clarification from county counsel with respect to this

16  order, and your answer was no.

17         MR. HELD:  This is now --

18         MR. SHLENS:  You mischaracterized what he said,

19  by the way.  He didn't say, "This order is vague.  I

20  would ask for clarification."  He didn't say that.  He

21  said, "This is an order to maintain."  So he didn't say

22  what you said he said.  He said if there was an

23  ambiguity then he would.

24         MR. HELD:  The problem I have is your question

25  is asking about privileged communication with his

148

```
1    attorney, county counsel.  I mean, that's invasive of
2    the attorney-client privilege.  And it's also not
3    reasonably calculated to lead to the discovery of
4    admissible evidence under the strength of Kulas.
5           MR. McLANE:  Sure.  This is reasonably
6    calculated.  I'm trying to find out what happened with
7    this order.  And that's all I'm asking you.
8    BY MR. McLANE:
9       Q    What happened with this particular order?
10          MR. HELD:  Vague and ambiguous.  What do you
11   mean what happened with it?
12   BY MR. McLANE:
13      Q    How was this order processed, this particular
14   order?  Do you know?
15      A    I do not know specifically how this particular
16   was processed.  I do not know.
17      Q    Well, this was an order that was produced in
18   discovery by the jail department.  So it's in your
19   records.  So it was in your records somewhere.  And I'm
20   trying to find out what happened to this order.
21          Did this get directed to the -- to CFMG?  Do
22   you have any information whether this order was
23   communicated to CFMG?
24      A    He was continued on medications so far as I
25   understand.  So my understanding would be yes, this
```

149

1  order was communicated to CFMG, medication were

2  continued.

3        What I would -- the information I was providing

4  you with is this simply says to maintain on medication.

5     Q   I understand what it says.  I'm just asking

6  what happened to the order.

7        Are you saying for a fact that you know that

8  this order was communicated to CFMG?

9     A   No.  None whatsoever.  I'm saying that he was

10 continued on it.  I know that our medical staff is in

11 contact with Patton.  It very well may be that they had

12 communication and this order never even came into play

13 because between the two of them they spoke and they

14 continued it.  So the order could have been slightly

15 moot, to steal a legal phrase, because the two

16 organizations were already on it.  I don't know what

17 specifically happened on this order.

18    Q   Okay.  So that's my question.  So you don't

19 know what exactly happened?

20    A   Right.

21    Q   Do you know whether this order would have

22 been -- what's the procedure -- not with respect to this

23 order particularly.  What is the procedure for where

24 such orders are kept by -- court orders, Superior Court

25 orders, where are they kept or maintained by the Ventura

150

1     A    I have no knowledge.

2     Q    That's all I'm trying to get at.

3     A    Fair enough.

4     Q    Do you have any information or knowledge from

5    your review of the records that the Superior Court was

6    ever notified that Mr. Hernandez had discontinued his

7    medications?

8     A    No.

9     Q    Do you have any information or knowledge from

10   your review of the records that Patton State Hospital

11   was ever notified that Mr. Hernandez discontinued his

12   medications?

13    A    No.

14    Q    Now, are you aware of any policies or

15   procedures in the jail -- let's just assume for the fact

16   that the records indicate that Patton State Hospital

17   recommended that Mr. Hernandez stay on anti-psychotic

18   medications.  Let's just assume that for the purposes of

19   this deposition.

20         MR. HELD:  Could I have that again.  Somehow I

21   got lost on that.

22   BY MR. McLANE:

23    Q    I'm saying for the purposes of this deposition,

24   just assume for the record -- I'm not saying whether

25   it's true or not -- that Patton State Hospital

153

1    recommended that Mr. Hernandez stay on -- remain

2    medically compliant on anti-psychotic medications.

3           Is there any procedures or policies that you're

4    aware of within the jail to ensure that he stays

5    medically compliant per Patton State Hospital's

6    recommendations?

7           MR. SHLENS:  Your question is again vague when

8    you say the jail.

9           MR. McLANE:  I'm talking about just the jail.

10   Not CFMG.

11          MR. SHLENS:  So the Sheriff's Department?

12          MR. McLANE:  The Sheriff's Department.

13          MR. HELD:  You mean the custodial aspects of

14   the jail.

15          MR. McLANE:  We'll get to CFMG at another

16   deposition.  I'm not asking him about his knowledge of

17   CFMG's procedures.

18          MR. SHLENS:  Thank you.

19   BY MR. McLANE:

20      Q    I'm asking you about the jail's procedures.  So

21   any sort of policies or procedures you're aware of?

