# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ESTHER BISELLI AND THE ESTATE OF DANIEL T. HERNANDEZ BY AND THROUGH HIS PERSONAL REPRESENTATIVE ESTHER BISELLI; K.N.H., [NAME REDACTED] A MINOR BY AND THROUGH HER GUARDIAN AND MOTHER, AMBER RODRIGUEZ, )))))))))  Plaintiffs, ))  vs. )) COUNTY OF VENTURA, VENTURA COUNTY SHERIFFS DEPARTMENT; SHERIFF BOB BROOKS; CALIFORNIA FORENSIC MEDICAL GROUP; TAYLOR FITHIAN, M.D., DR. JOHN KORZELIUS, DR. MELVIN MYUNG JUNG, MARIA BAEZLIN, DOES 1 through 10, inclusive, )))))))))))))  Defendants. )))) | Case No.  CV 09-08694-CAS(EX)   Pages 1 - 213 |

DEPOSITION OF DEPUTY JOHN DAVID EISENHARD

WEDNESDAY, APRIL 13, 2011

FILE NO:  110413TLC1

REPORTED BY:  TAMARA L. CARLSON, CSR NO. 12555

1    inmates are housed at that facility.

2         A.    It ranges between 500 at a low to 700, 800.

3    I'm not sure.

4         Q.    At the time of February 16, 2009, can you give

5    me an estimate?

6         A.    No.

7         Q.    Was it overcrowded at that time?

8              MR. HELD:  Objection.  Vague and ambiguous as

9    to the term "overcrowded."

10             Subject to the objection, you may respond, if

11   you know.

12             THE WITNESS:  I don't know.

13   BY MR. MCLANE:

14        Q.    Were there enough beds for every inmate in the

15   facility?

16             MR. HELD:  Objection.  Lack of foundation.

17             You may respond, if you know.

18             THE WITNESS:  I don't know.

19   BY MR. MCLANE:

20        Q.    Well, as of February 16, 2009, how many

21   inmates were housed in administrative segregation?

22        A.    I don't know.

23        Q.    How many cells are there for administrative

24   segregation as of February 16, 2009?

25        A.    16.

                                                        38

1      Q.   And Daniel Hernandez was housed there; is that

2   correct?

3      A.   In segregated housing, yes.

4      Q.   So he was in one of those 16 cells; is that

5   correct?

6      A.   Yes.

7      Q.   Could you describe where the, in relation to

8   administrative segregation, where the medical wing of

9   the jail is.

10      A.   Right down the hall.  It's like an L-shape.

11      Q.   So you have the 16 cells for administrative

12   segregation and then, like as another leg of the L, the

13   medical wing?

14      A.   Yes.

15      Q.   Is that where suicide-risk people are housed?

16          MR. SHLENS:  Lacks foundation.

17          MR. HELD:  Yeah, I think -- I agree.  I have

18   to join that because there's no foundation that's been

19   established that this witness would know about that, but

20   you can certainly explore it.  So I preserve the

21   objection of lack of foundation.

22          But if you know, you can respond.

23          THE WITNESS:  Can you clarify your question?

24   BY MR. MCLANE:

25      Q.   Yeah.  When a person is considered suicidal,

                                                        39

1   are they housed in a different part of the jail?

2        A.   Yes.

3        Q.   Where is that?

4        A.   Medical.

5        Q.   Can you describe the physical layout of the

6   medical wing?

7             MR. HELD:   I'm going to object as overbroad.

8             Do you want the -- I'm not sure even what you

9   mean exactly.

10            MR. MCLANE:   Okay.   Let me strike that.

11   BY MR. MCLANE:

12        Q.   How many cells are in the medical wing for

13   inmates?

14        A.   20.

15        Q.   20?

16        A.   (Inaudible response.)

17            MR. HELD:   Well, now, let's clarify this.   So

18   there's 16 in segregated and 20 in medical?

19            THE WITNESS:   Yes, sir.

20            MR. HELD:   Okay.   Go ahead.

21   BY MR. MCLANE:

22        Q.   And as of February 16, 2009, do you know

23   whether all the cells in the medical wing were filled

24   with inmates?

25        A.   I have no idea.

40

1  call another person for backup to respond to the

2  situation?

3      A.   We always call for backup for an inmate who is

4  classified as psych.  Additional precaution requires two

5  deputies to be moved and handcuffed at all times due to

6  his violent states.  We're required to call additional

7  people in case he wants to fight us or attack us.

8      Q.   What happened?  Did you go in the cell with

9  Senior Deputy Sedgwick?

10     A.   Yes, with medical staff.

11     Q.   And with medical staff?

12     A.   Yes.

13     Q.   What medical staff?

14     A.   I don't remember.

15     Q.   And what happened?

16     A.   Went in there to get him out, took his

17  vitals -- I don't know what his vital readings

18  were -- and then we took him down to a safety cell and

19  placed him in the safety cell.

20     Q.   What's a "safety cell"?  Can you describe

21  that?

22     A.   It's a rubber room.

23     Q.   Is that the term you use, "rubber room"?

24          MR. HELD:   In another generation, I think it

25  was called a padded cell.

                                                      48

1   BY MR. MCLANE:

2       Q.   "Rubber room," is that the term, the slang

3   that's used in the jail for a safety cell?

4       A.   Yeah.

5       Q.   Can you describe a safety cell?  What it looks

6   like?

7       A.   It's soft, not rubber, but soft walls.   I

8   don't know what the material is.  We call it "rubber,"

9   in general.

10      Q.   And do you recall what he was allowed?  Was

11  this a Level 1 response?

12      A.   Yes, Level 1 safety precautions.

13      Q.   And can you describe what Level 1 safety

14  precautions are?

15      A.   The inmate is placed inside a padded cell;

16  given a green safety blanket called a "smock"; monitored

17  every 15 minutes by a deputy, senior, whoever is there,

18  staff member.  The monitor is then logged on a monitor

19  log that's hanging by the door; so there's actually a

20  written response log.  And he's checked every 15

21  minutes.

22      Q.   And do you know how long -- okay.  What's

23  the -- strike that.

24           What's the purpose of the green safety blanket

25  or smock?

                                                        49

1     A.    Blanket, it's like a blanket they can cover up

2  with.

3     Q.    Is it made out of paper?

4     A.    I don't know the material.

5     Q.    Is it --

6     A.    It's tear proof.

7     Q.    Okay.  Tear proof.

8           So that's --

9     A.    Yes.

10    Q.    You know those are tear proof?

11    A.    Yes.

12    Q.    As opposed to the towels and sheets?  You

13 don't know whether they're tear proof or not?

14    A.    I'm not aware of that.

15    Q.    You haven't learned in your experience at the

16 jail that the regular towels and sheets are considered

17 "tear proof"?

18    A.    No.

19    Q.    Have you ever seen torn towels or sheets in

20 Daniel Hernandez's cell prior to his death?

21    A.    I don't know.

22    Q.    You have no recollection one way or the other?

23    A.    I searched a lot of cells in my time there.  I

24 don't remember finding any particular things inside his

25 cell.

                                                    50

1          MR. HELD:  It's not "Dr. Moskowitz."

2   BY MR. MCLANE:

3      Q.   Okay.  Psychiatric Nurse Moskowitz or Dr. Jung

4   concerning his condition?

5      A.   I don't recall any conversations I had with

6   either of them.

7      Q.   You indicated also that there were inmates,

8   psychiatric -- that some of the inmates housed in the

9   medical wing had psychiatric conditions; is that

10  correct?

11     A.   Yes.

12     Q.   Were any of them housed there for long

13  stretches of time?

14          MR. SHLENS:  It's vague.

15          THE WITNESS:  Yeah.

16  BY MR. MCLANE:

17     Q.   Like weeks or months?

18          MR. SHLENS:  Same objection.

19          THE WITNESS:  Yes.

20          MR. MCLANE:  Now I'm going to mark this as

21  Plaintiffs' Exhibit 6.

22          If you could just review that for a moment,

23  the first two pages.

24          (Plaintiffs' Exhibit 6 was marked for

25          identification.)

                                                    64

1       MR. HELD:  These Bates stamp numbers are now

2  inconsistent with our agreement.

3       MR. MCLANE:  No, no.  These are not exhibit

4  numbers.  These are just the --

5       Off the record for a second.

6       (Discussion off the record.)

7       MR. MCLANE:  Can we go back on the record?

8       MR. HELD:  Sure.

9  BY MR. MCLANE:

10      Q.  Okay.  You testified earlier about this

11  incident with Deputy Sedgwick?

12      A.  Uh-huh, Senior Sedgwick.

13      Q.  Senior Deputy Sedgwick.  Is this the incident

14  you're referring to as reflected in this Jail Incident

15  Report?

16      A.  Yes, sir.

17      Q.  And can I refer to the Jail Incident Report as

18  "JIR"?

19      A.  Yeah.

20      Q.  Is that how you refer to them?

21      A.  Yes, sir.

22      Q.  And you indicated that he was placed in safety

23  precautions Level 1; is that correct?

24      A.  Yes, sir.

25      Q.  And that's the rubber room; is that correct?

                                                    65

1       A.    Yes.

2       Q.    To prevent any risk of suicide?

3       A.    Injury to self or the cell that he was in.

4       Q.    Or to others; correct?

5       A.    Correct.

6       Q.    And injury to self can include suicide; is

7   that correct?

8       A.    Yes, sir.

9       Q.    If you turn to the page 3 of that, that

10  confirms what you said, that he had been recommended to

11  Level 1; is that correct?

12      A.    Yes, sir.

13      Q.    You recalled that incident very well.

14            You know, just a comment.

15            You accurately recalled this, and I won't go

16  into this any further.

17            If you turn to the next to the bottom

18  paragraph, it says a "Dr. Yung," Y-u-n-g.

19            Is that Dr. Jung with a J?

20      A.    Yes.

21            MR. SHLENS:   It is pronounced "Yung" by the

22  way.

23            MR. MCLANE:   Okay.  Dr. Yung.  So it's spelled

24  the way it's pronounced.  Thank you.

25            MR. HELD:   I'm sorry, which paragraph are

                                                          66

1    technician.

2         Q.   Okay.  What about an officer Malagon?  Odeon

3    Malagon?

4         A.   Yeah, he's classification.  He was.  He's not

5    there anymore.

6         Q.   By classification, you're talking about --

7         A.   The unit.

8         Q.   The unit who classifies the inmates for the

9    long term?

10        A.   Yeah -- yes, sorry.

11        Q.   Can you describe -- what's the difference

12   between administrative segregation and the conditions of

13   confinement as opposed those inmates housed in general

14   population?

15             MR. HELD:  Could we -- it sounded like a good

16   question except it was a little confusing or compound.

17             Could you rephrase that?

18   BY MR. MCLANE:

19        Q.   Okay.  I'm just trying to figure out -- okay.

20   When I'm asking these questions, I'm talking about the

21   time of Daniel Hernandez's death so we know what the

22   conditions are at the time of his death.  Not now, just

23   back then.

24        A.   Okay.

25        Q.   Inmates who are housed in administrative

                                                        83

1    segregation, for those inmates can you describe the

2    conditions of confinement --

3              MR. HELD:  I'm going --

4              MR. MCLANE:  -- for them, as opposed to

5    inmates who are not in administrative segregation?

6              MR. HELD:  Oh, I see.  I understand.

7              How does their housing --

8              MR. MCLANE:  Differ from general population?

9              MR. HELD:  Okay.

10   BY MR. MCLANE:

11       Q.   I'll ask some specific questions that may

12   trigger it, like are they on 24-hour-a-day lockdown?

13   How often do they go to the rec deck?  You know, those

14   sorts of conditions.  How often are they given access to

15   the day room?  Those sorts of things, as opposed to

16   general population inmates.

17             Can you describe those conditions?

18       A.   Yes, sir.  Inmates housed in administrative

19   segregation are on a 23-hour lockdown program.  So in

20   prison I guess that's like the SHU, security housing

21   unit, giving them one hour of day room per day.  That's

22   where they do the phone, work out, watch TV, shower,

23   whatever they like.

24       Q.   In the day room are they allowed to interact

25   with other inmates, or are they given their own separate

                                                           84

1    day-room hour by themselves?

2         A.   Own separate day-room hour by themselves.

3         Q.   Are the ad seg inmates allowed to have

4    physical contact or interact face-to-face with any other

5    ad seg inmates?

6         A.   No.   They're not supposed to.

7              (The reporter requested clarification.)

8              MR. MCLANE:   Ad seg, by "ad seg," I'm

9    referring to --

10             MR. HELD:   It's actually "ad," a-d, short for

11   administrative.

12             MR. SHLENS:   It's administrative segregation;

13   so a-d s-e-g, ad seg.

14   BY MR. MCLANE:

15        Q.   You understand what I'm referring to by

16   ad seg?

17        A.   Yeah.

18             MR. HELD:   But you're saying "ag."

19             MR. MCLANE:   I'm trying to say "ad seg" but it

20   probably sounds like "ag seg."

21             You know what I'm referring to; right?

22             THE WITNESS:   Uh-huh.

23             MR. HELD:   I think you're "spoonerizing" and

24   putting the G from seg into the D.

25             MR. MCLANE:   Okay.   Ad seg, you're probably

                                                        85

1        Q.    Oh, the second day you think he was going to a

2    visit?

3        A.    We're talking about the same thing; right?

4        Q.    Right.  The following day, not the day before

5    where you discussed "Bulldogs always face west" or he

6    said that.  The following day, the second incident.

7        A.    Yes.

8        Q.    So let's refer to the first incident and the

9    second incident.

10        A.    The second incident he was put back in his

11    cell.  I think so.

12        Q.    And you believe he may have had a visit the

13    second incident?

14        A.    Either a visit or roof.  We normally only pull

15    them out and belly chain-shackle them to go to the roof,

16    a visit, or they've got to leave seg housing.

17        Q.    Was he evaluated by any psych doctors on the

18    first visit or second visit, to your knowledge?

19        A.    It wouldn't be psych.  It would be medical, a

20    general medical nurse, if he was.

21        Q.    Why do you say that?

22        A.    Because it's not a psychiatric issue.

23        Q.    Talking about the bulldogs the second day

24    wasn't a psychiatric issue to you?

25        A.    No.

                                                        104

1           MR. HELD:  Same objections.

2           THE WITNESS:  Correct.  I don't.

3   BY MR. MCLANE:

4      Q.   But in your opinion, you didn't think it was

5   necessary to refer him to a psychiatric nurse or a

6   psychiatric doctor for either of those incidents;

7   correct?

