# EXHIBIT J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


ESTHER BISELLI AND THE ESTATE    )
OF DANIEL T. HERNANDEZ, BY AND   )
THROUGH HIS PERSONAL             )
REPRESENTATIVE ESTHER BISELLI;   )
K.N.H., [NAME REDACTED] A MINOR, )
BY AND THROUGH HER GUARDIAN AND  )
MOTHER, AMBER RODRIGUEZ,         )
                                 )
          PLAINTIFFS,            )
                                 )
          VS.                    ) CASE NO.
                                 ) CV 09-08694-CAS(Ex)
COUNTY OF VENTURA, VENTURA       )
COUNTY SHERIFFS DEPARTMENT;      )
SHERIFF BOB BROOKS; CALIFORNIA   )
FORENSIC MEDICAL GROUP;          )
TAYLOR FITHIAN, M.D., DR. JOHN   )
KORZELIUS, DR. MELVIN MYUNG      )
JUNG, MARIA BAEZLIN, DOES 1      )
THROUGH 10, INCLUSIVE,           )
                                 )
          DEFENDANTS.            )
_____)


VIDEOTAPED DEPOSITION OF MARVIN MYUNG JUNG, M.D.

THURSDAY, DECEMBER 15, 2011


FILE NO. 3078

REPORTED BY SHARON D. ALLEN, C.S.R. NO. 10752

| | | |
|---|---|---|
| 10:28 | 1 | anyone? |
| 10:28 | 2 | A     No. |
| 10:28 | 3 | Q     Okay.  Were you interviewed by anyone |
| 10:28 | 4 | concerning the death of Daniel Hernandez besides |
| 10:28 | 5 | Mr. Bertling? |
| 10:28 | 6 | A     No. |
| 10:28 | 7 | Q     You weren't interviewed by the medical |
| 10:28 | 8 | examiner? |
| 10:28 | 9 | A     No. |
| 10:28 | 10 | Q     Were you interviewed by anyone at CFMG? |
| 10:28 | 11 | A     No. |
| 10:28 | 12 | Q     Were you interviewed by any -- any of the |
| 10:28 | 13 | staff, the jail staff, not CFMG, but the jail staff |
| 10:29 | 14 | at Ventura County jail concerning the death of |
| 10:29 | 15 | Daniel Hernandez? |
| 10:29 | 16 | A     No. |
| 10:29 | 17 | Q     From February -- from January 2007 to |
| 10:29 | 18 | February 16, 2009 were you the psychiatrist at CFMG |
| 10:29 | 19 | at the Ventura County main jail? |
| 10:29 | 20 | A     Yes. |
| 10:29 | 21 | Q     Were you the head psychiatrist? |
| 10:29 | 22 | A     I'm the only psychiatrist. |
| 10:29 | 23 | Q     So you were the -- other than someone who's |
| 10:29 | 24 | substituting in for you because you're sick or on |
| 10:29 | 25 | vacation, were you the only psychiatrist at -- at |

| | | |
|---|---|---|
| 10:29 | 1 | the Ventura County main jail -- |
| 10:29 | 2 | A    That's right. |
| 10:29 | 3 | Q    -- from January 2007 to February 16, 2009? |
| 10:29 | 4 | A    Yes. |
| 10:29 | 5 | Q    So you're ultimately responsible for the |
| 10:29 | 6 | psychiatric treatment of all the patient inmates? |
| 10:29 | 7 | MR. BERTLING:  Well, lacks foundation, calls for |
| 10:29 | 8 | speculation, may be a legal conclusion.  What do you |
| 10:29 | 9 | mean by "responsible"?  For what purpose?  It's |
| 10:29 | 10 | vague and ambiguous?  What do you mean by |
| 10:29 | 11 | "responsible"? |
| 10:29 | 12 | MR. McLANE:  I don't think so. |
| 10:29 | 13 | Q    Do you understand the question? |
| 10:29 | 14 | I understood your objection.  He can answer |
| 10:29 | 15 | the question if he understands. |
| 10:29 | 16 | MR. BERTLING:  What do you mean by |
| 10:29 | 17 | "responsible"?  Are you talking about legally |
| 10:30 | 18 | responsible -- |
| 10:30 | 19 | MR. McLANE:  Responsible for the care.  I'm |
| 10:30 | 20 | talking about -- |
| 10:30 | 21 | MR. BERTLING:  -- or providing mental |
| 10:30 | 22 | healthcare? |
| 10:30 | 23 | MR. McLANE:  Providing mental healthcare. |
| 10:30 | 24 | MR. BERTLING:  Okay.  That's fine. |
| 10:30 | 25 | THE DEPONENT:  Yes. |

| | | |
|---|---|---|
| 10:30 | 1 | BY MR. McLANE: |
| 10:30 | 2 | Q   So you're the one who is responsible for |
| 10:30 | 3 | mental healthcare? |
| 10:30 | 4 | A   Yes. |
| 10:30 | 5 | Q   Okay.  And in terms of the hierarchy during |
| 10:30 | 6 | this time period, was Dr. Korzelius your boss during |
| 10:30 | 7 | this time period? |
| 10:30 | 8 | A   No, not necessarily. |
| 10:30 | 9 | Q   Okay.  Who did you report to during this |
| 10:30 | 10 | time period? |
| 10:30 | 11 | A   I -- |
| 10:30 | 12 | Q   Who was your supervisor, if you had one? |
| 10:30 | 13 | A   If I had one, it would be Dr. Fithian. |
| 10:30 | 14 | Q   Okay.  But Dr. Fithian's not at the |
| 10:30 | 15 | premises, correct? |
| 10:30 | 16 | A   Right. |
| 10:30 | 17 | Q   Okay.  So -- and I'm talking about |
| 10:30 | 18 | responsibility.  I'm talking about responsible for |
| 10:30 | 19 | mental healthcare treatment for the patient inmates. |
| 10:30 | 20 | So you're the person who oversaw the mental |
| 10:30 | 21 | healthcare treatment of all the patient inmates -- |
| 10:30 | 22 | A   Yes. |
| 10:30 | 23 | Q   -- during this time period from January |
| 10:30 | 24 | 2007 to February 16, 2009? |
| 10:31 | 25 | A   Yes. |

| | | |
|---|---|---|
| 10:31 | 1 | Q    Did you -- and during this time period, |
| 10:31 | 2 | there were psychiatric nurses that were working for |
| 10:31 | 3 | CFMG? |
| 10:31 | 4 | A    Yes. |
| 10:31 | 5 | Q    And I know of a couple, but during this |
| 10:31 | 6 | time period who were the psychiatric nurses who |
| 10:31 | 7 | worked -- that worked underneath you at the Ventura |
| 10:31 | 8 | County main jail from January 2007 through February |
| 10:31 | 9 | 16, 2009? |
| 10:31 | 10 | A    I assume was it Linda and Diane. |
| 10:31 | 11 | Q    Linda -- Linda Moscowitz and Diane |
| 10:31 | 12 | Rodelander? |
| 10:31 | 13 | A    Yes. |
| 10:31 | 14 | Q    Anyone else? |
| 10:31 | 15 | A    No. |
| 10:31 | 16 | Q    Okay.  So these were -- this was the |
| 10:31 | 17 | psychiatric staff -- |
| 10:31 | 18 | A    Yes. |
| 10:31 | 19 | Q    -- responded -- the team that was |
| 10:31 | 20 | responsible for treating the mental healthcare |
| 10:31 | 21 | issues for patient inmates at the Ventura County |
| 10:31 | 22 | main jail during the time period January 2007 |
| 10:32 | 23 | through February 16, 2009? |
| 10:32 | 24 | A    Yes. |
| 10:32 | 25 | Q    Was there anyone else on staff besides that |

| | | |
|---|---|---|
| 10:32 | 1 | dealing with psychiatric or psychological issues |
| 10:32 | 2 | during this time period? |
| 10:32 | 3 | A    I don't know exactly who was covering who, |
| 10:32 | 4 | but sometimes they are sick or they have vacation, |
| 10:32 | 5 | and there is a coverage from outside person. |
| 10:32 | 6 | Q    Okay.  But was there an on-staff |
| 10:32 | 7 | psychologist during this time period? |
| 10:32 | 8 | A    No. |
| 10:32 | 9 | Q    Okay.  Was there any other on-staff |
| 10:32 | 10 | employee dealing with psychological or psychiatric |
| 10:32 | 11 | issues on a regular basis besides you, Nurse |
| 10:32 | 12 | Moscowitz and Nurse Rodelander? |
| 10:32 | 13 | A    That's right. |
| 10:32 | 14 | Q    Just the three of you? |
| 10:32 | 15 | A    Yes. |
| 10:32 | 16 | Q    Okay.  Where did you go to -- did you |
| 10:33 | 17 | graduate from high school? |
| 10:33 | 18 | A    Yes. |
| 10:33 | 19 | Q    Did you -- where did you go to high school? |
| 10:33 | 20 | A    It was in Korea. |
| 10:33 | 21 | Q    Okay.  And you -- you got your high school |
| 10:33 | 22 | degree in Korea? |
| 10:33 | 23 | A    Right.  Right. |
| 10:33 | 24 | Q    Did -- and after that did you -- you became |
| 10:33 | 25 | a doctor.  So where did you get your medical |

| | | |
|---|---|---|
| 11:10 | 1 | Q    So you don't visit, let's say, a patient |
| 11:10 | 2 | who might have a bipolar condition or other types of |
| 11:10 | 3 | conditions on this interval that you described? |
| 11:10 | 4 | A    No, unless they decompensate we see. |
| 11:10 | 5 | Q    Okay.  And how would you know that they |
| 11:10 | 6 | were decompensating? |
| 11:10 | 7 | A    I would be notified usually by the staff or |
| 11:10 | 8 | medical staff. |
| 11:10 | 9 | Q    But you're the only trained psychiatrist on |
| 11:10 | 10 | staff, correct? |
| 11:10 | 11 | A    Yes. |
| 11:10 | 12 | Q    Do you remember having any interactions |
| 11:10 | 13 | with Daniel Hernandez prior to February 16, 2009? |
| 11:11 | 14 | A    No. |
| 11:11 | 15 | Q    Let's turn to Exhibit 44.  It's in another |
| 11:11 | 16 | binder, I believe.  Can you turn to Page 54?  Look |
| 11:11 | 17 | at the bottom photograph of Page 54. |
| 11:11 | 18 | Do you recognize this individual? |
| 11:11 | 19 | A    No. |
| 11:11 | 20 | Q    We'll stipulate for the record this is a |
| 11:11 | 21 | picture of Daniel Hernandez. |
| 11:11 | 22 | So you don't recognize him at all? |
| 11:11 | 23 | A    No. |
| 11:11 | 24 | Q    Do you remember -- do you remember having |
| 11:11 | 25 | any interactions whatsoever with an individual named |

| | | |
|---|---|---|
| 11:17 | 1 | or psychiatric staff of CFMG? |
| 11:17 | 2 | A   No. |
| 11:17 | 3 | Q   Can you recall at any time discussing |
| 11:17 | 4 | Daniel Hernandez with the jail staff? |
| 11:17 | 5 | A   No. |
| 11:17 | 6 | Q   Do you recall speaking to any -- anyone on |
| 11:17 | 7 | the outside, any sort of psychologist or any other |
| 11:17 | 8 | person concerning Mr. Hernandez? |
| 11:17 | 9 | A   No. |
| 11:17 | 10 | Q   Okay.  In treating an inmate patient in |
| 11:18 | 11 | jail, those individuals have no choice to be there, |
| 11:18 | 12 | correct? |
| 11:18 | 13 | A   Correct. |
| 11:18 | 14 | Q   And so those people depend on -- on CFMG |
| 11:18 | 15 | and the psychiatric staff and you to ensure their |
| 11:18 | 16 | safety, correct? |
| 11:18 | 17 | MR. BERTLING:  Lacks foundation and calls for |
| 11:18 | 18 | speculation. |
| 11:18 | 19 | But go ahead and answer the question, if |
| 11:18 | 20 | you can. |
| 11:18 | 21 | THE DEPONENT:  I couldn't say we are responsible |
| 11:18 | 22 | for their safety.  Safety is by the custody staff's |
| 11:18 | 23 | responsibility. |
| 11:18 | 24 | BY MR. McLANE: |
| 11:18 | 25 | Q   Okay.  Let me clarify it.  But you're -- |

| | | |
|---|---|---|
| 11:18 | 1 | but they rely on you for their mental health |
| 11:18 | 2 | treatment, correct? |
| 11:18 | 3 | A    Yes. |
| 11:18 | 4 | Q    They can't go to a psychiatrist of their |
| 11:18 | 5 | choice, correct? |
| 11:18 | 6 | A    Correct. |
| 11:18 | 7 | Q    And it's incumbent on you to provide the |
| 11:19 | 8 | same standard of mental healthcare as what they |
| 11:19 | 9 | would receive if they could go to a doctor of their |
| 11:19 | 10 | choice on the outside? |
| 11:19 | 11 | A    Yes. |
| 11:19 | 12 | Q    That's your understanding of your |
| 11:19 | 13 | responsibility to treat these inmate patients as -- |
| 11:19 | 14 | as if they were private patients you were seeing in |
| 11:19 | 15 | the community? |
| 11:19 | 16 | A    Yes. |
| 11:19 | 17 | Q    And in some sense it's even more important |
| 11:19 | 18 | because they have nowhere else to go but you, |
| 11:19 | 19 | correct? |
| 11:19 | 20 | A    Yes. |
| 11:19 | 21 | MR. BERTLING:  Well, lacks foundation, calls for |
| 11:19 | 22 | speculation. |
| 11:19 | 23 | BY MR. McLANE: |
| 11:19 | 24 | Q    Your answer was yes? |
| 11:19 | 25 | A    Yeah. |

| | | |
|---|---|---|
| 11:23 | 1 | you rely on your individual training? |
| 11:23 | 2 | A    Yes. |
| 11:23 | 3 | Q    So you rely on your individual training, |
| 11:23 | 4 | not Title 15, correct? |
| 11:23 | 5 | A    Yeah. |
| 11:23 | 6 | Q    Okay.  Do you recall ever an individual |
| 11:23 | 7 | treatment plan that you administered for Daniel |
| 11:23 | 8 | Hernandez? |
| 11:23 | 9 | A    No. |
| 11:23 | 10 | Q    Do you have an understanding as to whether |
| 11:23 | 11 | Daniel Hernandez went to Patton State Hospital? |
| 11:23 | 12 | A    Yes. |
| 11:23 | 13 | Q    Okay.  When he came back from Patton State |
| 11:23 | 14 | Hospital, was he placed on an individual treatment |
| 11:23 | 15 | plan? |
| 11:23 | 16 | MR. BERTLING:  By whom? |
| 11:23 | 17 | MR. McLANE:  By Dr. Jung. |
| 11:24 | 18 | MR. BERTLING:  Okay. |
| 11:24 | 19 | THE DEPONENT:  We continued the recommendation |
| 11:24 | 20 | of Patton State Hospital. |
| 11:24 | 21 | BY MR. McLANE: |
| 11:24 | 22 | Q    So is there a written plan, a report you |
| 11:24 | 23 | do -- |
| 11:24 | 24 | A    No. |
| 11:24 | 25 | Q    -- or is your treatment plan just you |

| | | |
|---|---|---|
| 11:24 | 1 | continue him on the medications that Patton |
| 11:24 | 2 | recommended? |
| 11:24 | 3 | A     And then evaluate his condition. |
| 11:24 | 4 | Q     Describe your evaluation of Daniel |
| 11:24 | 5 | Hernandez. |
| 11:24 | 6 | A     I don't recall. |
| 11:24 | 7 | MR. BERTLING:  Do you want him to look at the |
| 11:24 | 8 | record or try to do it from memory? |
| 11:24 | 9 | BY MR. McLANE: |
| 11:24 | 10 | Q     From memory first.  If you have a memory. |
| 11:24 | 11 | A     I don't have a recollection. |
| 11:24 | 12 | Q     Okay.  Do you recall interviewing him after |
| 11:24 | 13 | he came back from Patton? |
| 11:24 | 14 | A     No. |
| 11:24 | 15 | Q     Do you recall doing any testing when he |
| 11:24 | 16 | came back from Patton? |
| 11:24 | 17 | A     No. |
| 11:24 | 18 | Q     Do you recall taking him off medications |
| 11:24 | 19 | when he came back from Patton? |
| 11:24 | 20 | A     No. |
| 11:25 | 21 | Q     During the years -- strike that. |
| 11:25 | 22 | In terms of policies and treatment, |
| 11:25 | 23 | treatment of -- of inmate patients during the years |
| 11:25 | 24 | 2007 through February 16, 2009, did you recommend |
| 11:25 | 25 | any changes in the treatment of patients, changes in |

| 11:44 | 1 | while the order forms are what you as a doctor have |
| 11:44 | 2 | prescribed in terms of medications or treatment, |
| 11:44 | 3 | correct? |
| 11:44 | 4 | A    Correct. |
| 11:44 | 5 | Q    Now, did it just -- do the order forms deal |
| 11:44 | 6 | just with prescription of medications, or do they |
| 11:45 | 7 | deal with specific treatment? |
| 11:45 | 8 | A    Order form is for just medication. |
| 11:45 | 9 | Q    Okay.  If there is an order regarding |
| 11:45 | 10 | treatment of a patient, where is that documented? |
| 11:45 | 11 | MR. BERTLING:  Well, vague and ambiguous as to |
| 11:45 | 12 | what type of treatment.  Are you talking about |
| 11:45 | 13 | psychiatric?  Medical?  Dental? |
| 11:45 | 14 | BY MR. McLANE: |
| 11:45 | 15 | Q    Psychiatric treatment. |
| 11:45 | 16 | A    There is a front sheet called a treatment |
| 11:45 | 17 | plan, and usually listing the major problems. |
| 11:45 | 18 | Q    So let's turn to Exhibit 97 -- excuse me. |
| 11:45 | 19 | Exhibit 87.  I apologize.  It's the CFMG file. |
| 11:46 | 20 | MS. WEISBERG:  It's that separate binder. |
| 11:46 | 21 | BY MR. McLANE: |
| 11:46 | 22 | Q    I think it's this binder. |
| 11:46 | 23 | MS. WEISBERG:  That's right. |
| 11:46 | 24 | MR. BERTLING:  There you go. |
| 11:46 | 25 | /// |

| | | |
|---|---|---|
| 11:46 | 1 | BY MR. McLANE: |
| 11:46 | 2 |     Q    Okay.  Looking at the first page of |
| 11:46 | 3 | Exhibit 87, is this the treatment plan page that you |
| 11:46 | 4 | just referred to? |
| 11:46 | 5 |     A    Here and initial evaluation by nursing |
| 11:46 | 6 | staff. |
| 11:46 | 7 |     Q    The nursing assessment form? |
| 11:46 | 8 |     A    Yeah. |
| 11:46 | 9 |     Q    Okay.  We'll turn to that for Mr. Hernandez |
| 11:46 | 10 | as well. |
| 11:46 | 11 |     Now, can you describe what the treatment |
| 11:46 | 12 | plan was for him on 9 slash '04? |
| 11:46 | 13 | MR. BERTLING:  Well, lacks foundation that the |
| 11:46 | 14 | document we're looking at identifies the treatment |
| 11:46 | 15 | plan. |
| 11:46 | 16 |     But go ahead and answer the question, if |
| 11:46 | 17 | you can. |
| 11:46 | 18 | BY MR. McLANE: |
| 11:46 | 19 |     Q    Well, you had just testified, and maybe I'm |
| 11:46 | 20 | wrong, that you indicated that there was a face |
| 11:46 | 21 | sheet that would describe a treatment plan for a |
| 11:46 | 22 | particular inmate patient. |
| 11:46 | 23 |     Is this the face sheet that you were |
| 11:47 | 24 | referring to? |
| 11:47 | 25 |     A    Yes. |

| | | |
|---|---|---|
| 11:47 | 1 | Q    Okay.  So let's look at this face sheet for |
| 11:47 | 2 | Mr. Hernandez, the first entry, September 2004.  So |
| 11:47 | 3 | the treatment plan is health maintenance? |
| 11:47 | 4 | A    Yes. |
| 11:47 | 5 | Q    Okay.  And then on February 2007 it says |
| 11:47 | 6 | ASPD; is that correct? |
| 11:47 | 7 | A    Yes. |
| 11:47 | 8 | Q    What does that stand for? |
| 11:47 | 9 | A    Antisocial personality disorder. |
| 11:47 | 10 | Q    What was the treatment plan for this for |
| 11:47 | 11 | Mr. Hernandez? |
| 11:47 | 12 | MR. BERTLING:  Well, lacks foundation that this |
| 11:47 | 13 | document would show what that treatment plan was. |
| 11:47 | 14 | This is actually a document entitled "Problem List." |
| 11:47 | 15 | MR. McLANE:  He testified that this list would |
| 11:47 | 16 | indicate the treatment plan. |
| 11:47 | 17 | Q    I'm asking you does this face sheet -- |
| 11:47 | 18 | MR. BERTLING:  I don't think he -- |
| 11:47 | 19 | MR. McLANE:  Let me just ask the question. |
| 11:47 | 20 | Q    Does this face sheet reflect in any aspect |
| 11:47 | 21 | this -- this type of document called Problem List, |
| 11:48 | 22 | does this reflect in any aspect the treatment plan |
| 11:48 | 23 | for a particular inmate patient, this form? |
| 11:48 | 24 | MR. BERTLING:  Does this form in and of itself |
| 11:48 | 25 | talk about what the treatment plan is, Doctor? |

| 11:48 | 1 | THE DEPONENT:  Actually, supposed to be |
| 11:48 | 2 | treatment plan and just listing the major problems. |
| 11:48 | 3 | BY MR. McLANE: |
| 11:48 | 4 | Q    Okay.  So by treatment plan you're just |
| 11:48 | 5 | talking about listing problems, correct? |
| 11:48 | 6 | A    Right. |
| 11:48 | 7 | Q    You're not talking about how you treat the |
| 11:48 | 8 | problems? |
| 11:48 | 9 | A    Correct. |
| 11:48 | 10 | Q    Okay.  Where is the treatment plan for |
| 11:48 | 11 | treating the problems? |
| 11:48 | 12 | MR. BERTLING:  Well, vague -- |
| 11:48 | 13 | BY MR. McLANE: |
| 11:48 | 14 | Q    What would that document be? |
| 11:48 | 15 | MR. BERTLING:  Vague and ambiguous as to what |
| 11:48 | 16 | problem you're talking about.  You have the records |
| 11:48 | 17 | before you.  There are multiple pages with progress |
| 11:48 | 18 | notes, orders.  So what specific problems are you |
| 11:48 | 19 | talking about?  Are you talking about -- |
| 11:48 | 20 | MR. McLANE:  I'm just talking in general a |
| 11:48 | 21 | psychiatric treatment plan. |
| 11:48 | 22 | Q    For example, where would that be listed, |
| 11:48 | 23 | the treatment plan, for a particular inmate patient? |
| 11:48 | 24 | A    Usually initial evaluation makes some |
| 11:49 | 25 | treatment plan. |

| | | |
|---|---|---|
| 11:49 | 1 | Q    The initial evaluation? |
| 11:49 | 2 | A    Yes. |
| 11:49 | 3 | Q    What if a problem develops after they're |
| 11:49 | 4 | initially evaluated?  Where would that -- and you |
| 11:49 | 5 | needed to treat the person, where would that |
| 11:49 | 6 | treatment plan be kept? |
| 11:49 | 7 | A    It would be in the progress notes. |
| 11:49 | 8 | Q    So the treatment is in the progress notes? |
| 11:49 | 9 | A    Sometimes. |
| 11:49 | 10 | Q    And sometimes in this problem list? |
| 11:49 | 11 | A    Yes. |
| 11:49 | 12 | Q    And sometimes in the nursing assessment? |
| 11:49 | 13 | A    Yes. |
| 11:49 | 14 | Q    Any other type of document that would set |
| 11:49 | 15 | forth the treatment plan? |
| 11:49 | 16 | A    No. |
| 11:49 | 17 | Q    Okay.  So we're talking about the problem |
| 11:49 | 18 | list, the nursing assessment and the progress notes |
| 11:49 | 19 | basically? |
| 11:49 | 20 | MR. BERTLING:  Also, just vague and ambiguous as |
| 11:49 | 21 | to what you refer to as treatment plan.  He's |
| 11:49 | 22 | already talked about doctor's orders regarding |
| 11:49 | 23 | medications that are given that are obviously part |
| 11:49 | 24 | and parcel of the treatment plan. |
| 11:49 | 25 | MR. McLANE:  Well, that's what he just stated as |