22      A    Yes.

23      Q    What are those policies and procedures?

24      A    I'm not trying to be tongue-in-cheek, but we

25   open the doors and allow the nurses in to provide them.

154

1    Q    What if the inmate, let's say as in this case,

2  refuses to take medications, what are the policies and

3  procedures when there's been a recommendation by Patton

4  State Hospital to stay on medications and the inmate

5  refuses?  What are the policies and procedures by the

6  jail staff concerning what to do in response to that?

7         MR. HELD:  Objection.  Incomplete and improper

8  hypothetical, calls for speculation, lack of foundation.

9         THE WITNESS:  We would rely on the expertise of

10 CFMG for input and direction.

11 BY MR. McLANE:

12    Q    Do you have any knowledge whether you -- there

13 was any sort of -- when Mr. Hernandez was not

14 medically -- refused his medications, any communication

15 by the jail staff to CFMG to address the fact that he

16 was no longer taking his medications?

17    A    I'm not aware of any.

18    Q    Okay.  Now, same question about, you know, this

19 court order, whatever it means.  It says maintain the

20 defendant on medication as recommended by Patton State

21 Hospital, the November 6th order by Judge Clark.

22         Let's assume for the fact that --

23         MR. HELD:  Assume for the fact?

24 BY MR. McLANE:

25    Q    Okay.  Let's assume -- Strike that.

155

#:1597

1          Okay.  This is an order.  You guys received it.

2   Is there any policies or procedures in place when we

3   know that Mr. Hernandez stopped taking medications what

4   Ventura County jail policies or procedures in that

5   instance, when they received an order such as -- such as

6   this order from the judge?

7          MR. HELD:  I thought that was the last

8   question.

9          MR. McLANE:  No.  That was about Patton State

10  Hospital.  Now I'm talking about the order from the

11  judge.

12         THE WITNESS:  There would be -- in my reading

13  of this, there would really be nothing to do, because

14  this doesn't say anything about forcing medication,

15  providing medication over the objections of somebody.

16  It simply says maintain upon the recommendation.  So

17  long as the patient was compliant --

18  BY MR. McLANE:

19     Q    Well, he's no longer compliant.  We know he

20  wasn't compliant.  So you're saying in response to this

21  order the jail's response would be to do nothing?

22         MR. HELD:  Well, no.  I disagree.  That

23  mischaracterizes his testimony.  His testimony is that

24  in any event, custodial staff would not interfere with

25  the forensic medical providers provision of medication

156

Personal Court Reporters · San Fernando Valley · (818) 988-1900 · Santa Barbara · (805) 966-0177 · Ventura · (805) 654-1058

1    if the inmate wished to continue to take it, barring

2    some contradicting order by the forensic medical

3    provider.

4           MR. McLANE:   I don't think that was his answer.

5    We may disagree.

6    BY MR. McLANE:

7       Q    But I want your answer.  What is your answer in

8    response to that?  You got this order, however you

9    interpret it, stating he's ordered to maintain the

10   defendant on medication as recommended by Patton State

11   Hospital.  We know he discontinued it.

12          What is the policy and procedure by the jail

13   staff in this situation?

14      A    We would continue to support medical staff,

15   give them access so that they could continue to attempt

16   to deliver medication.  And at some point -- then at

17   some point they, under their expertise, would make a

18   determination as to how to continue from that point.

19      Q    Is there any written policy to this effect?  Or

20   you're just saying in your judgment or experience this

21   is how it would be handled?

22      A    In my experience this is how it's handled.

23      Q    I don't believe I saw any policy to that

24   effect.  Are you aware of any specific written policy to

25   that effect?

                                                        157

1    if the inmate wished to continue to take it, barring

2    some contradicting order by the forensic medical

3    provider.

4            MR. McLANE:   I don't think that was his answer.

5    We may disagree.

6    BY MR. McLANE:

7    Q    But I want your answer.   What is your answer in

8    response to that?   You got this order, however you

9    interpret it, stating he's ordered to maintain the

10   defendant on medication as recommended by Patton State

11   Hospital.   We know he discontinued it.

12           What is the policy and procedure by the jail

13   staff in this situation?

14   A    We would continue to support medical staff,

15   give them access so that they could continue to attempt

16   to deliver medication.   And at some point -- then at

17   some point they, under their expertise, would make a

18   determination as to how to continue from that point.