8      A.    correct.

9      Q.   On either of those incidents, what other

10  behavior on the first incident -- let me take a step

11  back.

12          These two incidents, we'll call them

13  Incident 1 and Incident 2.  How long before February 16,

14  2009, did they occur?

15     A.   I don't know.

16     Q.   A month?

17     A.   No.

18     Q.   Weeks?

19     A.   No.  Probably a week, couple days.  I don't

20  know.  I don't know the exact dates.  If you have the

21  JIR, I could actually tell you.

22     Q.   We'll get to that.  We'll get it out so you

23  can get into those.

24          On the first incident, did he receive a JIR

25  for that?

                                                    106

1    A.   He didn't receive a JIR.

2    Q.   For the first incident, he didn't?

3    A.   A JIR was written, but --

4    Q.   Okay.  I'm sorry.

5         But was he put on any sort of discipline for

6    the first incident?

7    A.   They don't get put on discipline right away.

8    Q.   Okay.  Was he under discipline at that time?

9    A.   I don't believe so.

10   Q.   Was he under disciplinary isolation at that

11   time?

12   A.   I don't believe so.

13   Q.   But you're not sure; is that correct?

14   A.   I'm not sure.  You'd have to check his history

15   log.

16   Q.   What other behavior did you observe from

17   the -- the second incident you said was triggered by

18   either you were putting belly chains on for either a

19   visit or going to the roof.

20        What about the first incident?  What triggered

21   that?

22   A.   For me to respond to his cell?

23   Q.   Yeah.

24   A.   A loud noise.

25   Q.   He was making loud noises?

                                                    107

1      A.    I heard a loud noise coming from his cell.

2      Q.    What kind of loud noise?

3      A.    Thumping.

4      Q.    Thumping?  What was he doing when you came to

5    his cell?

6      A.    Jumping and stepping off the table onto the

7    ground and stepping back onto the table and jumping.

8      Q.    Looking at Plaintiffs' Exhibit 2 -- if you

9    could place that before the witness.

10          Or I could show you my Plaintiffs' Exhibit 2.

11          THE REPORTER:  I have it.

12          MR. MCLANE:  Okay.  Thank you.

13   BY MR. MCLANE:

14     Q.    By "table," is that depicted in Exhibit 2?

15     A.    No.

16     Q.    Where is the table located in the

17   administrative segregation unit?

18     A.    If you're looking at your picture right now,

19   your back is to the table.

20     Q.    Excuse me?

21     A.    If I'm taking a picture like this, the table

22   is behind me.

23     Q.    Is it like a desk or something?

24     A.    Yeah.

25     Q.    Is there like a chair there?  A built-in

108

1  chair?

2       A.   It's a cylinder stool, I guess a cylinder

3  object that they sit on, maybe a foot from the ground.

4       Q.   So he was jumping from the table to the

5  ground?

6       A.   Yes.

7       Q.   Did you tell him to stop it?

8       A.   Yes.

9       Q.   Did he keep doing it?

10       A.   A couple times, and I told him to stop again,

11  and he finally stopped.

12       Q.   And did you ask him why he was doing it?

13       A.   Yes.

14       Q.   What did he say?

15       A.   The bulldog statement, "Bulldogs always face

16  west."

17       Q.   And that was it?

18       A.   That was it.

19       Q.   Did you put him on disciplinary segregation as

20  a result of that incident?

21       A.   I wrote a JIR of the incident.

22       Q.   And you don't recall whether he was put on

23  disciplinary isolation?

24       A.   No.

25       Q.   Did, for this first incident, did he say

109

1   anything else?

2        A.   Uh-huh.

3        Q.   What else did he say?

4        A.   He challenged me to fight, to come into his

5   cell.

6        Q.   Had he ever challenged you to a fight before?

7        A.   No.

8        Q.   Did you do anything to provoke that?

9        A.   No.

10        Q.   Did he say why he wanted to fight you?

11        A.   No.

12        Q.   What did he say?  Do you recall his exact

13   words?

14        A.   I don't remember his exact --

15        Q.   To your best estimate, what do you recall?

16        A.   He was upset, and he punched the little, tiny

17   window, and he said, "Come in here and" -- something to

18   the extent of "Come in here, and I'll kick your ass" or

19   "I'll fight you" or something.

20        Q.   Okay.  Had you been doing any checks on that

21   floor?

22             Were you the administrative segregation

23   officer that day?

24        A.   Yes, I was the seg housing deputy that day.

25        Q.   I haven't asked you about this, but

                                                110

1    administrative segregation housing, is there one deputy

2    for all the units in a special booth or something

3    outside the cells?

4        A.   Yes.  One deputy for segregated housing, yes.

5        Q.   Okay.  So what do you do while you're on

6    administrative segregation duty?

7        A.   Do the normal daily operations for seg

8    housing.

9        Q.   And what are those?

10       A.   Feeding three times, hourly cell checks.

11       Q.   Give the scan checks?

12       A.   Yes.  Give them their day room.

13       Q.   Are you in a booth?

14       A.   No.

15       Q.   Where are you located as that deputy?  Do you

16   have a desk?

17       A.   It's in a central location.  It's a desk.

18       Q.   Can you see into all the cells?

19       A.   No.

20       Q.   So you have to walk around to check into the

21   cells?

22       A.   Yes.

23       Q.   Where are the visits for administrative

24   segregation inmates?

25       A.   On Level 2, the same level they're on, but

                                                      111

1    it's out in the central control area.

2        Q.   So a person, a family member, or somebody who

3    has permission to visit, they have to go up to Level 2

4    to visit?

5        A.   Yes.

6        Q.   Okay.  On that second incident, do you recall

7    any other behavior from him other than, you know, the

8    bulldog statement and challenging you to fight?

9        A.   No.

10            Which incident are you talking about?

11       Q.   The second incident.

12       A.   Which is the one where he's outside of his

13   cell?

14       Q.   Outside of his cell?

15       A.   No.

16       Q.   Anything else that you recall that he said?

17       A.   No.

18       Q.   Do you recall that he was, at either the first

19   or second incident, that he was responding to internal

20   stimuli or kind of like looking out in space and kind of

21   laughing to himself?

22            MR. HELD:  I'm going to object.  Vague and

23   ambiguous.  Argumentative.

24            You may respond.

25            THE WITNESS:  No.  I don't remember any.  I
                                                      112

1  don't recall.

2  BY MR. MCLANE:

3      Q.   Did you recall him ever doing that while he

4  was in custody?  Talking to himself?

5      A.   I don't know if he talked to himself.  A lot

6  of people talk to themselves.

7      Q.   Did you hear him talking to himself?

8      A.   I might have.  I don't remember.

9      Q.   When you were on ad seg duty and he was in his

10  cell, did you hear him making loud noises?  Disturbing

11  other inmates?

12          MR. SHLENS:  Beyond what's been testified to

13  already?

14          MR. MCLANE:  Yes.  Beyond these two incidents.

15          MR. HELD:  Within the framework of a point in

16  time?

17          MR. MCLANE:  Well, prior to February 16, 2009.

18  BY MR. MCLANE:

19      Q.   If you can pinpoint the time, that would be

20  great.

21      A.   It's difficult because he's had several

22  custody stays too; so...

23      Q.   Well, let's say --

24      A.   And I don't remember him all the time.  From

25  the incidents you and I were talking about is probably

                                                    113

1    the only time that I've dealt with him or caught my

2    attention from him.

3        Q.   When you were in administrative segregation

4    and he was there, did you hear him making noises from

5    his cell?

6        A.   Maybe.  I don't want to say yes; I don't want

7    to say no because I don't --

8        Q.   Did you hear other inmates telling him to be

9    quiet?

10       A.   The inmates tell each other to be quiet all

11   the time.  They don't use that kind of language, but

12   they --

13       Q.   Okay.  More graphic language.

14           Were there any people making graphic

15   statements to be quiet to Daniel Hernandez in

16   administrative segregation?

17       A.   I don't know if they were directed towards

18   him.  I'm trying to remember any incidents, and it's

19   been a while, and I...

20       Q.   I understand.  I'm just asking for your best

21   recollection.

22       A.   I don't know.

23       Q.   Is he considered, to your knowledge, a loud

24   inmate?

25       A.   At times.  From only the incident of him

                                                        114

1   making the loud jumping noise and then the incident of

2   where the excited delirium state, where he was grunting

3   and shouting, I guess.

4       Q.   All right.

5       A.   I don't remember anything else.

6       Q.   And how do you -- you seem to distinguish

7   between that earlier incident that we'll talk about

8   as --I'll just give you the date, I believe it was --

9         MR. HELD:  May 5.

10  BY MR. MCLANE:

11      Q.   -- may 5 and these two incidences.  And the

12  first one's excited delirium, and these two you didn't

13  see as excited delirium.

14        What do you see as the differences between

15  those incidents?

16      A.   Well, I'm not a doctor, but from excited

17  delirium he was nonresponsive and acting bizarre, to me.

18      Q.   Okay.

19      A.   That's bizarre.  The other behavior, it's -- I

20  don't want to say it's normal.  It's normal for jail.

21      Q.   He wasn't being responsive --

22      A.   He wasn't being responsive for the excited

23  delirium state.  He was responding to me for the other

24  two by getting upset with me for telling him to stop

25  jumping.  And then he carried that on to the next day,

                                                  115

1  remembering what I said from the day before, asking me

2  why I was talking about the bulldogs.

3        MR. SHLENS:  Do you have a report or something

4  so we can put this in a timeframe context?  I mean it

5  kind of seems like you're hiding the ball on that

6  timeframe, and I'd kind of like to know what we're

7  talking about.

8        MR. MCLANE:  We're going to get to that.

9        MR. SHLENS:  If you also have something to

10  refresh his recollection, if you think there's something

11  else.  It's not supposed to be a memory contest here is

12  all.

13  BY MR. MCLANE:

14      Q.   Okay.  Do you recall Mr. Hernandez refusing

15  food?  Refusing meals?

16      A.   I don't remember.  No, I don't.

17      Q.   No specific recollection?

18      A.   No.

19      Q.   Do you recall Mr. Hernandez ever lying rigid

20  in his cell?

21      A.   No.  Sounds like something that's from a

22  report because we use "lying rigid" a lot in reports.

23      Q.   Do you have any specific recollection --

24      A.   No, I don't remember.

25      Q.   Do you recall him ever having a sheet over his

                                                       116

1  head?

2       A.   No.  I don't recall that.

3       Q.   Did you ever see Mr. Hernandez talking to

4  himself in front of you?

5       A.   Like whispering.  I don't know.

6       Q.   Do you know what he was saying on those

7  occasions when he was whispering?

8       A.   Thinking out loud.  I don't know.

9       Q.   Did you -- did Mr. Hernandez ever smell of

10  urine that you recall?

11       A.   I don't know.  I don't know.  I don't recall.

12       Q.   Did you ever see Mr. Hernandez with a scar on

13  his wrists?

14       A.   I don't recall.

15       Q.   Were you aware that he had in the past

16  reported suicidal ideations?

17       A.   Yes.

18       Q.   Okay.  When did you become aware of that?

19       A.   I don't know.  It would be in their history.

20       Q.   So in reviewing the history, that's looking at

21  this VCJIS --

22       A.   VCJIS.

23       Q.   VCJIS system?

24       A.   Yes, sir.

25       Q.   But you didn't have access to the CFMG file;

                                                        117

1    is that correct?

2         A.    Correct.

3         Q.    Okay.  So you never looked at his CFMG file;

4    is that correct?

5         A.    Correct.

6         Q.    I just want to talk a minute about your

7    background training.

8              In your capacity, you started as a sheriff

9    deputy in 2006; is that correct?

10        A.    I started as a provisional deputy sheriff.

11        Q.    As a provisional deputy sheriff, what does

12   that mean?  You're on probation until they hire you

13   permanently?

14        A.    Kind of.  It was a program where they hire you

15   to -- you are an acting deputy while in the confines of

16   the custody environment.  As soon as you leave the jail,

17   you're not a deputy.  So it's like you're an acting

18   deputy until you graduate the academy.

19        Q.    So you went to an academy?

20        A.    I had to go to the academy.  Everybody does.

21        Q.    And what sort of training did you receive in

22   the academy concerning psychological or psychiatric

23   treatment of inmates?

24        A.    (Inaudible response.)

25        Q.    Do you recall anything specifically?

                                                      118

1        A.   Nothing specific, everything was all general.

2        Q.   Was the training to be everything concerning a

3   sheriff deputy including working on the streets and that

4   sort of thing, or was it specifically tailored to

5   working in the jails?

6        A.   Streets.

7        Q.   Did you receive any specific training in this

8   academy concerning working in the jails?

9        A.   Yes.

10       Q.   What sort of training or courses did you take

11  concerning working in a jail?

12       A.   Lots of them.   It's a learning domain.   I

13  don't -- I forget the number, but there's a bunch of

14  books.

15       Q.   Is it a POST training?

16       A.   Yes.

17       Q.   And "POST" stands for police officer standard

18  training?

19       A.   Yes.

20       Q.   Did you receive any domain training concerning

21  psychiatric or mental issues?

22       A.   I don't recall.

23       Q.   Possible, but you don't recall any specific

24  training?

25       A.   Yeah.   I don't recall.

                                                    119

1       Q.    After the academy, when did you start working

2    in the jail?

3       A.    I worked in the jail before the academy.

4       Q.    Okay.  So --

5       A.    So what they do is they start you in the

6    academy -- or they started me in jail in September of

7    '06.  I got hired in August, started in September.

8       Q.    Okay.

9       A.    Went to the academy in February of '07.

10      Q.    Okay.

11      A.    Graduated the academy in about June or July,

12   and then went back to the jail as a full-time deputy in

13   custody and jail and out of custody.

14      Q.    Oh, are you working the streets too?

15      A.    No.  It's just when I say "full-time," I mean

16   on and off duty?

17      Q.    Okay.  I understand.

18            So have you had specific training concerning

19   working with inmates with mental illness?

20      A.    Before or --

21      Q.    Let's say in the academy, that you recall?

22      A.    No, not that I recall.

23      Q.    Okay.  How about after the academy while being

24   posted in the men's central jail?