| | | |
|---|---|---|
| 11:49 | 1 | the treatment plan, those three types of documents. |
| 11:49 | 2 | Q    Is there any other documents, as your |
| 11:49 | 3 | counsel has just provided?  The doctor's orders, is |
| 11:50 | 4 | that part of the treatment plan? |
| 11:50 | 5 | A    I would say so. |
| 11:50 | 6 | Q    Okay.  So we've got doctor's orders, |
| 11:50 | 7 | problem list, nursing assessment, progress notes. |
| 11:50 | 8 | Any other type of document where the treatment plan |
| 11:50 | 9 | would be set forth? |
| 11:50 | 10 | A    No. |
| 11:50 | 11 | Q    Okay.  Do you do any written reports |
| 11:50 | 12 | setting forth the particular treatment plan for an |
| 11:50 | 13 | inmate patient? |
| 11:50 | 14 | A    No. |
| 11:50 | 15 | Q    Now, on May 2008 -- are these your notes |
| 11:50 | 16 | here?  Are any of these notes on this page your |
| 11:50 | 17 | notes? |
| 11:50 | 18 | MR. BERTLING:  Just so the record is clear, |
| 11:50 | 19 | we're looking at Bates stamp 0 -- 5097 -- |
| 11:50 | 20 | MR. McLANE:  Yes. |
| 11:50 | 21 | MR. BERTLING:  -- as part of Exhibit 48? |
| 11:50 | 22 | MR. McLANE:  No.  Excuse me.  It's 87. |
| 11:50 | 23 | MR. BERTLING:  87.  Thank you. |
| 11:50 | 24 | BY MR. McLANE: |
| 11:50 | 25 | Q    So 87.  Are any of these notes yours? |

| | | |
|---|---|---|
| 11:50 | 1 | A    No. |
| 11:50 | 2 | Q    Who generally puts -- who generally would |
| 11:50 | 3 | be writing notes in the problem list?  Is that the |
| 11:50 | 4 | psych nurses? |
| 11:51 | 5 | A    No.  I do. |
| 11:51 | 6 | Q    Okay.  So you do, but you're saying none of |
| 11:51 | 7 | these notes are yours? |
| 11:51 | 8 | A    It was written already by psych nurse.  So |
| 11:51 | 9 | I didn't add any. |
| 11:51 | 10 | Q    Okay.  This last entry on May 2008, it says |
| 11:51 | 11 | "Mood D," slash, "OC," is that your writing? |
| 11:51 | 12 | A    No. |
| 11:51 | 13 | Q    Do you understand what that says? |
| 11:51 | 14 | A    Mood disorder with psychotic features. |
| 11:51 | 15 | Q    Okay.  So in May -- in September 2004 it |
| 11:51 | 16 | indicated problems, health maintenance.  February |
| 11:51 | 17 | 2007, antisocial personality disorder, and May 2008, |
| 11:51 | 18 | mood disorder with psychotic features; is that |
| 11:51 | 19 | correct? |
| 11:51 | 20 | A    Right. |
| 11:51 | 21 | Q    Okay.  He came back from Patton |
| 11:51 | 22 | approximately October 30, 2008.  You have an |
| 11:51 | 23 | understanding he came back from Patton, correct? |
| 11:51 | 24 | A    Yes. |
| 11:51 | 25 | Q    Why isn't there any sort of entry |

| | | |
|---|---|---|
| 11:51 | 1 | concerning him coming back from Patton on this |
| 11:52 | 2 | problem list? |
| 11:52 | 3 | MR. BERTLING:  Objection.  Calls for |
| 11:52 | 4 | speculation. |
| 11:52 | 5 | But if you -- |
| 11:52 | 6 | BY MR. McLANE: |
| 11:52 | 7 | Q    If you know. |
| 11:52 | 8 | MR. BERTLING:  If you know, Doctor, you can go |
| 11:52 | 9 | ahead and answer. |
| 11:52 | 10 | THE DEPONENT:  That is not a problem itself. |
| 11:52 | 11 | Coming back from Patton is not a problem. |
| 11:52 | 12 | BY MR. McLANE: |
| 11:52 | 13 | Q    Well, if his diagnosis changed or if he was |
| 11:52 | 14 | taken in at intake and evaluated and there was a |
| 11:52 | 15 | different problem or the same problem, would it be |
| 11:52 | 16 | listed on this problem list? |
| 11:52 | 17 | A    I don't really care that much about the |
| 11:52 | 18 | diagnosis. |
| 11:52 | 19 | Q    What do you mean you don't care about the |
| 11:52 | 20 | diagnosis? |
| 11:52 | 21 | A    Their diagnosis. |
| 11:52 | 22 | Q    You don't care about Patton's diagnosis? |
| 11:52 | 23 | A    Right. |
| 11:52 | 24 | Q    Okay.  So if he -- did you see him when he |
| 11:52 | 25 | came back from Patton? |

| | | |
|---|---|---|
| 11:52 | 1 | A    Yes. |
| 11:52 | 2 | Q    Okay.  Did you have a diagnosis for him -- |
| 11:52 | 3 | from him coming back from Patton? |
| 11:52 | 4 | A    Yes. |
| 11:52 | 5 | Q    What are you looking at now? |
| 11:52 | 6 | A    It's initial note when he came back. |
| 11:52 | 7 | MR. BERTLING:  This is Exhibit -- this is |
| 11:52 | 8 | Exhibit 5196 of Exhibit 83. |
| 11:53 | 9 | MS. WEISBERG:  I think you mean 87. |
| 11:53 | 10 | MR. McLANE:  I think it's Exhibit 83.  I think |
| 11:53 | 11 | it's actually -- |
| 11:53 | 12 | MR. BERTLING:  Bates stamp 5196 of whatever |
| 11:53 | 13 | exhibit -- are we on Exhibit 83? |
| 11:53 | 14 | MR. McLANE:  I don't think -- |
| 11:53 | 15 | MS. WEISBERG:  87. |
| 11:53 | 16 | MR. BERTLING:  87.  Okay. |
| 11:53 | 17 | MR. McLANE:  Hold on a second.  87. |
| 11:53 | 18 | MR. BERTLING:  No.  I'm looking at Page 5196 of |
| 11:53 | 19 | Exhibit 87. |
| 11:53 | 20 | MR. McLANE:  Hold on.  It's actually Exhibit 85. |
| 11:53 | 21 | You're looking at 5196 of 87. |
| 11:53 | 22 | MR. BERTLING:  Right. |
| 11:53 | 23 | MR. McLANE:  I have it as Exhibit 85, but |
| 11:53 | 24 | let's -- |
| 11:53 | 25 | MR. BERTLING:  They're in both places. |

| | | |
|---|---|---|
| 11:53 | 1 | MR. McLANE:  Right.  Hold on a second. |
| 11:53 | 2 | MS. WEISBERG:  If you can throw that on the |
| 11:53 | 3 | binder. |
| 11:53 | 4 | MR. BERTLING:  Sure.  No problem. |
| 11:53 | 5 | MS. WEISBERG:  Thank you. |
| 11:53 | 6 | MR. BERTLING:  So do you want us to go to |
| 11:53 | 7 | Exhibit 85? |
| 11:53 | 8 | MR. McLANE:  It's the same exhibit.  You can |
| 11:53 | 9 | stay there if it's easier.  Let me just go there |
| 11:53 | 10 | myself. |
| 11:53 | 11 | Q    Okay.  So is this document your interaction |
| 11:53 | 12 | with Daniel Hernandez on November 3, 2008? |
| 11:54 | 13 | A    Yes. |
| 11:54 | 14 | Q    Okay.  What does this note say? |
| 11:54 | 15 | A    You want me to read? |
| 11:54 | 16 | Q    Yes, if you could read it. |
| 11:54 | 17 | A    28 year old single Hispanic male, father of |
| 11:54 | 18 | one with history of antisocial object relation who |
| 11:54 | 19 | returned from Patton forensic hospital after |
| 11:54 | 20 | two-month stay on 1372.  Original charge is second |
| 11:54 | 21 | degree robbery and possession of deadly weapon. |
| 11:54 | 22 | Current medications include Zyprexa, 10 milligrams |
| 11:54 | 23 | per day, and he claims he has been doing well.  On |
| 11:54 | 24 | interview he is coherent.  He is calm/coherent. |
| 11:54 | 25 | Said he wants to be on 1026 then CONREP.  So out to |

| | | |
|---|---|---|
| 11:54 | 1 | work. |
| 11:54 | 2 | Q    Excuse me.  So what?  What did you just |
| 11:54 | 3 | say? |
| 11:54 | 4 | A    Go out to work. |
| 11:55 | 5 | Q    Okay. |
| 11:55 | 6 | A    Transparently manipulative, and impression |
| 11:55 | 7 | was mood disorder, antisocial personality disorder, |
| 11:55 | 8 | and the plan is continue the current treatment plan. |
| 11:55 | 9 | Q    So you said you didn't care about Patton, |
| 11:55 | 10 | but obviously you consulted the Patton treatment, |
| 11:55 | 11 | correct? |
| 11:55 | 12 | A    Treatment, yeah.  We are looking at |
| 11:55 | 13 | treatment, but sometimes diagnosis itself is not |
| 11:55 | 14 | that relevant. |
| 11:55 | 15 | Q    What do you mean by the diagnosis is not |
| 11:55 | 16 | that relevant to the treatment? |
| 11:55 | 17 | A    Because I'm making an independent |
| 11:55 | 18 | diagnostic impression. |
| 11:55 | 19 | Q    But you take into account what Patton says, |
| 11:55 | 20 | correct? |
| 11:55 | 21 | A    Yes.  Yes. |
| 11:55 | 22 | Q    Do you know what Patton diagnosed him as? |
| 11:55 | 23 | A    I don't know exactly. |
| 11:55 | 24 | Q    We'll get back into that. |
| 11:55 | 25 | Let me ask you a few questions about this. |

| | | |
|---|---|---|
| 11:55 | 1 | Antisocial in object relation.  What does object |
| 11:56 | 2 | relation mean? |
| 11:56 | 3 | A   Object relation is another word for |
| 11:56 | 4 | interpersonal relationship.  When you relate -- you |
| 11:56 | 5 | are relating as an object. |
| 11:56 | 6 | Q   What does that mean? |
| 11:56 | 7 | A   Object relation is another word for |
| 11:56 | 8 | interpersonal relationship. |
| 11:56 | 9 | Q   Well, you say antisocial object relation. |
| 11:56 | 10 | I'm trying to figure out what was the significance |
| 11:56 | 11 | of you noting that? |
| 11:56 | 12 | A   That's his basically relatedness with other |
| 11:56 | 13 | people. |
| 11:56 | 14 | Q   With people or objects? |
| 11:56 | 15 | A   People.  Actually, people is object.  It's |
| 11:56 | 16 | a psychoanalytic term of -- |
| 11:56 | 17 | Q   What does -- what -- when you use the term |
| 11:56 | 18 | ob- -- |
| 11:56 | 19 | A   What is representing to you as object. |
| 11:56 | 20 | That's why you are -- they're relating to you. |
| 11:56 | 21 | Q   They're relating to a person as an object? |
| 11:56 | 22 | A   Yeah. |
| 11:56 | 23 | Q   Is that what you mean? |
| 11:56 | 24 | A   Um-hum. |
| 11:56 | 25 | Q   Okay.  So they have difficulty in relating |

| | | |
|---|---|---|
| 11:57 | 1 | to others, is that what you mean? |
| 11:57 | 2 | A    Object not as a thing.   Object as a subject |
| 11:57 | 3 | and object in that way -- sense. |
| 11:57 | 4 | Q    Okay.   Now, you said he -- |
| 11:57 | 5 | MR. HELD:  David, may I interrupt and ask one |
| 11:57 | 6 | question? |
| 11:57 | 7 | MR. McLANE:  Sure. |
| 11:57 | 8 | MR. HELD:  Do you mean objective versus |
| 11:57 | 9 | subjective? |
| 11:57 | 10 | THE DEPONENT:  No.   This -- I don't think I can |
| 11:57 | 11 | really explain easily.   This is a psychoanalytic |
| 11:57 | 12 | term when you said interpersonal relationship they |
| 11:57 | 13 | said object relations because you are relating |
| 11:57 | 14 | person actually what he represents that -- as a |
| 11:57 | 15 | person. |
| 11:57 | 16 | MR. HELD:  Thank you. |
| 11:57 | 17 | BY MR. McLANE: |
| 11:57 | 18 | Q    Okay.   Now, it says two-month stay on 1372. |
| 11:57 | 19 | What is 1372? |
| 11:57 | 20 | A    Not competent to stand trial. |
| 11:57 | 21 | Q    So you understood he had been at Patton |
| 11:57 | 22 | because he had been found not competent.   And so he |
| 11:58 | 23 | returned from Patton competent to stand trial? |
| 11:58 | 24 | A    Yes. |
| 11:58 | 25 | Q    Is that your understanding? |

| | | |
|---|---|---|
| 11:58 | 1 | A    Yes. |
| 11:58 | 2 | Q    Okay.  Did he tell you what his charges |
| 11:58 | 3 | were?  Is that where this information came from, or |
| 11:58 | 4 | did you consult something else? |
| 11:58 | 5 | A    I don't remember.  Usually I see the |
| 11:58 | 6 | computer and find out. |
| 11:58 | 7 | Q    VCIJIS system and look up and see what |
| 11:58 | 8 | they're charged with? |
| 11:58 | 9 | A    Yeah. |
| 11:58 | 10 | Q    What relevance did that have to you in |
| 11:58 | 11 | terms of your diagnosis? |
| 11:58 | 12 | A    The charges? |
| 11:58 | 13 | Q    Yes. |
| 11:58 | 14 | A    Usually looking at the charges you can have |
| 11:58 | 15 | a lot of understanding about the person. |
| 11:58 | 16 | Q    Okay.  Well, what understanding did it give |
| 11:58 | 17 | you as far as you can tell? |
| 11:58 | 18 | A    Consistent with antisocial personality. |
| 11:58 | 19 | Q    So what did you base your diagnosis of |
| 11:58 | 20 | antisocial on?  What was the basis for that |
| 11:59 | 21 | diagnosis? |
| 11:59 | 22 | A    It's from his -- |
| 11:59 | 23 | Q    You indicated the charges.  Anything else? |
| 11:59 | 24 | A    From the past record probably. |
| 11:59 | 25 | Q    What past record? |

| | | |
|---|---|---|
| 11:59 | 1 | A      I'm not sure what you mean. |
| 11:59 | 2 | Q      Well, I'm asking you.  You said from the |
| 11:59 | 3 | past record.  What do you mean by "past record"? |
| 11:59 | 4 | A      Looking at the past record. |
| 11:59 | 5 | Q      What past record? |
| 11:59 | 6 | MR. BERTLING:  Are you talking about the CFMG |
| 11:59 | 7 | psychiatric notes? |
| 11:59 | 8 | THE DEPONENT:  Yeah, right. |
| 11:59 | 9 | BY MR. McLANE: |
| 11:59 | 10 | Q      Okay.  So are you saying -- do you have a |
| 11:59 | 11 | specific recollection that you reviewed his entire |
| 11:59 | 12 | CFMG file before meeting with him? |
| 11:59 | 13 | A      Anyway, this is impression of interaction |
| 11:59 | 14 | and observation. |
| 11:59 | 15 | Q      So this is based upon your impressions? |
| 11:59 | 16 | A      Yeah. |
| 11:59 | 17 | Q      Okay.  It's not based upon reviewing his |
| 11:59 | 18 | file? |
| 11:59 | 19 | MR. BERTLING:  Well, misstates his testimony. |
| 11:59 | 20 | His testimony is that it could be based on that as |
| 11:59 | 21 | well. |
| 11:59 | 22 | BY MR. McLANE: |
| 11:59 | 23 | Q      Well, I'm asking him do you have a specific |
| 12:00 | 24 | recollection of reviewing this file? |
| 12:00 | 25 | A      No. |

| | | |
|---|---|---|
| 12:00 | 1 | Q    Okay.  Is this more based on, as far as |
| 12:00 | 2 | your -- your understanding today, as you testified |
| 12:00 | 3 | today, based upon your impressions and meeting him? |
| 12:00 | 4 | MR. BERTLING:  Calls for speculation that it |
| 12:00 | 5 | does not include reviewing the file.  You may want |
| 12:00 | 6 | to lay the foundation and ask him what he does to |
| 12:00 | 7 | come to that conclusion.  He's already indicated to |
| 12:00 | 8 | you earlier that he does look at the file. |
| 12:00 | 9 | MR. McLANE:  No.  He indicated -- let him |
| 12:00 | 10 | testify, Mr. Bertling.  You're testifying for him. |
| 12:00 | 11 | MR. BERTLING:  I'm not testifying for him. |
| 12:00 | 12 | MR. McLANE:  Yes, you are.  Let me ask him the |
| 12:00 | 13 | questions.  If you want to object, you can object. |
| 12:00 | 14 | I'd appreciate you cut out the speaking objections |
| 12:00 | 15 | and coaching him on his testimony. |
| 12:00 | 16 | MR. BERTLING:  I did object.  I did object.  Go |
| 12:00 | 17 | ahead and ask the question. |
| 12:00 | 18 | MR. McLANE:  I'm asking the question. |
| 12:00 | 19 | Q    Do you recall specifically reviewing this |
| 12:00 | 20 | file before coming up with this diagnosis? |
| 12:00 | 21 | A    I don't recall. |
| 12:00 | 22 | Q    Okay.  Is it your practice to review the |
| 12:00 | 23 | entire file before coming up with the diagnosis? |
| 12:00 | 24 | A    If it's available, we do. |
| 12:00 | 25 | Q    You don't know whether the file was |

| | | |
|---|---|---|
| 12:00 | 1 | available? |
| 12:00 | 2 | A    No. |
| 12:00 | 3 | Q    Okay.  Now, what was the basis -- what did |
| 12:01 | 4 | you specifically observe in your impressions to come |
| 12:01 | 5 | up with the diagnosis of antisocial?  You mentioned |
| 12:01 | 6 | the charges.  Is there anything else? |
| 12:01 | 7 | A    Demeanors and relatedness and behavior in |
| 12:01 | 8 | general. |
| 12:01 | 9 | Q    What did you specifically observe in his |
| 12:01 | 10 | demeanor or relatedness? |
| 12:01 | 11 | A    I don't recall. |
| 12:01 | 12 | Q    Okay.  You also indicated -- you wrote down |
| 12:01 | 13 | 1026 in this note.  What is 1026? |
| 12:01 | 14 | A    Not guilty for the reason of insanity. |
| 12:01 | 15 | Q    States he wants to be on 1026? |
| 12:01 | 16 | A    Yes. |
| 12:01 | 17 | Q    What does that mean to you? |
| 12:01 | 18 | A    He wants to declare that he's insane so he |
| 12:01 | 19 | cannot -- he can get away from the charges. |
| 12:02 | 20 | Q    Okay.  Did you diagnosis him or -- or -- or |
| 12:02 | 21 | conduct any test to determine whether he was insane |
| 12:02 | 22 | at the time of the charges? |
| 12:02 | 23 | A    No.  I had nothing to do with that. |
| 12:02 | 24 | Q    That was just something he said, and you |
| 12:02 | 25 | reported it? |

| | | |
|---|---|---|
| 12:07 | 1 | Q    And it treats people with mental |
| 12:07 | 2 | conditions, correct? |
| 12:07 | 3 | A    Correct.  Yes. |
| 12:07 | 4 | Q    So Mr. Hernandez had a mental condition |
| 12:07 | 5 | that caused him to be sent to Patton, correct? |
| 12:08 | 6 | A    They believed he had mental condition. |
| 12:08 | 7 | Q    You didn't believe he had a mental |
| 12:08 | 8 | condition? |
| 12:08 | 9 | A    That's not what I'm saying.  Some people |
| 12:08 | 10 | may not have mental condition. |
| 12:08 | 11 | Q    Okay.  But Mr. Hernandez had a mental |
| 12:08 | 12 | condition, correct? |
| 12:08 | 13 | A    Yes. |
| 12:08 | 14 | Q    You diagnosed him ASPD with a mood |
| 12:08 | 15 | disorder, correct? |
| 12:08 | 16 | A    Correct. |
| 12:08 | 17 | Q    Okay.  And you continued him on Zyprexa, |
| 12:08 | 18 | correct? |
| 12:08 | 19 | A    Yes. |
| 12:08 | 20 | Q    And that's an antipsychotic medication, |
| 12:08 | 21 | correct? |
| 12:08 | 22 | A    Yes. |
| 12:08 | 23 | Q    You wouldn't be giving an antipsychotic |
| 12:08 | 24 | medication to someone who didn't have a mental |
| 12:08 | 25 | disorder, correct? |

| | | |
|---|---|---|
| 12:08 | 1 | A     Depends. |
| 12:08 | 2 | Q     You give Zyprexa to individuals who do not |
| 12:08 | 3 | have any mental condition? |
| 12:08 | 4 | A     Not serious mental condition, you can have |
| 12:08 | 5 | it. |
| 12:08 | 6 | Q     Okay.  Well, they have some sort of mental |
| 12:08 | 7 | condition, correct? |
| 12:08 | 8 | A     Yes. |
| 12:08 | 9 | Q     You wouldn't be prescribing it to someone |
| 12:08 | 10 | who doesn't have any mental condition, correct? |
| 12:08 | 11 | A     Yes. |
| 12:08 | 12 | Q     Okay.  Did you document whether or not |
| 12:08 | 13 | Mr. Hernandez had a serious mental condition? |
| 12:08 | 14 | MR. BERTLING:  Well, vague and ambiguous as to |
| 12:08 | 15 | what you mean by serious mental condition. |
| 12:09 | 16 | But go ahead and answer the question. |
| 12:09 | 17 | THE DEPONENT:  I don't know the question. |
| 12:09 | 18 | BY MR. McLANE: |
| 12:09 | 19 | Q     In that note you don't document whether his |
| 12:09 | 20 | condition is serious or mild or what degree of his |
| 12:09 | 21 | condition? |
| 12:09 | 22 | A     Documented he had mood disorder. |
| 12:09 | 23 | Q     Okay.  What's the mood disorder? |
| 12:09 | 24 | A     Mood disorder is predominantly affecting |
| 12:09 | 25 | the mood. |

| 12:09 | 1 | Q   Is that like bipolar?  Is that a mood |
| 12:09 | 2 | disorder? |
| 12:09 | 3 | A   Yes. |
| 12:09 | 4 | Q   Okay.  Did you -- did you further define |
| 12:09 | 5 | what his mood disorder was? |
| 12:09 | 6 | A   Mood disorder NOS.  So not otherwise |
| 12:09 | 7 | specified. |
| 12:09 | 8 | Q   Okay.  So you couldn't specifically |
| 12:09 | 9 | determine what his mood disorder was? |
| 12:09 | 10 | A   Correct. |
| 12:09 | 11 | Q   Okay. |
| 12:09 | 12 | A   It's not typical mood disorder or bipolar. |
| 12:09 | 13 | Q   So what -- how -- do you have any |
| 12:09 | 14 | recollection as to what his mood disorder was? |
| 12:09 | 15 | A   No. |
| 12:09 | 16 | Q   Okay.  Now, did you know when -- I believe |
| 12:10 | 17 | you testified -- but you knew that he was taken -- |
| 12:10 | 18 | that Patton State Hospital recommended he take |
| 12:10 | 19 | Zyprexa, and you continued on that medication, |
| 12:10 | 20 | correct? |
| 12:10 | 21 | A   Yes. |
| 12:10 | 22 | Q   Okay.  Now, let's take a look at Exhibit 36 |
| 12:10 | 23 | and 37. |
| 12:10 | 24 | MR. BERTLING:  36 is right in here.  The other |
| 12:10 | 25 | book, Doctor. |

| | | |
|---|---|---|
| 12:13 | 1 | A    Correct. |
| 12:13 | 2 | Q    Were you aware -- but he was on medication |
| 12:13 | 3 | at the time of your interview, correct? |
| 12:13 | 4 | A    Yes. |
| 12:13 | 5 | Q    And that might regulate his psychotic |
| 12:13 | 6 | condition, correct? |
| 12:13 | 7 | A    I highly doubt the amount of medication he |
| 12:13 | 8 | was taking controlled the psychosis. |
| 12:13 | 9 | Q    Okay.  So you expected him to display some |
| 12:13 | 10 | signs in this interview? |
| 12:13 | 11 | A    No. |
| 12:13 | 12 | Q    Okay.  So from Patton they indicated he had |
| 12:13 | 13 | an Axis II disorder psychotic D slash ONOS, right? |
| 12:13 | 14 | MR. BERTLING:  I believe that's actually an |
| 12:13 | 15 | Axis I. |
| 12:13 | 16 | MR. McLANE:  Axis I.  My fault, Peter. |
| 12:13 | 17 | Q    Axis I, psychotic D slash ONOS. |
| 12:13 | 18 | A    Yeah. |
| 12:13 | 19 | Q    Do you recall reading that before you -- |
| 12:13 | 20 | A    I don't have a recollection. |
| 12:13 | 21 | Q    Okay.  And Axis II, it has no diagnosis, |
| 12:13 | 22 | correct? |
| 12:13 | 23 | A    Right. |
| 12:13 | 24 | Q    So they did not diagnose him with |
| 12:13 | 25 | antisocial personality disorder, correct? |