19   Q    Is there any written policy to this effect?   Or

20   you're just saying in your judgment or experience this

21   is how it would be handled?

22   A    In my experience this is how it's handled.

23   Q    I don't believe I saw any policy to that

24   effect.   Are you aware of any specific written policy to

25   that effect?

157

1     A     No.

2     Q     So in your judgment, based on this order and

3  the guy not being medically compliant, you wouldn't

4  notify the court?

5     A     No.

6     Q     Your answer is "no"?

7           MR. HELD:  Could I just have the question read

8  back.

9           THE WITNESS:  My answer was "no."

10                      (Record read.)

11          MR. HELD:  Do you mean to say -- the way he

12 used a negative, yes, you wouldn't notify the court?

13          THE WITNESS:  Right.  We would not notify the

14 court that this was happening.  There's no -- in my

15 interpretation, this is not a condition of probation.

16 It's not a condition of anything.  It is simply an order

17 to us to do something so long as we are able to.  So as

18 long as we are able to, we do.

19          MR. McLANE:  One moment.

20          THE WITNESS:  This is 55?

21                  (Deposition Exhibit No. 55

22                  was marked for identification.)

23 BY MR. McLANE:

24    Q     Yes.  Have you ever seen this document before?

25    A     No, I have not.

158

1       A    No.   The 72-hour Inmate Reception Center which

2   is to detect -- which is to find inmates which may be in

3   crisis or inmates having difficulty adjusting to jail

4   life.  Their Classification, in other words, where we're

5   going to house them in the criteria is -- has already

6   been decided.  However, at any time we could reclassify

7   someone based on the security needs of the facility.

8       Q    Let me see.  One second.  I don't know if this

9   will help or not.  Just one second.

10          Now, if you could turn to Exhibit 27.  Again,

11  it's a VCIJIS record.  And it talks about -- at the top

12  it says, "Classification ASAP2DVAP."

13      A    Yes.

14      Q    Can you define that classification to us?

15      A    I thought that might be your question.  So the

16  first two letters are Ad Seg, which means

17  administratively segregated inmate.  The next two

18  letters, AP, are additional precautions.  What that

19  indicates is that the inmate, for security reasons,

20  additional precautions are to be used when moving him.

21  That means when this inmate leaves his cell, he is to be

22  handcuffed, belly chained, shackled.  Those types of

23  precautions are taken.

24          The next, the 2D means that this inmate is a

25  two-deputy move, which means this inmate does not leave

228

1   his cell unless there are two deputies present when the

2   inmate is out of his cell, and that is a security

3   concern.

4        The next two letters, VA mean violent

5   assaultive, which means this inmate has shown a

6   propensity to be violent or assaultive to staff.  And

7   the final letter P means psychiatric inmate.

8        Q    Do you know when this -- can it be determined

9   when -- was this --

10        Okay.  He was initially booked April 12th.  So

11   he would have gone through a classification process?

12        A    Yes.

13        Q    So he came up with this classification; is that

14   right?

15        A    Potentially.  The additional precautions, the

16   two-deputy move portion, those can be -- those are

17   typically the result of in-custody behavior.  Whether

18   it's that particular custody stay or a past one, I don't

19   know.  But those can be added on at any time based on

20   custody behavior.

21        The other ones are usually a more -- a little

22   more historically based, so when you come into custody,

23   you can look back in time and say, "Yes.  You're going

24   to remain that classification until something changes."

25        Q    We can't tell from this document when these --

229

1   suicidal, SU1?

2       A    Correct.

3       Q    That makes a lot of sense.

4            So in terms of those classifications that we

5   went through in terms of two-deputy move and the other

6   classifications, there isn't like a separate

7   classification for suicidal?

8       A    No, there's not.

9       Q    Okay.  There's a classification for

10  psychiatric?

11      A    Correct.

12      Q    So if someone is suicidal, he'd be in safety

13  cells, but he wouldn't be in his classification -- there

14  might be a Jail Incident Report that says SU1, SU2 or

15  SU3, but it wouldn't be part of his classification?

16      A    The code would appear on that line of letters

17  because, remember, that line of letters is seen by the

18  people in the jail, and SU1 would tell them this

19  particular inmate needs to be treated a certain way.  In

20  other words, they're on a 15-minute log.  They're not

21  allowed to have a blanket.  They can or cannot go to

22  court.

23           So it is a code that is attached to their

24  classification, however it is, not in and of itself, a

25  classification.  It's simply an indicator to staff.

                                                        233