25      A.    Yes.

                                                        120

1        Q.   And when did that training occur?

2        A.   Last year.

3        Q.   In 2010?

4        A.   Yes.

5        Q.   Did you receive any training prior to that

6    time in -- prior to February 16, 2009, the date of the

7    suicide, any specific training that you recall?

8        A.   I don't recall.  I don't think so.  Nothing

9    formal.

10        Q.   So informal training, just working in the jail

11    basically?

12        A.   Experience.

13        Q.   Any training courses by any CFMG personnel

14    that you recall prior to February 16, 2009?

15        A.   Yes, yes.

16        Q.   What training was that?

17        A.   Just basic -- I don't know what it was called,

18    just a basic course that we go to and listen to them

19    talk.

20        Q.   It was a one-day training?

21        A.   Not even.  I think it's a couple --

22        Q.   A couple hours?

23        A.   Four to six hours.  I'm not really sure.

24        Q.   Can you describe that training, that four to

25    six hour training?

121

1       A.   It's, again, everything is general.  It talks

2   about all the -- the one thing that I remember is

3   communicable diseases.

4       Q.   Was it mental health training?

5       A.   It was both.

6       Q.   Was there training in assessing suicide risks

7   that you recall?

8       A.   No, I don't recall.

9       Q.   You don't recall any training in assessing

10  suicide risks prior to February 16, 2009?

11      A.   No.

12      Q.   Would there be a record of what training you

13  received?

14      A.   Yes.

15      Q.   Okay.  And is that record in your personnel

16  file?

17      A.   I think so, yeah.  It should be.

18      Q.   Because your personnel file would keep a

19  record of all the training courses that you've taken

20  while at the jail?

21      A.   Yeah.  It's supposed to, yeah.

22      Q.   Do you recall any testing or evaluations to

23  determine whether you had -- strike that.

24           Is there any certifications or any sort of

25  certifications or some sort of certificates indicating

                                                    122

1   you received mental health training?

2        A.    No.

3        Q.    That you're aware of?

4        A.    No, not that I'm aware of.

5        Q.    Okay.  Did the medical staff or the

6   psychiatric staff, to your knowledge, ever advise you

7   that Mr. Hernandez had a psychological disorder?

8        A.    His armband says he does.

9        Q.    Okay.  Because part of his designation is P?

10       A.    Yes.

11       Q.    And P means you have some sort of psychiatric

12  designation?

13       A.    Yes.

14       Q.    Did you ever learn what his psychiatric

15  disorder was?

16       A.    No.

17       Q.    Did you ever inquire to find out what his

18  psychiatric disorder was?

19       A.    No.

20       Q.    Did you talk to Dr. Jung or Nurse Moskowitz or

21  anyone else on the psychiatric staff about what type of

22  psychiatric disorder that he had?

23       A.    No.

24       Q.    Did they ever advise you that he might be

25  suicidal, to keep a careful watch on him?

                                                         123

1          A.    No.

2          Q.    In terms of -- strike that.

3                Do you know what Level 1, 2, or 3 safety

4     levels are?

5          A.    Yes.

6          Q.    As of February 16, 2009, did you know what

7     that meant?

8          A.    Yes.

9          Q.    Can you describe what those safety levels are?

10         A.    I described Level 1 before lunch.

11         Q.    Okay.  Well, can you describe it again.  I

12    know it's asked and answered, but can you just describe

13    those again, to the best of your knowledge.

14         A.    Sure.  Level 1 safety precautions:  You're put

15    in that padded room, all clothing is taken away from the

16    inmate and he's given no personal belongings.  The only

17    thing they're given is a green safety smock/blanket, and

18    the padded room is located in medical or booking.  We

19    have three padded rooms in our facility:  Two in

20    medical; one in booking.  If someone goes on a level 1,

21    2, or 3 safety precautions, they are moved from where

22    they are currently housed and housed in medical or

23    booking immediately.

24         Q.    What's the difference between Level 1 and 2?

25         A.    1 is they're checked every 15 minutes, and

                                                    124

1  they're only given that green safety blanket.

2         Once determined that they can go to Level 2,

3  which is pretty much easing up on the "You're not

4  allowed anything" to "Okay.  We're going to give you

5  some stuff back and see how you do."  It's all

6  psychiatric staff there.  We just assist in removing

7  stuff and giving them their stuff back.

8      Q.    So they're monitored in Level 1 or 2 by the

9  psychiatric staff?

10     A.    No, they're not.  What?

11     Q.    Well, I mean, you said that you're assisting

12 the psychiatric staff with regards to Level 1 and 2.

13        Are you monitoring them or is --

14     A.    What I meant to say was --

15     Q.    I'm sorry, go ahead.

16     A.    -- from Level 1 is a 15-minute monitoring log,

17 which is every 15 minutes they're checked on by a staff

18 member.  They go up there; look at the inmate; get some

19 kind of movement; see if they're visibly breathing,

20 awake, standing, whatever we see going on; write it down

21 on the log; put your numbers on it, the accurate time

22 and date.

23        Once psychiatric staff determines they're no

24 longer a Level 1 threat -- I don't know how they

25 determine it.  That's their psych staff rules -- they

                                                    125

1    move them to a Level 2 safety precautions; they let us

2    know.  They can go to 2 or 3.  I'll explain 3 later.

3              Level 2 is they're checked every 30 minutes.

4    At this point, they're moved to a regular cell, still in

5    medical or booking.

6         Q.   It's not a padded cell?

7         A.   Not Level 2 or 3.  Level 2 and 3 are regular

8    cells now.  But Level 2, they're only given the wool

9    blanket; a mattress; and blue clothing, a blue jail

10   smock and blue pants -- no orange clothing, no orange

11   shirt, no orange boxers, no orange socks, no towel, no

12   sheets; and they're placed in a cell and monitored every

13   30 minutes.  They're given no items, no nothing.

14        Q.   Basically no items that they could potentially

15   use to commit suicide?

16        A.   Harm themselves, yes.

17        Q.   Anything else about Level 2, or are you on to

18   Level 3?

19        A.   Level 2 is there, and then they go to Level 3,

20   which is they're checked on every hour, which is pretty

21   much like a cell scan, but we're still writing on the

22   log, which is right next to the door, what they're doing

23   that hour when we come by and look at them.

24        Q.   Now, are they --

25        A.   At that point, they're given back everything,

                                                    126

1    all their clothing.  The only thing they're not allowed

2    to have is anything sharp:  No combs, no picks, no

3    sporks, and no pencils, no golf pencils.

4        Q.   Okay.  Now is Level 3 -- is that in the

5    booking area?

6        A.   Or medical.

7        Q.   Or medical.  So it can be -- and there's like

8    three cells total, you were saying?

9        A.   No.

10       Q.   How many cells are dedicated to the

11   psychiatric, these safety cells?

12       A.   Safety cells are only for Level 1 safety

13   precautions.  That's it.

14       Q.   Safety cells are only Level 1?

15       A.   Only Level 1.

16       Q.   Okay.

17       A.   The padded rooms, they've got a grate in the

18   floor, and there's nothing in it.  There's a camera and

19   a light.

20       Q.   And in Level 2 and 3, what type of cells are

21   those?

22       A.   Regular cells.

23       Q.   Do they have to be in the medical ward --

24       A.   Yes.

25       Q.   -- or can they be in any --

127

1        A.    Yes.   They have to be in a cell in medical.

2   If there's not a cell available in medical, they're in

3   booking because there's always a nurse in booking or

4   always a nurse in medical.   And there's always a staff

5   member around within earshot of both areas.

6        Q.    Okay.

7        A.    Someone's always in booking; someone's always

8   in medical, nonstop.

9        Q.    Okay.

10       A.    So that's the only places that safety

11  precautions can end up.

12       Q.    And in Level 2 and 3, you're saying that

13  they're not the padded cells.

14             Do they have cameras in there?

15       A.    No.   That's what the monitoring log is for.

16       Q.    And the camera allows whoever is monitoring

17  Level 1 to see inside the whole cell.

18       A.    The camera that's inside the cell?

19       Q.    Yeah.

20       A.    Yeah.

21       Q.    The safety cell, does it have glass walls or

22  solid walls?

23       A.    The safety cell?

24       Q.    The safety cell.

25       A.    That's the padded room.

                                                    128

1   BY MR. MCLANE:

2        Q.   I'm just asking your personal opinion.

3        A.   I don't know his stress levels.

4             MR. MCLANE:   One second.

5             (Discussion off the record.)

6   BY MR. MCLANE:

7        Q.   Now we were speaking about these two incidents

8   separated by a day that you thought were perhaps a week

9   or a few days before his suicide.   So I'm going to

10  present to you the reports now.

11       A.   Okay.

12       Q.   Maybe that will refresh your recollection

13  about those incidents.

14            This is Plaintiffs' Exhibit 7, and

15  February 12th will be Plaintiffs' 8.

16            (Plaintiffs' Exhibits 7 and 8 were

17            marked for identification.)

18  BY MR. MCLANE:

19       Q.   Let's just first review the February 11th.

20            Have you had a chance to review the JIR for

21  February 11th?

22       A.   Just now, yes.

23       Q.   Let's go over that incident.   In this report

24  you've quoted Mr. Hernandez several times and he

25  says -- excuse my language here, but I'm going to use

139

1    the language that's in the report.   He says:

2         "Fuck you, punk."

3         Is that correct?

4    A.   Correct.

5    Q.   And he says:

6         "Open the fucking door, you pussy!   You

7         run this jail right.   Come in and do

8         something about it, you fucking faggot!"

9         He said that?

10   A.   Yes.

11   Q.   Okay.   And he said later:

12        "Your [sic] a fucking pussy and go rape

13        yourself you fucking faggot."

14        Is that correct?

15   A.   Yes.

16   Q.   Nowhere in here does he say anything about

17   "Bulldogs always face west"; correct?

18   A.   Correct.

19   Q.   And you thought that was important today to

20   mention, but you didn't mention it in your report;

21   correct?

22   A.   Correct.

23   Q.   And if you turn to page 3, he was disciplined

24   for this; correct?

25   A.   He was given discipline for it, yes.

                                        140

1    Q.    He was given discipline?

2    A.    Which means it doesn't start right away.

3    Q.    Okay.  Well, it says -- turn to the bottom of

4    1006.

5          We know he committed suicide on February 16th;

6    correct?

7    A.    Correct.

8    Q.    He was put in begin-date disciplinary

9    isolation on February 13th; correct?

10   A.    Correct.

11   Q.    Four days before his suicide; correct?

12   A.    Yes.

13   Q.    Describe what disciplinary isolation is?

14   A.    They're in the same cell.  They're not removed

15   from their cell.  They're not allowed to have or

16   supposed to have any jail-issued books, any kind of

17   reading material other than Bibles or religious

18   material.  They're allowed to have a couple pencils,

19   pieces of paper.  At that time we were still doing

20   envelopes; so they could mail out letters.  They were

21   allowed to have that, and if he had any commissary, that

22   was taken away -- commissary items like edible items.

23   Q.    Well, it indicates here he lost commissary for

24   30 days beginning February 13th; correct?

25   A.    Correct.

141

1     Q.    And he was placed in disciplinary isolation 27

2  days commencing February 13th; correct?

3     A.    Yes.

4     Q.    And he lost all his visits for 30 days;

5  correct?

6     A.    Yes.

7     Q.    Now, isn't there people placed in disciplinary

8  isolation, a piece of paper is placed over the small

9  window in their cell?

10    A.    Yes.

11    Q.    Describe that for me.

12    A.    It's like this:  Put it over the window; pick

13 it up to check; put it back down.

14    Q.    But the inmate cannot see out the cell?

15    A.    Out the -- well, they can see out the cracks,

16 and they can see out the window that's in the back of

17 the cell.

18    Q.    Okay.  So what's the point of putting the

19 piece of paper over their window?

20    A.    Discipline.  It's the way it's been run in the

21 jail.  There's an isolation area that's upstairs on 4

22 and 3, that when inmates get put on isolation, they get

23 moved to an isolation cell where there is no window and

24 there is no outside contact.

25    Q.    Was he moved to an isolation cell?

142

1      A.   No.   The inmates in segregated housing, due to

2  their classification being a two-deputy-move inmate, due

3  to his violent behaviors, you just leave them in the

4  cell and remove the items from the cell that he's not

5  allowed to have, instead of taking a chance and moving

6  him to another cell.

7      Q.   What's the point of placing paper over his

8  window?

9      A.   To block his view to the outside world; so he

10 can't see what's going on out there.

11     Q.   To further isolate him; right?

12     A.   Yeah.

13     Q.   Can't see any people; right?

14     A.   Correct.

15     Q.   Can't see any guards --

16     A.   No.

17     Q.   -- unless you lift up the piece of paper?

18     A.   Except for us when we come back.

19     Q.   But when you don't lift up the piece of paper,

20 he can't see you; correct?

21     A.   He can't see us anyway.

22     Q.   And he can't see any other inmates; correct?

23     A.   Correct.

24     Q.   From his view, if that window was open, could

25 he see into the day room?

143

1      A.   Depending on where his cell is.

2           What cell was he in?   D?

3      Q.   MJ-2-SG-D-02

4      A.   Yeah.  I'm figuring it out.  Hold on.   D-02

5  has a window, and it's actually -- I can't describe it.

6      Q.   Go ahead.  You're describing it.

7      A.   From his view, if he didn't have this up, he

8  would be able to see into a day room; so I can give you

9  that.

10     Q.   So -- thank you for giving me that.

11     A.   I can't give the layout of the jail cell.

12     Q.   Okay.  I won't ask you to give me the

13  architectural plans.  I appreciate that.

14          So if an inmate is exercising or in the day

15  room, without the piece of paper, you could potentially

16  see that inmate; correct?

17     A.   Yes.

18     Q.   So the point of the piece of paper over the

19  window is to further isolate him and to punish him;

20  correct?

21     A.   Yes.

22     Q.   Now, were you at the disciplinary hearing for

23  this February 12th incident?  I mean February 11th

24  incident?

25     A.   No.

                                                     144

1      Q.    Tell me about these disciplinary hearings.

2   How are they conducted?

3      A.    By the senior deputy.

4      Q.    Does it state here on page 2 who the senior

5   deputy is?

6      A.    Yes, it does.

7      Q.    So is it Volpe?

8      A.    Correct.

9      Q.    And you provide testimony, or how does that

10   work?  You just give the report?

11      A.    And he goes and gets the testimony and gets

12   the inmate to say his side.