| | | |
|---|---|---|
| 12:14 | 1 | A    Correct. |
| 12:14 | 2 | Q    Okay.  And then below it describes continue |
| 12:14 | 3 | to be medication compliant, correct? |
| 12:14 | 4 | A    Yes. |
| 12:14 | 5 | Q    And that's in specific instructions to the |
| 12:14 | 6 | patient? |
| 12:14 | 7 | MR. BERTLING:  It says continued to be |
| 12:14 | 8 | medication compliant. |
| 12:14 | 9 | BY MR. McLANE: |
| 12:14 | 10 | Q    Benefit side effects of meds. |
| 12:14 | 11 | MR. BERTLING:  Right. |
| 12:14 | 12 | MR. McLANE:  Okay. |
| 12:14 | 13 | MR. BERTLING:  So -- go ahead. |
| 12:14 | 14 | BY MR. McLANE: |
| 12:14 | 15 | Q    Do you recall reviewing that at all? |
| 12:14 | 16 | A    No. |
| 12:14 | 17 | Q    Okay.  Is it important for you in |
| 12:14 | 18 | evaluating an individual who comes back from Patton |
| 12:14 | 19 | to review the nursing discharge summary? |
| 12:14 | 20 | A    It's helpful. |
| 12:14 | 21 | Q    It's helpful.  But -- okay.  But you have |
| 12:14 | 22 | no recollection whether you did in this case? |
| 12:14 | 23 | A    No. |
| 12:14 | 24 | Q    Okay.  Is it your practice to review the |
| 12:14 | 25 | nursing discharge? |

| | | |
|---|---|---|
| 12:14 | 1 | A    Yes. |
| 12:14 | 2 | Q    But you don't know whether you did? |
| 12:14 | 3 | MR. BERTLING:  You know, you've asked that |
| 12:14 | 4 | question seven times now. |
| 12:14 | 5 | MR. McLANE:  So let's move on. |
| 12:14 | 6 | MR. BERTLING:  Yeah, let's do that. |
| 12:14 | 7 | BY MR. McLANE: |
| 12:14 | 8 | Q    Okay.  So did you review the doctor's |
| 12:15 | 9 | discharge from Patton? |
| 12:15 | 10 | A    I don't remember. |
| 12:15 | 11 | Q    Do you know what the doctor's discharge is? |
| 12:15 | 12 | A    Doctor discharge note. |
| 12:15 | 13 | Q    Or report. |
| 12:15 | 14 | MR. BERTLING:  Well, lacks foundation that it's |
| 12:15 | 15 | transferred at this time, that it's part of the CFMG |
| 12:15 | 16 | chart, excuse me.  So -- |
| 12:15 | 17 | MR. McLANE:  But -- |
| 12:15 | 18 | MR. BERTLING:  You can ask whether he recalls |
| 12:15 | 19 | reviewing it.  He said no.  So let's move on. |
| 12:15 | 20 | MR. McLANE:  Well, I didn't get that answer. |
| 12:15 | 21 | Q    Do you recall reviewing -- |
| 12:15 | 22 | A    No. |
| 12:15 | 23 | Q    Okay.  Well, let me finish the question |
| 12:15 | 24 | first. |
| 12:15 | 25 | Do you recall reviewing a doctor's |

| | | |
|---|---|---|
| 12:15 | 1 | discharge report from Patton prior to conducting |
| 12:15 | 2 | your evaluation of Mr. Hernandez? |
| 12:15 | 3 | A    No. |
| 12:15 | 4 | Q    Do you recall calling up Patton and asking |
| 12:15 | 5 | to get a copy of the doctor discharge report? |
| 12:15 | 6 | A    I didn't. |
| 12:15 | 7 | Q    You know for sure you didn't? |
| 12:15 | 8 | A    Usually that's not usual practice. |
| 12:15 | 9 | Q    What do you mean by it's not the usual |
| 12:15 | 10 | practice? |
| 12:16 | 11 | A    We don't call Patton. |
| 12:16 | 12 | Q    Well, would it have been important to you |
| 12:16 | 13 | in making your diagnosis and treatment plan for |
| 12:16 | 14 | Mr. Hernandez to have a copy of what the Patton |
| 12:16 | 15 | doctors said about Mr. Hernandez? |
| 12:16 | 16 | A    I think probably the nursing assessment |
| 12:16 | 17 | here is probably adequate. |
| 12:16 | 18 | Q    Okay.  So it's not -- never your practice |
| 12:16 | 19 | to try to get ahold of the doctor's discharge |
| 12:16 | 20 | summary? |
| 12:16 | 21 | A    No. |
| 12:16 | 22 | Q    Okay.  Would you turn to Exhibit 73. |
| 12:16 | 23 | MR. BERTLING:  73.  Okay.  Right here. |
| 12:16 | 24 | BY MR. McLANE: |
| 12:16 | 25 | Q    Okay.  This is the doctor's discharge |

| | | |
|---|---|---|
| 12:16 | 1 | report for Mr. Hernandez.  It's dated February 18, |
| 12:17 | 2 | 2009, two days after his death. |
| 12:17 | 3 | Okay?  Do you see this? |
| 12:17 | 4 | A    Yes. |
| 12:17 | 5 | Q    Okay.  You don't believe it's essential for |
| 12:17 | 6 | taking care of a patient that returns from Patton to |
| 12:17 | 7 | get ahold of the doctor's discharge summary? |
| 12:17 | 8 | MR. BERTLING:  Would you ask that -- repeat that |
| 12:17 | 9 | question?  Let me just -- vague and ambiguous.  For |
| 12:17 | 10 | what purpose?  For his treatment plan? |
| 12:17 | 11 | MR. McLANE:  For his treatment. |
| 12:17 | 12 | MR. BERTLING:  All right. |
| 12:17 | 13 | BY MR. McLANE: |
| 12:17 | 14 | Q    Do you understand what I'm asking?  Do you |
| 12:17 | 15 | believe it's -- I said -- you don't believe it's |
| 12:17 | 16 | essential to review, if it's available, the doctor's |
| 12:17 | 17 | discharge summary in order to develop a treatment |
| 12:17 | 18 | plan for a patient coming back from Patton? |
| 12:17 | 19 | MR. BERTLING:  Well, first of all, let me object |
| 12:17 | 20 | that this document even was in existence.  It's |
| 12:17 | 21 | dated February 18, 2009. |
| 12:17 | 22 | MR. McLANE:  I understand that, but I'm just |
| 12:17 | 23 | saying -- go ahead, Peter. |
| 12:18 | 24 | MR. BERTLING:  Let me finish my objection. |
| 12:18 | 25 | It's an incomplete hypothetical, it calls |

| | | |
|---|---|---|
| 12:18 | 1 | for speculation.  What do you mean?  Important for |
| 12:18 | 2 | what purpose? |
| 12:18 | 3 | BY MR. McLANE: |
| 12:18 | 4 | Q    Important for diagnosing and treating a |
| 12:18 | 5 | patient. |
| 12:18 | 6 | A    If it's available, it would be helpful. |
| 12:18 | 7 | Q    Okay.  But you -- it's not your practice to |
| 12:18 | 8 | call to determine whether it's available, correct? |
| 12:18 | 9 | A    No. |
| 12:18 | 10 | Q    Okay.  It's only if it's in the file and |
| 12:18 | 11 | you have it, that you might look at it, correct? |
| 12:18 | 12 | A    Yes. |
| 12:18 | 13 | Q    Okay.  And if you turn to the discharge |
| 12:18 | 14 | diagnosis on Page 2 of this document, again, it's |
| 12:18 | 15 | the same diagnosis on the nursing discharge, |
| 12:18 | 16 | correct, psychotic disorders NOS, correct? |
| 12:18 | 17 | A    Yes. |
| 12:18 | 18 | Q    And no diagnosis on Axis II, correct? |
| 12:18 | 19 | A    Right. |
| 12:18 | 20 | Q    And Axis II is antisocial personality |
| 12:19 | 21 | disorder, correct? |
| 12:19 | 22 | A    Yes. |
| 12:19 | 23 | Q    That's an Axis II diagnosis? |
| 12:19 | 24 | A    Yes. |
| 12:19 | 25 | Q    So they ruled that out, correct? |

| | | |
|---|---|---|
| 12:19 | 1 | MR. BERTLING: Well, go ahead. |
| 12:19 | 2 | Lacks foundation, calls for speculation. |
| 12:19 | 3 | But go ahead and answer that. |
| 12:19 | 4 | THE DEPONENT: Yeah. That was their opinion. |
| 12:19 | 5 | BY MR. McLANE: |
| 12:19 | 6 | Q Okay. So your opinion differed from |
| 12:19 | 7 | theirs; is that what you're saying? |
| 12:19 | 8 | A Yes. |
| 12:19 | 9 | MR. BERTLING: Also object they didn't have the |
| 12:19 | 10 | same information that Dr. Jung did. |
| 12:19 | 11 | But go ahead. |
| 12:19 | 12 | BY MR. McLANE: |
| 12:19 | 13 | Q What is psychotic disorder NOS, to your |
| 12:19 | 14 | understanding? |
| 12:19 | 15 | A It's a psychotic disorder. It's not clear |
| 12:19 | 16 | cut whether it's schizophrenia or from other |
| 12:20 | 17 | psychotic disorder. When you're not sure what it |
| 12:20 | 18 | is, then that's what psychotic disorder NOS is. |
| 12:20 | 19 | Q So what happens at Patton is that they |
| 12:20 | 20 | treat them over a period of time, in this case they |
| 12:20 | 21 | treated him from August 28 to October 30, for a |
| 12:20 | 22 | two-month period. So he regains his competency. So |
| 12:20 | 23 | then he comes back to Ventura County jail, correct? |
| 12:20 | 24 | A Yes. |
| 12:20 | 25 | Q Did you believe that they were in a better |

| | | |
|---|---|---|
| 12:20 | 1 | position to diagnosis him than you were? |
| 12:20 | 2 | MR. BERTLING:  Well, vague and ambiguous. |
| 12:20 | 3 | At that time while they were treating him? |
| 12:20 | 4 | MR. McLANE:  Yes. |
| 12:20 | 5 | Q    I mean the amount of time that they |
| 12:20 | 6 | typically spend with him and they treat him, and |
| 12:20 | 7 | he's in their charge for a couple of months for the |
| 12:20 | 8 | specific purpose to regain his competency, do you |
| 12:20 | 9 | believe that their interaction over a two-month |
| 12:21 | 10 | period gives them a better baseline to diagnose him |
| 12:21 | 11 | then your, as you called it, your practice of |
| 12:21 | 12 | one-time interview for 15 to 20 minutes? |
| 12:21 | 13 | MR. BERTLING:  Well, first of all, it lacks |
| 12:21 | 14 | foundation that Dr. Jung had a one-time interview |
| 12:21 | 15 | for 15 or 20 minutes.  I think the record is replete |
| 12:21 | 16 | with multiple psychiatric progress notes, multiple |
| 12:21 | 17 | encounters with this patient on multiple times |
| 12:21 | 18 | before he was even sent to Patton. |
| 12:21 | 19 | Your question is an incomplete |
| 12:21 | 20 | hypothetical.  It calls for speculation. |
| 12:21 | 21 | But if you can answer the question the way |
| 12:21 | 22 | it's phrased, please do. |
| 12:21 | 23 | THE DEPONENT:  I cannot tell.  I cannot answer |
| 12:21 | 24 | that question. |
| 12:21 | 25 | /// |

| 12:39 | 1 | testified she wrote this note that she received a |
|---|---|---|
| 12:39 | 2 | phone call from an aunt on April 16, 2008 indicating |
| 12:39 | 3 | where the aunt communicated to her that she believed |
| 12:39 | 4 | Mr. Hernandez was very suicidal. |
| 12:39 | 5 | Do you have a specific recollection of |
| 12:39 | 6 | reviewing this note when you evaluated Daniel |
| 12:39 | 7 | Hernandez on November 3, 2008? |
| 12:39 | 8 | A    No. |
| 12:40 | 9 | Q    Would it have been important to know that |
| 12:40 | 10 | five months before, on April 16, 2008, that the aunt |
| 12:40 | 11 | had called and said she believed Mr. Hernandez was |
| 12:40 | 12 | suicidal? |
| 12:40 | 13 | MR. BERTLING:  Objection.  Vague and ambiguous. |
| 12:40 | 14 | Important to know for what purpose? |
| 12:40 | 15 | BY MR. McLANE: |
| 12:40 | 16 | Q    For his diagnosis, treatment in evaluating |
| 12:40 | 17 | his suicide risk. |
| 12:40 | 18 | A    It depends on mental status at the time of |
| 12:40 | 19 | the examination. |
| 12:40 | 20 | Q    Okay.  So what does that mean? |
| 12:40 | 21 | A    If there is some risk of suicide, I would |
| 12:40 | 22 | be interested to know the past history and all that. |
| 12:40 | 23 | But when there is no risk at the time of |
| 12:40 | 24 | examination, I don't think -- it's not that |
| 12:40 | 25 | relevant. |

| | | |
|---|---|---|
| 12:40 | 1 | Q    Were you -- are you saying that there was |
| 12:40 | 2 | no risk of suicide for Mr. Hernandez on November |
| 12:40 | 3 | 3rd? |
| 12:40 | 4 | A    When I initially examined him at the time |
| 12:40 | 5 | of examination. |
| 12:40 | 6 | Q    Did you conduct any testing?  Did you ask |
| 12:40 | 7 | him any questions, do you feel suicidal today?  Did |
| 12:40 | 8 | you ask him that? |
| 12:40 | 9 | A    Usually that's the routine question that I |
| 12:41 | 10 | may have asked. |
| 12:41 | 11 | Q    Well, in your note on November 3rd you |
| 12:41 | 12 | don't say anything that -- whether you asked that or |
| 12:41 | 13 | not, correct? |
| 12:41 | 14 | A    No. |
| 12:41 | 15 | Q    You didn't document that he was not a |
| 12:41 | 16 | suicide risk, correct? |
| 12:41 | 17 | A    But from the impression and from experience |
| 12:41 | 18 | it was obvious he was not suicidal. |
| 12:41 | 19 | Q    Well, you don't say it in there that he's |
| 12:41 | 20 | not a suicide risk, correct? |
| 12:41 | 21 | A    That was not the issue, yes. |
| 12:41 | 22 | Q    That was not the issue?  Is that what you |
| 12:41 | 23 | just said? |
| 12:41 | 24 | A    Suicide risk was not the issue at the time. |
| 12:41 | 25 | Q    Okay.  So you didn't ask him anything about |

| | | |
|---|---|---|
| 12:41 | 1 | whether he was a suicide risk or not? |
| 12:41 | 2 | MR. BERTLING:  Lacks foundation, calls for |
| 12:41 | 3 | speculation and misstates his testimony. |
| 12:41 | 4 | BY MR. McLANE: |
| 12:41 | 5 | Q    I'm asking you.  You didn't ask him |
| 12:41 | 6 | anything about whether he felt suicidal? |
| 12:41 | 7 | A    I don't recall. |
| 12:41 | 8 | Q    You didn't ask him whether he had -- had |
| 12:41 | 9 | suicide attempts in the past, correct? |
| 12:41 | 10 | A    I don't have recollection about that. |
| 12:41 | 11 | Q    And in your note on November 3, 2008 you |
| 12:41 | 12 | don't say anything, one way or the other, whether |
| 12:41 | 13 | you believed he was a suicide risk or not? |
| 12:42 | 14 | A    Because from the interaction there was no |
| 12:42 | 15 | need to -- to document. |
| 12:42 | 16 | Q    Okay.  So after he was cleared out of |
| 12:43 | 17 | reception housing, he returned to his -- to |
| 12:43 | 18 | administrative segregation, correct? |
| 12:43 | 19 | A    I think so. |
| 12:43 | 20 | Q    What do you mean "I think so"? |
| 12:43 | 21 | A    I don't recall. |
| 12:43 | 22 | Q    Okay.  Well, he was -- he was returned to |
| 12:43 | 23 | the housing that he was designated by the sheriffs, |
| 12:43 | 24 | correct? |
| 12:43 | 25 | A    I -- I don't have -- |

| | | |
|---|---|---|
| 12:43 | 1 | Q    Well, he was no longer in special housing, |
| 12:43 | 2 | correct? |
| 12:43 | 3 | A    He was not in special housing. |
| 12:43 | 4 | Q    Okay. |
| 12:43 | 5 | A    Never been in special housing. |
| 12:44 | 6 | Q    Okay.  Well, he was in reception housing, |
| 12:44 | 7 | correct? |
| 12:44 | 8 | A    Yes. |
| 12:44 | 9 | Q    Okay.  Reception housing is when inmates |
| 12:44 | 10 | come back, and they're evaluated, correct? |
| 12:44 | 11 | A    Right. |
| 12:44 | 12 | Q    Before they go back to where they're |
| 12:44 | 13 | designated by the sheriffs, correct? |
| 12:44 | 14 | A    Yes. |
| 12:44 | 15 | Q    Okay.  So he was taken out of special |
| 12:44 | 16 | housing, correct? |
| 12:44 | 17 | A    Reception housing. |
| 12:44 | 18 | Q    Reception housing and no longer under your |
| 12:44 | 19 | observation, correct? |
| 12:44 | 20 | A    Yes. |
| 12:44 | 21 | Q    When you interviewed him on November 3rd, |
| 12:44 | 22 | did you -- did you -- do you have any independent |
| 12:44 | 23 | recollection of any observation you did of |
| 12:44 | 24 | Mr. Hernandez outside that November 3rd interview? |
| 12:44 | 25 | A    No. |

| 12:44 | 1 | . Q    Did you know whether he was going to be |
|---|---|---|
| 12:44 | 2 | housed in administrative segregation -- |
| 12:44 | 3 | A    No. |
| 12:44 | 4 | Q    -- after you cleared him out? |
| 12:44 | 5 | A    No. |
| 12:44 | 6 | Q    Would you have wanted to have known |
| 12:44 | 7 | whether -- where he was going to be housed after you |
| 12:45 | 8 | cleared him out of special housing? |
| 12:45 | 9 | A    No. |
| 12:45 | 10 | Q    Well, on his -- on his hand -- on his band |
| 12:45 | 11 | it would have indicated whether he was an ad seg, |
| 12:45 | 12 | administrative segregation, inmate, correct? |
| 12:45 | 13 | A    I'm -- I'm not sure. |
| 12:45 | 14 | Q    You're not sure of -- you know that if |
| 12:45 | 15 | they're yellow band, they're psychiatric patients, |
| 12:45 | 16 | correct? |
| 12:45 | 17 | A    Yes. |
| 12:45 | 18 | Q    Do you know what designates someone as an |
| 12:45 | 19 | administrative segregation inmate by their color or |
| 12:45 | 20 | any indication on the armband? |
| 12:45 | 21 | A    I'm not sure. |
| 12:45 | 22 | Q    From after November 3rd to the time of |
| 12:45 | 23 | Mr. Hernandez's death on February 16, 2009, three |
| 12:45 | 24 | and a half months, you never saw him again, correct? |
| 12:45 | 25 | . . A    Right. |

| | | |
|---|---|---|
| 12:45 | 1 | Q    When you took him off medication on |
| 12:45 | 2 | November 18, you didn't see him that day, correct? |
| 12:45 | 3 | A    No. |
| 12:45 | 4 | Q    That was just based upon your determination |
| 12:45 | 5 | after consulting with the psychiatric nurses because |
| 12:45 | 6 | he was refusing his medications, correct? |
| 12:46 | 7 | A    Record indicated he's been refusing |
| 12:46 | 8 | medications. |
| 12:46 | 9 | Q    Okay.  But when you took him off the |
| 12:46 | 10 | medications, you didn't go see him, correct? |
| 12:46 | 11 | A    No. |
| 12:46 | 12 | Q    You didn't ask to see him, correct? |
| 12:46 | 13 | A    No. |
| 12:46 | 14 | Q    What was the basis of you changing the |
| 12:46 | 15 | treatment plan by removing him from medications on |
| 12:46 | 16 | November 18, 2008? |
| 12:46 | 17 | A    This is not the changing.  It's we have no |
| 12:46 | 18 | legal right to continue medication when they refuse |
| 12:46 | 19 | medication. |
| 12:46 | 20 | Q    So the sole basis for you taking him off |
| 12:46 | 21 | the medication was his refusal? |
| 12:46 | 22 | A    Right. |
| 12:46 | 23 | Q    It wasn't based on any observation, |
| 12:46 | 24 | interview, monitoring of Mr. Hernandez? |
| 12:46 | 25 | A    No. |

| 12:46 | 1 | Q You didn't speak with him to try to get him |
| 12:46 | 2 | back on medication, did you? |
| 12:46 | 3 | A Usually it's no use talking to them once |
| 12:46 | 4 | they refuse medication. So... |
| 12:46 | 5 | Q My question -- I understand what you just |
| 12:46 | 6 | said, but you did not speak to Mr. Hernandez, did |
| 12:46 | 7 | you? |
| 12:46 | 8 | A Correct. Yes. |
| 12:46 | 9 | Q You didn't go to where he was housed and |
| 12:47 | 10 | meet with him and try to get him to go back on his |
| 12:47 | 11 | medication? |
| 12:47 | 12 | A No. |
| 12:47 | 13 | Q Did you have any concern after taking him |
| 12:47 | 14 | off medication that he might decompensate? |
| 12:47 | 15 | A There may be some concern, but there are so |
| 12:47 | 16 | many people refusing medications, and very few |
| 12:47 | 17 | decompensate. |
| 12:47 | 18 | Q Well, some do decompensate, and you |
| 12:47 | 19 | testified earlier that you always err on the side of |
| 12:47 | 20 | caution when you treat your mental health patients? |
| 12:47 | 21 | MR. BERTLING: No. That was -- your question |
| 12:47 | 22 | was focusing on suicidal patients and whether he |
| 12:47 | 23 | errs on the side of caution with dealing with |
| 12:47 | 24 | somebody who presents as a suicide risk. So don't |
| 12:47 | 25 | put words in his mouth, please. |

| | | |
|---|---|---|
| 12:47 | 1 | BY MR. McLANE: |
| 12:47 | 2 | Q    Okay.  Do you err on the side of caution |
| 12:47 | 3 | when you are treating mentally ill patients? |
| 12:47 | 4 | MR. BERTLING:  Well, vague and ambiguous as to |
| 12:47 | 5 | what you mean by "err on the side of caution" when |
| 12:47 | 6 | you're talking about a patient like this who has a |
| 12:47 | 7 | low dose of Zyprexa that refuses to take it.  Your |
| 12:47 | 8 | question -- |
| 12:48 | 9 | MR. McLANE:  You're now testifying about a low |
| 12:48 | 10 | dose of Zyprexa.  He hasn't testified to that. |
| 12:48 | 11 | Q    So let me ask you, okay, from November 3rd |
| 12:48 | 12 | to February 16, 2009 did you make any efforts to |
| 12:48 | 13 | check up on Mr. Hernandez? |
| 12:48 | 14 | A    Usually it's not standard practice. |
| 12:48 | 15 | Q    But did you make any efforts -- |
| 12:48 | 16 | A    No. |
| 12:48 | 17 | Q    -- to check up on him? |
| 12:48 | 18 | A    No. |
| 12:48 | 19 | Q    And you took him off medication solely |
| 12:48 | 20 | because of the legal -- |
| 12:48 | 21 | A    I didn't take him off medication. |
| 12:48 | 22 | Medication he was refusing, and we just had to stop |
| 12:48 | 23 | it. |
| 12:48 | 24 | Q    Okay.  Well, you discontinued medication, |
| 12:48 | 25 | you no longer prescribed it, correct? |

| | | |
|---|---|---|
| 12:48 | 1 | A    Correct. |
| 12:48 | 2 | Q    Okay.  And when you prescribed the |
| 12:48 | 3 | medication, it was a 30-day course, correct? |
| 12:48 | 4 | A    No. |
| 12:48 | 5 | Q    It was not when you first prescribed it? |
| 12:48 | 6 | A    It was 30 days or 60 days or 90 days.  It |
| 12:48 | 7 | depends. |
| 12:48 | 8 | Q    Okay.  Well, let's -- let's turn to the |
| 12:48 | 9 | doctor's orders. |
| 12:48 | 10 | A    Yeah, it was ordered for 30 days. |
| 12:48 | 11 | Q    Okay.  Turn to Exhibit 86. |
| 12:49 | 12 | MR. BERTLING:  We're there. |
| 12:49 | 13 | BY MR. McLANE: |
| 12:49 | 14 | Q    Okay.  Yeah, you're right there. |
| 12:49 | 15 | Okay.  Can you read your entries on Exhibit |
| 12:49 | 16 | 86? |
| 12:49 | 17 | MR. BERTLING:  Well, lacks foundation that these |
| 12:49 | 18 | are his entries. |
| 12:49 | 19 | MR. McLANE:  Well, let's -- let's find out. |
| 12:49 | 20 | THE DEPONENT:  Discontinued Zyprexa, yeah. |
| 12:49 | 21 | BY MR. McLANE: |
| 12:49 | 22 | Q    Okay.  Look at the first entry, "Doctor's |
| 12:49 | 23 | Orders."  Is this your doctor's orders, Zyprexa, 10 |
| 12:49 | 24 | milligrams, take for 30 days? |
| 12:49 | 25 | A    Yes. |