13      Q.    And it indicated on page 2 that Mr. Hernandez

14   shook his head side to side, indicating he didn't want

15   to talk.

16            Is that correct?

17      A.    That's what it says, yes.

18      Q.    I'm on page 2.

19      A.    Yes.

20      Q.    So and then if you turn to page 3 -- page 4,

21   sorry.  I apologize.  It indicates that you wrote the

22   JIR; correct?

23      A.    Uh-huh.

24      Q.    Volpe made the finding of discipline; correct?

25      A.    Uh-huh.

                                                    145

1    Q.   And J. McGrath approved it; correct?

2    A.   I wrote the report, Senior Deputy McGrath

3  approved it, and then Volpe did the hearing.

4    Q.   Okay.

5    A.   The report has to be approved before the

6  hearing is done.

7    Q.   Okay.  And was there any consultation with

8  anyone at CFMG or the psychiatric staff before imposing

9  this discipline?

10    A.   No, not to my knowledge.

11    Q.   Turning to Plaintiffs' Exhibit 8, which is

12  before you, if you could review that JIR.

13         Have you had a chance to review the report?

14    A.   Yes, sir.

15    Q.   And you wrote this report?

16    A.   Yes.

17    Q.   And you indicated previously you thought it

18  was for a visit or going up to the --

19    A.   Roof.

20    Q.   -- roof for exercise?

21    A.   Uh-huh.

22    Q.   It was for a visit; correct?

23    A.   Yes.

24    Q.   So Mr. Hernandez said:

25         "What did you say about the bulldogs the

146

1              other day?"

2              Correct?

3      A.     Correct.

4      Q.     And he said:

5              "What did you say about the bulldogs?"

6              Correct?

7      A.     Yes.

8      Q.     And it appears you didn't respond at all to

9  him?

10     A.     Told him to face the wall.

11     Q.     You just told him to face the wall?

12     A.     Uh-huh.

13     Q.     But he didn't respond to your command;

14  correct?  He continued to walk toward you?

15     A.     Yes.

16     Q.     And then he began to tense his arms and began

17  squirming and moving his shoulders to resist you in

18  asserting control over him?

19     A.     Yes.

20     Q.     That was basically the incident?

21     A.     Yes.

22     Q.     Did you know who he was going to visit that

23  day?

24     A.     No.  I have no idea.

25     Q.     And then if you turn to -- at the bottom it's

                                                    147

1    Bates stamped 1020, at the bottom right-hand corner.

2           Do you see that?

3       A.   1020?

4       Q.   Oh, excuse me.   1020.

5           MS. WEISBERG:   This way.

6           THE WITNESS:   All the way in the back?

7           MR. MCLANE:   It's the sixth page.

8           THE WITNESS:   Got it.

9    BY MR. MCLANE:

10      Q.   This is the disciplinary report; correct?

11      A.   Yes.

12      Q.   And what was the discipline imposed on

13   Mr. Hernandez for this incident?

14      A.   5 days isolation, 21 commissary, 21 visit.

15      Q.   Now the isolation was to commence March 12;

16   correct?

17      A.   Correct.

18      Q.   And if you turn to Exhibit 7, if you turn to

19   the page indicating the discipline, it indicates that

20   disciplinary isolation was for 27 days, beginning on

21   February 13 and going to March 11, 2009; correct?

22      A.   Yes.

23      Q.   So that five days for the second incident on

24   February 12 was just to be one consecutive?

25      A.   Yes.

148

1     Q.   So he's actually -- and this finding was on

2  February 13th; correct?

3     A.   Yes.

4     Q.   The hearing?

5     A.   Yes.

6     Q.   Just three days before his suicide?

7     A.   Yes.

8     Q.   So as far as Mr. Hernandez knew, he was going

9  to be in disciplinary isolation until March 16, 2009;

10  correct?

11     A.   Correct.

12     Q.   Now, when a person is in disciplinary

13  isolation and you put the paper over the window, the

14  only way the guard can see as to what's going on is when

15  they lift up the paper; correct?

16     A.   Yes.

17     Q.   There's no video camera in those cells;

18  correct?

19     A.   No.

20     Q.   There's audio; correct?

21     A.   There's audio in the hallways.  You can hear.

22     Q.   You guys can listen in?

23     A.   There's emergency call buttons, yes.

24     Q.   Can you hear what's going on in the cell other

25  than yelling when you hear it from outside?

149

1          Is there a way to listen in through a speaker

2     or any listening device, or you can only listen in if

3     they push the emergency button?

4          A.   Well, they either have to push it, or we have

5     to push on the other side.

6               It's an emergency call button that the inmate

7     pushes when he has an emergency or a plumbing problem

8     and lets us know what's going on.

9          Q.   Okay.

10         A.   And if we want, we can actually push the

11    button and talk to him that way too.

12         Q.   Okay.  So it's a way of two-way communication?

13    But there's not listening going on all day?

14         A.   No.  Not all the time.

15         Q.   It's only if you press the button in response

16    to an inmate making an emergency request to you?

17         A.   Yeah.

18         Q.   That's the standard practice?

19         A.   Yes.

20              MR. VOGEL:  Can I ask a question on that?

21              MR. MCLANE:  Yes.

22

23                        EXAMINATION

24    BY MR. VOGEL:

25         Q.   If you're in the booth, can you just push the
                                                        150

1         MR. MCLANE:  You sure?

2         MR. HELD:  Yeah.

3         MR. MCLANE:  If you can mark this June 30th

4    incident, it would be?

5         THE REPORTER:  14.

6         MR. MCLANE:  Plaintiffs' 14.

7         (Plaintiffs' Exhibit 14 was marked for

8         identification.)

9    BY MR. MCLANE:

10        Q.   I know that you weren't involved in this

11   incident; correct?

12        A.   Correct.

13        Q.   But this was an incident dated June 30, 2008?

14        A.   Correct.

15        Q.   Involving Officers Sedgwick, Miller, and Kipp?

16        A.   Deputies.

17        Q.   Deputies, excuse me.

18             And this reflects that Mr. Hernandez appeared

19   rigid with clear liquid coming out of his mouth, holding

20   his breath, and his body was rigid, and he smelled of

21   urine; correct?

22        A.   Correct.

23        Q.   Did you ever see him tense up as described in

24   this report?

25        A.   No.

                                                      184

1      Q.   Did you ever see him become rigid?

2           MR. HELD:  Well, I'm going to object to that

3   last question and move to strike it.

4           Are you asking him whether he personally

5   witnessed the events in this incident?

6           MR. MCLANE:  No.  Just whether he had seen him

7   tense up at any point in time.

8           MR. HELD:  Ever?

9           MR. MCLANE:  Ever, ever.  I'm just using this

10  as a basis to ask him about some of the behavior

11  reflected in the report.

12          MR. HELD:  I understand.

13  BY MR. MCLANE:

14     Q.   So did you ever see him, Mr. Hernandez, appear

15  rigid and like just like lying in his cell and not

16  responding to your commands or anything like that?

17     A.   He didn't respond.  I don't know if he was

18  rigid or not.

19     Q.   Was that a routine thing with Mr. Hernandez

20  not responding?

21          MR. HELD:  Objection.  Overbroad.  Calls for a

22  narrative.  Lack of foundation.

23          THE WITNESS:  In my previous reports I put

24  that he didn't respond when I would say something to

25  him.

                                                185

1   on isolation.

2           MR. MCLANE:   I believe we have the isolation

3   records, Plaintiffs' Exhibit 24.

4           (Plaintiffs' Exhibit 24 was marked for

5           identification.)

6   BY MR. MCLANE:

7       Q.   This is a disciplinary log, if you look at it,

8   covering the months of December, January, and February;

9   is that right?

10      A.   Correct.

11      Q.   He was in disciplinary isolation from

12  December 19th through December 23rd; is that right?

13      A.   Yes.

14      Q.   The first page?

15      A.   Yes.

16      Q.   And he appeared to refuse several meals during

17  this time period; correct?

18      A.   Correct.

19      Q.   Turn to the next page.  This disciplinary

20  report for the handball is numbered

21  171308 -- correct? -- from the prior Exhibit 23?

22      A.   Yeah.

23      Q.   Turn to the second page, January.  If you look

24  at the disciplinary number at the bottom, it's for the

25  same event; correct?

                                                        204

1      A.    Yeah.

2      Q.    So he's on discipline for the handball

3  incident in isolation from January 6th through

4  January 12th; correct?

5      A.    Correct.

6      Q.    And then if you look at the next page, it

7  appears that he was on disciplinary isolation from

8  February 13th through February 16th, the date of his

9  death; correct?

10     A.    Correct.

11     Q.    And he received his meals on February 13th; he

12  refused on February 14th --

13     A.    Where did he refuse?

14     Q.    What?

15     A.    Where did he refuse?

16     Q.    Well, "Remarks: Refused."

17     A.    That's a cleaning cart.  He refused a cleaning

18  cart.

19     Q.    What does that mean, "He refused a cleaning

20  cart"?

21     A.    He didn't want to clean his cell that day.

22     Q.    And he refused a cleaning cart on the 16th as

23  well; correct?

24     A.    Yes.

25     Q.    And then if you look at the next page, there's

                                                    205

1  all these logs from, looks like from the -- well, it

2  goes from the 17th -- it's not filled out obviously

3  because he died -- through March 11th; correct?

4       A.   Uh-huh.

5       Q.   And there's nothing, and that's because he was

6  supposed to be on disciplinary isolation through that

7  time period; correct?

8       A.   Yes.

9       Q.   Now, knowing what you know now about

10  Mr. Hernandez's suicide, is there anything that you

11  would have done, personally, different in how you

12  treated Mr. Hernandez?

13      A.   No.

14      Q.   Would you, as a result of those two

15  disciplinary incidents on February 11th or

16  February 12th, would you have had a psychiatric nurse

17  evaluate him?

18      A.   No.

19      Q.   Would you have -- do you believe it was

20  appropriate to put him in disciplinary isolation and

21  cover up his window?

22      A.   Yes.

23      Q.   So basically if you had another chance with

24  Mr. Hernandez, you would have done everything the same?

25      A.   Yes.

                                                206

# EXHIBIT G

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

ESTHER BISELLI AND THE ESTATE        )
OF DANIEL T. HERNANDEZ, BY AND       )
THROUGH HIS PERSONAL                 )
REPRESENTATIVE ESTHER BISELLI;       )
K.N.H., [NAME REDACTED] A MINOR,)
BY AND THROUGH HER GUARDIAN AND      )
MOTHER, AMBER RODRIGUEZ,             )
                                     )
           PLAINTIFFS,               )
                                     ) CASE NO.
           VS.                       ) CV 09-08694-CAS(Ex)
                                     )
COUNTY OF VENTURA; VENTURA           )
COUNTY SHERIFFS DEPARTMENT;          )
SHERIFF BOB BROOKS; CALIFORNIA       )
FORENSIC MEDICAL GROUP;              )
TAYLOR FITHIAN, M.D.; DR. JOHN       )
KORZELIUS; DR. MELVIN MYUNG          )
JUNG; MARIA BAEZLIN, DOES 1          )
THROUGH 10, INCLUSIVE,               )
                                     )
           DEFENDANTS.               )
_____)

DEPOSITION OF KAREN HANSON

THURSDAY, APRIL 21, 2011

FILE NO.  110421KAE1

REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

```
 1     Q    By "his jacket," what do you mean?

 2     A    His file.

 3     Q    His file at the jail?

 4     A    I think that's where they keep them.

 5     Q    Did you ever see this document again after you

 6  handed it off to the reception deputies?

 7     A    Not until this.

 8     Q    So turning to the bottom of the form, there are

 9  a number of categories with "yes" or "no."

10     A    Yes.

11     Q    Do you see that?

12     A    Yes.

13     Q    And I'm going to ask you about each one, to

14  give you a heads up.

15     A    Okay.

16     Q    So for gang related history, you marked "no."

17  Where did you get that information?

18     A    From Daniel.

19     Q    For suicidal, you checked "no."  Where did you

20  get that information?

21     A    From Daniel.

22     Q    Are all --

23          MR. HELD:  Just for clarity of the record, I

24  know this was not an intentional misstatement on your

25  part, but you used the word "checked" and someone
```

                                                          33

1    looking at the transcript might look for a checkmark and

2    it's circled.  So I'm sorry to be a nitpicker, but just

3    so we're crystal clear.

4              MS. WEISBERG:  We want a clear record.  I

5    appreciate that.

6    BY MS. WEISBERG:

7        Q    For the rest of these categories, there are 12.

8    Were all of your circlings based on information you got

9    from Daniel?

10       A    Yes.

11       Q    Did you check any other source of information

12   before you circled these answers?

13       A    No.

14       Q    Now, if you'll look in this binder and turn to

15   Exhibit 21.  And to clarify your last response, and I'm

16   sorry to do this to you, but can you turn back to

17   Exhibit 35.

18              I believe you answered, and correct me if I'm

19   wrong, that that -- that the answers on the bottom of

20   the form were based on responses from Daniel Hernandez

21   and not information from other sources.

22       A    Yes.

23       Q    To follow up, would you have written any of

24   those answers based on documentation you received from

25   Patton?

                                                          34

# EXHIBIT H

# DEPOSITION OF JEREMY REA JACKSON

```
                 UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION
ESTHER BISELLI AND THE        )  NO. CV_09-08694-CAS(Ex)
ESTATE OF DANIEL T.           )
HERNANDEZ, BY AND THROUGH     )
HIS PERSONAL REPRESENTATIVE   )
ESTHER BISELLI; K.N.H., [NAME )
REDACTED] A MINOR, BY AND     )
THROUGH HER GUARDIAN AND      )
MOTHER, AMBER RODRIGUEZ,      )
                              )
            Plaintiffs,       )
                              )
       vs.                    )
                              )
                              )
COUNTY OF VENTURA, VENTURA    )
COUNTY SHERIFFS               )
DEPARTMENT; SHERIFF BOB       )
BROOKS; CALIFORNIA FORENSIC   )
MEDICAL GROUP; TAYLOR         )
FITHIAN, M.D., Dr. JOHN       )
KORZELIUS, Dr. MELVIN MYUNG   )
JUNG, MARIA BAEZLIN, DOES 1   )
through 10, inclusive,        )
                              )
            Defendants.       )
_____)
```

Wasco, California            Thursday, May 10, 2012
                        -oOo-
                   DEPOSITION OF
                JEREMY REA JACKSON
                        -oOo-


Reported by:

MARTHA S. GUERRA,
Certificate No. 6398

1

## DEPOSITION OF JEREMY REA JACKSON

1      A.    Yes.

2      Q.    Which jail was this?

3      A.    I went to Todd Road.

4      Q.    And how long were you at Todd Road?

5      A.    From July to about November of 2008.

6      Q.    And after November 2008, were you transferred

7  to another Ventura County Jail facility?