| | | |
|---|---|---|
| 12:49 | 1 | Q   Okay.  Now, is this your handwriting, or |
| 12:49 | 2 | are you just reading it, and you know that's your |
| 12:49 | 3 | order? |
| 12:49 | 4 | A   That's -- that's not my handwriting. |
| 12:49 | 5 | Q   Okay.  That was a nurse who took your order |
| 12:49 | 6 | and wrote it in the file? |
| 12:49 | 7 | A   Right. |
| 12:49 | 8 | Q   Do you know whose handwriting it is? |
| 12:49 | 9 | A   It's one of the booking nurses. |
| 12:49 | 10 | Q   Okay. |
| 12:49 | 11 | A   Nurses. |
| 12:49 | 12 | Q   Now, the next entry below, can you read |
| 12:50 | 13 | that, what it says? |
| 12:50 | 14 | A   Psych nurse line, November 2, '08. |
| 12:50 | 15 | Q   Okay.  And then the next line below that? |
| 12:50 | 16 | A   Verbal order Dr. Jung, and the nurse's |
| 12:50 | 17 | name, RN. |
| 12:50 | 18 | Q   Okay.  And the next line below that? |
| 12:50 | 19 | A   Noted, and actually, it's again nurse's |
| 12:50 | 20 | name, some RN. |
| 12:50 | 21 | Q   And then it has the date 10/30/08, correct? |
| 12:50 | 22 | A   Correct. |
| 12:50 | 23 | Q   And is that your signature or initials? |
| 12:50 | 24 | A   Yeah. |
| 12:50 | 25 | Q   Okay.  So what were you noting here? |

| | | | |
|---|---|---|---|
| 12:50 | 1 | A | Noting that I gave verbal orders. |
| 12:50 | 2 | Q | The verbal orders for the Zyprexa? |
| 12:50 | 3 | A | Right. |
| 12:50 | 4 | Q | So you're basically confirming the nurse's |
| 12:50 | 5 | | note about the Zyprexa, that you wrote down that I |
| 12:50 | 6 | | gave him Zyprexa? |
| 12:50 | 7 | A | Yes. |
| 12:50 | 8 | Q | Okay.   Your next doctor order with respect |
| 12:50 | 9 | | to him, Mr. Hernandez, is dated November 18, |
| 12:51 | 10 | | correct? |
| 12:51 | 11 | A | Yeah. |
| 12:51 | 12 | Q | Okay.   And what does that say? |
| 12:51 | 13 | A | Discontinue Zyprexa. |
| 12:51 | 14 | Q | And what does it say below there? |
| 12:51 | 15 | A | Noted by nurse. |
| 12:51 | 16 | Q | And is that your signature? |
| 12:51 | 17 | A | Yeah. |
| 12:51 | 18 | Q | So is it just the nurse confirming what you |
| 12:51 | 19 | | signed -- |
| 12:51 | 20 | A | Correct. |
| 12:51 | 21 | Q | -- that you discontinued the Zyprexa? |
| 12:51 | 22 | A | Correct. |
| 12:51 | 23 | Q | Are you aware of any progress notes by CFMG |
| 12:51 | 24 | | or by you or anyone from November 3rd to February 16 |
| 12:51 | 25 | | concerning Daniel Hernandez? |

| | | | |
|---|---|---|---|
| 12:51 | 1 | A | No. |
| 12:51 | 2 | Q | Did you review the file to look for those |
| 12:51 | 3 | progress notes? | |
| 12:51 | 4 | A | No. |
| 12:51 | 5 | Q | Okay.  Now, if you could turn to the third |
| 12:52 | 6 | page of Exhibit 86.  This is the -- this is the | |
| 12:52 | 7 | charting of him taking medication, correct? | |
| 12:52 | 8 | A | Yeah. |
| 12:52 | 9 | Q | And it indicates, if you'll look at the |
| 12:52 | 10 | entries, that he took the Zyprexa from November 3rd | |
| 12:52 | 11 | to November 13th, correct? | |
| 12:52 | 12 | A | Yeah. |
| 12:52 | 13 | Q | And then he started refusing on November |
| 12:52 | 14 | 14th, 15th, 16th and 17th, correct? | |
| 12:52 | 15 | A | Correct. |
| 12:52 | 16 | Q | So, in fact, he was compliant for 10 days, |
| 12:52 | 17 | correct? | |
| 12:52 | 18 | A | Um-hum.  Yes. |
| 12:52 | 19 | Q | And then he refused for four days? |
| 12:52 | 20 | A | Right. |
| 12:52 | 21 | Q | And then you discontinued it, correct? |
| 12:52 | 22 | A | Right. |
| 12:53 | 23 | Q | You know, is it your judgment that it's |
| 12:53 | 24 | okay to discontinue an individual on medication | |
| 12:53 | 25 | without personally observing them? | |

| | | |
|---|---|---|
| 12:53 | 1 | A    It's not the clinical decision.   It's a |
| 12:53 | 2 | legal decision. |
| 12:53 | 3 | Q    Well, there are options, correct? |
| 12:53 | 4 | A    No, there is no options. |
| 12:53 | 5 | Q    Okay.   Well, let's talk about that for a |
| 12:53 | 6 | minute.   If you believe that someone should be on |
| 12:53 | 7 | medication and they're not taking the medication, |
| 12:53 | 8 | you can refer them to an -- to the local county |
| 12:53 | 9 | hospital to involuntarily medicate, correct? |
| 12:53 | 10 | A    No. |
| 12:53 | 11 | Q    You cannot? |
| 12:53 | 12 | A    No. |
| 12:53 | 13 | Q    Could you have gone to the court and |
| 12:53 | 14 | informed them that he's no longer taking medication? |
| 12:53 | 15 | A    No. |
| 12:53 | 16 | Q    You mean you can't do anything? |
| 12:53 | 17 | A    That's right. |
| 12:53 | 18 | Q    No matter what? |
| 12:53 | 19 | A    That's right. |
| 12:53 | 20 | Q    That's your understanding that -- did |
| 12:53 | 21 | you -- did you tell the jail staff that |
| 12:53 | 22 | Mr. Hernandez is refusing his medication, you should |
| 12:54 | 23 | look at him a little more carefully to see how he's |
| 12:54 | 24 | doing? |
| 12:54 | 25 | A    At any moment there are -- 20, 30, 40 |

| | | |
|---|---|---|
| 12:54 | 1 | people are refusing medications. |
| 12:54 | 2 | Q    I'm asking about in this case with |
| 12:54 | 3 | Mr. Hernandez -- |
| 12:54 | 4 | A    No. |
| 12:54 | 5 | Q    -- did you alert -- well, let me ask the |
| 12:54 | 6 | question, and then you can answer it. |
| 12:54 | 7 | Did you alert the jail staff that |
| 12:54 | 8 | Mr. Hernandez was not taking his medications? |
| 12:54 | 9 | MR. BERTLING:  Did you personally do that, |
| 12:54 | 10 | Doctor? |
| 12:54 | 11 | THE DEPONENT:  No. |
| 12:54 | 12 | MR. BERTLING:  Okay.  Fine. |
| 12:54 | 13 | BY MR. McLANE: |
| 12:54 | 14 | Q    So did you take any steps with respect to |
| 12:54 | 15 | Mr. Hernandez after he -- after you took off -- took |
| 12:54 | 16 | him off his medications, any steps to alert anyone |
| 12:54 | 17 | about it other than documenting it in the file? |
| 12:54 | 18 | MR. BERTLING:  Well, lacks foundation that he's |
| 12:54 | 19 | taking him off.  The patient's refused.  He's -- |
| 12:54 | 20 | MR. McLANE:  However you want to characterize |
| 12:54 | 21 | it. |
| 12:54 | 22 | MR. BERTLING:  Fine. |
| 12:54 | 23 | BY MR. McLANE: |
| 12:54 | 24 | Q    You discontinued the medications, correct? |
| 12:54 | 25 | MR. BERTLING:  The patient refused taking the |

| | | |
|---|---|---|
| 12:55 | 1 | medications that he had prescribed. |
| 12:55 | 2 | BY MR. McLANE: |
| 12:55 | 3 | Q    And then you discontinued the medications, |
| 12:55 | 4 | correct? |
| 12:55 | 5 | A    I had to discontinue. |
| 12:55 | 6 | Q    You said you had no other options?  Your |
| 12:55 | 7 | understanding is you have no other options?  You |
| 12:55 | 8 | can't refer him to Ventura County Mental Health to |
| 12:55 | 9 | involuntarily medicate him? |
| 12:55 | 10 | A    No. |
| 12:55 | 11 | Q    And -- |
| 12:55 | 12 | A    If he meet the criteria to be admitted to |
| 12:55 | 13 | the hospital, then we may send him to the hospital. |
| 12:55 | 14 | Q    Well, on November 18th, did you see him to |
| 12:55 | 15 | see if he met the criteria? |
| 12:55 | 16 | A    No. |
| 12:55 | 17 | Q    Wouldn't it be standard practice before |
| 12:55 | 18 | removing -- before -- when a patient is refusing and |
| 12:55 | 19 | then you discontinue the medication, that you would |
| 12:55 | 20 | at least observe him, interview him, talk to him |
| 12:55 | 21 | before you take him off the medications? |
| 12:55 | 22 | MR. BERTLING:  It's an incomplete hypothetical. |
| 12:55 | 23 | THE DEPONENT:  I'm not taking him off. |
| 12:55 | 24 | MR. BERTLING:  Excuse me.  It's an incomplete |
| 12:55 | 25 | hypothetical, lacks foundation that he doesn't |

| | | |
|---|---|---|
| 12:55 | 1 | discuss these issues with the healthcare provider |
| 12:55 | 2 | who was there when he refused his medications to |
| 12:56 | 3 | talk about his status, and it also lacks foundation |
| 12:56 | 4 | that he's taking him off as opposed to your client's |
| 12:56 | 5 | son simply refusing to take his medications as he |
| 12:56 | 6 | had done at Patton. |
| 12:56 | 7 | MR. McLANE:  He was taking Zyprexa at Patton. |
| 12:56 | 8 | MR. BERTLING:  Well, you see in the discharge |
| 12:56 | 9 | summary it says that he was refusing the medication. |
| 12:56 | 10 | It says it on there. |
| 12:56 | 11 | MR. McLANE:  Refusing the Olanzapine, not the |
| 12:56 | 12 | Zyprexa. |
| 12:56 | 13 | MR. BERTLING:  They're the same medication. |
| 12:56 | 14 | THE DEPONENT:  Olanzapine is Zyprexa. |
| 12:56 | 15 | BY MR. McLANE: |
| 12:56 | 16 | Q    Well, it indicates Zyprexa he was taking. |
| 12:56 | 17 | A    He was getting Zydis, which is actually |
| 12:56 | 18 | orally integrating medication because of somebody |
| 12:56 | 19 | who is not compliant using that.  So he was probably |
| 12:56 | 20 | not compliant. |
| 12:56 | 21 | Q    Well, you don't know? |
| 12:56 | 22 | A    I'm just assuming. |
| 12:56 | 23 | MR. BERTLING:  He does. |
| 12:56 | 24 | BY MR. McLANE: |
| 12:56 | 25 | Q    Okay.  So let's continue.  So did you have |

| | | |
|---|---|---|
| 12:56 | 1 | a specific conversation with a nurse regarding him |
| 12:56 | 2 | not taking his medications? |
| 12:56 | 3 | A    No. |
| 12:56 | 4 | Q    Okay.  It indicates here -- let's turn to |
| 12:56 | 5 | Exhibit 86, the fourth page. |
| 12:57 | 6 | MR. BERTLING:  Just one second here. |
| 12:57 | 7 | BY MR. McLANE: |
| 12:57 | 8 | Q    These are the refusals. |
| 12:57 | 9 | So on November 14 he's refusing, correct? |
| 12:57 | 10 | A    The Zyprexa, right. |
| 12:57 | 11 | Q    And then there is a notation continue |
| 12:57 | 12 | Zyprexa, 10 milligrams. |
| 12:57 | 13 | Is that your initial? |
| 12:57 | 14 | A    HS, right. |
| 12:57 | 15 | Q    H -- |
| 12:57 | 16 | A    HS. |
| 12:57 | 17 | Q    What does HS mean? |
| 12:57 | 18 | A    At bedtime. |
| 12:57 | 19 | Q    Okay.  So on November 14th you said |
| 12:57 | 20 | continue it, correct? |
| 12:57 | 21 | A    Try to continue, yeah. |
| 12:57 | 22 | Q    And November 16th there is a refusal and on |
| 12:57 | 23 | November 17th there is a refusal.  Okay.  Do you -- |
| 12:57 | 24 | do you recall talking to the nurse at all about his |
| 12:57 | 25 | refusal? |

| | | |
|---|---|---|
| 12:57 | 1 | A    No. |
| 12:58 | 2 | Q    If you had a patient in the community who |
| 12:58 | 3 | you were seeing, since you say you treat the |
| 12:58 | 4 | individuals at Ventura County jail the way you would |
| 12:58 | 5 | treat a patient on the outside, and they refused |
| 12:58 | 6 | their medications and stopped taking them, would you |
| 12:58 | 7 | have attempted to talk to them to try to get them |
| 12:58 | 8 | back on their medications? |
| 12:58 | 9 | MR. BERTLING:  Lacks foundation that it's the |
| 12:58 | 10 | same process or procedure at a private office, |
| 12:58 | 11 | wherever that may be, as opposed to the way things |
| 12:58 | 12 | are done in a county jail. |
| 12:58 | 13 | But go ahead and answer the question, if |
| 12:58 | 14 | you can, the way it's phrased. |
| 12:58 | 15 | THE DEPONENT:  You may encourage them to take |
| 12:58 | 16 | the medication. |
| 12:58 | 17 | BY MR. McLANE: |
| 12:58 | 18 | Q    In this case you didn't encourage, |
| 12:59 | 19 | Mr. Hernandez, correct? |
| 12:59 | 20 | A    We tried.  I said continue.  Means |
| 12:59 | 21 | encourage him to take the medication. |
| 12:59 | 22 | Q    For three days, correct? |
| 12:59 | 23 | A    Right. |
| 12:59 | 24 | Q    And the fourth day you just discontinued |
| 12:59 | 25 | it, correct? |

| 12:59 | 1 | A    Correct. |
| 12:59 | 2 | Q    Okay.  Now, you're on the second floor. |
| 12:59 | 3 | Where is your office located? |
| 12:59 | 4 | A    It's actually first -- second floor.  You |
| 12:59 | 5 | can call second floor. |
| 12:59 | 6 | Q    Okay.  And that's right across the hallway |
| 12:59 | 7 | from administrative segregation, correct? |
| 12:59 | 8 | A    Correct. |
| 12:59 | 9 | Q    How far away are you like 10 feet, 20 feet |
| 12:59 | 10 | away? |
| 12:59 | 11 | A    Yes. |
| 12:59 | 12 | Q    And if Mr. Hernandez was housed in |
| 12:59 | 13 | administrative segregation, you could have walked |
| 12:59 | 14 | over and seen him, correct? |
| 12:59 | 15 | A    I could have seen him, yes. |
| 12:59 | 16 | Q    You chose not to see him when you |
| 12:59 | 17 | discontinued the medication? |
| 12:59 | 18 | A    There was no reason to see him. |
| 12:59 | 19 | Q    But you chose -- but you didn't see him, |
| 12:59 | 20 | correct? |
| 12:59 | 21 | A    That's right. |
| 12:59 | 22 | Q    From November 18th to February 16, 2009 you |
| 12:59 | 23 | never saw Mr. Hernandez, correct? |
| 12:59 | 24 | MR. BERTLING:  Don't answer that question. |
| 12:59 | 25 | He has asked and answered that question |

| 13:00 | 1 | four times now.  Please move on.  You're now getting |
| 13:00 | 2 | argumentative, and -- |
| 13:00 | 3 | MR. McLANE:  No.  No.  I just -- |
| 13:00 | 4 | MR. BERTLING:  You've asked that question four |
| 13:00 | 5 | times, and you've gotten the answer. |
| 13:00 | 6 | MR. McLANE:  Okay. |
| 13:00 | 7 | MR. BERTLING:  So please move on. |
| 13:00 | 8 | MR. McLANE:  Okay.  We'll move on. |
| 13:00 | 9 | Q     Did you ever send a psych nurse in to check |
| 13:00 | 10 | up on Daniel Hernandez after the medication was |
| 13:00 | 11 | discontinued? |
| 13:00 | 12 | A     No. |
| 13:00 | 13 | Q     Did you ever consult with a jail deputy to |
| 13:00 | 14 | see how Mr. Hernandez was doing after you |
| 13:00 | 15 | discontinued him from the medication? |
| 13:00 | 16 | A     Usually standard practice is we -- it |
| 13:00 | 17 | depends on their observation, and then they will |
| 13:00 | 18 | notify us. |
| 13:00 | 19 | Q     I understand that.  But did you consult |
| 13:01 | 20 | with any jail deputy -- |
| 13:01 | 21 | A     No. |
| 13:01 | 22 | Q     -- concerning Mr. Hernandez after you |
| 13:01 | 23 | discontinued him on medication? |
| 13:01 | 24 | A     No. |
| 13:01 | 25 | Q     You have access to the -- to the inmate |

| | | |
|---|---|---|
| 13:01 | 1 | computer system, correct? |
| 13:01 | 2 | A    Yes. |
| 13:01 | 3 | Q    The VCIJIS system? |
| 13:01 | 4 | A    Yes. |
| 13:01 | 5 | Q    You can look at jail incident reports? |
| 13:01 | 6 | A    Yes. |
| 13:01 | 7 | Q    Did you ever after discontinuing him from |
| 13:01 | 8 | the medication ever consult with the VCIJIS system |
| 13:01 | 9 | concerning Daniel Hernandez? |
| 13:01 | 10 | A    No. |
| 13:01 | 11 | Q    Are you aware of any CFMG policy in effect |
| 13:01 | 12 | during this time period that would require you to |
| 13:02 | 13 | check up on an inmate that you had discontinued on |
| 13:02 | 14 | medications? |
| 13:02 | 15 | A    No. |
| 13:02 | 16 | Q    Let's turn to Exhibit 18. |
| 13:02 | 17 | Looking at the first page, this Certificate |
| 13:02 | 18 | of Mental Competence, did you ever see this? |
| 13:02 | 19 | A    Yes. |
| 13:02 | 20 | Q    Okay.  That's in the CFMG file? |
| 13:02 | 21 | A    I'm not sure. |
| 13:02 | 22 | Q    I'm -- what's the basis for you saying that |
| 13:02 | 23 | you saw this? |
| 13:02 | 24 | A    I saw this form. |
| 13:02 | 25 | Q    Saw this form.  But did you see it with |

| | | |
|---|---|---|
| 13:02 | 1 | respect to Mr. Hernandez? |
| 13:03 | 2 | A    No. |
| 13:03 | 3 | Q    Okay.  That's what I was asking.  So I'm |
| 13:03 | 4 | sorry if I was vague on that.  I'm asking with |
| 13:03 | 5 | respect to Mr. Hernandez. |
| 13:03 | 6 | A    No. |
| 13:03 | 7 | Q    Okay.  Turn to the second page.  This is an |
| 13:03 | 8 | order concerning Daniel Hernandez dated November 6. |
| 13:03 | 9 | So obviously after he returned from Patton.  You had |
| 13:03 | 10 | seen him November 3rd. |
| 13:03 | 11 | And in the fourth paragraph it says "The |
| 13:03 | 12 | Ventura County sheriff is ordered to maintain the |
| 13:03 | 13 | defendant on medication as recommended by Patton |
| 13:03 | 14 | State Hospital." |
| 13:03 | 15 | Look at this document for a second.  Did |
| 13:03 | 16 | you ever see this document? |
| 13:03 | 17 | A    No. |
| 13:03 | 18 | Q    Have you ever seen documents like this |
| 13:03 | 19 | before? |
| 13:03 | 20 | A    No. |
| 13:03 | 21 | Q    Okay.  Now, if you had received an order -- |
| 13:03 | 22 | have you -- if you had received an order such as |
| 13:04 | 23 | this from the court to say maintain the individual |
| 13:04 | 24 | on medications, what would you have done with that |
| 13:04 | 25 | if you discontinued Mr. Hernandez -- |

| 13:04 | 1 | MR. BERTLING:  Well -- |
| 13:04 | 2 | BY MR. McLANE: |
| 13:04 | 3 | Q    -- from medications?  If you had seen it, |
| 13:04 | 4 | hypothetically, what would you have done in response |
| 13:04 | 5 | to that? |
| 13:04 | 6 | MR. BERTLING:  In a situation where the |
| 13:04 | 7 | medications are no longer being given because the |
| 13:04 | 8 | inmate refuses to take them? |
| 13:04 | 9 | MR. McLANE:  Yes.  Yes. |
| 13:04 | 10 | Q    I'm trying to figure out hypothetically if |
| 13:04 | 11 | you had seen an order such as this, what would you |
| 13:04 | 12 | have done? |
| 13:04 | 13 | A    Nothing much can be done. |
| 13:04 | 14 | Q    Would you have notified the court? |
| 13:04 | 15 | MR. BERTLING:  Well, lacks foundation what he |
| 13:04 | 16 | would do as opposed to someone else. |
| 13:04 | 17 | BY MR. McLANE: |
| 13:04 | 18 | Q    Okay.  Would you have notified Nicoleta |
| 13:04 | 19 | Weeks to notify the court or anyone -- anyone at the |
| 13:04 | 20 | Ventura County jail? |
| 13:04 | 21 | A    That's not a standard practice. |
| 13:04 | 22 | Q    Okay. |
| 13:04 | 23 | MR. BERTLING:  For you to notify Nicoleta, |
| 13:04 | 24 | correct? |
| | 25 | |

| | | |
|---|---|---|
| 13:04 | 1 | BY MR. McLANE: |
| 13:04 | 2 |    Q   Well, from any point.  Would you have |
| 13:05 | 3 | notified anyone on the psych staff -- |
| 13:05 | 4 |    A   No.  No. |
| 13:05 | 5 |    Q   -- or anyone in the jail to say hey, we got |
| 13:05 | 6 | this order, he's not taking his medications, someone |
| 13:05 | 7 | should alert the court?  Are you saying no, that's |
| 13:05 | 8 | not what you would have done? |
| 13:05 | 9 |    A   Usually we don't. |
| 13:05 | 10 |    Q   Okay.  Is there any written CFMG policy |
| 13:05 | 11 | that you are aware of that deals with the situation |
| 13:05 | 12 | where there is a court order to keep someone |
| 13:05 | 13 | medically compliant but you discontinue the |
| 13:05 | 14 | medications?  Are you aware of any policy? |
| 13:05 | 15 |    A   No. |
| 13:05 | 16 |    Q   Okay.  What is your understanding of the |
| 13:06 | 17 | CFMG policy in effect at this time concerning |
| 13:06 | 18 | forcibly medicating a patient? |
| 13:06 | 19 |    A   When there is imminent danger to self and |
| 13:06 | 20 | others.  That's the only time. |
| 13:06 | 21 |    Q   That you can medicate them? |
| 13:06 | 22 |    A   Right. |
| 13:06 | 23 |    Q   And what do you do afterwards?  Do you try |
| 13:06 | 24 | to refer them to a county hospital if they need |
| 13:06 | 25 | continued medication after that danger passes? |

| | | |
|---|---|---|
| 13:11 | 1 | We're going off the record at 1310. |
| 13:11 | 2 | (Brief recess taken.) |
| 13:31 | 3 | THE VIDEOGRAPHER:  This is the beginning of DVD |
| 13:31 | 4 | No. 3.  We're back on the record at 1331. |
| 13:31 | 5 | BY MR. McLANE: |
| 13:31 | 6 | Q    Dr. Jung, you testified earlier that on |
| 13:31 | 7 | November 3rd, you diagnosed Mr. Hernandez with a |
| 13:31 | 8 | mood disorder, antisocial personality disorder. |
| 13:31 | 9 | Didn't you tell a Mr. Adams on July 9, 2008 that |
| 13:31 | 10 | Mr. Hernandez had a psychotic disorder? |
| 13:31 | 11 | A    To Mr. Adams?  I'm not sure. |
| 13:32 | 12 | Q    Mr. Adams, an individual who was appointed |
| 13:32 | 13 | by the court to determine whether Mr. Hernandez |
| 13:32 | 14 | should have a conservatorship.  Do you recall |
| 13:32 | 15 | speaking to someone from the outside on July 9, |
| 13:32 | 16 | 2008? |
| 13:32 | 17 | A    No. |
| 13:32 | 18 | Q    Okay.  Let's turn to Exhibit 15. |
| 13:32 | 19 | MR. BERTLING:  Okay. |
| 13:32 | 20 | BY MR. McLANE: |
| 13:32 | 21 | Q    Turn to Page 7 of this report.  This is a |
| 13:32 | 22 | report by Brian Adams, a court investigator to the |
| 13:32 | 23 | Ventura County Superior Court concerning the |
| 13:32 | 24 | conservatorship of Daniel Hernandez, and under the |
| 13:32 | 25 | section other contacts. |

| | | |
|---|---|---|
| 13:32 | 1 | MR. BERTLING:  Just so the record is clear, this |
| 13:32 | 2 | is talking about an evaluation which was in July of |
| 13:32 | 3 | '08 and not in November of '08. |
| 13:33 | 4 | MR. McLANE:  Yes.  That's fine. |
| 13:33 | 5 | MR. BERTLING:  All right. |
| 13:33 | 6 | BY MR. McLANE: |
| 13:33 | 7 | Q    So back in July of '08.  Please review this |
| 13:33 | 8 | paragraph to yourself, these two paragraphs under |
| 13:33 | 9 | other contacts. |
| 13:33 | 10 | MR. BERTLING:  And just so the record is clear, |
| 13:33 | 11 | I think it does misstate.  You -- you indicate that |
| 13:33 | 12 | he told Dr. Adams that he was psychotic, and this |
| 13:33 | 13 | document says that he thinks that the proposed |
| 13:33 | 14 | conservatee may have some sort of mood disorder. |
| 13:33 | 15 | MR. McLANE:  Okay.  You're correct there. |
| 13:33 | 16 | Q    So let's review this.  Do you recall this |
| 13:33 | 17 | conversation, Dr. Jung? |
| 13:33 | 18 | A    No. |
| 13:33 | 19 | Q    Okay.  Isn't it a fact that you spoke to -- |
| 13:34 | 20 | do you recall having an outside conversation with an |
| 13:34 | 21 | outside investigator concerning Mr. Hernandez? |
| 13:34 | 22 | A    No. |
| 13:34 | 23 | Q    Okay.  Didn't you tell this outside |
| 13:34 | 24 | investigator that Mr. Hernandez had erratic and |
| 13:34 | 25 | bizarre behavior and has had it since last year? |