8      A.    I was transferred back to Ventura County Jail.

9      Q.    The Main Jail?

10     A.    The Main Jail, yes.

11     Q.    Where were you housed in the Main Jail?

12     A.    It's known as Seg. or Segregation.  The

13  nickname is the "dungeon."

14     Q.    Is it called Ad. Seg. or Administrative

15  Segregation?

16     A.    Yes.

17     Q.    While at the jail did you -- while you were in

18  Administrative Segregation at Ventura County Main Jail,

19  did you meet an inmate named Daniel Hernandez?

20     A.    Yes.

21              (Whereupon, the document having been

22               previously marked will also be attached

23               to this deposition as Plaintiffs'

24               Exhibit 111.)

25          MR. MCLANE:  Showing you what has been marked

                                                              12

## DEPOSITION OF JEREMY REA JACKSON

1  in the previous deposition as Defense Exhibit 111.

2      Q.    Do you recognize this individual?

3      A.    Yes.

4      Q.    Who is it?

5      A.    That's Daniel Hernandez.

6          MR. MCLANE:  Mr. Vogel, can you show that

7  picture to the camera?

8          MR. SHLENS:  Same objections as before, by the

9  way.  Do I need to repeat them or --

10          MR. MCLANE:  No.  No.  That's fine.  You

11  maintain all your objections anyway.

12          MR. SHLENS:  Thanks.

13          MR. MCLANE:  Okay.

14      Q.    When you were in Administrative Segregation,

15  when approximately when did you become aware -- or you

16  met Mr. Hernandez?  You can give a rough time estimate

17  after you went to Administrative Segregation at the Main

18  Jail in November 2008?

19      A.    Maybe December, probably, seems about the time

20  that I started noticing him.

21      Q.    Okay.  And were you housed in Administrative

22  Segregation -- no.  Strike that.

23          Were you housed with Daniel Hernandez in

24  Administrative Segregation until the time he committed

25  suicide?

13

## DEPOSITION OF JEREMY REA JACKSON

```
 1        A.    Yes.
 2        Q.    And do you recall the approximate date that he
 3   committed suicide?
 4        A.    Sometime in early February, I think.
 5        Q.    So you believe that he committed suicide
 6   sometime in February 2009?
 7        A.    Yes.
 8        Q.    When you were housed in Administrative
 9   Segregation with Mr. Hernandez, were you also housed
10   with an inmate named Rudy Negrete?
11        A.    Yes.
12        Q.    Okay.  Can you tell us the cell numbers in
13   Administrative Segregation where Daniel Hernandez, you,
14   and Rudy were housed?  Do you recall the cell numbers?
15        A.    I was in E1.  Rudy Negrete was in E2.  And
16   Daniel Hernandez was in D2.
17        Q.    Now, is D2 cell next to E1 where you're
18   located?
19        A.    Yes.
20        Q.    Now, can you describe how the housing in
21   Administrative Segregation works in terms of the pods
22   and their relation, if you're in E pod and Mr. Hernandez
23   is in the D pod, can you describe the relationship to
24   each other physically?
25        A.    Yeah.  Yes.  In the E pod there's only two
```

14

## DEPOSITION OF JEREMY REA JACKSON

1    cells, and it was E1 and E2.  And we were able to see

2    each other whenever we'd come out for, like, dayroom and

3    we could talk to each other through a little vent.

4    Daniel Hernandez' cell, he was in D2, his wall was

5    connected with mine, but there was a wall that separated

6    us where he was in a different pod.  He was in D pod and

7    there was two cells over there.

8        Q.    In the D pod, when you were housed with Daniel

9    Hernandez from, at least you became aware of him in

10   December up to the time of his death in February, did

11   Mr. Hernandez have a roommate in his cell?

12       A.    No.

13       Q.    Did -- in the other pod -- in the other cell

14   in his pod, he was in D2, the other cell would be D1,

15   was there a cell mate in D1 that you're aware of?

16       A.    There wasn't one, no.

17       Q.    So he was alone in the D pod by himself?

18       A.    Yes.

19       Q.    And in the E pod that you shared with

20   Mr. Negrete, did both of you have your own cells?

21       A.    Yes.

22       Q.    Did you guys share your cells with anyone up

23   to the time of Daniel Hernandez' death?

24       A.    No.

25       Q.    What is segregated housing?  Can you describe

15

## DEPOSITION OF JEREMY REA JACKSON

```
 1    it?
 2        A.    You're isolated away from all other inmates.
 3    That's the best way I could think of it, is just you're
 4    isolated away from anyone.
 5        Q.    Can you roam around the Administrative
 6    Segregation Unit --
 7        A.    No.
 8        Q.    -- during the day?
 9        A.    No.  You're locked in your cell 23 hours a
10    day.
11        Q.    How did that make you feel, being locked in
12    your cell 23 hours a day?
13        A.    Depressing.
14              MR. SHLENS:  Same line.  Objection.
15              MR. MCLANE:  Q.  Depressed?
16        A.    Depressing.
17        Q.    Why is that?
18        A.    There's no TV down there.  There's nothing to
19    do but stare at the walls.  And you've got a little
20    window to look out and every once in a while you could
21    see a guard maybe walk by.  You see that for a split
22    second, but that's about all you get.
23        Q.    Did you see other inmates?
24        A.    No.  You can't see them.
25        Q.    When you were in your room?
```

16

# DEPOSITION OF JEREMY REA JACKSON

1     A.    No, you can't see them.

2     Q.    Now, you said you were out of your cell an

3  hour a day in the dayroom.  Could you watch TV in the

4  dayroom?

5     A.    Yes.

6     Q.    In your cell could you have reading material

7  if you wanted to read?

8     A.    Yes.

9     Q.    Okay.  But in the dayroom, would you be in the

10  dayroom with other inmates from Administrative

11  Segregation or is that by yourself?

12     A.    By yourself.

13     Q.    When would be your opportunity to interact

14  with other cellmates in Administrative Segregation, when

15  you were housed there from November up to Daniel

16  Hernandez' death in February?

17     A.    When they would -- when you'd go up on the

18  roof, you'd have your chance to talk with them.

19     Q.    How often would you go -- in this time

20  period -- and we're going to, because you were only in

21  Administrative Segregation with Daniel Hernandez, at

22  least, from December through February 2009 when he

23  committed suicide, we're going to focus in on that time

24  period for all my questions during this deposition.

25        During that time period, how many times did

17

## DEPOSITION OF JEREMY REA JACKSON

1    you go up to the roof during that time period?  If you

2    can give an approximation.

3       A.    I don't believe I went.  Let's see, wait.

4    From December to February?

5       Q.    To February.

6       A.    Oh.  Maybe three, but I can't be sure.

7    After -- after that time I didn't go for a long time.

8       Q.    Did you ever -- were you ever up on the roof

9    with Daniel Hernandez?

10       A.    Yes.

11       Q.    Do you recall any interaction with Daniel

12    Hernandez?

13       A.    A little bit, yes.

14       Q.    Could you describe that interaction?

15       A.    When we would talk it was like I wasn't having

16    a conversation with him because he -- he wasn't making

17    any sense.

18       Q.    Can you recall, like, specific conversations

19    that led you to believe that he wasn't making any sense?

20       A.    He would ask me if I was going to give him

21    that soup that I promised to give him.  And I didn't

22    know what he was talking about.

23       Q.    Had you promised him a soup?

24       A.    No.

25       Q.    Okay.  Did he -- when he was up on the roof,

18

## DEPOSITION OF JEREMY REA JACKSON

1   how did Mr. Hernandez behave?

2       A.    He talked to himself a lot.

3       Q.    What was he talking about?

4       A.    I couldn't understand what he was saying.  He

5   would just start talking to himself after you would ask

6   him a question.  He would turn towards the wall or

7   towards the fence and he'd start talking to himself.

8       Q.    When you were down in your cell next to

9   Mr. Hernandez' cell, could you hear him?

10      A.    Yes.

11      Q.    Can you describe what you heard in the cell

12  next to him?  Because -- okay.  Strike that.

13            You're in E -- you're in E1 and he's in D2; is

14  that right?

15      A.    Correct.

16      Q.    Now, you can't see into the cells; is that

17  right?

18      A.    Correct.

19      Q.    But between you there's a wall?

20      A.    Yes.

21      Q.    Could you hear through the wall as to what he

22  was doing or saying?

23      A.    Yes.

24      Q.    Can you describe what you heard during this

25  time period?

19

## DEPOSITION OF JEREMY REA JACKSON

1  A.   A lot of yelling.  He would yell something

2  like, "Get away from me, Satan," over and over.  "Get

3  out of here, Satan, get away from me."  And he did a lot

4  of kicking on the walls.  Really heavy, hard kicking.

5  Q.   Could you feel it through the wall?

6  A.   It rattled the whole wall and my bunk.

7  Q.   Did you ever hear him doing anything, banging

8  the sprinklers or doing anything like that?

9  A.   It sounded like he was kicking something on

10  the roof in the last, like, two weeks maybe before he

11  committed suicide.

12  Q.   Did you ever hear, in the last two weeks

13  before he committed suicide, any sounds on the floor?

14  A.   Yeah.  Like he -- there was sounds of him,

15  like, jumping off of the sink or the bunk, something

16  high where it was a really heavy thud.

17  Q.   Now, did you ever discuss Mr. Hernandez with

18  Mr. Negrete?

19  A.   While I was there?

20  Q.   Yes.

21  A.   Yes.

22  MR. SHLENS:  Narrow down the time frame,

23  please.

24  MR. MCLANE:  During the time period -- I'm

25  limiting when the time frame -- and Mr. Shlens is

20

## DEPOSITION OF JEREMY REA JACKSON

1  correct.

2       Q.    During the time period before he died and you

3  were in Administrative Segregation, including up to the

4  day of his death, do you recall any specific

5  conversations you had with Mr. Negrete concerning Daniel

6  Hernandez?

7       A.    It's been a long time.  I don't know.  It's

8  been four years.  Only discussions that we had about him

9  were just that he wasn't all there.  That's pretty much

10  all we talked about as far as about Daniel.

11      Q.    And why did you think that Mr. Hernandez was

12  not all there?

13      A.    By his behavior, the way he acted.  We could

14  usually tell when someone's faking it.  And his was

15  constant.  He never -- it seemed very, very real.

16      Q.    When he was yelling in his cell, "Get out,

17  demon," do you recall him saying anything about bulldogs

18  or anything?

19           MR. SHLENS:  Objection.  That misstates

20  testimony.

21           MR. MCLANE:  Q.  I'm asking him about did he

22  say anything about bulldogs.  I know you haven't

23  testified to that yet.  I'm just wondering if he said

24  anything about that.

25           MR. SHLENS:  The preamble to your question was

21

## ASSOCIATED REPORTERS OF VISALIA
## (559) 625-0544  (800) 605-0544

## DEPOSITION OF JEREMY REA JACKSON

1    off.  That's fine.

2         MR. MCLANE:  Q.  Go ahead.

3         A.    He would yell out "bulldog" or "bulldogs," I

4    don't know if it was plural, but he would yell out

5    "bulldog" or "bulldogs."  And then he would bark after

6    that.  Or -- and he did that throughout the day.

7         Q.    And this behavior that you witnessed, did it

8    seem to get better or worse over time?

9         A.    Worse.

10        Q.    And why do you say that?

11        A.    He stopped eating after a while.  The banging

12   seemed like it was more.  It was just more constant.

13        Q.    How did you know that he stopped eating?

14        A.    You could hear through the wall whenever the

15   guard would come around and open his tray slot.  And the

16   guard would ask him if he wanted his food.  And I

17   couldn't hear Daniel, I couldn't hear his response, but

18   you'd hear the guard say, "All right, going once, going

19   twice," and then he would shut it.  And that happened a

20   lot.

21        Q.    When Daniel was yelling -- okay.  Strike that.

22             Is there a way for the guard -- how many

23   guards were stationed in, or deputies, were stationed in

24   the Ad. Seg. Unit during the day?

25        A.    One.

ASSOCIATED REPORTERS OF VISALIA
(559) 625-0544  (800) 605-0544

## DEPOSITION OF JEREMY REA JACKSON

```
 1            MR. HELD:  Object -- objection.  Lack of
 2    foundation.
 3            MR. MCLANE:  Q.  Well, based on your knowledge
 4    living in the Administrative Segregation Unit, at least
 5    from December through February 2008 -- oh, 2009, did
 6    you -- were you in the Administrative Segregation Unit
 7    after February 2009?
 8        A.    Yes.
 9        Q.    Were you there the whole time 'til you came --
10        A.    All the way.
11        Q.    -- to state custody?
12        A.    Correct.  Yes.
13        Q.    In the Main Jail Administrative Segregation
14    Unit?
15        A.    Yes.
16        Q.    All my questions are designed as to what --
17    how Administrative Segregation was before Daniel died in
18    the time that you went to Administrative Segregation in
19    November 2008.
20            To your knowledge, being in Administrative
21    Segregation, how many deputies would be stationed in
22    Administrative Segregation during the day?
23        A.    One.
24        Q.    And was there an intercom system?
25        A.    Yes.
```

## DEPOSITION OF JEREMY REA JACKSON

1     Q.    How did that work?

2     A.    It's up towards the front desk where the front

3 door is.  They could press the button and let us know if

4 we have a visit or let us know if we have a court

5 hearing or something.  But they could hear us and we

6 could hear them.

7     Q.    Could a deputy listen in on an inmate just by

8 pressing a button for that particular pod unit?

9     A.    Yes.

10    Q.    And so each -- each cell in Administrative

11 Segregation had an intercom speaker for which the guard

12 could hear what was going on if you pressed the button

13 to listen what was going on with the inmate?

14    A.    Yes.

15    Q.    Now, when Daniel -- can you describe the

16 frequency of Daniel, you know, yelling out to himself

17 about Satan or bulldogs?  How often did that occur

18 during the day, during this time period?

19    A.    I don't know.  It was throughout the day.  Off

20 and on.