| | | |
|---|---|---|
| 13:34 | 1 | MR. BERTLING:  You know, I'm not going to let |
| 13:34 | 2 | him answer this question.  He has no recollection of |
| 13:34 | 3 | having this discussion.  This is a Dr. Y-o-u-n-g. |
| 13:34 | 4 | It may or may not be Dr. J-u-n-g, but the person you |
| 13:34 | 5 | need to discuss this with is Mr. Adams.  I'm not |
| 13:34 | 6 | going to have him testify regarding a report on this |
| 13:34 | 7 | particular patient. |
| 13:34 | 8 | MR. McLANE:  Well, I don't think you can |
| 13:34 | 9 | instruct him not to answer.  I can explore it with |
| 13:34 | 10 | him. |
| 13:34 | 11 | MR. BERTLING:  Go ahead and ask your question. |
| 13:34 | 12 | BY MR. McLANE: |
| 13:34 | 13 | Q    Is there any other Dr. Young at the Ventura |
| 13:34 | 14 | County main jail? |
| 13:34 | 15 | A    No. |
| 13:34 | 16 | Q    Okay.  Do sometimes people misspell your |
| 13:34 | 17 | name as Y-o-u-n-g? |
| 13:34 | 18 | A    Correct. |
| 13:34 | 19 | Q    Take -- looking at these two paragraphs in |
| 13:35 | 20 | context, are you the only -- okay.  I think I asked |
| 13:35 | 21 | that already. |
| 13:35 | 22 | MR. BERTLING:  So what's -- what's your question |
| 13:35 | 23 | about this particular report? |
| 13:35 | 24 | MR. McLANE:  Hold on a second.  I will ask my |
| 13:35 | 25 | questions. |

| | | |
|---|---|---|
| 13:35 | 1 | MR. BERTLING:  Okay. |
| 13:35 | 2 | MR. McLANE:  It's not your deposition.  Okay? |
| 13:35 | 3 | MR. BERTLING:  Just get your question out, |
| 13:35 | 4 | please. |
| 13:35 | 5 | MR. McLANE:  I will in due order. |
| 13:35 | 6 | Q    Okay.  So would you -- |
| 13:35 | 7 | MR. BERTLING:  By the way, just a second. |
| 13:35 | 8 | Doctor, is this your document, is this a |
| 13:35 | 9 | document that you prepared? |
| 13:35 | 10 | THE DEPONENT:  No. |
| 13:35 | 11 | MR. BERTLING:  Is this a document that you |
| 13:35 | 12 | signed off on? |
| 13:35 | 13 | THE DEPONENT:  No. |
| 13:35 | 14 | MR. BERTLING:  Is this a document that you |
| 13:35 | 15 | indicated was in any way accurate? |
| 13:35 | 16 | THE DEPONENT:  No. |
| 13:35 | 17 | MR. BERTLING:  Okay. |
| 13:35 | 18 | BY MR. McLANE: |
| 13:35 | 19 | Q    Okay.  Would you disagree with the |
| 13:35 | 20 | statement in here that it says "Dr. Young states the |
| 13:35 | 21 | proposed conservatee has erratic and bizarre |
| 13:35 | 22 | behavior and has had it since last year"? |
| 13:35 | 23 | MR. BERTLING:  Well, objection.  Lacks |
| 13:35 | 24 | foundation, calls for speculation. |
| 13:35 | 25 | If you can agree and you know based on your |

| | | |
|---|---|---|
| 13:35 | 1 | personal knowledge, you can respond to the question. |
| 13:36 | 2 | But if you don't know, tell him you don't know. |
| 13:36 | 3 | BY MR. McLANE: |
| 13:36 | 4 | Q    I'm asking do you disagree with the |
| 13:36 | 5 | statement about Mr. Hernandez, the statement |
| 13:36 | 6 | attributed to you that he has erratic and bizarre |
| 13:36 | 7 | behavior and has had it since last year? |
| 13:36 | 8 | A    Yes. |
| 13:36 | 9 | Q    You would disagree with that statement? |
| 13:36 | 10 | A    I would agree with that statement. |
| 13:36 | 11 | Q    Oh, you would agree with that statement? |
| 13:36 | 12 | A    Yes. |
| 13:36 | 13 | Q    And then the next statement is that -- |
| 13:36 | 14 | concerning Mr. Hernandez is that he has some |
| 13:36 | 15 | antisocial personality behaviors and continued |
| 13:36 | 16 | saying the symptoms are atypical for any particular |
| 13:36 | 17 | diagnosis but feels the proposed conservatee may |
| 13:36 | 18 | have some sort of mood disorder. |
| 13:36 | 19 | Would you agree with that statement? |
| 13:36 | 20 | A    Yes. |
| 13:36 | 21 | Q    Stated that he's prescribed two milligrams |
| 13:36 | 22 | of Risperdal for the proposed conservatee but the |
| 13:36 | 23 | proposed conservatee refuses to take any |
| 13:36 | 24 | medications. |
| 13:36 | 25 | Would you agree with that statement? |

| | | |
|---|---|---|
| 13:37 | 1 | A    Yes. |
| 13:37 | 2 | Q    Your impressions of Mr. Hernandez at that |
| 13:37 | 3 | time in July 2008? |
| 13:37 | 4 | A    I believe that's true. |
| 13:37 | 5 | Q    Okay.  And you explained that after the |
| 13:37 | 6 | proposed conservatee calms down he either denies all |
| 13:37 | 7 | the behavior or is completely nonresponsive.  So he |
| 13:37 | 8 | is unable to make any type of diagnosis because the |
| 13:37 | 9 | proposed conservatee will not talk to him. |
| 13:37 | 10 | Is that your understanding of the situation |
| 13:37 | 11 | back then? |
| 13:37 | 12 | A    I believe so. |
| 13:37 | 13 | Q    Okay.  And you concluded saying he does not |
| 13:37 | 14 | think his behavior is an act and stated something is |
| 13:37 | 15 | wrong. |
| 13:37 | 16 | Would you agree with that statement as of |
| 13:37 | 17 | July 2008? |
| 13:37 | 18 | A    Right. |
| 13:37 | 19 | Q    Okay.  You indicated in -- November 3rd |
| 13:37 | 20 | that he's transparently manipulative, but in here |
| 13:37 | 21 | the statement attributed to you you agree with |
| 13:37 | 22 | that -- you indicated that his behavior is not an |
| 13:37 | 23 | act and something is wrong. |
| 13:37 | 24 | How do you explain your statement on |
| 13:38 | 25 | November 3, 2008 where you conclude that he's |

| | | |
|---|---|---|
| 13:38 | 1 | transparently manipulative where in this statement |
| 13:38 | 2 | you do not? |
| 13:38 | 3 | A    Particularly mood disorder is never steady. |
| 13:38 | 4 | It's not the same mental status at one point.  They |
| 13:38 | 5 | move from one state to the other state. |
| 13:38 | 6 | Q    And they can move back again, correct? |
| 13:38 | 7 | A    Right. |
| 13:38 | 8 | Q    So after November 3, 2008, then he can go |
| 13:38 | 9 | back again to a full-blown mood disorder, correct? |
| 13:38 | 10 | A    Could.  Possible.  Potentially. |
| 13:38 | 11 | Q    But you've got to monitor it to figure that |
| 13:38 | 12 | out? |
| 13:38 | 13 | A    It's monitored by custody. |
| 13:38 | 14 | Q    Okay.  Now, in anything that you've seen |
| 13:38 | 15 | from Patton, from this report by Mr. Adams, anything |
| 13:38 | 16 | indicating that Mr. Hernandez was faking a mental |
| 13:39 | 17 | illness? |
| 13:39 | 18 | A    No. |
| 13:39 | 19 | MR. BERTLING:  Lacks foundation -- |
| 13:39 | 20 | Go ahead. |
| 13:39 | 21 | BY MR. McLANE: |
| 13:39 | 22 | Q    When you say that he is transparently |
| 13:39 | 23 | manipulative, you're not saying he's faking a mental |
| 13:39 | 24 | illness, are you? |
| 13:39 | 25 | A    No. |

| 13:49 | 1 | THE DEPONENT:  No. |
| 13:49 | 2 | BY MR. McLANE: |
| 13:49 | 3 | Q    Do you -- have you ever seen an inmate with |
| 13:49 | 4 | disciplinary isolation with a piece of paper over |
| 13:49 | 5 | the window of his cell so he can't see out, yes? |
| 13:49 | 6 | A    Yes. |
| 13:49 | 7 | Q    So that's part of disciplinary isolation? |
| 13:49 | 8 | A    Yes. |
| 13:49 | 9 | Q    Do you know what administrative segregation |
| 13:49 | 10 | is at the Ventura County main jail? |
| 13:49 | 11 | A    I'm not quite sure. |
| 13:49 | 12 | Q    Wouldn't it be important for you to know as |
| 13:49 | 13 | a staff psychiatrist what conditions individuals are |
| 13:50 | 14 | being housed in with the psychiatric label? |
| 13:50 | 15 | A    I'm not sure.  It's not that relevant. |
| 13:50 | 16 | Q    The conditions of housing can some -- are |
| 13:50 | 17 | not relevant to determine -- |
| 13:50 | 18 | A    Most of the time -- |
| 13:50 | 19 | Q    -- assisting in your mental care treatment |
| 13:50 | 20 | of an inmate? |
| 13:50 | 21 | A    Most of the time, no. |
| 13:50 | 22 | Q    Sometimes yes? |
| 13:50 | 23 | A    Yes. |
| 13:50 | 24 | Q    So if an individual is suicidal, their |
| 13:50 | 25 | conditions of housing are quite important, correct? |

| 13:54 | 1 | MR. McLANE:  It's not calling for an expert |
| 13:54 | 2 | opinion. |
| 13:54 | 3 | Q    Should you have been informed that |
| 13:54 | 4 | Mr. Hernandez, after being discontinued from |
| 13:54 | 5 | medication, he engaged in several disruptive |
| 13:55 | 6 | behavioral incidents in the jail, engaged in meal |
| 13:55 | 7 | refusals, was housed in disciplinary isolation? |
| 13:55 | 8 | Should the jail staff have told you this? |
| 13:55 | 9 | A    No.  If it's not the risk of suicide, |
| 13:55 | 10 | usually it doesn't come to my attention. |
| 13:55 | 11 | Q    Okay.  So you're saying -- but you didn't |
| 13:55 | 12 | observe him, correct? |
| 13:55 | 13 | A    Correct. |
| 13:55 | 14 | Q    Only the jail staff, correct? |
| 13:55 | 15 | A    Correct. |
| 13:55 | 16 | Q    And maybe some of the nurses on the meal |
| 13:55 | 17 | refusals, correct? |
| 13:55 | 18 | A    Meal is by the deputies. |
| 13:55 | 19 | Q    By the deputies, but also they're monitored |
| 13:55 | 20 | by the medical nurses, correct, on their meal |
| 13:55 | 21 | refusals? |
| 13:55 | 22 | A    Yes. |
| 13:55 | 23 | Q    Okay.  But they're not experts in |
| 13:55 | 24 | psychiatry, correct? |
| 13:55 | 25 | A    Correct. |

| 14:09 | 1 | hypothetical. |

14:09   1   hypothetical.

14:09   2   MR. McLANE:  Okay.  Well, we disagree, and this

14:09   3   may require a continued deposition.

14:09   4   Q   You were the treating psychiatrist for

14:10   5   Mr. Hernandez, correct?

14:10   6   A   Correct.

14:10   7   Q   The only one he had access to, correct?

14:10   8   A   Yes.

14:10   9   Q   Okay.  Would you consider, based upon now

14:10   10   being aware of these various incident reports, that

14:10   11   Mr. Hernandez was in a state of stress at the time

14:10   12   of his suicide?

14:10   13   MR. BERTLING:  Same instruction not to answer

14:10   14   the question.

14:10   15   Calls for an expert opinion, vague and

14:10   16   ambiguous, lacks foundation, and it's an incomplete

14:10   17   hypothetical, but my instruction is not to answer.

14:10   18   BY MR. McLANE:

14:10   19   Q   Okay.  Now, based on your training and

14:10   20   experience, inmates who are in more stressful

14:10   21   situations are more likely to commit suicide,

14:10   22   correct?

14:10   23   MR. BERTLING:  Let me just object that that's an

14:10   24   incomplete hypothetical and vague and ambiguous.

14:10   25   But if you can answer the question the way

| | | |
|---|---|---|
| 14:15 | 1 | Q    Do you agree that his medical condition at |
| 14:15 | 2 | the time of his suicide was a contributing factor to |
| 14:15 | 3 | his suicide? |
| 14:15 | 4 | MR. BERTLING:   I'm going to instruct him not to |
| 14:15 | 5 | answer that question. |
| 14:15 | 6 | That calls, first of all, for an expert |
| 14:15 | 7 | opinion and it also lacks foundation.   As you |
| 14:15 | 8 | pointed out, he hadn't seen him since November 3rd. |
| 14:15 | 9 | But I'm instructing him not to answer the |
| 14:15 | 10 | question because that calls for an expert opinion. |
| 14:15 | 11 | MR. HELD:   And I will join in those grounds.   I |
| 14:15 | 12 | also object because it would call for the witness to |
| 14:15 | 13 | invade the fact finding province of the jury. |
| 14:15 | 14 | BY MR. McLANE: |
| 14:15 | 15 | Q    Okay.   Now, I'm not going to go through |
| 14:15 | 16 | every single progress note of yours concerning |
| 14:16 | 17 | Mr. Hernandez, but I'm going to go through the ones |
| 14:16 | 18 | starting in January '07. |
| 14:16 | 19 | MR. BERTLING:   And they would be in Exhibit 87? |
| 14:16 | 20 | MR. McLANE:   There are different exhibits. |
| 14:16 | 21 | I'll -- I'll refer them to you. |
| 14:16 | 22 | MR. BERTLING:   Okay.   Perfect. |
| 14:16 | 23 | BY MR. McLANE: |
| 14:16 | 24 | Q    Okay.   Turn to Exhibit 20.   Okay.   This is |
| 14:17 | 25 | his -- Mr. Hernandez's intake on January 22, 2007. |

| 14:17 | 1 | And on the second page, we've already reviewed this, |
| 14:17 | 2 | but just laying a foundation for other questions. |
| 14:17 | 3 | It indicated that he had attempted suicide a week |
| 14:17 | 4 | and a half prior to the date of this document, which |
| 14:17 | 5 | is January 24, 2007.  And he was cleared to -- out |
| 14:17 | 6 | of reception housing by Ms. Moskowitz on January 25, |
| 14:17 | 7 | 2007. |
| 14:17 | 8 | But I want you now to refer to Exhibit 74. |
| 14:17 | 9 | Now, if you could turn to the fourth page of |
| 14:18 | 10 | Exhibit 74.  I believe these are your notes.  Are |
| 14:18 | 11 | these your notes? |
| 14:18 | 12 | A    Yes. |
| 14:18 | 13 | Q    Okay.  And it's dated January 23, 2007? |
| 14:18 | 14 | A    Yes. |
| 14:18 | 15 | Q    Can you read these notes? |
| 14:18 | 16 | A    Twenty-six year old Hispanic male.  Father |
| 14:18 | 17 | of one.  Tile setter. |
| 14:18 | 18 | DEPOSITION OFFICER:  I'm sorry? |
| 14:18 | 19 | MR. BERTLING:  Tile setter. |
| 14:18 | 20 | BY MR. McLANE: |
| 14:18 | 21 | Q    Is that like a job description? |
| 14:18 | 22 | A    Yeah, job description. |
| 14:18 | 23 | Q    That he reported to you -- |
| 14:18 | 24 | A    Yeah. |
| 14:18 | 25 | Q    -- that he was a tile setter? |

| | | |
|---|---|---|
| 14:18 | 1 | A   Yeah.   Who turned himself in for absconding |
| 14:18 | 2 | from parole office.   Released from the prison in May |
| 14:18 | 3 | '06 after two year stay for robbery conviction.   He |
| 14:18 | 4 | was placed in the safety cell after an incident |
| 14:19 | 5 | fighting with deputy in the booking area and was |
| 14:19 | 6 | charged with battery to a peace officer. |
| 14:19 | 7 | Q   Now, are you saying -- I just want to stop |
| 14:19 | 8 | you here.   Are you saying that you placed him in the |
| 14:19 | 9 | safety cell or in a prior incarceration -- |
| 14:19 | 10 | A   No.   By he was placed by the deputies. |
| 14:19 | 11 | Q   On -- on this date, January 23, 2007? |
| 14:19 | 12 | MR. BERTLING:   Well, the 22nd is the date he was |
| 14:19 | 13 | placed. |
| 14:19 | 14 | BY MR. McLANE: |
| 14:19 | 15 | Q   Okay.   Well, so concerning this intake in |
| 14:19 | 16 | his booking into the Ventura County jail on January |
| 14:19 | 17 | 22, 2007, correct? |
| 14:19 | 18 | A   Yes. |
| 14:19 | 19 | Q   So continue reading. |
| 14:19 | 20 | A   On interview he is coherent, more or less |
| 14:19 | 21 | cooperative to interviewer.   He related that he |
| 14:19 | 22 | refused to go to shower room because he was |
| 14:19 | 23 | convinced other inmate would hurt him.   State he had |
| 14:20 | 24 | certain crossed out tattoos and is disrespect to |
| 14:20 | 25 | south siders. |

| | | |
|---|---|---|
| 14:20 | 1 | Q    Meaning he has a crossed out tattoo?  Do |
| 14:20 | 2 | you know what this means?  What does this mean to |
| 14:20 | 3 | you?  It says here that he has a crossed out tattoo, |
| 14:20 | 4 | and did you say disrespect to south siders? |
| 14:20 | 5 | A    Yeah.  He had probably south side tattoos |
| 14:20 | 6 | and he tried to cross out. |
| 14:20 | 7 | Q    He was worried that south siders might |
| 14:20 | 8 | attack him because he crossed out his tattoo? |
| 14:20 | 9 | A    Right. |
| 14:20 | 10 | Q    Because he crossed out his tattoo? |
| 14:20 | 11 | A    Right. |
| 14:20 | 12 | Q    Okay.  Continue reading. |
| 14:20 | 13 | A    No psych treatment in the community. |
| 14:20 | 14 | Claimed he was treated for depression while at Kern |
| 14:20 | 15 | County prison.  He said he needed to be alone. |
| 14:20 | 16 | Q    So what does it say at the bottom? |
| 14:20 | 17 | A    The impression was situational stress and |
| 14:21 | 18 | antisocial personality disorder. |
| 14:21 | 19 | Q    What's the last? |
| 14:21 | 20 | A    Rehouse per classification. |
| 14:21 | 21 | Q    Okay.  So then he was rehoused -- |
| 14:21 | 22 | A    Yeah. |
| 14:21 | 23 | Q    -- according to whatever he was classified? |
| 14:21 | 24 | A    Right. |
| 14:21 | 25 | Q    Okay.  Now, take a look at Exhibit 76, the |

| | | |
|---|---|---|
| 14:21 | 1 | first page.  Excuse me.  Sorry.  Going back to |
| 14:21 | 2 | Exhibit 75. |
| 14:21 | 3 | MR. BERTLING:  Exhibit 75, Doctor. |
| 14:21 | 4 | BY MR. McLANE: |
| 14:21 | 5 | Q    Yes.  That is a medications document? |
| 14:21 | 6 | A    Yeah. |
| 14:22 | 7 | Q    Did you place him on medications on January |
| 14:22 | 8 | 23, 2007? |
| 14:22 | 9 | A    Yeah. |
| 14:22 | 10 | Q    What does it -- major tranquilizer and then |
| 14:22 | 11 | there's some handwriting.  Do you know what that |
| 14:22 | 12 | says? |
| 14:22 | 13 | A    Trilafon up to 64 milligrams and Haldol to |
| 14:22 | 14 | 40 milligrams. |
| 14:22 | 15 | Q    What is Trilafon? |
| 14:22 | 16 | A    It's a major tranquilizer. |
| 14:22 | 17 | Q    And what is Haldol? |
| 14:22 | 18 | A    Same, major tranquilizer. |
| 14:22 | 19 | Q    Okay.  Do you specifically recall giving |
| 14:22 | 20 | him these prescriptions? |
| 14:22 | 21 | A    No, I don't remember. |
| 14:22 | 22 | Q    What is your understanding and your |
| 14:22 | 23 | practice as to why you would prescribe these |
| 14:22 | 24 | medications? |
| 14:22 | 25 | A    Somebody who is schizophrenia or major mood |

| | | |
|---|---|---|
| 14:22 | 1 | disorder with disruptive behavior would use this |
| 14:22 | 2 | medication. |
| 14:23 | 3 | Q    So either schizophrenia or mood disorder |
| 14:23 | 4 | with disruptive -- disruptive behavior? |
| 14:23 | 5 | A    Or manic side. |
| 14:23 | 6 | Q    Manic side.  And then antidepressants |
| 14:23 | 7 | there's something listed? |
| 14:23 | 8 | A    Yeah. |
| 14:23 | 9 | Q    Whats that? |
| 14:23 | 10 | A    Doxepin, 250 milligrams. |
| 14:23 | 11 | Q    What is Doxepin? |
| 14:23 | 12 | A    Doxepin is tricyclic antidepressant. |
| 14:23 | 13 | Q    Okay.  And there is an -- is that your |
| 14:23 | 14 | signature below? |
| 14:23 | 15 | A    Yes. |
| 14:23 | 16 | Q    And there's something indicated -- checked |
| 14:23 | 17 | that he understands the nature and effects of the |
| 14:23 | 18 | medication, consents to taking such medication but |
| 14:23 | 19 | did not wish to sign the form? |
| 14:23 | 20 | A    Yes. |
| 14:23 | 21 | Q    Is that what happened, he consented to the |
| 14:23 | 22 | medication but didn't want to sign the form? |
| 14:23 | 23 | A    That's right. |
| 14:23 | 24 | Q    Okay.  Now, if you could turn to |
| 14:23 | 25 | Exhibit 76.  These are progress notes on January 23, |

| | | |
|---|---|---|
| 14:24 | 1 | 2007.  And the entry starts -- just starting with |
| 14:24 | 2 | the quote "Mr. Hernandez states I'm feeling |
| 14:24 | 3 | depressed and don't trust many people.  People are |
| 14:24 | 4 | really" -- I can't read that.  "Me.  I thought about |
| 14:24 | 5 | suicide.  I tried it a week ago.  Tylenol and Advil |
| 14:24 | 6 | took 42 tablets.  I thought of ways, but I think I |
| 14:24 | 7 | would take the easy way out with a gun.  Right now |
| 14:24 | 8 | I'm just depressed and feel afraid of others. |
| 14:24 | 9 | People do want to hurt me," and it continues. |
| 14:24 | 10 | Now, did you review this note when you gave |
| 14:24 | 11 | him -- prescribed the various medications that you |
| 14:24 | 12 | gave him? |
| 14:24 | 13 | A    I -- possible.  I don't have a |
| 14:24 | 14 | recollection. |
| 14:24 | 15 | Q    Well, you would have to have had a basis to |
| 14:25 | 16 | prescribe a medication, correct? |
| 14:25 | 17 | A    Right. |
| 14:25 | 18 | Q    Now, your prior note that we went through |
| 14:25 | 19 | didn't indicate any sort of psychiatric issues, just |
| 14:25 | 20 | the antisocial personality disorder, correct? |
| 14:25 | 21 | A    Right. |
| 14:25 | 22 | Q    Now, this indicates more about suicide. |
| 14:25 | 23 | So, you know, just your understanding and practice |
| 14:25 | 24 | would you have reviewed this note as the basis to |
| 14:25 | 25 | prescribe those medications such as Haldol and |

| | | |
|---|---|---|
| 14:25 | 1 | Trilafon and Doxepin? |
| 14:25 | 2 | A     Yeah, right. |
| 14:25 | 3 | Q     You probably reviewed this note, correct? |
| 14:25 | 4 | A     Right. |
| 14:25 | 5 | Q     Okay.  So in the CFMG file there is a |
| 14:25 | 6 | documented suicide attempt, correct? |
| 14:25 | 7 | A     Correct. |
| 14:25 | 8 | MR. BERTLING:  Of which he was aware. |
| 14:25 | 9 | MR. McLANE:  Right. |
| 14:25 | 10 | Q     And so -- |
| 14:25 | 11 | MR. BERTLING:  And then prescribed medications |
| 14:25 | 12 | and put him on safety precautions. |
| 14:25 | 13 | MR. McLANE:  That's fine.  You can ask all the |
| 14:25 | 14 | questions you want when it's your turn.  Let me |
| 14:25 | 15 | conduct my deposition. |
| 14:26 | 16 | MR. BERTLING:  Conduct it. |
| 14:26 | 17 | MR. McLANE:  Fine.  When it's your turn, you can |
| 14:26 | 18 | ask your questions. |
| 14:26 | 19 | Q     Do you know who wrote this note looking at |
| 14:26 | 20 | Exhibit 76? |
| 14:26 | 21 | A     It's one of the psych techs who worked |
| 14:26 | 22 | before Linda. |
| 14:26 | 23 | Q     Before Linda Moskowitz? |
| 14:26 | 24 | A     Not before Linda. |
| 14:26 | 25 | Q     Before Nurse Rodelander? |

| 14:26 | 1 | A    Yes. |

14:26  1    A    Yes.