21    Q.    Was it every day?

22    A.    Every day, yeah.

23    Q.    Was it loud?

24    A.    Yes.

25    Q.    Now, you know what the dayrooms are in the

24

## DEPOSITION OF JEREMY REA JACKSON

1   jail; is that right?

2        A.    Yes.

3        Q.    And you would get the dayroom?

4        A.    Yes.

5        Q.    Did you hear Daniel from the dayroom yelling

6   out?

7        A.    Yes.

8        Q.    And that was an enclosed room; is that right?

9        A.    Correct.

10       Q.    And the guard's station in Administrative

11   Segregation, was his station enclosed or was it open?

12       A.    Open.

13       Q.    When you -- do you believe when Daniel yelled

14   out it was loud enough that the guards could hear?

15            MR. HELD:   Objection.

16            MR. MCLANE:   Q.   In Administrative

17   Segregation?

18            MR. HELD:   Objection.   Question calls for the

19   witness to speculate.   Lack of foundation.

20            MR. MCLANE:   Q.   You can answer even though

21   there's an objection.

22       A.    Yes.

23       Q.    And why do you say that?

24       A.    Because we could see the desk when we could

25   come out, it's just right there.   It's right down the

25

## DEPOSITION OF JEREMY REA JACKSON

1    hall.  From our cell it's 30 feet, maybe.  And

2    everything echoes.

3        Q.    Did you ever hear a guard respond via intercom

4    or go to Daniel's cell in response to him yelling during

5    the day?

6        A.    Yes.

7        Q.    And what -- can you recall a specific response

8    by the guards or how they typically responded to Daniel?

9        A.    They either did it through the intercom or

10   they'd walk down there and yell at him through the door.

11       Q.    Do you know what they yelled at him?

12       A.    Just to, "Shut the F up."

13       Q.    How often did that occur when the guards would

14   go to his cell to tell him to -- to be quiet?

15       A.    It was only with certain guards.  Some guards

16   would just ignore it, others would go down there and

17   tell him.

18       Q.    What was the frequency of them going down

19   there?  Would it be once a day?  Would it be once a

20   week?  Or do you have any recollection of that?

21       A.    I don't know.

22       Q.    Now, you could look at what's previously been

23   marked as Exhibit 26.  Do you recognize the scene

24   depicted in this photo?

25       A.    Yes.

## DEPOSITION OF JEREMY REA JACKSON

```
 1              MR. MCLANE:  Can you show that photo,
 2   Mr. Vogel?  Okay.
 3                   (Whereupon, the document having been
 4                    previously marked will also be attached
 5                    to this deposition as Plaintiffs'
 6                    Exhibit 113.)
 7              MR. MCLANE:  Q.  If you could take a look at
 8   what's been marked as Exhibit 113.  Do you recognize
 9   what's depicted in both those photos in 113?
10        A.   Yes.
11        Q.   Can you describe?
12        A.   The top one is the sprinkler.  And the bottom
13   picture is the intercom speaker.
14        Q.   Is that the intercom speaker in the cells?
15        A.   Yes.
16        Q.   And the sprinkler at the top, does it have a
17   cap over it?
18        A.   Yes.
19        Q.   If the cap's removed, what's underneath it?
20        A.   The sprinkler.
21        Q.   And could you hang something from the
22   sprinkler head?
23        A.   Yes.
24              MR. SHLENS:  Speculation.
25              MR. MCLANE:  Q.  So if someone was trying to
```

31

## DEPOSITION OF JEREMY REA JACKSON

1    commit suicide by a noose, if he kicked off the cap to

2    the sprinkler head, could he use the sprinkler head to

3    hang himself?

4            MR. HELD:  Objection.  Lack of foundation.

5    Calls for the witness to speculate.

6            MR. SHLENS:  Join.

7            MR. MCLANE:  You can answer.

8            THE WITNESS:  Yes, you could kick it off or

9    you could just get it to where there's an open crack and

10   you could slide a sheet under there and tie it.  But

11   yes, you could hang yourself from that.

12           MR. MCLANE:  Q.  And how do you know that?

13      A.    We've heard that other people have been hung

14   in there, from the guards.

15      Q.    Using the sprinkler head?

16      A.    Sprinklers.  Or the pull-up bar in the

17   dayroom.

18      Q.    Did you recall ever, from being next to

19   Mr. Hernandez, hearing any noise or sound like he was

20   trying to kick off the cap to that sprinkler?

21           MR. HELD:  Objection.  This question would

22   call for the witness to speculate.  It lacks foundation

23   that he would know what that sound was like as opposed

24   to any other sound.  And it's also not reasonably

25   calculated to lead to the discovery of admissible

32

## DEPOSITION OF JEREMY REA JACKSON

1   evidence in this lawsuit.

2            MR. SHLENS:   Join.

3            MR. MCLANE:   You can answer.

4            THE WITNESS:   Yes.   It sounded like he was

5   kicking something that was up to my right, which is

6   where his sprinkler would have been.

7            MR. MCLANE:   Q.   Why do you say that's what it

8   sounded like?

9       A.    It's just -- he kept on kicking something that

10  sounded like it was right up there to the right.   And

11  that's where his sprinkler is.   And mine was also right

12  there to the right.

13      Q.    From the dayroom where you spent an hour every

14  day, did you ever see Mr. Hernandez trying to kick out

15  the sprinkler or jumping off his bunk bed or anything

16  like that?

17      A.    No.

18            MR. MCLANE:   Mr. Vogel is showing Exhibit 113.

19      Q.    When you heard -- you said you heard

20  Mr. Hernandez repeatedly say "bulldogs" and bark; is

21  that right?

22      A.    Correct.

23      Q.    Did you have any information whether he

24  belonged to a gang or not?

25      A.    No.

33

## DEPOSITION OF JEREMY REA JACKSON

1      Q.     Have you ever heard of the Bulldogs gang?

2      A.     Yes.

3      Q.     Did you have any personal knowledge or

4  information that he belonged to that gang?

5      A.     No.

6      Q.     Did he ever tell you he belonged to that gang?

7      A.     No.

8      Q.     Did he ever tell you that he belonged to any

9  gang?

10     A.     No.

11     Q.     Describe Mr. Hernandez' personal appearance as

12 time went on from December, when you first encountered

13 him, through his death in February 2009?

14     A.     He started looking sick, real skinny, pale.

15 He looked weak.

16     Q.     Did he appear to be gaining weight or losing

17 weight as time went on?

18     A.     Losing weight.

19     Q.     Do you know why he might have been losing

20 weight?

21     A.     He wasn't eating.

22     Q.     Were you ever aware during this time period

23 whether Mr. Hernandez was on disciplinary isolation?

24     A.     Yes.

25     Q.     Do you know what disciplinary isolation is?

34

## DEPOSITION OF JEREMY REA JACKSON

1      A.    Yes.

2      Q.    What is it?

3      A.    When they put a piece of paper over your

4  window, when you break the rules, for a certain amount

5  of time.

6      Q.    And how did you know that Mr. Hernandez was on

7  disciplinary isolation?

8      A.    He had paper over his window, which that's a

9  positive that you're on discipline.

10     Q.    How could you tell there was a paper over his

11 window?  Where were you when you saw this paper on his

12 window?

13     A.    When I would go out for dayroom or when they

14 would pull me out for visit.  Or if I could go to the

15 roof.  Any time I'd cross by the hallway or by his cell,

16 you could see.

17     Q.    Do you know what other restrictions an inmate

18 would have if he was on disciplinary isolation besides

19 having his cell window covered?

20            MR. SHLENS:  Speculation and overbroad.  Go

21 ahead.

22            THE WITNESS:  You'd lose visits that you'd get

23 with your family or you'd lose store.  You don't get to

24 order store.  And dayroom.  You lose dayroom privileges.

25 They give you a shower every other day or every other

35

## DEPOSITION OF JEREMY REA JACKSON

```
 1    two days, they'd give you a five-minute or ten-minute
 2    shower down the hall.
 3              MR. MCLANE:  Q.  So it's more isolation than
 4    Administrative Segregation?
 5         A.   Correct.  And you lose roof time, too.  So you
 6    don't get to go to the roof.
 7         Q.   Is it considered a form of punishment for a
 8    rules violation?
 9         A.   Yes.
10         Q.   Were you ever on disciplinary isolation
11    yourself?
12         A.   No.
13         Q.   Now, if someone is on disciplinary -- you know
14    what -- during this time period, again, while you were
15    at the Main Jail, did the deputies conduct cell scans?
16    Cell checks?
17         A.   Yes.  Yes.  Cell checks.
18         Q.   Can you describe what those are?
19         A.   They have a wand, I think it's called, a
20    little wand.  And they scan it on the door and it says
21    on there what time they did that.  They go by each door
22    and they scan.
23         Q.   Could you hear it from your cell when they did
24    the cell scans?
25         A.   Yes.  It beeps.  I think.
```

36

## DEPOSITION OF JEREMY REA JACKSON

1      A.    Yes.

2      Q.    Do you recall whether he lifted up the paper

3   for inmates on disciplinary isolation?

4          MR. SHLENS:  It's vague as to time.  It's

5   overbroad.

6          MR. MCLANE:  Q.  During the time period when

7   you were -- before Daniel Hernandez' death from December

8   to February 2009.

9          MR. SHLENS:  Still vague as to time and

10  overbroad.

11         THE WITNESS:  It was kind of off and on.

12  Sometimes he lifted it up, sometimes he didn't.

13         MR. MCLANE:  Q.  A few days before his suicide

14  do you recall an incident involving a towel?

15     A.    Yes.

16     Q.    Can you describe that incident?

17     A.    Daniel Hernandez went to dayroom.  And when he

18  came back from dayroom, the guard, I believe it was

19  Anderson, searched the dayroom and found a tore towel in

20  the trash.  And he went to Hernandez' cell and started

21  questioning him if it was his towel.  I didn't hear

22  Daniel respond, but from what it sounded like, it

23  sounded like he was -- he wasn't answering.

24     Q.    You could hear Deputy Anderson ask him about

25  the towel?

38

## DEPOSITION OF JEREMY REA JACKSON

1      A.    Yes.

2      Q.    What did Deputy Anderson ask him?  To the best

3  of your ability to recall.  I know it's a long time ago.

4      A.    Yeah.  He was saying that, "You were the only

5  one in there," or something like that.  He asked him to

6  show his -- he said, "Show me your towel."  And I guess

7  he didn't show it.  And he said, "Well, obviously this

8  is yours.  You don't have a towel and this towel is tore

9  in the dayroom and it was in the trash, so."  And then

10  he asked him, "Where's the rest of it?"  I didn't hear

11  Daniel's re -- his response on that either.

12      Q.    How do you know he was talking to Daniel

13  Hernandez?

14      A.    I could hear that he -- he was right next

15  door.  There's no one else next to Hernandez.

16      Q.    After this -- did the guards, after this

17  conversation that Deputy Hernandez had with

18  Mr. Hernandez, did the guards --

19           MR. HELD:  "Deputy Hernandez"?

20           MR. MCLANE:  No.  Deputy Anderson had with

21  Mr. Hernandez.  Thank you, Jeff.

22      Q.    Can you tell us, did the guards do anything?

23  Did the deputies do anything?

24      A.    If they found a tore towel?

25      Q.    Did they do anything after the conversation

## DEPOSITION OF JEREMY REA JACKSON

```
 1    between Deputy Anderson and Mr. Hernandez?

 2            MR. SHLENS:  It's overbroad and vague.

 3            THE WITNESS:  They didn't search his cell, no.

 4            MR. MCLANE:  Q.  Did they search anybody's

 5    cell?

 6       A.   Yes.

 7       Q.   But they didn't search Mr. Hernandez' cell?

 8       A.   No.

 9       Q.   And how do you know that?

10       A.   Because we could hear and see everyone get

11    brought out.  They get brought out of their cell and

12    they get put in the dayroom while they're searching

13    their cell.

14       Q.   So you could see the various inmates being

15    brought to the dayroom?

16       A.   Correct.

17       Q.   Was it the dayroom across from your pod so you

18    could see?

19       A.   Yes.

20       Q.   And you saw other inmates brought out to the

21    dayroom but not Mr. Hernandez?

22       A.   Yes.  And plus, you could hear his door open

23    because it's electronic, so it's real loud.

24       Q.   So you didn't hear his door open?

25       A.   No.
```

40

## DEPOSITION OF JEREMY REA JACKSON

1    Q.    Was your cell tossed?

2    A.    Yes.

3    Q.    Was Mr. Negrete's cell tossed?

4    A.    Yes.

5    Q.    Shortly before Mr. Hernandez' suicide in

6   February 2009, did you hear any sort of deep thud or

7   noise from his cell?

8    A.    A little bit before.  A little bit before he

9   committed suicide?

10    Q.    I'm asking you.

11    A.    Oh.  Yeah, his -- yeah.  Deep thud, yes.

12    Q.    What did it sound like to you?

13    A.    There was different sounds.  Some came from

14   the walls, like he was kicking the wall or something.

15   Some were on the floor.  And some was coming from, like,

16   the roof area.

17    Q.    How loud was the sound?

18    A.    Real loud.  It echoed through the whole

19   dungeon, the whole Seg.

20    Q.    Did the guards hear it?

21    A.    Yes.  They could hear it upstairs, in fact.

22   Or was it downstairs.  They would hear it downstairs.

23   The guys -- the guards down in booking would come up and

24   yell at him and tell him that, "We could hear it all the

25   way down there."

41

## DEPOSITION OF JEREMY REA JACKSON

1   Q.   The thud and the banging or the yelling out?

2   A.   No, the -- the actual banging.

3   Q.   And they came up and said they could hear it?

4   A.   Yeah.

5   Q.   Did they tell Mr. Hernandez that?

6   A.   Yes.

7   Q.   And what did they say to him?

8   A.   They said, "Hernandez, we could hear you all

9   the way down there echoing through the whole jail."

10  Q.   When you found out that Mr. Hernandez

11  committed suicide, did this banging mean anything to

12  you?

13       MR. HELD:  Objection.  Not reasonably

14  calculated to lead to the discovery of admissible

15  evidence.  Irrelevant.

16       MR. MCLANE:  You may answer the question.

17       MR. SHLENS:  Join.

18       THE WITNESS:  I assume he hung himself on the

19  sprinkler.  I thought he was kicking the sprinkler to

20  loosen it up so he could get his sheet or maybe that

21  towel that he tore in the dayroom.