14:26  2    Q    Was that Jose Nunez?

14:26  3    A    Yes.

14:26  4    Q    So he had the same position that Nurse

14:26  5  Rodelander --

14:26  6    A    Right.

14:26  7    Q    -- has now?

14:26  8    A    Right.

14:26  9    Q    So he's basically a psych nurse?

14:26  10    A    Psych nurse.

14:26  11    Q    Okay.  Now, if you turn to the second page

14:26  12  of Exhibit 76.  There is an entry on -- are you --

14:26  13    MR. BERTLING:  Yep.

14:26  14  BY MR. McLANE:

14:26  15    Q    Okay.  Second page of Exhibit 76.  Okay.

14:27  16  This is a progress note dated February 7, 2007.  Do

14:27  17  you know a Tracy Breece?

14:27  18    A    No.

14:27  19    Q    Okay.  Apparently on February 7, 2007 Tracy

14:27  20  Breece indicated that Mr. Hernandez said he's been

14:27  21  hearing voices for a week now.  The medicine I am

14:27  22  offered here isn't helping.  The voices they tell me

14:27  23  to hurt myself and others by cutting with whatever I

14:27  24  can find.  And then it indicates Level 2 safety

14:27  25  precautions ordered.  Monitor in day room until

| | | |
|---|---|---|
| 14:27 | 1 | Level 1 safety cell available. |
| 14:27 | 2 | Do you recall this incident on February 7? |
| 14:27 | 3 | A    No. |
| 14:27 | 4 | Q    Okay.  Is it the practice of CFMG at the |
| 14:28 | 5 | jail that it's only the psychiatrist, or you, that |
| 14:28 | 6 | would order the Level 1 or Level 2 or Level 3 safety |
| 14:28 | 7 | cells or Dr. Korzelius, one of the doctors? |
| 14:28 | 8 | A    Yeah. |
| 14:28 | 9 | Q    Can the nurses on their own order that sort |
| 14:28 | 10 | of safety cell precaution, or do they have to |
| 14:28 | 11 | consult with either you or Dr. Korzelius? |
| 14:28 | 12 | A    Yeah, with consulting.  After consultation. |
| 14:28 | 13 | Q    They can't order it on their own? |
| 14:28 | 14 | A    Not on their own, yeah. |
| 14:28 | 15 | Q    So -- so this Tracy Breece would have had |
| 14:28 | 16 | to have cleared it with either you or Dr. Korzelius |
| 14:28 | 17 | to place him in the Level 2 safety cell, correct? |
| 14:28 | 18 | A    Yes. |
| 14:28 | 19 | Q    Okay.  What's the difference in your |
| 14:28 | 20 | opinion or your -- not your opinion, but your |
| 14:28 | 21 | understanding of a Level 1 safety cell placement |
| 14:28 | 22 | versus a Level 2 and a Level 3 during the time |
| 14:28 | 23 | period of 2007 through February 16, 2009?  What is |
| 14:29 | 24 | your understanding of those three different |
| 14:29 | 25 | placements and what they indicate about the |

| | | |
|---|---|---|
| 14:29 | 1 | potential suicide risk? |
| 14:29 | 2 | A    Same as probably other times.   Level 1 is |
| 14:29 | 3 | there is imminent danger. |
| 14:29 | 4 | Q    That the rubber room you're referring to? |
| 14:29 | 5 | A    Right. |
| 14:29 | 6 | Q    Imminent danger to themselves, right? |
| 14:29 | 7 | A    Themselves. |
| 14:29 | 8 | Q    Okay.  And what's the difference between a |
| 14:29 | 9 | Level 1 and Level 2 and Level 3 safety cell? |
| 14:29 | 10 | A    Suicide risk is probably not that high, and |
| 14:29 | 11 | they can be observed. |
| 14:29 | 12 | Q    In Level 2? |
| 14:29 | 13 | A    Level 2. |
| 14:29 | 14 | Q    But Level 1 is a high suicide risk? |
| 14:29 | 15 | A    High suicide risk, and every 15 minutes |
| 14:29 | 16 | they check. |
| 14:29 | 17 | Q    What about Level 3, what is the difference |
| 14:29 | 18 | between Level 2 and Level 3? |
| 14:29 | 19 | A    Level 3 there is a potential risk of |
| 14:29 | 20 | suicide, not quite ready to go to general |
| 14:29 | 21 | population. |
| 14:29 | 22 | Q    So is it more of a step down procedure |
| 14:29 | 23 | that -- |
| 14:29 | 24 | A    Yeah. |
| 14:29 | 25 | Q    You wouldn't -- you wouldn't put someone |

| | | |
|---|---|---|
| 14:29 | 1 | initially in a Level 3, that you'd place them in |
| 14:30 | 2 | either a Level 1 or Level 2? |
| 14:30 | 3 | A    Some people would go to Level 3. |
| 14:30 | 4 | Q    Right away? |
| 14:30 | 5 | A    Right away. |
| 14:30 | 6 | Q    Okay.  As far as suicide risk, you would |
| 14:30 | 7 | put it as the lower of the three? |
| 14:30 | 8 | A    Right. |
| 14:30 | 9 | Q    Level 1 would be high risk, Level 2 would |
| 14:30 | 10 | be medium risk, Level 3 low risk? |
| 14:30 | 11 | A    Right. |
| 14:30 | 12 | Q    But some risk, you wouldn't put them in |
| 14:30 | 13 | there unless there was some risk, right? |
| 14:30 | 14 | A    Right. |
| 14:31 | 15 | Q    Now, if you turn to Exhibit 77.  This is |
| 14:31 | 16 | just what we were talking about a second ago.  This |
| 14:31 | 17 | is actually Tracy Breece's jail incident report |
| 14:31 | 18 | saying that Daniel Hernandez is placed on Level 2 |
| 14:31 | 19 | safety precautions per psych M.D. classification. |
| 14:31 | 20 | That would have been you, correct? |
| 14:31 | 21 | A    Right. |
| 14:31 | 22 | Q    You're the psych M.D., correct? |
| 14:31 | 23 | A    Right. |
| 14:31 | 24 | Q    Now, turn to Page 3 of Exhibit 77.  I |
| 14:31 | 25 | believe you wrote two different entries on February |

| | | |
|---|---|---|
| 14:31 | 1 | 7 and May 24, 2007? |
| 14:31 | 2 | A    Yeah. |
| 14:31 | 3 | Q    Can you read both entries? |
| 14:31 | 4 | A    Brought down from the quad. |
| 14:31 | 5 | Q    This is the entry of February 7, 2007. |
| 14:31 | 6 | A    February 7, yeah. |
| 14:31 | 7 | Q    Okay. |
| 14:31 | 8 | A    Brought down from the quad for complaining |
| 14:32 | 9 | of auditory hallucinations of a commanding nature. |
| 14:32 | 10 | Housed at rec room due to the nonavailability of |
| 14:32 | 11 | special housing housing early this morning.  On |
| 14:32 | 12 | interview he is calm, coherent and euthymic. |
| 14:32 | 13 | Q    Excuse me.  I heard the calm and coherent, |
| 14:32 | 14 | but I heard a truck outside. |
| 14:32 | 15 | A    Euthymic means a normal mood. |
| 14:32 | 16 | Q    What was that?  Euth -- |
| 14:32 | 17 | A    Euthymic. |
| 14:32 | 18 | Q    Euthymic? |
| 14:32 | 19 | A    Yeah. |
| 14:32 | 20 | Q    That's a word, euthymic? |
| 14:32 | 21 | A    Yeah. |
| 14:32 | 22 | Q    And that means normal mood? |
| 14:32 | 23 | A    Normal mood.  Neutral mood. |
| 14:32 | 24 | Q    Go ahead. |
| 14:32 | 25 | A    Claims that he is hearing demon's voice |

| | | |
|---|---|---|
| 14:32 | 1 | telling him to hurt self and others.  No urgency or |
| 14:32 | 2 | plan to hurt self or others.  But the fact that he |
| 14:32 | 3 | hears the low threatening voice -- |
| 14:33 | 4 | Q    Bothered him? |
| 14:33 | 5 | A    -- bothered him. |
| 14:33 | 6 | Q    Okay. |
| 14:33 | 7 | A    Medication adjustment and return to his |
| 14:33 | 8 | house, return to his housing. |
| 14:33 | 9 | Q    Okay.  So he -- you adjusted his |
| 14:33 | 10 | medication? |
| 14:33 | 11 | A    Yeah. |
| 14:33 | 12 | Q    And did you place him on Level 2 safety |
| 14:33 | 13 | precautions, or is this after he was on Level 2 |
| 14:33 | 14 | safety precautions and you returned him to housing? |
| 14:33 | 15 | A    Regular housing. |
| 14:33 | 16 | Q    Okay.  What about this note below on May |
| 14:33 | 17 | 24, 2007?  What does it say? |
| 14:33 | 18 | A    Three months after seen at the SU.  So he |
| 14:33 | 19 | was obviously at Todd Road facility.  Called |
| 14:33 | 20 | special -- |
| 14:33 | 21 | Q    Wait.  Wait.  Excuse me.  Seen at SU? |
| 14:33 | 22 | A    Special use room, and -- |
| 14:33 | 23 | Q    That refers to the Todd Road facility? |
| 14:33 | 24 | A    Todd Road facility they call SU. |
| 14:33 | 25 | Q    So whenever it says SU it doesn't -- |

| | | |
|---|---|---|
| 14:34 | 1 | there's no room at the Ventura County jail that -- |
| 14:34 | 2 | A    No.   He was -- he was probably housed in |
| 14:34 | 3 | Todd Road by then. |
| 14:34 | 4 | Q    Okay. |
| 14:34 | 5 | A    People who are in Todd Road will go to SU. |
| 14:34 | 6 | Q    What does SU at Todd Road signify? |
| 14:34 | 7 | A    Signify they're in Level 2 or 3. |
| 14:34 | 8 | Q    Level 2 or 3 safety cell? |
| 14:34 | 9 | A    Safety precaution. |
| 14:34 | 10 | Q    Okay.  Go ahead with the note.  The next |
| 14:34 | 11 | line required -- |
| 14:34 | 12 | A    Required a TASER and sustained multiple |
| 14:34 | 13 | abrasions as he was acutely agitated. |
| 14:34 | 14 | Q    So the deputies TASERed him? |
| 14:34 | 15 | A    Yes. |
| 14:34 | 16 | Q    Because he was agitated? |
| 14:34 | 17 | A    Yes. |
| 14:34 | 18 | Q    Go ahead. |
| 14:34 | 19 | A    On interview he is calm, coherent and |
| 14:34 | 20 | euthymic.  States he doesn't need psych medication. |
| 14:34 | 21 | Relate incident in that he felt there was no way |
| 14:35 | 22 | out.  Tried proper procedures, but no response. |
| 14:35 | 23 | Q    Okay.  So he's saying that there was no way |
| 14:35 | 24 | out? |
| 14:35 | 25 | A    Yeah, that he felt no way out. |

| | | |
|---|---|---|
| 14:35 | 1 | Q    And what does tried proper procedures, is |
| 14:35 | 2 | that referring to you or him? |
| 14:35 | 3 | A    Probably him. |
| 14:35 | 4 | Q    Tried proper procedures, but -- |
| 14:35 | 5 | A    But there was no response. |
| 14:35 | 6 | Q    Okay. |
| 14:35 | 7 | A    No response.  He felt his life was |
| 14:35 | 8 | threatened by other inmate. |
| 14:35 | 9 | Q    Okay.  And there is a couple squibbles at |
| 14:35 | 10 | the bottom left? |
| 14:35 | 11 | A    Plan is observation. |
| 14:35 | 12 | Q    Oh, so that means your plan is to observe |
| 14:35 | 13 | him? |
| 14:35 | 14 | A    Yeah. |
| 14:35 | 15 | Q    Okay.  Now, turn to Exhibit 78.  This is |
| 14:36 | 16 | the CFMG medical report for Mr. Hernandez on |
| 14:36 | 17 | February 16, 2007. |
| 14:36 | 18 | Is this something that you prepared? |
| 14:36 | 19 | A    No. |
| 14:36 | 20 | Q    Medical provider, do you recognize who that |
| 14:36 | 21 | is? |
| 14:36 | 22 | A    One of the RNs. |
| 14:36 | 23 | Q    Okay.  Do you know the person's name, or |
| 14:36 | 24 | can you read it? |
| 14:36 | 25 | A    No.  No. |

| 14:38 | 1 | BY MR. McLANE: |
|---|---|---|
| 14:38 | 2 | Q    Okay.   Date, May 22.    That refers to him |
| 14:38 | 3 | being TASERed, and do you know whose notes these |
| 14:38 | 4 | are? |
| 14:38 | 5 | MR. BERTLING:  Do you know who wrote this, |
| 14:38 | 6 | Doctor? |
| 14:38 | 7 | THE DEPONENT:  It looks familiar, but I don't |
| 14:38 | 8 | remember the name. |
| 14:38 | 9 | BY MR. McLANE: |
| 14:38 | 10 | Q    It refers to that same incident that you |
| 14:38 | 11 | wrote a note about on May 24, correct, about him |
| 14:38 | 12 | being TASERed? |
| 14:38 | 13 | A    Yeah. |
| 14:38 | 14 | Q    Okay.   And in here he said -- he was asking |
| 14:38 | 15 | if he can start back on psych meds on May 22. |
| 14:38 | 16 | Do you see that? |
| 14:38 | 17 | A    Yeah. |
| 14:38 | 18 | Q    Did you start him back on psych meds? |
| 14:39 | 19 | A    I don't remember. |
| 14:39 | 20 | Q    Do you recall? |
| 14:39 | 21 | A    No. |
| 14:39 | 22 | Q    Okay.   Okay.   Turn to Exhibit 80, please. |
| 14:39 | 23 | This is a -- he's -- this is a jail incident report. |
| 14:39 | 24 | Incident type, medical.   Suicidal.   Incident, |
| 14:39 | 25 | suicidal ideation.   Placed on Level 1 until |

| | | |
|---|---|---|
| 14:39 | 1 | evaluated by psych nurse/doctor. |
| 14:39 | 2 | Did you place him on Level 1? |
| 14:39 | 3 | A    Probably somebody -- somebody did. |
| 14:39 | 4 | Q    So it had to be either you or |
| 14:39 | 5 | Dr. Korzelius? |
| 14:39 | 6 | A    In -- in actual practice they are put in |
| 14:39 | 7 | the safety cell by the staff first, and they will |
| 14:39 | 8 | notify us. |
| 14:39 | 9 | Q    And then you confirm the safety cell |
| 14:40 | 10 | placement -- |
| 14:40 | 11 | A    Yeah. |
| 14:40 | 12 | Q    -- after they're placed there? |
| 14:40 | 13 | A    Yeah. |
| 14:40 | 14 | Q    Now, look at the second page.  There is a |
| 14:40 | 15 | series of entries.  Any of these entries are yours? |
| 14:40 | 16 | A    No. |
| 14:40 | 17 | Q    Okay.  If you had placed him in the safety |
| 14:40 | 18 | cell, would you have reviewed these progress notes? |
| 14:40 | 19 | A    Probably I do. |
| 14:40 | 20 | Q    Okay.  It indicates here in 6907 "Placed in |
| 14:40 | 21 | the safety cell by custody.  Stated he was |
| 14:40 | 22 | suicidal."  And on June 9, 2007 he's asking if he's |
| 14:40 | 23 | going to get his psych meds, and see if there's |
| 14:40 | 24 | anything else. |
| 14:40 | 25 | Now, if you turn to Page 190, Bates stamped |

```
14:40    1    at the bottom.  On June 10 they discontinued Level 1
14:41    2    safety precautions and rehoused to SU cell.
14:41    3               What is an SU cell?
14:41    4       A    Special use room, people who are on Level 2
14:41    5    or 3.
14:41    6       Q    And it indicates Level 3 safety
14:41    7    precautions?
14:41    8       A    Yeah.
14:41    9       Q    Okay.  Now, he -- you said you probably
14:41   10    reviewed his progress notes.  On the June 9, 2007
14:41   11    progress note it indicates he was placed in a safety
14:42   12    cell by custody, and he stated he was suicidal, and
14:42   13    then S is subjective.
14:42   14               That means it's coming from the patient,
14:42   15    correct, when it's an S note?  Is that what that
14:42   16    means, Dr. Jung?  SUB is subjective, right?
14:42   17       A    Yeah.
14:42   18       Q    That means it's a report by the individual?
14:42   19       A    Yes.
14:42   20       Q    So he reported "I just said I was suicidal
14:42   21    because I want my meds.  Taken off meds a couple
14:42   22    months ago at my request because I was tired of
14:42   23    messing with them.  Hearing voices daily.  Long
14:42   24    history, tell him to kill self.  If I get my meds,
14:42   25    I'll be okay."
```

| | | |
|---|---|---|
| 14:42 | 1 | Do you recall this event? |
| 14:42 | 2 | A    No. |
| 14:42 | 3 | Q    Okay.   These notes evidence that he's |
| 14:42 | 4 | hearing voices telling him to kill himself, but if |
| 14:42 | 5 | he gets his meds, he'd be okay, correct? |
| 14:43 | 6 | A    Correct. |
| 14:43 | 7 | Q    So that's something in your typical |
| 14:43 | 8 | practice you would have reviewed in determining to |
| 14:43 | 9 | place him in the safety cell? |
| 14:43 | 10 | A    Yes. |
| 14:43 | 11 | Q    Okay.   Do you know what a 30-day evaluation |
| 14:43 | 12 | is, Dr. Jung? |
| 14:43 | 13 | MR. BERTLING:   Objection.   That's an incomplete |
| 14:43 | 14 | hypothetical. |
| 14:43 | 15 | But go ahead and answer the question, if |
| 14:43 | 16 | you can. |
| 14:43 | 17 | THE DEPONENT:   Thirty-day evaluation? |
| 14:43 | 18 | BY MR. McLANE: |
| 14:44 | 19 | Q    Yes.   If you turn to Exhibit 81. |
| 14:44 | 20 | MR. BERTLING:   This is a medical-general |
| 14:44 | 21 | document. |
| 14:44 | 22 | MR. McLANE:   Yes. |
| 14:44 | 23 | Q    Now, is that something you would have done? |
| 14:44 | 24 | MR. BERTLING:   It says "The inmate is medically |
| 14:44 | 25 | cleared to continue in current housing." |

| | |
|---|---|
| 14:44 | 1 |
| 14:44 | 2 |
| 14:44 | 3 |
| 14:44 | 4 |
| 14:44 | 5 |
| 14:44 | 6 |
| 14:44 | 7 |
| 14:44 | 8 |
| 14:44 | 9 |
| 14:44 | 10 |
| 14:44 | 11 |
| 14:45 | 12 |
| 14:45 | 13 |
| 14:45 | 14 |
| 14:45 | 15 |
| 14:45 | 16 |
| 14:45 | 17 |
| 14:45 | 18 |
| 14:45 | 19 |
| 14:45 | 20 |
| 14:45 | 21 |
| 14:46 | 22 |
| 14:46 | 23 |
| 14:46 | 24 |
| 14:46 | 25 |

BY MR. McLANE:

Q    At the top it says "Incident, 30-day evaluation."

What does that refer to, do you know?

MR. BERTLING:  Do you know?

THE DEPONENT:  No.

BY MR. McLANE:

Q    Is that a medical evaluation or psychological, or you just don't know?

A    I'm not sure.

Q    Okay.  Okay.  Turn to Exhibit 82.  If you turn to the fourth page of Exhibit 82, it's a jail incident report dated July 20, 2007.  It indicates that you placed him on safety precaution Level 1.

Do you see that?

A    Yes.

Q    Now, if you turn to the next page, it's a form indicating special housing admit orders.

What does special housing admit orders mean as opposed to doctor's orders?  Is -- is that the form that's filled out when someone is admitted into a safety cell?

A    Yeah.

Q    Okay.  Is this something you would have completed?

| | | | |
|---|---|---|---|
| 14:46 | 1 | A | Usually completed by nurse who -- |
| 14:46 | 2 | Q | Pursuant to your instructions? |
| 14:46 | 3 | A | Right. |
| 14:46 | 4 | Q | Because it indicates here diagnosis |
| 14:46 | 5 | | suicidal statements and ideations, and below it says |
| 14:46 | 6 | | "Medications, treatments, TO Dr. Jung." |
| 14:46 | 7 | | What does that mean? |
| 14:46 | 8 | A | Talking order. |
| 14:46 | 9 | Q | So this means you gave the talking order to |
| 14:46 | 10 | | place him on safety precautions Level 1 because of |
| 14:46 | 11 | | suicidal statements and ideations? |
| 14:46 | 12 | A | Yeah. |
| 14:46 | 13 | Q | Do you know what you base that on, placing |
| 14:46 | 14 | | him in safety cell Level 1? |
| 14:46 | 15 | A | It indicates he has a suicide -- made a |
| 14:46 | 16 | | suicide statement. |
| 14:46 | 17 | Q | Okay.  Now, turning to the first page of |
| 14:46 | 18 | | 82, which are progress notes.  Do you recall talking |
| 14:46 | 19 | | to the nurse where she indicated to you that a woman |
| 14:47 | 20 | | stating she is the aunt of Mr. Hernandez is |
| 14:47 | 21 | | concerned because the family has not heard from him |
| 14:47 | 22 | | in two months?  Do you recall anything to that |
| 14:47 | 23 | | effect? |
| 14:47 | 24 | A | No.  No. |
| 14:47 | 25 | Q | Do you recall anyone telling you that he -- |

| | | |
|---|---|---|
| 14:47 | 1 | that the aunt said she got a letter stating this |
| 14:47 | 2 | will be the last letter? |
| 14:47 | 3 | A     No. |
| 14:47 | 4 | Q     In your experience this will be a last |
| 14:47 | 5 | letter, that might constitute a suicidal statement, |
| 14:47 | 6 | correct? |
| 14:47 | 7 | A     Suicidal thought, yes. |
| 14:47 | 8 | Q     Okay.  Because if you're only writing one |
| 14:47 | 9 | more letter, that means you might commit suicide, |
| 14:47 | 10 | correct? |
| 14:47 | 11 | A     Yeah. |
| 14:47 | 12 | Q     Yes? |
| 14:47 | 13 | A     Yes. |
| 14:47 | 14 | MR. HELD:   Objection.   Argumentative. |
| 14:47 | 15 | BY MR. McLANE: |
| 14:47 | 16 | Q     Okay.  So on July 28, 2008 you placed him |
| 14:47 | 17 | on Level 1 suicide -- safety cell, right? |
| 14:48 | 18 | MR. BERTLING:   Actually, it's July -- |
| 14:48 | 19 | MR. McLANE:   Maybe it's another day. |
| 14:48 | 20 | MR. BERTLING:   This was written on the 28th.   It |
| 14:48 | 21 | doesn't indicate what date he was placed on it, but |
| 14:48 | 22 | if you go and look at -- |
| 14:48 | 23 | MR. McLANE:   The special housing admit order |
| 14:48 | 24 | says July 28, 2007.  Sorry.  July 28, 2007, not |
| 14:48 | 25 | 2008. |

| 14:48 | 1 | MR. BERTLING:  Correct. |
| 14:48 | 2 | MR. McLANE:  Okay. |
| 14:48 | 3 | Q    Okay.  Looking at Exhibit 82, are any of |
| 14:49 | 4 | these notes yours?  If you could look at each page |
| 14:49 | 5 | and tell me if any of these notes are yours. |
| 14:49 | 6 | A    No. |
| 14:49 | 7 | MR. BERTLING:  There are still a few more. |
| 14:49 | 8 | BY MR. McLANE: |
| 14:49 | 9 | Q    Just go through the whole thing.  So none |
| 14:50 | 10 | of those notes are yours? |
| 14:50 | 11 | A    No. |
| 14:50 | 12 | Q    Okay.  Now, turn to Exhibit 83.  The first |
| 14:50 | 13 | page there appears to be a note dated July 30, 2007. |
| 14:50 | 14 | Is this your writing? |
| 14:50 | 15 | A    Yeah. |
| 14:50 | 16 | Q    Okay.  This is dated July 30, 2007.  Can |
| 14:50 | 17 | you read this note? |
| 14:50 | 18 | A    Refusing medication approximately for 30 |
| 14:50 | 19 | days.  Didn't eat breakfast, lunch today.  On |
| 14:50 | 20 | interview he was cooperative but very vague, evasive |
| 14:50 | 21 | about reason for refusing meals.  I don't know.  He |
| 14:51 | 22 | is hungry and stated he would eat dinner.  Avoid eye |
| 14:51 | 23 | contact.  Mood is subdued.  Again, vague about |
| 14:51 | 24 | suicide intent.  State no hesitantly.  Affect is |
| 14:51 | 25 | depressed. |