22       MR. MCLANE:  Q.  On February 16th, the day of

23  his suicide, did you hear anything from Mr. -- well, in

24  February 2009.  You don't know the precise date.  In

25  February 2009 when he committed suicide, the day of the

42

## DEPOSITION OF JEREMY REA JACKSON

```
 1    suicide do you recall hearing anything from

 2    Mr. Hernandez?

 3        A.    He was quieter that day.  I do remember him

 4    singing a song.

 5        Q.    What was the song?

 6        A.    I think -- I can't remember who the singer is.

 7    Maybe oh, -- oh, the Red -- Red Hot Chili Peppers, I

 8    think.

 9        Q.    If you can recall the lyrics?  Do you recall

10    what the lyrics were?

11        A.    "Take me to the place I love.  Take me all the

12    way.  I don't ever want to feel like I did that day."

13    And he'd repeat that over and over singing it.

14        Q.    How loud was the singing?

15        A.    Loud.  Enough for the whole pod to hear or the

16    whole Seg.

17        Q.    Now, who was the guard who was on duty the day

18    of Mr. Hernandez' suicide?

19        A.    Valdez and one other one.  Well, it was

20    Valdez.  One came from a different area whenever it

21    happened.

22        Q.    Did you get the dayroom that day?

23        A.    Yes.

24        Q.    And what time, approximately, were you in the

25    dayroom?
```

43

## DEPOSITION OF JEREMY REA JACKSON

1      A.    I believe I was in there from three to four.

2      Q.    And did you observe anything with Deputy

3  Valdez in terms of the cell check or scan during that

4  hour, three to four?

5      A.    I saw him scan the door.

6      Q.    Did he lift up the paper to his cell?

7      A.    No.

8      Q.    And how do you know this?

9      A.    I saw him.

10     Q.    Are you absolutely sure he didn't lift up the

11 paper?

12     A.    Positive.

13     Q.    And do you recall anything specifically about

14 how you learned about Mr. Hernandez' suicide?  Or what

15 you heard or observed during this time period?

16     A.    To be more --

17     Q.    That was a bad question.  I'll withdraw it.

18           How did you find out that Mr. Hernandez

19 committed suicide?

20     A.    All the guards came in and they put paper over

21 our window.  And you could hear everyone talking about

22 it.

23     Q.    And do you recall Deputy Valdez conducting the

24 evening dinner, bringing it to the various cells?

25     A.    Yes.

44

ASSOCIATED REPORTERS OF VISALIA
(559) 625-0544  (800) 605-0544

## DEPOSITION OF JEREMY REA JACKSON

1                          CROSS EXAMINATION

2    BY MR. VOGEL:

3        Q.    Good morning, Mr. Jackson.  This is Brian

4    Vogel.  I just want to follow up with a few -- just a

5    few more questions.

6              MR. MCLANE:  One moment.  Sorry.

7              MR. VOGEL:  Q.  So, Mr. Jackson, as I

8    understand it, you occupied a cell in the Administrative

9    Segregation Unit in-between Daniel Hernandez and Rudy

10   Negrete?

11       A.    Yes.

12       Q.    So there was a wall between your cell and that

13   of Daniel Hernandez?

14       A.    Yes.

15       Q.    And could you hear a lot of what went on in

16   Mr. Hernandez' cell from where you were?

17       A.    Yes.

18       Q.    And do you recall ever having any

19   conversations with Mr. Negrete or with jail staff about

20   Mr. Hernandez' condition?

21       A.    Can you repeat the question?

22       Q.    Do you recall ever having conversations -- and

23   let's go one at a time perhaps -- with Mr. Negrete about

24   Daniel Hernandez?

25       A.    Me and Rudy, or Negrete, would talk about how

                                                          52

## DEPOSITION OF JEREMY REA JACKSON

 1    Daniel wasn't all there.  That's the only conversations

 2    that we'd had about him.  That it was pretty much that

 3    he had problems in his mind.  Seemed very depressed.

 4         Q.    Okay.  And was there ever a time that you

 5    talked about Mr. Hernandez singing an unusual song,

 6    "Taking me to the place I love"?  Do you recall any

 7    conversation relating to that?

 8         A.    It's been a long time.

 9         Q.    During your stay in the Administrative

10    Segregation Unit, were you ever placed in disciplinary

11    isolation?

12         A.    No.

13         Q.    So during your stay, you did not have that

14    piece of paper placed over your cell window?

15         A.    Correct.

16         Q.    And so you could see out of that small cell

17    window of yours?

18         A.    Yes.

19         Q.    And from there and from the dayrooms when you

20    went to the dayrooms, you could see the piece of paper

21    over the cells of those people in Administrative

22    Segregation who were on disciplinary isolation; is that

23    right?

24              MR. SHLENS:  Lacks foundation.

25              THE WITNESS:  Yes.

53

## DEPOSITION OF JEREMY REA JACKSON

1   when they were chaining him up, and that's when I heard

2   a commotion.

3       Q.    And what do you remember hearing next?

4       A.    Just the guards taking him down.  I heard him

5   hit the ground and you could hear the guards tell him to

6   stop moving.

7       Q.    Okay.  And what do you recall after that?

8       A.    That's all I -- that's all I can remember.

9       Q.    With respect to the intercom system, were

10  there times that you could hear the guards speaking with

11  Daniel Hernandez over the intercom?

12      A.    Yes.

13      Q.    And what kind of things did you hear them

14  saying?

15      A.    For him to be quiet.

16      Q.    And that was in response to what kinds of

17  activities?

18      A.    Yelling, kicking, loud noises.

19      Q.    And here again, with respect to some of the

20  things that he would say that didn't make sense, he

21  would bark like a bulldog?

22      A.    Bark.  Yes.

23      Q.    And could you just describe some of the other

24  things that he would -- that he would say or yell that

25  didn't seem to make sense?

ASSOCIATED REPORTERS OF VISALIA
(559) 625-0544  (800) 605-0544

## DEPOSITION OF JEREMY REA JACKSON

1      A.     He'd yell over and over, "Get out of my cell,

2    Satan."  "Leave me alone, Satan.  Get away.  Leave me

3    alone."  He'd say it over and over throughout the night.

4      Q.     And you recall responses from -- to this by

5    some of the jail staff?

6      A.     Sometimes, yes.

7      Q.     Okay.  And that included talking to him over

8    the intercom and asking him to be quiet?

9      A.     Over the intercom.  Or sometimes they would go

10   down there to his cell door and tell him to be quiet.

11     Q.     And do you recall them ever doing anything

12   else in response to these incidents?

13     A.     No.

14          MR. VOGEL:  Mr. Held?

15                 CROSS EXAMINATION

16   BY MR. HELD:

17     Q.     Thank you for agreeing to be here today.  My

18   name is Jeff Held.  I have some questions today, if

19   that's okay with you.

20     A.     Yes.

21     Q.     Okay.  All of the questions that I'm going to

22   ask you, Mr. Jackson, only concern the few months before

23   Mr. Hernandez' suicide.  So I'm concerned with December

24   of 2008, January and February of 2009.  Okay?

25     A.     Okay.

58

## DEPOSITION OF JEREMY REA JACKSON

1     Q.    When you were in Administrative Segregation

2  during that period, did your cell have a window?

3     A.    It had a back window and a small window on the

4  front door.

5     Q.    Estimate for me, if you could, the size of the

6  window on the front door.

7     A.    The front door is about four inches across and

8  six inches, maybe, in height.

9     Q.    Did it offer you an unobstructed view of the

10  corridor in Ad. Seg. if you were looking through it?

11     A.    Which is the corridor?

12     Q.    You know, the hallway that --

13     A.    I could see the hallway, guards passing by

14  from their hips up.

15     Q.    But how far in each direction?  Could you see

16  the entire hallway or just a small section of it?

17     A.    As big as the window is, I'd say about six

18  feet, maybe.

19     Q.    In either direction?

20     A.    It's hard to explain.  Yeah.  Maybe six feet

21  in length, maybe.  Maybe more.

22     Q.    I'm just wondering, as you would be standing

23  at your cell door looking outside the window, you've

24  told us you could see out into the hallway.  And I'm

25  just trying to get an estimate in whatever you're

59

## ASSOCIATED REPORTERS OF VISALIA
## (559) 625-0544  (800) 605-0544

# DEPOSITION OF JEREMY REA JACKSON

1  told us about his being so loud you couldn't sleep?

2      A.    Not until after he -- after he hung himself.

3      Q.    And what did you say then?

4      A.    I think they just asked me questions.

5      Q.    And they interviewed you in the course of

6  their investigation?

7      A.    Yes.

8      Q.    And in that investigation did you tell the

9  interviewing jail personnel that you had any clue or

10  indication that Daniel was going to take his own life?

11      A.    I can't remember.

12      Q.    At any time before Daniel took his life, did

13  you say anything to any jail personnel about Daniel

14  Hernandez other than his disturbing your sleep by this

15  noisyness?

16      A.    Not that I could remember, no.

17      Q.    At any time before he died, did the thought

18  ever cross your mind that Daniel Hernandez was going to

19  kill himself?

20      A.    Yeah.  Yes.

21      Q.    Tell us more, when did you think that or why

22  did you think that?

23      A.    Me and Rudy Negrete, who was my neighbor, we

24  would actually talk about what ifs.  What if he hangs

25  himself.  Because the way he was acting.

66

## DEPOSITION OF JEREMY REA JACKSON

1    Q.    How often did you and Rudy discuss that?

2    A.    I don't know.  But it was more than once.

3  Like a few times.

4    Q.    A few times?

5    A.    Yeah.

6    Q.    Maybe, like, two or three, four times?

7    A.    Yeah.  Yes.

8    Q.    Can you quote yourself what was said more

9  exactly?  What words did you use about Daniel?

10    A.    I said, "Man, he's probably going to hang

11  himself."  That's pretty much the -- what I would say to

12  my neighbor.

13    Q.    And what motivated you to think that?

14    A.    He seemed like he was getting more depressed

15  and more depressed.  And then he started kicking the

16  thing towards the sprinkler.  That kind of made me think

17  that.

18    Q.    When did you and Rudy last have such a

19  conversation like that?

20    A.    It was close to when he hung himself.  Within

21  that week, maybe.

22    Q.    I'm not suggesting that you have to have an

23  answer if you don't.  That's fine.  But can I press you

24  for a better time estimate?

25          Was it five, six, seven days before?  A day or

67

ASSOCIATED REPORTERS OF VISALIA
(559) 625-0544  (800) 605-0544

## DEPOSITION OF JEREMY REA JACKSON

1   two before?  Do you have any more accurate estimate of

2   when you and Rudy last had such a conversation?

3       A.    No.

4       Q.    And did you, or to your knowledge Rudy

5   Negrete, communicate that thought to any jail personnel?

6       A.    I don't know about Rudy, but I did not, no.

7       Q.    Did you ever see any indication that Daniel

8   Hernandez was manufacturing any implements of death?

9           MR. MCLANE:  Objection.  Vague and ambiguous,

10  "implements of death."

11          MR. HELD:  Q.  You could answer if you

12  understand.

13      A.    Well, the towel incident kind of made me think

14  that maybe he was going to tie that around the

15  sprinkler.

16      Q.    Did you ever see the torn portion of the

17  towel?

18      A.    No.

19      Q.    Do you have any indication, though, or any

20  information that Daniel actually had a torn towel or

21  part of a torn towel in his cell?

22      A.    Only by hearing Deputy Anderson talk about it.

23      Q.    You may have said this and I just didn't pick

24  it up.  But in point of time, how long before Daniel's

25  suicide did this torn towel discussion occur?

68

## DEPOSITION OF JEREMY REA JACKSON

```
1              THE VIDEOGRAPHER:  This is the end of the
2    first tape in the deposition of Jeremy Jackson.  May
3    10th, 2012.  Off the record at 12:24.
4              (Recess taken - 12:24 to 12:37 p.m.)
5              THE VIDEOGRAPHER:  This is the beginning of
6    the second tape in the deposition of Jeremy Jackson.
7    May 10, 2012.  We're back on the record at 12:37.
8                      CROSS EXAMINATION
9    BY MR. SHLENS:
10     Q.    All right.  Mr. Jackson, my name is Steve
11   Shlens.  My office represents California Forensic
12   Medical Group, doctors and nurses involved there.
13             I have some follow-up areas and a couple other
14   areas that I'll ask you about.  I'll be kind of jumping
15   around, so I apologize about that.
16             Daniel Hernandez.  You mentioned that you did
17   have a chance to speak to him personally a couple of
18   times, right?
19     A.    Yes.
20     Q.    What did you call him?
21     A.    "Daniel."
22     Q.    Any other names?
23     A.    And his last name, "Hernandez."
24     Q.    Anything else?
25     A.    "Lollipop."
```

72

## DEPOSITION OF JEREMY REA JACKSON

1     Q.   Did you call -- I don't mean this rudely.  Did

2 you call that to his face, or not?

3     A.   I don't think so, no.

4     Q.   How about to his face, any other names?

5     A.   No, that's the only ones.

6     Q.   Who came up with "Lollipop"?

7     A.   I don't know.  They started calling him it

8 because he was real skinny and he had a big head.  And

9 so they said he looked like a lollipop.

10     Q.   Was that a name -- do you know who came up

11 with that name?

12     A.   I can't think of, no.

13     Q.   Anyone ever call him "Teddy"?

14     A.   No.

15     Q.   Any other names?

16     A.   That's all I could think of.

17     Q.   You said in response to some questions from

18 Mr. McLane, that Daniel in, say, the last month of his

19 life, started looking sick, pale, weak.  You said he was

20 real skinny and losing weight because he wasn't eating.