| | | | |
|---|---|---|---|
| 14:51 | 1 | Q | What do you mean "state no hesitantly"? |
| 14:51 | 2 | A | He's saying no, hesitant manner. |
| 14:51 | 3 | Q | About when he's suicidal? |
| 14:51 | 4 | A | Yes. |
| 14:51 | 5 | Q | So is that what you mean by vague because |
| 14:51 | 6 | | he's hesitating? |
| 14:51 | 7 | A | Yeah. |
| 14:51 | 8 | Q | He's saying no, but hesitating? |
| 14:51 | 9 | A | No. |
| 14:51 | 10 | Q | Does that indicate that might be suicidal |
| 14:51 | 11 | | to you? |
| 14:51 | 12 | A | He's ambivalent. |
| 14:51 | 13 | Q | Ambivalent did you say? |
| 14:51 | 14 | A | Yeah. |
| 14:51 | 15 | Q | Okay.  Go ahead. |
| 14:51 | 16 | A | Affect is depressed with apparent |
| 14:51 | 17 | | psychomotor deceleration. |
| 14:51 | 18 | Q | What is psychomotor deceleration? |
| 14:51 | 19 | A | It's sign of depression.  Their mental |
| 14:52 | 20 | | activity and physical motion, they are decelerating. |
| 14:52 | 21 | Q | Meaning slowed down? |
| 14:52 | 22 | A | Slowed down, yeah. |
| 14:52 | 23 | Q | Okay.  What does the next line say? |
| 14:52 | 24 | A | Housing, at special housing. |
| 14:52 | 25 | Q | So what does that mean? |

| 14:52 | 1 | A    We're going to house and observe at the |
| 14:52 | 2 | special housing. |
| 14:52 | 3 | Q    Okay.  Is that Level 1, 2 or 3? |
| 14:52 | 4 | A    No.  There's no level indicated.  I don't |
| 14:52 | 5 | know. |
| 14:52 | 6 | MR. BERTLING:  Let's see.  It's on the next page |
| 14:52 | 7 | I think, Doctor. |
| 14:52 | 8 | BY MR. McLANE: |
| 14:52 | 9 | Q    Well, the next page says "Inmate to be |
| 14:52 | 10 | placed on" -- |
| 14:52 | 11 | A    Level 3. |
| 14:52 | 12 | Q    So it's Level 3, is that what that refers |
| 14:52 | 13 | to? |
| 14:52 | 14 | A    Yeah. |
| 14:52 | 15 | Q    Okay.  Now, if you turn to the next page |
| 14:52 | 16 | after that instruction, it's special housing |
| 14:52 | 17 | admission assessment sheet. |
| 14:52 | 18 | Are you familiar with this type of |
| 14:52 | 19 | document? |
| 14:52 | 20 | A    Yeah. |
| 14:52 | 21 | Q    Okay.  And it's dated October 2nd -- excuse |
| 14:53 | 22 | me.  Apologize.  August 2, 2007.  It indicates flat |
| 14:53 | 23 | affect for Mr. Hernandez, zero eye contact, stares |
| 14:53 | 24 | straight ahead, extremely pale. |
| 14:53 | 25 | Did you review this at all? |

| | | |
|---|---|---|
| 14:53 | 1 | A    I don't recall.  I -- I may have. |
| 14:53 | 2 | Q    You could have? |
| 14:53 | 3 | A    Yeah. |
| 14:53 | 4 | Q    Is this a form that you're familiar with in |
| 14:53 | 5 | your practice? |
| 14:53 | 6 | A    Yes.  Yes. |
| 14:53 | 7 | Q    Is it something that you review while a |
| 14:53 | 8 | patient, an inmate patient, is in special housing? |
| 14:53 | 9 | A    Yes. |
| 14:53 | 10 | Q    Okay.  Now, if you could turn to two pages |
| 14:53 | 11 | later.  I believe these are a series of notes by |
| 14:53 | 12 | you. |
| 14:53 | 13 | Are these your notes? |
| 14:53 | 14 | A    Yes. |
| 14:53 | 15 | Q    And I believe it goes on for a page and a |
| 14:53 | 16 | half.  So could you read the first entry, July 31, |
| 14:53 | 17 | 2007? |
| 14:54 | 18 | A    Seen at a cell in the booking area.  He was |
| 14:54 | 19 | probably housed in the booking area.  Cooperative to |
| 14:54 | 20 | interview.  State he started eating.  State he feels |
| 14:54 | 21 | bad, quote unquote, would not elaborate.  Affect and |
| 14:54 | 22 | mood remain depressed.  Dysphoric.  Means more |
| 14:54 | 23 | depressed. |
| 14:54 | 24 | Q    Dysphoria is a depression? |
| 14:54 | 25 | A    Yeah. |

| | | |
|---|---|---|
| 14:54 | 1 | Q    Okay.  Go ahead. |
| 14:54 | 2 | A    Expressing mood.  Avoids eye contact. |
| 14:54 | 3 | Agreed to try another antidepressant. |
| 14:54 | 4 | Q    Per -- what is that? |
| 14:54 | 5 | A    Plan.  Plan is stabilization. |
| 14:54 | 6 | Q    Okay.  Give him medication to stabilize |
| 14:54 | 7 | him? |
| 14:54 | 8 | A    Another antidepressant considering. |
| 14:54 | 9 | Q    Do you know what that antidepressant will |
| 14:54 | 10 | be? |
| 14:54 | 11 | A    I don't -- I don't know.  I have to find |
| 14:54 | 12 | out. |
| 14:54 | 13 | Q    Okay.  Now, there is the next entry, that's |
| 14:54 | 14 | yours too, right? |
| 14:55 | 15 | A    Yeah. |
| 14:55 | 16 | Q    And this is dated August 1, 2007.  Can you |
| 14:55 | 17 | read that? |
| 14:55 | 18 | A    Refused a.m. medication.  Reportedly he's |
| 14:55 | 19 | been eating adequately.  Interview was attempted. |
| 14:55 | 20 | Lying on the mattress with -- |
| 14:55 | 21 | Q    Looks like interview -- |
| 14:55 | 22 | A    -- paper napkin over his eyes. |
| 14:55 | 23 | Q    So when you say interview attempted? |
| 14:55 | 24 | A    I tried to interview, yeah. |
| 14:55 | 25 | Q    But he's like lying on the mattress with |

| | | |
|---|---|---|
| 14:55 | 1 | paper napkin over his eyes? |
| 14:55 | 2 | A    Yeah. |
| 14:55 | 3 | Q    Okay. |
| 14:55 | 4 | A    Would not respond to directions.   Deputy |
| 14:55 | 5 | tried to -- tried by nudging his foot and removing |
| 14:55 | 6 | paper over his face, but no verbal or nonverbal |
| 14:55 | 7 | response.   Plan is close observation. |
| 14:56 | 8 | Q    Okay.   What about the next entry, August 2, |
| 14:56 | 9 | 2007? |
| 14:56 | 10 | A    Stay in bed with blanket over his head and |
| 14:56 | 11 | not responsive.   Approach the door after repeated |
| 14:56 | 12 | urging.   Avoid eye contact and poorly communicative. |
| 14:56 | 13 | Other respect he hasn't eaten breakfast, lunch |
| 14:56 | 14 | today.   Eaten dinner last night, quote unquote, not |
| 14:56 | 15 | hungry.   Moderate psychomotor deceleration noted. |
| 14:56 | 16 | Q    Psychomotor, what did you call it, |
| 14:56 | 17 | deceleration? |
| 14:56 | 18 | A    Deceleration. |
| 14:56 | 19 | Q    Is that the same thing you described, |
| 14:56 | 20 | slowing down? |
| 14:56 | 21 | A    Yeah. |
| 14:56 | 22 | Q    Okay. |
| 14:56 | 23 | A    Plan is close observation and medical |
| 14:56 | 24 | supportive treatment. |
| 14:56 | 25 | Q    Okay.   Now, on August 3, 2007. |

| | | |
|---|---|---|
| 14:56 | 1 | A   Continued refuse to eat, refused a.m. |
| 14:57 | 2 | medication.  Marked psychomotor deceleration noted. |
| 14:57 | 3 | Q   What was in a mocked? |
| 14:57 | 4 | A   Marked. |
| 14:57 | 5 | MR. BERTLING:  Marked. |
| 14:57 | 6 | BY MR. McLANE: |
| 14:57 | 7 | Q   Marked? |
| 14:57 | 8 | A   Yes. |
| 14:57 | 9 | Q   Okay.  So marked -- |
| 14:57 | 10 | A   Increased. |
| 14:57 | 11 | Q   Increased psychomotor deceleration? |
| 14:57 | 12 | A   Noted.  Directable to some extent.  Vague |
| 14:57 | 13 | and evasive.  States he does not know why he's |
| 14:57 | 14 | refusing medication.  States I would eat lunch today |
| 14:57 | 15 | if you want me to. |
| 14:57 | 16 | Q   What does the next line say? |
| 14:57 | 17 | A   Close observation. |
| 14:57 | 18 | Q   On the prior entry you said medical support |
| 14:57 | 19 | on August 2.  What does medical support mean? |
| 14:57 | 20 | A   Just support generally -- just provide |
| 14:57 | 21 | support and reassurance.  Medical support means |
| 14:57 | 22 | medically treating. |
| 14:57 | 23 | Q   Because he wasn't eating and he was slowing |
| 14:57 | 24 | down, decelerating? |
| 14:58 | 25 | A   Providing some liquid and food.  Little |

| 14:58 | 1 | bit. |
| 14:58 | 2 | Q    Okay. |
| 14:58 | 3 | A    Whatever necessary. |
| 14:58 | 4 | Q    Now, turn to the next page.  There's two |
| 14:58 | 5 | entries, August 6 and August 7.  Let's start with |
| 14:58 | 6 | August 6, 2007. |
| 14:58 | 7 | A    August 6.  Eating adequately, but fully |
| 14:58 | 8 | compliant with medication.  More directable and |
| 14:58 | 9 | amenable.  Agree to stay on medication. |
| 14:58 | 10 | Q    That's August 6.  What about August 7? |
| 14:58 | 11 | A    Lying on the bed apparently sleeping. |
| 14:58 | 12 | Would not respond to verbal directions to get up and |
| 14:58 | 13 | approach the door.  He ate breakfast.  Plan is |
| 14:58 | 14 | observation. |
| 14:58 | 15 | Q    On the next page those -- any of those your |
| 14:59 | 16 | notes? |
| 14:59 | 17 | A    No. |
| 14:59 | 18 | Q    And the next page, which is 197, any of |
| 14:59 | 19 | those your notes? |
| 14:59 | 20 | A    No. |
| 14:59 | 21 | Q    And the next page, 196, are any of those |
| 14:59 | 22 | your notes? |
| 14:59 | 23 | A    No. |
| 14:59 | 24 | Q    What about 195? |
| 14:59 | 25 | A    No. |

| 14:59 | 1 | Q     And if you turn to the last page of this |
|---|---|---|
| 14:59 | 2 | exhibit, it says released August 8.  Are you |
| 14:59 | 3 | familiar with that in the CFMG file?  Next page. |
| 14:59 | 4 | Not that page.  There's one more page of this |
| 14:59 | 5 | exhibit. |
| 14:59 | 6 | Are you familiar when it's stamped |
| 14:59 | 7 | "Released," that means he's no longer in custody? |
| 14:59 | 8 | A     Removed from the custody. |
| 14:59 | 9 | Q     Okay.  He either went to prison or another |
| 14:59 | 10 | jail or released out of jail, correct? |
| 14:59 | 11 | A     Or 5150 to jail hospital. |
| 14:59 | 12 | DEPOSITION OFFICER:  I'm sorry.  5115? |
| 14:59 | 13 | THE DEPONENT:  5150. |
| 14:59 | 14 | BY MR. McLANE: |
| 14:59 | 15 | Q     What is 5150? |
| 14:59 | 16 | A     It's 72-hour hold. |
| 15:00 | 17 | Q     Okay.  Do you understand where |
| 15:00 | 18 | Mr. Hernandez was released to? |
| 15:00 | 19 | A     I don't recall. |
| 15:00 | 20 | MR. McLANE:  Okay.  I'm going to take a break |
| 15:00 | 21 | for five minutes.  It's now three o'clock.  So we've |
| 15:00 | 22 | been going an hour and a half. |
| 15:00 | 23 | MR. BERTLING:  Fine. |
| 15:00 | 24 | THE VIDEOGRAPHER:  This is the end of DVD No. 3. |
| 15:00 | 25 | We're going off the record at 1500. |

| | | |
|---|---|---|
| 15:00 | 1 | (Brief recess taken.) |
| 15:22 | 2 | THE VIDEOGRAPHER:  This is the beginning of DVD |
| 15:22 | 3 | No. 4.  We're back on the record at 1522. |
| 15:22 | 4 | BY MR. McLANE: |
| 15:22 | 5 | Q    Okay.  Dr. Jung, I'm going to go to |
| 15:22 | 6 | Mr. Hernandez's next incarceration after being |
| 15:22 | 7 | released in August 2007.  He came back to -- came |
| 15:22 | 8 | back to Ventura County main jail on April 12, 2008. |
| 15:22 | 9 | So I'd ask that you turn to Exhibit 56. |
| 15:22 | 10 | MR. BERTLING:  It's back this way.  56. |
| 15:23 | 11 | MR. McLANE:  Close.  Close.  It's the intake |
| 15:23 | 12 | health screening on April 12, 2008.  We went through |
| 15:23 | 13 | this before. |
| 15:23 | 14 | MR. BERTLING:  Then why do we need to go through |
| 15:23 | 15 | it again? |
| 15:23 | 16 | MR. McLANE:  No, not the whole thing. |
| 15:23 | 17 | Q    This is -- this -- on Page 2 refers to a |
| 15:23 | 18 | phone call by an aunt.  A note taken to -- already |
| 15:23 | 19 | testified to by Nurse Rodelander that she took and |
| 15:23 | 20 | indicated that -- that Nurse Rodelander received a |
| 15:23 | 21 | phone call from Mr. Hernandez's aunt who said my |
| 15:23 | 22 | nephew spoke with a family member and stated it's |
| 15:23 | 23 | over.  I'm ending my life.  When this interviewer, |
| 15:23 | 24 | Ms. Rodelander, questioned the aunt about exact |
| 15:23 | 25 | statements, she wasn't sure and quoted her and said |

| 15:23 | 1 | "Well, I don't know.  He didn't talk to me.  I just |
| 15:23 | 2 | know he's very suicidal." |
| 15:24 | 3 | Do you recall having a discussion with |
| 15:24 | 4 | Nurse Rodelander about having a discussion about the |
| 15:24 | 5 | phone call with the aunt on April 16, 2008? |
| 15:24 | 6 | A    No. |
| 15:24 | 7 | Q    But this is in the progress notes, correct? |
| 15:24 | 8 | A    Yes. |
| 15:24 | 9 | Q    You would have had access to this note if |
| 15:24 | 10 | you had wanted to see it, or you may have seen this, |
| 15:24 | 11 | correct? |
| 15:24 | 12 | A    Yes. |
| 15:24 | 13 | Q    You just don't have any specific |
| 15:24 | 14 | recollection today? |
| 15:24 | 15 | A    No.  No. |
| 15:24 | 16 | Q    Okay.  Okay.  If you could turn to |
| 15:24 | 17 | Exhibit 6.  Now, this is on May 5, 2008, jail |
| 15:25 | 18 | incident report.  Less than a month after his -- |
| 15:25 | 19 | Mr. Hernandez's booking into the jail. |
| 15:25 | 20 | MR. BERTLING:  You mean for this incarceration? |
| 15:25 | 21 | MR. McLANE:  For this incarceration. |
| 15:25 | 22 | Q    Do you recall an incident where |
| 15:25 | 23 | Mr. Hernandez was drooling, not responding to |
| 15:25 | 24 | commands, and it indicates, I believe, that he was |
| 15:25 | 25 | referred to a safety cell?  Do you recall this |

| | | |
|---|---|---|
| 15:25 | 1 | incident? |
| 15:25 | 2 | A    That may be the incident, I'm not sure, |
| 15:26 | 3 | that I saw. |
| 15:26 | 4 | Q    The one that you just recalled on your own? |
| 15:26 | 5 | A    Yeah. |
| 15:26 | 6 | Q    The one that -- |
| 15:26 | 7 | A    He was drooling, nose running. |
| 15:26 | 8 | Q    Yes.   That's what this reports says.   So |
| 15:26 | 9 | you think this is the incident that you recall? |
| 15:26 | 10 | A    I may have seen him. |
| 15:26 | 11 | Q    Okay.   Well, it turns out that -- if you |
| 15:26 | 12 | turn to the third page, it says recommended to |
| 15:26 | 13 | psych.   Safety precautions Level 1 per psychiatrist. |
| 15:26 | 14 | That must have meant you, correct? |
| 15:26 | 15 | A    Yeah. |
| 15:26 | 16 | Q    So based on this incident where you saw him |
| 15:26 | 17 | drooling and acting erratically, you referred him to |
| 15:26 | 18 | Level 1 safety precautions, correct? |
| 15:26 | 19 | A    Yeah. |
| 15:26 | 20 | Q    And then on the next page there is a |
| 15:26 | 21 | special housing admit orders, correct? |
| 15:26 | 22 | A    Yeah. |
| 15:26 | 23 | Q    And under diagnosis, what does that -- |
| 15:26 | 24 | those initials say?   R slash 0, what does that mean? |
| 15:26 | 25 | A    Doesn't mean much.   Rule out psychotic |

| 15:27 | 1 | mental illness. |

15:27  1   mental illness.

15:27  2       Q    Okay.  And he's placed on Level 1 safety

15:27  3   precaution.  Whose initials are next to that at the

15:27  4   top where it says safety precautions Level 1

15:27  5   checked?

15:27  6       MR. BERTLING:  If you know.

15:27  7   BY MR. McLANE:

15:27  8       Q    If you know.  There is some sort of

15:27  9   initials.

15:27  10      A    It looks like a JIR to me.

15:27  11      Q    Oh.  So that's based on the jail incident

15:27  12  report?

15:27  13      A    Yeah.

15:27  14      Q    Okay.  And then it indicates a prescription

15:27  15  VO Dr. Jung.  So do you know what a cocktail is?

15:27  16      A    Yeah.

15:27  17      Q    That's been referred to by previous -- I

15:27  18  believe Nurse Rodelander's testified as to what a

15:27  19  cocktail is.  And it's Haldol, Ativan and Benadryl.

15:27  20           Can you explain the cocktail that you

15:27  21  prescribed on this date?

15:27  22      A    It's for the emergency purpose using

15:27  23  tranquilizer, the rapid tranquilizing and calm them

15:28  24  down.

15:28  25      Q    What is that?  Is that the Haldol or the

| | | |
|---|---|---|
| 15:28 | 1 | Ativan that is the tranquilizer or is it all three? |
| 15:28 | 2 | A    Called a major and minor tranquilizer. |
| 15:28 | 3 | Q    Is the Haldol the major? |
| 15:28 | 4 | A    Major tranquiler, yeah. |
| 15:28 | 5 | Q    To calm a person down who is in an agitated |
| 15:28 | 6 | state? |
| 15:28 | 7 | A    Right. |
| 15:28 | 8 | Q    And the Ativan, is that minor? |
| 15:28 | 9 | A    Minor tranquilizer.  Has the same calming |
| 15:28 | 10 | effect. |
| 15:28 | 11 | Q    What is the Benadryl for, because I've |
| 15:28 | 12 | taken Benadryl myself, but not with a cocktail. |
| 15:28 | 13 | What is the Benadryl for? |
| 15:28 | 14 | MR. BERTLING:  You should try it. |
| 15:28 | 15 | THE DEPONENT:  Some sedative effect, but at the |
| 15:28 | 16 | same time to prevent side effect. |
| 15:28 | 17 | MR. McLANE:  Going to get this in at trial. |
| 15:28 | 18 | Q    Okay.  Go ahead. |
| 15:28 | 19 | A    Side effect may occur from using Haldol. |
| 15:28 | 20 | That reduces the chance of having side effect. |
| 15:28 | 21 | Q    What -- what type of side effects are you |
| 15:28 | 22 | referring to? |
| 15:28 | 23 | A    Called extrapyramidal symptom. |
| 15:29 | 24 | Q    What? |
| 15:29 | 25 | A    Extrapyramidal symptom. |

| 15:29 | 1 | Q   What is extrapyramidal symptom? |
| 15:29 | 2 | A   Usually tremors and muscle stiffness. |
| 15:29 | 3 | Q   Is this common for individuals who are in a |
| 15:29 | 4 | highly agitated state to prescribe this type of |
| 15:29 | 5 | cocktail? |
| 15:29 | 6 | A   Yes. |
| 15:29 | 7 | Q   Okay.  And does it immediately have some |
| 15:29 | 8 | sort of calming effect when you prescribe it? |
| 15:29 | 9 | A   Yes. |
| 15:29 | 10 | Q   Do you know whether this was involuntary or |
| 15:29 | 11 | voluntary when you prescribed it?  Was this an |
| 15:29 | 12 | emergency? |
| 15:29 | 13 | A   Appeared to be involuntary. |
| 15:29 | 14 | Q   Is that the IM now? |
| 15:29 | 15 | A   Injection. |
| 15:29 | 16 | Q   Intramuscular now? |
| 15:29 | 17 | A   Correct. |
| 15:29 | 18 | Q   Did you inject it, or the nurses inject it |
| 15:29 | 19 | per your order? |
| 15:29 | 20 | A   Nurses inject. |
| 15:29 | 21 | Q   Involuntary meaning the deputies are |
| 15:29 | 22 | probably holding him down and then the nurses are |
| 15:29 | 23 | injecting him with the injection? |
| 15:29 | 24 | MR. BERTLING:  Lacks foundation, calls for |
| 15:29 | 25 | speculation that it was involuntary, that he didn't |

| | | |
|---|---|---|
| 15:29 | 1 | agree to it. |
| 15:29 | 2 | But go ahead and answer the question.  Do |
| 15:30 | 3 | you know how it was given? |
| 15:30 | 4 | THE DEPONENT:  I don't know exactly how it was |
| 15:30 | 5 | given. |
| 15:30 | 6 | BY MR. McLANE: |
| 15:30 | 7 | Q     But intramuscular now means involuntary, is |
| 15:30 | 8 | that your understanding? |
| 15:30 | 9 | A     Involuntary. |
| 15:30 | 10 | Q     Is there a way to give this cocktail |
| 15:30 | 11 | voluntarily if they take pills? |
| 15:30 | 12 | A     If he agrees to take medications by mouth. |
| 15:30 | 13 | Q     And it would be the same cocktail but by |
| 15:30 | 14 | mouth? |
| 15:30 | 15 | A     Right. |
| 15:30 | 16 | Q     But have a slower effect than the |
| 15:30 | 17 | injection, correct? |
| 15:30 | 18 | A     Correct. |
| 15:30 | 19 | Q     Now, turn to the next page.  This is your |
| 15:30 | 20 | doctor's orders, and I know it's your initials. |
| 15:30 | 21 | Becoming familiar with your signature.  Could you |
| 15:30 | 22 | read what these orders are on May 5th and May 6th. |
| 15:30 | 23 | A     So he is not in shape to give medication |
| 15:30 | 24 | consent.  So we offer medication, and if they accept |
| 15:30 | 25 | and took it as agreeing to take medication.  So I |

| | | |
|---|---|---|
| 15:31 | 1 | said offer Risperdal, two milligrams BID. |
| 15:31 | 2 | DEPOSITION OFFICER:  I'm sorry.  You're going to |
| 15:31 | 3 | have to say that slower. |
| 15:31 | 4 | MR. BERTLING:  Doctor, it's offer Risperdal. |
| 15:31 | 5 | Could you just repeat that again? |
| 15:31 | 6 | THE DEPONENT:  Offer Risperdal, two milligrams |
| 15:31 | 7 | BID. |
| 15:31 | 8 | BY MR. McLANE: |
| 15:31 | 9 | Q    What does BID mean? |
| 15:31 | 10 | A    Twice a day.  And Doxepin, 75 milligrams at |
| 15:31 | 11 | bedtime. |
| 15:31 | 12 | Q    Okay.  So this means it's offered, but he |
| 15:31 | 13 | didn't take it? |
| 15:31 | 14 | A    I don't quite -- he will take it or not |
| 15:31 | 15 | take it.  We will offer and see.  It's up to him. |
| 15:31 | 16 | Q    So it's your orders to offer it? |
| 15:31 | 17 | A    Yeah. |
| 15:31 | 18 | Q    Does it indicate on here that he took it or |
| 15:31 | 19 | not? |
| 15:31 | 20 | A    No, it didn't indicate whether he took it |
| 15:31 | 21 | or not. |
| 15:31 | 22 | Q    And this would have been something that |
| 15:31 | 23 | would have been done after he took the cocktail? |
| 15:31 | 24 | A    Right. |
| 15:31 | 25 | Q    Okay.  And on May 6 what does it say? |