21 How do you know he wasn't eating?

22     A.   We could hear whenever the guard would come

23 around and open the tray slot, he would tell him to come

24 and get his food.  And the guard would say, "You don't

25 want it?  All right.  Going once, going twice."  And

73

# EXHIBIT I

1              UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
2                   WESTERN DIVISION

3

4
   ESTHER BISELLI AND THE ESTATE    )
5  OF DANIEL T. HERNANDEZ, BY AND   )
   THROUGH HIS PERSONAL             )
6  REPRESENTATIVE ESTHER BISELLI;   )
   K.N.H., [NAME REDACTED] A MINOR, )
7  BY AND THROUGH HER GUARDIAN AND  )
   MOTHER, AMBER RODRIGUEZ,         )
8                                   )
            PLAINTIFFS,             )
9                                   ) CASE NO.
            VS.                     ) CV 09-08694-CAS(Ex)
10                                  )
   COUNTY OF VENTURA, VENTURA       )
11 COUNTY SHERIFFS DEPARTMENT;      )
   SHERIFF BOB BROOKS; CALIFORNIA   )
12 FORENSIC MEDICAL GROUP;          )
   TAYLOR FITHIAN, M.D., DR. JOHN   )
13 KORZELIUS, DR. MELVIN MYUNG      )
   JUNG, MARIA BAEZLIN, DOES 1      )
14 THROUGH 10, INCLUSIVE,           )
                                    )
15          DEFENDANTS.             )
   _____)
16

17

18

19        DEPOSITION OF DAVID J. JIMENEZ, ED.D.

20               FRIDAY, MAY 4, 2012

21

22

23 FILE NO.   7850-B

24 REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

25

```
 1   your testimony you brought to the deposition everything

 2   responsive to our subpoena request in your possession?

 3        A    Yes.  With the exception of the law enforcement

 4   reports written by three different law enforcement peace

 5   officers and the felony complaint that I could not

 6   locate.  They're somewhere in the trailer under some

 7   other category.

 8        Q    So those are documents that you attempted to

 9   locate but just couldn't?

10        A    Exactly.  And my secretary's billing records.

11   It's essentially the State form we use.

12        Q    We have your curriculum vitae, so I'm not going

13   to bore everyone with going through that to establish

14   your expertise.

15             But could you give an overall description of

16   your education.

17        A    Of course.  And practice?

18        Q    And your practice.

19        A    Of course.

20        Q    Just a narrative.  If no one has an objection,

21   I think we can get through it quicker this way.

22        A    Of course.  Briefly I moved to California in

23   1984, September 26 or -7.  My doctorate is from Indiana

24   University at Bloomington.  I was licensed in California

25   as a psychologist, which is a generic title irregardless
```

1   of your specialty.

2        On August 4, 1988 for the first four or five

3   years I directed child and adolescent inpatient

4   psychiatric programs between 1984 and 1988, thereabouts,

5   for psychiatric hospitals.

6        And the first program really was for

7   adolescents, co-education in L.A.  The second I opened

8   up and was the first clinical director for an 84-bed

9   adolescent inpatient facility.  It was a freestanding

10  psychiatric hospital named Gateways Hospital in L.A.  I

11  was there approximately four years.  I went --

12       Q    Gateways Hospital, is that like -- people that

13  have served their sentences or on probation?

14       A    They used to have -- when I was there they had

15  an adolescent inpatient program.  Residential we called

16  it.  I managed that program.  At the time they also had

17  some SVP.

18       Q    What is SVP?

19       A    These are the sex offenders who repeat.

20       Q    Sexually violent predators?

21       A    Yes.  I have not been near that hospital for

22  many years, but I understand they primarily only do that

23  now.

24       They had a locked unit, which is called North

25  Unit that had maybe six to eight beds in it, adults.

```
 1 │ I'm unaware of what they currently have to this day.
 2 │ But my impression is they're primarily SVP population
 3 │ and they have other satellite locations.
 4 │        I left that employment to open an 84 bed
 5 │ residential facility for a county provider and actually
 6 │ a private company under a county contractor in L.A. that
 7 │ took DCS or its mental health and probation warrants.   I
 8 │ was there about a year and a half.
 9 │        I left there essentially to take a position
10 │ with the County of L.A. at Rancho Los Olivos Medical
11 │ Center where I was the ward psychologist for about a
12 │ year and a half on a spinal cord injury ward, and the
13 │ next year and a half on a brain injury ward.   These are
14 │ all related to the rehabilitation wards.   It's a rehab
15 │ hospital.
16 │        The last year I was there I worked on their
17 │ pressure management ward which are essentially spinal
18 │ cord patients who come back for surgical procedures.
19 │        1991 I started my private practice and got on
20 │ the expert panels.  By "practice" I do very little
21 │ psychotherapy.  It is 99-percent evaluation and has been
22 │ through the years.
23 │    Q    So the entire time, let's say, from when you --
24 │ I guess 1988 to the present it's been basically forensic
25 │ evaluations?
```

1     A     Exactly.   Through training and experience

2  forensic is my specialty as well as clinical.

3          In the last ten years I would say that I've --

4  my time -- practice time is equally divided between

5  criminal matters and family law matters in child custody

6  evaluation.

7          As I mentioned, I have been in depositions

8  before.  I have testified over a hundred times in

9  various venues.

10    Q     Have you been qualified as an expert?

11    A     Every time.

12    Q     Have you ever not been qualified?

13    A     No.  No.  Never.  Never.  There's never been a

14  question.

15    Q     Is there anything else you want to describe

16  about your expertise?

17    A     Essentially I am appointed and retained by both

18  defense and prosecution.  Greater so defense because of

19  the nature of the system.

20    Q     What would you say is the percentage breakdown

21  between prosecution and defense appointments?

22    A     One in 15.  And in criminal -- probably one in

23  15 would be an estimate.  Again, the system is slanted

24  toward me being appointed more often by defense.

25    Q     Why is that, would you say?

1          MR. SHLENS:   These notes were prepared

2    concurrently with the evaluation?

3          THE WITNESS:   These notes, Pages 1, 2 and 3

4    that are unpaginated, they were -- I made them

5    concurrently with my interview of the defendant --

6          MR. SHLENS:   Thank you.

7          THE WITNESS:   -- at the same time as we spoke,

8    which is my custom and practice.   I don't make them

9    after the fact.

10   BY MR. McLANE:

11        Q    Have you compared -- let's turn to Exhibit 16.

12   You looked at Exhibit 16 while we were taking a break,

13   which is a Custody Care, Inc., David J. Jimenez.   And

14   you compared it to the report that you brought and

15   produced today at this deposition that you prepared

16   concerning Daniel Hernandez?

17        A    Yes.

18        Q    Did you make a comparison to see if it was the

19   exact same report?

20        A    I reviewed the report in your exhibit book, I

21   reviewed my work copy, and I reviewed the report that

22   was sent to me represented as my report from one of you

23   gentlemen, and I found them to be the same report.

24        Q    Okay.   So we'll just be working off of

25   Exhibit 16, which has already been marked as an exhibit

```
 1   in this case.
 2          Did you compare your notes, Exhibit 110, with
 3   your report to determine whether there are any
 4   additional statements or different statements in your
 5   notes that are not in this report?
 6      A    Essentially I will interview any defendant,
 7   take notes.  As I mentioned, those notes go to -- they
 8   will be sometimes more brief.  Clearly always more brief
 9   than my report.
10          And they will be -- as in this case, they may
11   not be full sentences.  So when I transfer from the
12   laptop to my desk top, I then will elaborate on my
13   observations and findings.
14      Q    So would you say that your notes are without --
15   what the person evaluating said, and then the report has
16   your -- also has your observations and your conclusions
17   about the individual?
18      A    My original notes informed my follow-up report,
19   so they are consistent with my report.
20      Q    You mean by "informed" -- what do you mean by
21   "informed"?
22      A    They are the essence of my interview with the
23   defendant.  And then what I'll do is I will edit them to
24   make them more readable, sometimes to make my own
25   questions more readable, sometimes for the reader.  And
```

1   if there are any incomplete sentences, I will fix that.

2   I don't change anything factually.  They're more

3   editorial, artistic.

4       Q    So your habit, practice and custom is to -- is

5   not to change anything factually from your notes to your

6   report?

7       A    Exactly.  Unless it's totally irrelevant to the

8   question.  There might be something I may have asked as

9   a matter of building rapport, that I may or may not have

10  it in my report.

11      Q    You were appointed to do a competency

12  evaluation under Evidence Code 730; is that right?

13      A    Correct.

14      Q    In your understanding, what is Evidence

15  Code 730?

16      A    My understanding is that there are certain

17  psychologists, psychiatrists who are qualified under

18  Evidence Code 730 to perform evaluations to the court.

19  A judge cannot go off that list and appoint someone

20  else.

21      Q    And you're on the list for Ventura County

22  Superior Court and Los Angeles County Superior Court and

23  other Superior Courts?

24      A    Riverside Superior Court and Orange County

25  Superior Court, yes.

1    Q    As well as Los Angeles and Ventura?

2    A    Yes.  Four jurisdictions, yes.

3    Q    And would it be accurate to say that -- safe to

4  say during the competency evaluation you're trying to

5  determine whether the person understands the nature of

6  the proceedings and whether the person has an ability to

7  assist counsel?

8    A    That's only a very limited part of the intent

9  of a --

10   Q    Why don't you describe in your own words what's

11 the point of the report.

12   A    'The standards really go back to case law 1960

13 and 1975 with Drope v. Missouri.  Prior to that there

14 was a 1960 case.

15        And there's two criteria.  There is some

16 latitude as an evaluator goes in to do a competency

17 evaluation.  The two criteria that one needs to address

18 is whether that defendant, okay, has a factual and

19 rational understanding of the proceedings, and further

20 whether that defendant that's being evaluated can relate

21 adequately with defense counsel, and can do so in a

22 rational manner.

23   Q    In order to make that determination in this

24 case, you went to the Ventura County jail and

25 interviewed Daniel Hernandez; is that correct?

```
 1      A     Correct.  He was detained at the time, yes.

 2      Q     And do you recall where in the jail you

 3   interviewed him?

 4      A     This has been a long time ago.

 5      Q     I understand.

 6      A     I probably conducted 200 evaluations since this

 7   time.  With the case I can tell you generally speaking

 8   on a competency evaluation -- and I won't say this was

 9   the case with Mr. Hernandez -- I am taken into after I

10   present credentials, court order, et cetera, into one of

11   three interview rooms in the main jail.

12           They're numbered 1, 2, 3.  I don't remember

13   which one he was in.

14      Q     Do you recall specifically -- is this based on

15   your habit and practice that --

16      A     Correct.

17      Q     -- it would have been in one of these rooms?

18      A     Correct.

19      Q     But you don't have a specific recollection

20   whether it was in a room or in his cell or in a medical

21   ward?

22      A     I don't have specific recollection, but I would

23   speculate it was in one of the three interview rooms.

24      Q     Okay.

25      A     There are times -- I know there's not a
```

```
 1    question before me.  There are times in L.A. that I will

 2    use -- I won't have a contact visit.  I'll see someone

 3    through the window.

 4        Q    In this case it was a contact visit?

 5        A    Yes.

 6        Q    Was he shackled or anything, restrained in any

 7    way when you met with him?

 8        A    I don't recall.

 9        Q    Was he sitting across from you at a table?

10        A    The only recollection of Mr. Hernandez is that

11    he had a slight build and a -- I note in my report a

12    long goatee type mustache that for me gave him sort of

13    an Asian appearance.  He was a slight build and had this

14    long goatee, pleasant, disorganized.

15        Q    Did you at all feel threatened during the

16    interview by him?

17        A    No.

18        Q    Did he attempt to attack you during the

19    interview?

20        A    No.  He was very polite.

21        Q    Okay.

22        A    Tangential, but polite.  Very polite.

23        Q    You say tangential but polite.  I'm not a

24    psychologist.  I'm sure that may have a specific meaning

25    for you as a psychologist.
```

```
 1              What do you mean by tangential?

 2      A    By tangential, when I would ask a question he

 3   would not always me give me a coherent response.

 4      Q    Okay.

 5      A    That was generally true throughout my interview

 6   with him.

 7      Q    Would you consider your overall evaluation of

 8   him in terms of how you conducted it typical according

 9   to your practice standards, how you would do an

10   evaluation?

11      A    It not only met my standards, I would say it

12   was on the uppermost criteria of my standards.   In

13   reviewing my report, I thought I did a fairly

14   comprehensive evaluation.

15      Q    I note in the report you eventually found that

16   he was not competent to stand trial.  That was your

17   conclusion; is that correct?

18      A    That was my professional opinion, yes.  At that

19   time.

20      Q    Did you go to court and testify to that fact or

21   do you know what happened after your report was

22   submitted to the court?

23      A    Right.  As an evaluator it is very rare that I

24   will be called in to testify on my reports.  I'm going

25   to speculate that's a function, at least in L.A., of
```

```
 1   third.  Is that what you're saying?

 2        A    Not maybe.  There is typically a third.

 3        Q    In this case do you know if there was another

 4   evaluator appointed?

 5        A    I have no knowledge.

 6        Q    After you did this report, did you have any

 7   further contact with Mr. Hernandez?

 8        A    None.

 9        Q    Were you ever notified by Ms. Helfrich the

10   outcome of the competency proceeding?

11        A    No.  But I never am by anyone.

12        Q    Okay.  Did --

13        A    It's not been my experience I'm notified.

14        Q    So until you were maybe contacted by attorneys

15   in this case or received certain documents, you had no

16   knowledge that the court had found him based on your

17   report to be incompetent to stand trial?

18        A    That's correct.

19        Q    Now, you said you found him incompetent to

20   stand trial.  Can you give a summary, sum and substance,

21   of why you made that determination for Mr. Hernandez?

22        A    That opinion is primarily contained on Page 5

23   of my report.  It would be the second paragraph.  I

24   found him to -- I termed him to have DSM-IV TR clinical

25   diagnoses of schizoid personality disorder, so my
```

```
 1    experience was mentally ill on the day I saw him.  Okay.
 2          MR. HELD:  Could I have the last sentence read
 3    back.  I just didn't quite get it.
 4                     (Record read.)
 5          THE WITNESS:  And because of his presentation
 6    to me I expanded my usual 1368 evaluation protocol to go
 7    into mental health history, et cetera.  It's throughout
 8    my report.
 9          But that paragraph summarizes my position
10    relative to competency with Mr. Hernandez.  He failed to
11    appreciate penalties.  He failed to appreciate the
12    charges against him.  He was cooperative, but his
13    responses would not -- did not help me in great detail
14    or to any extent, and certainly would not help defense
15    counsel in this case.
16          He certainly did not have any ability to self
17    represent.  If he elected to do that, he could not
18    challenge prosecution witnesses.  And typically the way
19    I'll do that is I'll introduce a hypothetical to the
20    defendant such as if -- we'll go in through -- I have a
21    list and I can go into how I conduct an evaluation.
22    BY MR. McLANE:
23          Q    Okay.  We'll go into that.
24          A    Essentially I'll pose a hypothetical where a
25    witness has come in, has made an allegation that he was
```