| | | |
|---|---|---|
| 15:31 | 1 | A    Discontinue special precaution and rehouse |
| 15:31 | 2 | per classification. |
| 15:31 | 3 | Q    And what does it say, discontinue Risperdal |
| 15:31 | 4 | and Doxepin? |
| 15:32 | 5 | A    And Doxepin.  Yeah.  He refused obviously |
| 15:32 | 6 | the medication. |
| 15:32 | 7 | Q    How do you know he refused?  Where is that |
| 15:32 | 8 | note for that? |
| 15:32 | 9 | A    I'm just assuming.  When I discontinued. |
| 15:32 | 10 | Q    Because he wasn't taking it, that he |
| 15:32 | 11 | discontinued, but is there anything that indicates |
| 15:32 | 12 | that he discontinued? |
| 15:32 | 13 | MR. BERTLING:  There is actually a note on 5/6. |
| 15:32 | 14 | THE DEPONENT:  He refused to take a medication. |
| 15:32 | 15 | MR. McLANE:  Which page are you referring? |
| 15:32 | 16 | MR. BERTLING:  000174.  There's a note, May 6, |
| 15:32 | 17 | 2008 time 12:20. |
| 15:32 | 18 | MR. McLANE:  What page are you referring to? |
| 15:32 | 19 | MR. BERTLING:  It's 134 down at the bottom here. |
| 15:32 | 20 | MR. McLANE:  Hold on. |
| 15:32 | 21 | MR. BERTLING:  It's part of the same exhibit. |
| 15:32 | 22 | MR. McLANE:  I know.  I'm looking.  Sorry.  174? |
| 15:32 | 23 | Q    Is that a note by you or Ms. Moskowitz, |
| 15:32 | 24 | or -- or this note above on 5/6, is that your note? |
| 15:32 | 25 | A    174? |

| | | |
|---|---|---|
| 15:32 | 1 | Q    On 174.  Are you reading the upper note? |
| 15:32 | 2 | A    Yeah.  Yeah. |
| 15:32 | 3 | Q    Is that your note? |
| 15:32 | 4 | A    That's my note. |
| 15:32 | 5 | Q    Okay.  Can you read that note on May 6, |
| 15:32 | 6 | 2008? |
| 15:33 | 7 | A    Seen at the safety cell in the booking. |
| 15:33 | 8 | Coherent and calm.  Claimed he has not done anything |
| 15:33 | 9 | unusual.  I just put my hand over my ears.  Unable |
| 15:33 | 10 | or unwilling to explain his behavior the day before |
| 15:33 | 11 | yesterday.  I just feel like doing that.  Maybe I |
| 15:33 | 12 | miss my -- miss my family.  I was not screaming.  I |
| 15:33 | 13 | was not crying.  Adamant about not taking |
| 15:33 | 14 | medication. |
| 15:33 | 15 | Apparently he has refused to take |
| 15:33 | 16 | medication. |
| 15:33 | 17 | Q    Okay.  So this was the basis for you |
| 15:33 | 18 | discontinuing it -- |
| 15:33 | 19 | A    Yeah. |
| 15:33 | 20 | Q    -- per your order? |
| 15:33 | 21 | A    Yes. |
| 15:33 | 22 | Q    Okay.  What do the next two lines indicate? |
| 15:33 | 23 | A    Discontinue -- |
| 15:33 | 24 | Q    Plan? |
| 15:33 | 25 | A    -- special precaution and discontinue |

| | | |
|---|---|---|
| 15:33 | 1 | medication. |
| 15:33 | 2 | Q   Okay.  I see.  Now, but you saw him the day |
| 15:33 | 3 | before, and he was crying, wasn't he? |
| 15:33 | 4 | A   Yeah. |
| 15:33 | 5 | Q   So he was denying that he was crying when |
| 15:34 | 6 | he was crying? |
| 15:34 | 7 | A   I have a note for -- |
| 15:34 | 8 | Q   What? |
| 15:34 | 9 | A   I have a note in 175, previous. |
| 15:34 | 10 | Q   Oh, okay.  Is this your note? |
| 15:34 | 11 | A   Yeah. |
| 15:34 | 12 | Q   Okay. |
| 15:34 | 13 | A   I printed. |
| 15:34 | 14 | Q   Yeah.  You know, because it seems different |
| 15:34 | 15 | than your other handwriting.  So I didn't recognize |
| 15:34 | 16 | it right away. |
| 15:34 | 17 | So you print and you handwrite sometimes? |
| 15:34 | 18 | MR. BERTLING:  We still can't read it. |
| 15:34 | 19 | BY MR. McLANE: |
| 15:34 | 20 | Q   So this is your note about that incident, |
| 15:34 | 21 | right? |
| 15:34 | 22 | A   Probably. |
| 15:34 | 23 | Q   So why don't you read your note on May 5, |
| 15:34 | 24 | 2008.  Go ahead. |
| 15:34 | 25 | A   Twenty-year old single Hispanic female, |

| | | |
|---|---|---|
| 15:34 | 1 | father of one.   History of mood -- |
| 15:34 | 2 | Q    Did you say female or male? |
| 15:34 | 3 | A    Male. |
| 15:34 | 4 | Q    I think you said female.  Go ahead. |
| 15:34 | 5 | A    Hispanic male, father of one with history |
| 15:34 | 6 | of mood instability and rage reaction.  In custody |
| 15:34 | 7 | for assault with deadly weapon.  Attempted a second |
| 15:34 | 8 | degree robbery, resisting and power hold.  Placed at |
| 15:35 | 9 | safety cell and received emergent medication after |
| 15:35 | 10 | he was observed, evaluated for erratic unusual |
| 15:35 | 11 | behavior in the morning.  He was not responding and |
| 15:35 | 12 | appeared upset.  He was weeping and crying with his |
| 15:35 | 13 | head in his knees wailing, highly tense with his |
| 15:35 | 14 | neck vein protruding.  Would not respond to |
| 15:35 | 15 | directions or questions. |
| 15:35 | 16 | Q    Now -- okay.  Now, is this something you |
| 15:35 | 17 | observed or something that someone reported to you? |
| 15:35 | 18 | A    No.  I observed I think.  This is what I |
| 15:35 | 19 | observed. |
| 15:35 | 20 | Q    Okay. |
| 15:35 | 21 | MR. BERTLING:  Is this the incident you were |
| 15:35 | 22 | talking about earlier? |
| 15:35 | 23 | THE DEPONENT:  Right.  But this is the only time |
| 15:35 | 24 | I remember. |
| 15:35 | 25 | /// |

| | | |
|---|---|---|
| 15:35 | 1 | BY MR. McLANE: |
| 15:35 | 2 | Q   Go ahead with the rest of the note. |
| 15:35 | 3 | A   Interview was attempted later.  He was |
| 15:35 | 4 | lying on the floor.  Apparently slept for many hours |
| 15:35 | 5 | because he got emergency medication.  Apparently |
| 15:36 | 6 | awake but would not respond to directions.  Vital |
| 15:36 | 7 | sign were within normal limits.  Impression, mood |
| 15:36 | 8 | disorder, NOS, and plan is close observation. |
| 15:36 | 9 | Q   Okay.  And then you discontinued it on May |
| 15:36 | 10 | 6th, and he was housed back to general housing, |
| 15:36 | 11 | correct? |
| 15:36 | 12 | A   Right. |
| 15:36 | 13 | Q   That's what your note indicated. |
| 15:36 | 14 | Okay.  So you ordered him on Level 1 safety |
| 15:36 | 15 | precaution on this occasion? |
| 15:36 | 16 | A   Initially, yes. |
| 15:36 | 17 | Q   Because you believed he was a suicide risk |
| 15:36 | 18 | at that time? |
| 15:36 | 19 | A   He was not fit to be housed anywhere at the |
| 15:36 | 20 | moment. |
| 15:36 | 21 | Q   So you're saying that he wasn't a suicide |
| 15:36 | 22 | risk? |
| 15:36 | 23 | A   It was not necessarily suicide risk. |
| 15:36 | 24 | Q   But do you have any independent |
| 15:36 | 25 | recollection one way or another whether he was a |

| | | |
|---|---|---|
| 15:44 | 1 | BY MR. McLANE: |
| 15:44 | 2 | Q    Turn to the third page.  It's sobering |
| 15:44 | 3 | safety cell restraints log. |
| 15:44 | 4 | DEPOSITION OFFICER:  I'm sorry. |
| 15:44 | 5 | MR. BERTLING:  Sobering safety cell restraints |
| 15:44 | 6 | log. |
| 15:44 | 7 | BY MR. McLANE: |
| 15:44 | 8 | Q    Are you familiar with that form? |
| 15:44 | 9 | A    Yes. |
| 15:44 | 10 | Q    This is something you review when you're |
| 15:44 | 11 | analyzing an inmate patient situation? |
| 15:44 | 12 | A    Yes. |
| 15:45 | 13 | Q    Okay.  Turn to Exhibit 14.  This is a -- |
| 15:45 | 14 | the third time he's placed on safety cell Level 1 |
| 15:45 | 15 | precautions during -- after May -- April 12, 2008, |
| 15:45 | 16 | and it indicates on Page 2 -- can you look at |
| 15:45 | 17 | Page 2? |
| 15:45 | 18 | MR. BERTLING:  Is this 18?  Sorry. |
| 15:45 | 19 | MR. McLANE:  Right. |
| 15:45 | 20 | MR. BERTLING:  Wait a second. |
| 15:45 | 21 | MR. McLANE:  You were there.  Exhibit 14. |
| 15:45 | 22 | MR. BERTLING:  You had yours circled. |
| 15:45 | 23 | BY MR. McLANE: |
| 15:45 | 24 | Q    Okay.  Now, did you -- this indicates that |
| 15:45 | 25 | you placed him on Level 1 safety cell precautions |

| | | |
|---|---|---|
| 15:45 | 1 | for bizarre behavior and danger to self per |
| 15:45 | 2 | Dr. Jung, correct? |
| 15:45 | 3 | A    Yeah. |
| 15:45 | 4 | Q    Okay.  Now turn to the next page.  Did you |
| 15:46 | 5 | give an order on June 3rd -- 30th to again give him |
| 15:46 | 6 | an emergency cocktail of Benadryl, Haldol and |
| 15:46 | 7 | Ativan? |
| 15:46 | 8 | A    Muscular. |
| 15:46 | 9 | Q    Muscular? |
| 15:46 | 10 | A    Yeah. |
| 15:46 | 11 | Q    Okay.  And intramuscular? |
| 15:46 | 12 | MR. BERTLING:  Actually says at the top |
| 15:46 | 13 | telephone order Dr. Jung. |
| 15:46 | 14 | BY MR. McLANE: |
| 15:46 | 15 | Q    So that's the telephone order to you -- |
| 15:46 | 16 | from you to Bennewate, correct? |
| 15:46 | 17 | A    Right. |
| 15:46 | 18 | Q    Do you know who Nurse Bennewate is?  Do you |
| 15:46 | 19 | recall her? |
| 15:46 | 20 | A    No. |
| 15:46 | 21 | Q    Okay.  Is this your signature at the bottom |
| 15:46 | 22 | here, on the bottom right? |
| 15:46 | 23 | A    Yeah, called this in. |
| 15:46 | 24 | Q    So explain this to me.  You gave a |
| 15:46 | 25 | telephone order to place him on Level 1 safety |

| | | |
|---|---|---|
| 15:46 | 1 | precautions and then came in and gave him the |
| 15:46 | 2 | cocktail or ordered the cocktail?  I'm trying to |
| 15:46 | 3 | figure it out because you signed it at the bottom, |
| 15:46 | 4 | but you gave the telephone order to place -- |
| 15:46 | 5 | A    I signed later. |
| 15:46 | 6 | Q    So you gave a telephone order to give the |
| 15:47 | 7 | cocktail, and then you signed it to verify you gave |
| 15:47 | 8 | that order? |
| 15:47 | 9 | A    Later, yeah. |
| 15:47 | 10 | Q    Okay.  Do you know why you gave him the |
| 15:47 | 11 | cocktail? |
| 15:47 | 12 | A    Probably he was in, again, urgent |
| 15:47 | 13 | situation. |
| 15:47 | 14 | Q    Urgent situation? |
| 15:47 | 15 | A    Danger to self and bizarre behavior, that's |
| 15:47 | 16 | what they say. |
| 15:47 | 17 | Q    So would you have been -- it's not based on |
| 15:47 | 18 | your observation but relying on the information they |
| 15:47 | 19 | gave you -- |
| 15:47 | 20 | A    Correct. |
| 15:47 | 21 | Q    -- about the situation? |
| 15:47 | 22 | A    Correct. |
| 15:47 | 23 | Q    And then you issued the order. |
| 15:47 | 24 | Now, if you turn to doctor's orders on |
| 15:47 | 25 | Page 18. |

| 15:47 | 1 | MR. BERTLING:  We're there. |
| 15:47 | 2 | MR. McLANE:  Okay. |
| 15:47 | 3 | Q    Now, are these -- does the cocktail that |
| 15:47 | 4 | you referred to on the special housing admit order, |
| 15:47 | 5 | is that the cocktail listed here? |
| 15:47 | 6 | MR. BERTLING:  No.  Well, I'll let him answer |
| 15:47 | 7 | that question. |
| 15:47 | 8 | BY MR. McLANE: |
| 15:47 | 9 | Q    On July 3rd, 2008? |
| 15:48 | 10 | MR. BERTLING:  This looks like a different -- |
| 15:48 | 11 | BY MR. McLANE: |
| 15:48 | 12 | Q    Would that have been a different day? |
| 15:48 | 13 | A    Second one. |
| 15:48 | 14 | Q    Oh, so you gave him -- wait.  Maybe.  Maybe |
| 15:48 | 15 | I got this wrong. |
| 15:48 | 16 | MR. BERTLING:  The other one is dated -- |
| 15:48 | 17 | THE DEPONENT:  June 30. |
| 15:48 | 18 | MR. BERTLING:  -- June 30.  This one is -- |
| 15:48 | 19 | MR. McLANE:  Is July 3rd. |
| 15:48 | 20 | MR. BERTLING:  Yes. |
| 15:48 | 21 | BY MR. McLANE: |
| 15:48 | 22 | Q    So you gave him a cocktail on June 30 and a |
| 15:48 | 23 | cocktail on July 3rd; is that correct? |
| 15:48 | 24 | A    Correct.  Correct. |
| 15:48 | 25 | Q    When you give the cocktail, would they be |

| 15:48 | 1 | required to be in special Level Housing 1 safety |
| 15:48 | 2 | cell? |
| 15:48 | 3 | A    Not necessarily. |
| 15:48 | 4 | Q    Would they be in some sort of Level 1, 2 or |
| 15:48 | 5 | 3? |
| 15:48 | 6 | A    Usually that's the case, but not |
| 15:48 | 7 | necessarily. |
| 15:48 | 8 | Q    To monitor them after you give them the |
| 15:48 | 9 | cocktail? |
| 15:48 | 10 | A    Yeah. |
| 15:48 | 11 | Q    Usually but not necessarily.  Have you ever |
| 15:48 | 12 | given a cocktail and they're not in Level 1, 2 or 3 |
| 15:49 | 13 | safety precautions? |
| 15:49 | 14 | A    Possible, probably.  They don't have to. |
| 15:49 | 15 | Q    Not in your experience? |
| 15:49 | 16 | MR. BERTLING:  They also could be in special |
| 15:49 | 17 | housing in the infirmary. |
| 15:49 | 18 | BY MR. McLANE: |
| 15:49 | 19 | Q    Well, is there other places they could be |
| 15:49 | 20 | housed to be given the cocktail? |
| 15:49 | 21 | A    Yeah. |
| 15:49 | 22 | Q    Okay.  Where would that have been? |
| 15:49 | 23 | A    If there is urgent situation on the quad, |
| 15:49 | 24 | then they may get the cocktail. |
| 15:49 | 25 | Q    Right there on the quad? |

| | | | |
|---|---|---|---|
| 15:49 | 1 | A | Yeah. |
| 15:49 | 2 | Q | In their -- where they're housed? |
| 15:49 | 3 | A | Right. |
| 15:49 | 4 | Q | But then would they have been transferred |

15:49   5   some place to be monitored?

| | | | |
|---|---|---|---|
| 15:49 | 6 | A | Most likely. |
| 15:49 | 7 | Q | Where would that have been? |
| 15:49 | 8 | A | Special housing. |
| 15:49 | 9 | Q | Special housing is where the safety cells |

15:49   10   are, right?

| | | | |
|---|---|---|---|
| 15:49 | 11 | A | Right. |
| 15:50 | 12 | Q | Okay.  Turn to the next page, Page 172. |
| 15:50 | 13 | | MR. BERTLING:  We're there. |
| 15:50 | 14 | | BY MR. McLANE: |
| 15:50 | 15 | Q | These are your notes, correct? |
| 15:50 | 16 | A | Yeah. |
| 15:50 | 17 | Q | Can you read the notes?  I don't think |

15:50   18   we're reviewed these notes, have we?  I don't think

15:50   19   so.

| | | | |
|---|---|---|---|
| 15:50 | 20 | A | Placed in safety cell -- |
| 15:50 | 21 | | MR. BERTLING:  Doctor, could you give the dates? |
| 15:50 | 22 | | THE DEPONENT:  July 1, '08.  Eleven o'clock. |

15:50   23   Placed at the safety cell last night.  So I'm seeing

15:50   24   the person the following day.  After he was observed

15:50   25   intentionally holding his breath, tensing his

| 15:50 | 1 | extremities, fist clenched, jaw tightened, not |
| 15:50 | 2 | responding to directions. |
| 15:50 | 3 | BY MR. McLANE: |
| 15:50 | 4 | Q    Now, that's not based on your observation |
| 15:50 | 5 | or based on what you were told? |
| 15:50 | 6 | A    Based on my review of the record and |
| 15:51 | 7 | probably talking with somebody. |
| 15:51 | 8 | Q    Okay.  Continue. |
| 15:51 | 9 | A    Not responding to directions.  Received |
| 15:51 | 10 | emergent medication as danger to self.  This a.m. |
| 15:51 | 11 | interview was attempted.  He was lying on the floor |
| 15:51 | 12 | not responding.  No muscle tension.  No resistance |
| 15:51 | 13 | to vital sign procedures.  When spoken to he state |
| 15:51 | 14 | he is fine without moving or opening his eyes. |
| 15:51 | 15 | Admits that he was upset, but refused to elaborate |
| 15:51 | 16 | Changed to special precaution to Level 3 and |
| 15:51 | 17 | continue close observation. |
| 15:51 | 18 | Q    So he was on Level 1, and then you changed |
| 15:51 | 19 | it to Level 3? |
| 15:51 | 20 | A    Level 3, yeah. |
| 15:51 | 21 | Q    Okay.  Read the next entry, which is -- |
| 15:51 | 22 | A    July 2, '08.  Observed -- |
| 15:51 | 23 | Q    Excuse me.  Strike that.  Before you read |
| 15:52 | 24 | it. |
| 15:52 | 25 | So when you say "close observation," that's |

| | | |
|---|---|---|
| 15:52 | 1 | .. your determination that you need -- that his |
| 15:52 | 2 | behavior warrants continued monitoring? |
| 15:52 | 3 | A    Full observation, right. |
| 15:52 | 4 | Q    Okay.  So go to July 2, 2008. |
| 15:52 | 5 | A    Observed writhing, tonic, athetoid manner. |
| 15:52 | 6 | Q    That's your observation, correct? |
| 15:52 | 7 | A    Yeah, right. |
| 15:52 | 8 | Q    What does tonic mean? |
| 15:52 | 9 | A    Tensing. |
| 15:52 | 10 | Q    Rigid? |
| 15:52 | 11 | A    Yeah, rigid, tensing. |
| 15:52 | 12 | Q    And what's ath- -- did you say athetoid? |
| 15:52 | 13 | A    Athetoid.  Little bit like a moving around. |
| 15:52 | 14 | Q    Like he's tense but like kind of twisting |
| 15:52 | 15 | his body? |
| 15:52 | 16 | A    Moving around, yeah. |
| 15:52 | 17 | Q    Okay. |
| 15:52 | 18 | A    Same as writhing I guess. |
| 15:52 | 19 | Q    Okay. |
| 15:52 | 20 | A    Not directable.  Sat on the bed when |
| 15:52 | 21 | instructed by the deputy after -- |
| 15:53 | 22 | MR. BERTLING:  With his head down. |
| 15:53 | 23 | THE DEPONENT:  With his head down.  Apparently |
| 15:53 | 24 | is aware of surrounding.  Peeking at interviewer |
| 15:53 | 25 | once in awhile.  No verbal response, and the plan is |

| | | |
|---|---|---|
| 15:53 | 1 | offer medication. |
| 15:53 | 2 | BY MR. McLANE: |
| 15:53 | 3 |    Q   Okay.  That's July 2, 2008.  Now, there is |
| 15:53 | 4 | an entry on the next page, July 3, 2008. |
| 15:53 | 5 |    A   Remain resistive.  Lying on the bed not |
| 15:53 | 6 | responding to directions.  Screams intermittently. |
| 15:53 | 7 | Refusing medications.  Apparently eating adequately. |
| 15:53 | 8 | No verbal response to questions.  Continue to offer |
| 15:53 | 9 | medication, and observation. |
| 15:53 | 10 |    Q   Now, if you turn to Page 120, any of these |
| 15:54 | 11 | entries yours on 120? |
| 15:54 | 12 |    A   No. |
| 15:54 | 13 |    Q   Okay.  What about on 118? |
| 15:54 | 14 |    A   No. |
| 15:54 | 15 |    Q   Okay.  Now, turn to Page 122. |
| 15:54 | 16 |    MR. BERTLING:  What is that? |
| 15:54 | 17 |    MR. McLANE:  That's toward the end of |
| 15:54 | 18 | Exhibit 114. |
| 15:54 | 19 |    MR. BERTLING:  I have it.  Thank you. |
| 15:54 | 20 | BY MR. McLANE: |
| 15:54 | 21 |    Q   Now, are any of these your notes? |
| 15:54 | 22 |    A   No. |
| 15:54 | 23 |    Q   Okay.  I note it indicates Ventura County |
| 15:54 | 24 | Sheriff's Department.  So it's probably not a form |
| 15:54 | 25 | you would write on, correct?  At the top it says -- |

| | | |
|---|---|---|
| 15:55 | 1 | A      Looks like a nursing -- nurse's notes. |
| 15:55 | 2 | Q      Okay.  Turn to the next page.  Now, there's |
| 15:55 | 3 | special housing discharge orders dated 7/6/08.  Do |
| 15:55 | 4 | you recall -- it appears to be a talking order from |
| 15:55 | 5 | you. |
| 15:55 | 6 | What does this order say on July 6? |
| 15:55 | 7 | A      Recommended discharge of special precaution |
| 15:55 | 8 | and rehouse per classification. |
| 15:55 | 9 | Q      Diagnosis, what does it say there? |
| 15:55 | 10 | A      Mood disorder with psychotic features and |
| 15:55 | 11 | antisocial personality disorder. |
| 15:55 | 12 | Q      And then below it, 7/10/08, are these -- it |
| 15:55 | 13 | appears to be your signature. |
| 15:55 | 14 | A      Yeah. |
| 15:55 | 15 | Q      Oh, you signed off on the discharge orders, |
| 15:55 | 16 | right? |
| 15:55 | 17 | A      Right. |
| 15:55 | 18 | Q      Below where it says talking order Dr. Jung, |
| 15:56 | 19 | Nurse Moskowitz, and then you signed, correct? |
| 15:56 | 20 | A      Yes. |
| 15:56 | 21 | Q      And below it, July 10, 2008, what does that |
| 15:56 | 22 | note say? |
| 15:56 | 23 | A      Return in one week.  Clear from special |
| 15:56 | 24 | precaution.  The nurse will follow up in one week. |
| 15:56 | 25 | So as a psych nurse on July 11, but this was more |

| 15:56 | 1 | needing attention.  So I wrote the psych nurse line |
| 15:56 | 2 | next day, and offer extra fluid and the vital signs |
| 15:56 | 3 | QD for one week and weigh every Tuesday for one |
| 15:56 | 4 | month. |
| 15:56 | 5 | Q    Was that because he was losing weight and |
| 15:56 | 6 | not eating? |
| 15:56 | 7 | A    Yeah, right. |
| 15:56 | 8 | Q    He was refusing food during this time |
| 15:56 | 9 | period? |
| 15:56 | 10 | A    I think so. |
| 15:56 | 11 | Q    And you were concerned about his weight |
| 15:56 | 12 | loss? |
| 15:56 | 13 | A    Yes. |
| 15:56 | 14 | Q    Okay.  And then the next page it appears |
| 15:57 | 15 | July 6 you discontinued safety precautions, correct? |
| 15:57 | 16 | A    Yes. |
| 15:57 | 17 | Q    Turn to Exhibit 16.  I don't believe I |
| 15:57 | 18 | showed you this exhibit. |
| 15:57 | 19 | MR. BERTLING:  We're there. |
| 15:57 | 20 | BY MR. McLANE: |
| 15:57 | 21 | Q    This is the competency evaluation prepared |
| 15:57 | 22 | by Dr. Jimenez, and just review it real quickly.  I |
| 15:57 | 23 | just want to find out have you ever seen this |
| 15:57 | 24 | before? |
| 15:57 | 25 | A    No. |