# EXHIBIT K

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

ESTHER BISELLI AND THE ESTATE     )
OF DANIEL T. HERNANDEZ, BY AND    )
THROUGH HIS PERSONAL              )
REPRESENTATIVE ESTHER BISELLI;    )
K.N.H., [NAME REDACTED] A MINOR,  )
BY AND THROUGH HER GUARDIAN AND   )
MOTHER, AMBER RODRIGUEZ,          )
                                  )
          PLAINTIFFS,             )
                                  ) CASE NO.
          VS.                     ) CV 09-08694-CAS(Ex)
                                  )
COUNTY OF VENTURA, VENTURA        )
COUNTY SHERIFFS DEPARTMENT;       )
SHERIFF BOB BROOKS; CALIFORNIA    )
FORENSIC MEDICAL GROUP;           )
TAYLOR FITHIAN, M.D., DR. JOHN    )
KORZELIUS, DR. MELVIN MYUNG       )
JUNG, MARIA BAEZLIN, DOES 1       )
THROUGH 10, INCLUSIVE,            )
                                  )
          DEFENDANTS.             )
_____    )

VIDEOTAPED DEPOSITION OF MATTHEW KOENIG

FRIDAY, APRIL 15, 2011

FILE NO.   110415KAE

REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

16:12:16   1        A      No, there's not.

         2        Q      And while you're a deputy in the

         3   Administrative Segregation unit, you indicated that

         4   there are hourly scans; is that right?

16:12:39   5        A      Correct.

         6             MR. HELD:   Wait.   The use of the word

         7   "scans," you mean checks confirmed by --

         8             MR. McLANE:   I'll ask him to define

         9   "scans."

16:12:50  10   BY MR. McLANE:

        11        Q      I mean, you used the word "scans" yourself.

        12        A      Right.

        13        Q      What do you refer to -- what do you mean by

        14   "scans"?

16:12:56  15        A      Once an hour we use a Guard system, it's a

        16   pipe that we scan the cell doors and we physically

        17   check to make sure that the inmate is breathing and

        18   they physically look okay.

        19             MR. HELD:   And you place this Guard 1 PIPE

16:13:10  20   against a card reading cartouche?

        21             THE WITNESS:   It's a little button on the

        22   door.

        23   BY MR. McLANE:

        24        Q      And tell me how this physically works, that

16:13:28  25   you use what you call this pipe to scan a particular

                                                                95

16:13:34 1   cell?

2        A     There is a --

3        Q     And this applies throughout the jail,

4   right?

16:13:41 5        A     Correct.

6        Q     These checks?

7        A     Correct.

8        Q     Okay.

9        A     Once an hour a deputy has to scan the cell

16:13:46 10  doors.  There's a scanner attached to the other end,

11  a little metal piece that fits the scan pipe, so you

12  scan that and then you physically look to see if the

13  person is breathing, if there's any injuries.

14       Q     You physically look through the --

16:14:05 15       A     The inmate's --

16       Q     The inmates's window.  And can you describe

17  that window in the Administrative Segregation unit

18  as it existed as of February 16th, 2009?

19       A     You mean the size of it?

16:14:15 20       Q     The size of it.

21       A     It's approximately a two foot to two and a

22  half foot square window in the middle of the cell.

23       Q     One moment.  If you could turn to

24  Exhibit 9.  It's in the binder with a tab.  You see

16:14:57 25  a piece of paper in the middle of the door.  Is this

96

16:33:45  1        A        Correct.

       2        Q        Okay.  And it's their responsibility to

       3   obtain the waiver or not?  Not your responsibility?

       4        A        Right.

16:34:02  5        Q        In talking about the Administrative

       6   Segregation wing, it's also referred to as the shoe

       7   unit in the jail?

       8        A        It's not very regularly called that, but...

       9        Q        What do you call it?

16:34:15 10        A        I call it -- I call it Seg.

      11        Q        Just Seg?

      12        A        Seg.  It's also nicknamed the dungeon.  It

      13   gets dark in there.  You know, but it's usually just

      14   Seg.

16:34:25 15        Q        It's darker than the other parts of the

      16   jail?

      17        A        Maybe a little bit, yeah.

      18        Q        Okay.  And how many cells are in the

      19   Administrative Segregation unit?

16:34:42 20        A        Approximately 15, 16, I think.

      21        Q        Okay.  From the desk where you're sitting

      22   at in Administrative Segregation, can you hear the

      23   inmates in their cells if they're talking to each

      24   other through the walls?

16:35:02 25        A        Yeah.  Clearly.

                                                            111

17:01:18  1   was handcuffed and then you entered the cell to take

2   him for a visit?

3       A   We didn't enter his cell.  After we

4   handcuffed him he came outside.

17:01:26  5       Q   Now, I know there's basically the cell --

6       A   Uh-huh.

7       Q   -- and then there's a sally port in front

8   of it --

9       A   Right.

17:01:31 10       Q   -- like a little room, and then there's the

11   hallway.  Where did this incident occur?

12       A   This happened in the Seg hallway, so it was

13   out of the sally port, out of his cell.  It was past

14   the second door.

17:01:48 15       Q   Okay.  And it appears that in this report,

16   you quote Mr. Hernandez?

17       A   Yes.

18       Q   And that's because those are the statements

19   you remembered him making?

17:02:04 20       A   Yes.

21       Q   He said, "Don't tell me to get ready.  Just

22   do it."

23       A   Yes.

24       Q   And he also said, "You know what you say

17:02:12 25   about the bulldog"?

127

17:02:14  1        A     Yes.

        2        Q     Did you understand what he was referring to

        3    when he said bulldog?

        4        A     No, I don't.

17:02:19  5        Q     Okay.  Did that seem strange to you that he

        6    used that language?

        7              MR. SHLENS:  That's vague.

        8              THE WITNESS:  All I can remember about that

        9    incident was Deputy Eisenhard told me the day prior

17:02:34 10    he made some statements to him, saying something

       11    about a bulldog and just basically threatening staff

       12    or challenging staff or something.  It's vague.  I

       13    don't remember exactly --

       14    BY MR. McLANE:

17:02:49 15        Q     Okay.

       16        A     -- from way back then.

       17        Q     In your experience do inmates usually look

       18    forward to visits?

       19        A     That depends.

17:03:15 20        Q     Answer the question however you want to

       21    answer it.

       22        A     Yeah.  It depends.

       23              MR. HELD:  I mean, I think it depends on

       24    the visitor.  For instance, if your pastor is

17:03:21 25    visiting you, you would look forward to it.

                                                    128

17:04:26  1   hypothetical, calls for speculation, calls for

2   expert opinion from a lay witness.

3          MR. SHLENS:  Join.

4          THE WITNESS:  I think he appeared to want

17:04:38  5   to challenge staff to fight.  I don't think he was a

6   danger to himself at that point.  He may have tried

7   to be a danger to staff, but he was handcuffed, so

8   there wasn't much damage he could have done besides

9   to his head.

17:04:55  10  BY MR. McLANE:

11         Q    You knew that he was a psych inmate based

12  on the P, correct?

13         A    Yes.

14         Q    Okay.  Did you inform the psychiatric staff

17:05:04  15  about his behavior on this day?

16         A    I don't recall.

17         Q    Well, let's turn to the second page of this

18  report.  It indicates that he was placed in an

19  alternate environment; is that right?

17:05:19  20        A    Right.

21         Q    So he wasn't placed in a safety cell; is

22  that right?

23         A    That's correct.

24         Q    And if you turn to the second page of the

17:05:34  25  exhibit, it's Deputy Eisenhard's report.  And if you

                                                           130

17:05:42 1    look at the bottom there on that page, it indicates

2    that Nurse Nestle evaluated Mr. Hernandez?

3       A    Correct.

4       Q    Who is Nurse Nestle?

17:05:55 5       A    I don't remember her personally, but I know

6    she's a medical -- medical nurse.

7       Q    She's not a psychiatric nurse?

8       A    I don't know.  I know she's a booking

9    nurse.  Sometimes a medical nurse later will be

17:06:11 10   psych nurses.  But it appears here that maybe she

11   was checking him for injuries.

12       Q    You gave a major write up for this?

13       A    Yes.

14       Q    And did you attend his disciplinary

17:06:32 15   hearing?

16       A    No.

17       Q    Or how did that work?

18       A    The senior does the disciplinary hearing.

19   They're the one that talks to the inmate and finds

17:06:39 20   him guilty or not guilty.

21       Q    Is it an actual hearing or do they just

22   talk to the inmate and make a decision as to whether

23   to sustain the recommended discipline by you?

24       A    They talk to the inmate.  They get their

17:06:56 25   side of the story.

                                          131

17:57:50  1          A     No, I don't.

       2          Q     Are you aware that any of them were

       3    cross-trained to respond to psychiatric issues as of

       4    February 16th, 2009 and before?

17:58:04  5          A     I don't recall back then if there were or

       6    not.

       7          Q     Now, if there's an inmate that you believe

       8    should be on Level 1, 2 or 3, would you walk them

       9    over to the Medical Housing unit, or how does that

17:58:20 10    work?

      11          A     It depends where they are.  If they're in

      12    Booking, the Booking nurse would.

      13          Q     Let's go to Administrative Segregation.

      14          A     Okay.

17:58:28 15          Q     How would that work?

      16          A     In Administrative Segregation if somebody

      17    says they're going to kill themselves, I'd

      18    immediately have them be handcuffed for their own

      19    safety as well as staffs'.  From there I call

17:58:41 20    another deputy over, as well as the medical nurse,

      21    if it's at night, or the psych nurse if it's in the

      22    day.  And then I would -- the nurse would determine

      23    if that person needs to be put on a log or not.

      24          Q     What about just -- not just for safety

17:59:00 25    precautions but just for treatment, how are inmates

                                                              167

17:59:04  1   in Administrative Segregation receiving mental

2   health treatment?

3        A    They get put on psych line or something

4   like that.

17:59:14  5        Q    Explain psych line.  I don't know what that

6   is.  What is psych line?

7        A    Psych line is a deputy or a regular nurse

8   puts somebody on psych line to see the psych nurse,

9   if they observe certain behavior that we've already

17:59:29 10   discussed about, you know, feces on the wall and so

11   forth.  But they can fill out a medical kite either

12   for treatment --

13             MR. HELD:  I'm sorry to interrupt you,

14   Matt.

17:59:38 15             THE WITNESS:  Sure.

16             MR. HELD:  Would you clarify the pronoun.

17   You said "they."

18             THE WITNESS:  Oh, the inmates --

19             MR. HELD:  Thank you.

17:59:44 20             THE WITNESS:  -- would fill out a medical

21   kite for either treatment or for psych staff to talk

22   to somebody, or if it's an immediate concern they'd

23   just tell us.

24   BY MR. McLANE:

17:59:56 25        Q    "They," you mean the inmates?

168

# EXHIBIT L

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

ESTHER BISELLI AND THE ESTATE          )
OF DANIEL T. HERNANDEZ, BY AND         )
THROUGH HIS PERSONAL                   )
REPRESENTATIVE ESTHER BISELLI;         )
K.N.H., [NAME REDACTED] A MINOR,)
BY AND THROUGH HER GUARDIAN AND        )
MOTHER, AMBER RODRIGUEZ,               )
                                       )
        PLAINTIFFS,                    )
                                       ) CASE NO.
        VS.                            ) CV 09-08694-CAS(Ex)
                                       )
COUNTY OF VENTURA, VENTURA             )
COUNTY SHERIFFS DEPARTMENT;            )
SHERIFF BOB BROOKS; CALIFORNIA         )
FORENSIC MEDICAL GROUP;                )
TAYLOR FITHIAN, M.D., DR. JOHN         )
KORZELIUS, DR. MELVIN MYUNG            )
JUNG, MARIA BAEZLIN, DOES 1            )
THROUGH 10, INCLUSIVE;                 )
                                       )
        DEFENDANTS.                    )
_____)

DEPOSITION OF LINDA MOSKOWITZ, R.N.

FRIDAY, SEPTEMBER 16, 2011

FILE NO.   110916KAE

REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

1    referred to psychiatric staff.

2        Q    If they don't fail --

3        A    If they don't fail, custody clears them.

4        Q    And is there any ongoing assessment of the

5    inmates who don't --

6        A    That's when I said the inmates who do not fail,

7    there is no routine ongoing psychiatric assessment.

8        Q    Okay.  That's what I wanted to make clear.

9    Thank you so much for making that clear.

10           What about -- you know that inmates at the main

11   jail, they have a yellow band -- psychiatric patients

12   will have a yellow band.

13           You're familiar with that, correct?

14       A    Yes.

15       Q    Now, if the psychiatric -- now, psychiatric

16   patients, with their yellow bands not being seen is not

17   on medication, okay, is there any policy or procedure by

18   CFMG if that inmate is not referred by the deputies or

19   is not -- doesn't do a blue kite for CFMG to routinely

20   check in on psychiatric patients with a yellow band

21   after they're cleared?

22       A    If someone is a primary psychiatric

23   classification, psychiatric nursing will follow up on a

24   30-, 60- or 90-day basis, depending upon assessment and

25   needs of that individual.

71

1      ·Q    Okay.  On the 30, 60, 90 -- do they need to be

2   on medications for you to follow up on that 30, 60, 90

3   day?

4      A    Not if they're a primary psychiatric

5   classification.

6      Q    Is there a secondary psychiatric

7   classification?

8      A    Yes.

9      Q    Explain the distinction between primary and

10  secondary.

11     A    Inmates that are primary psychiatric

12  classification or yellow banders, are locked down in

13  housing 22 to 23 hours a day because of that

14  classification.

15     Q    Are you talking about special housing?

16     A    No.

17     Q    Or Ad Seg?

18     A    No.  I'm talking about yellow band housing.

19     Q    Mr. Hernandez was housed in the --

20     A    He was not a primary psychiatric

21  classification.  He was a primary Administrative

22  Segregated classification.  He was a secondary

23  psychiatric classification.

24     Q    Okay.  So if your secondary psychiatric

25  classification is Mr. Hernandez, there's no routine

72

1    procedure by CFMG to check in on him?

2        A    That is correct.

3        Q    In preparation for this deposition, did you

4    review the CFMG medical file to become familiar with

5    Mr. Hernandez's case?

6        A    Briefly.

7        Q    Okay.  Did you see any -- besides this Nursing

8    Assessment of Psychiatric and Suicidal Inmate, did you

9    do any of the two assessments that you were referring

10   to that were done by psychiatric nurses at any time

11   from January 2007 to February 16th, 2009 for

12   Mr. Hernandez?

13       A    I don't specifically recall.  After this, one

14   was not done.

15            MR. BERTLING:  And "after this," you're

16   referring to Exhibit 38; is that correct?  This is 38.

17   It's the Nursing Assessment of Psychiatric and Suicidal

18   Inmate dated October 30th, 2008.

19            THE WITNESS:  Correct.

20   BY MR. McLANE:

21       Q    And you're definitive about that, that one was

22   not done.  How do you know that?

23       A    Because Mr. Hernandez came back into custody

24   via Patton State Hospital and our policy is for inmates

25   coming from Patton State Hospital, they are directly

73

1   referred to the psychiatrist.  They come with a package

2   of information, history, whatever from Patton State

3   Hospital that the psychiatrist receives; therefore, they

4   do not need our initial intake.  They have all that

5   information.

6        Q    They have the initial information for intake,

7   but what about ongoing psychiatric assessment by the

8   psychiatric staff of a secondary psychiatric patient

9   even if they came back from Patton?

10       A    I already answered that question.

11       Q    There is none is what you're saying?

12            MR. BERTLING:  It's a -- the question is vague

13   and ambiguous.  It depends on -- she just told you, that

14   those individuals are referred directly to Dr. Jung as

15   you saw happen in this case in the records, and he makes

16   the determination what to do.  That's not something that

17   Ms. Moskowitz does.

18   BY MR. McLANE:

19       Q    Okay.  So what about just -- does CFMG

20   participate in the classification process, whether

21   they're secondary or primary psychiatric?

22       A    The only classification that CFMG participates

23   in is whether or not they should or shouldn't be

24   psychiatric classification.  All the classification

25   decisions are made by Classification.

74

1    Q    So the issue of whether they're primary or

2    secondary psychiatric classification is made by the jail

3    staff?

4            MR. BERTLING:   It's an incomplete hypothetical,

5    vague and ambiguous.

6            Do you understand the question the way it's

7    phrased?

8            THE WITNESS:   Whether someone is a primary

9    psychiatric or secondary psychiatric classification has

10   to do with custody's classification system.

11   BY MR. McLANE:

12   Q    And you don't make that determination?

13   A    Correct.

14   Q    The jail staff makes that determination?

15   A    Correct.

16   Q    Do you have any input in whether they're

17   psychiatric -- they're primary or secondary psychiatric

18   classification?

19           MR. BERTLING:   Does she personally or does

20   Dr. Jung?  The question is vague and ambiguous.

21   BY MR. McLANE:

22   Q    At the initial classification stage, according

23   to procedures, is there any procedure for CFMG, to your

24   knowledge, to have any input in whether they're

25   classified as primary or secondary psychiatric?

75

1    A    I don't have direct knowledge.  I have an

2   understanding of how Classification works, but it's my

3   personal understanding and you'd have to ask them what

4   their policies are.

5        Q    Okay.  What's your personal understanding?

6        A    My personal understanding is if someone is

7   classified as protective custody or administratively

8   segregated, that supersedes everything.

9        Q    Now, I'm going to talk specifically -- I'm

10  changing direction, more talking about Daniel Hernandez.

11  Okay.  I'm going to ask you a series of questions

12  specifically about Mr. Hernandez's situation while he

13  was at the Ventura County jail from January 2007 to

14  February 16th, 2009 when he -- when he committed

15  suicide.

16           Were you working at the Ventura County jail on

17  the day of Mr. Hernandez's death?

18       A    I don't specifically recall, so I would guess

19  probably not.  Only because it seems to me if I was

20  there, I'd remember, or somebody would have told me

21  about it.

22       Q    Unless the death occurred after you had left to

23  go home during the day?

24       A    Somebody would have told me about it the next

25  morning.

76

1     Q    After Mr. Hernandez's death, so we're talking

2  about from February 16th, 2009, to the present, did you

3  speak with anyone, excluding Mr. Bertling or the lawyers

4  with Mr. Bertling's firm, about Mr. Hernandez and their

5  experiences with him?

6     A    Only vaguely.

7     Q    What do you mean "only vaguely"?

8     A    There were conversations among staff of the

9  fact that there was a suicide and, you know, who had

10  seen him, who hadn't seen him, et cetera.  So I was

11  aware at that point that I had, in fact, not seen him

12  during that incarceration.

13     Q    You didn't see him at all during the entire

14  incarceration from October 30th to February 16th, 2009?

15  Is that what you're saying?

16     A    Correct.

17     Q    You never interviewed him?  Is that what you're

18  saying?

19     A    Correct.

20     Q    You never observed him --

21     A    Correct.

22     Q    -- or his behavior at all during that last

23  incarceration?

24     A    Correct.

25     Q    Did you ever go up to the Administrative

77

1   Segregation unit during that time period?

2      A    I don't specifically recall.  It's certainly

3   within the realm of possibility.

4      Q    You don't recall ever seeing him once during

5   that last incarceration?

6      A    No, I did not.

7      Q    Did anybody else, like Dr. Jung or

8   Dr. Rodelander -- not Dr. Rodelander, Nurse Rodelander

9   discuss with you his last incarceration at the jail?

10         MR. BERTLING:  Vague and ambiguous as to time.

11         MR. McLANE:  Well, October 30th to

12   February 16th.

13         MR. BERTLING:  But when did this discussion

14   take place?  After his death?

15         MR. McLANE:  After his death.

16         THE WITNESS:  Only as I said before, only

17   vaguely and abstractly.

18   BY MR. McLANE:

19      Q    By vaguely and abstractly, what did they

20   exactly tell you?

21      A    I don't specifically recall.

22      Q    You have no memory whatsoever of the general

23   subject matter of the conversation other than it was

24   vaguely and abstractly?

25         MR. BERTLING:  First of all, let me object.

                                                         78

1    chart, I did not recall that.

2    BY MR. McLANE:

3        Q    But going through the chart triggered

4    something?

5        A    Yes.

6        Q    And what did it trigger?

7        A    There is a note in the chart where I responded

8    and he was refusing to respond.

9        Q    Okay.  Why don't we just go through the chart,

10   because I think that's going to help you and help me to

11   understand your interaction with Mr. Hernandez.  We'll

12   get through this more quickly.

13           If you could turn to Exhibit 20.  The first

14   page of Exhibit 20, it states the name of

15   Daniel Hernandez and it's dated January 22nd, 2007.

16           Do you recognize this type of document?

17       A    Yes.

18       Q    What is it?

19       A    It is an intake screening used by deputies in

20   Booking.

21       Q    Now, is that something that if an inmate is

22   referred to the medical staff, that the medical staff

23   will look at in evaluating the inmate?

24       A    I believe so.

25       Q    Have you ever looked at this form while -- when

98

1    you signed someone to clear them to reception housing?

2    Do you look at this form?

3        A    Yes.

4        Q    Now, turn to the second page.  Again, this

5    form, do you recognize this type of form?

6        A    Yes.

7        Q    What is it?

8        A    This is a Reception Housing Clearance Form.

9        Q    Are these forms that you normally -- you don't

10   fill out the top section and the middle section, but

11   CFMG employees sign off on the bottom section; is that

12   right?

13       A    That's right.

14       Q    Okay.  Can you describe the purpose of what

15   CFMG does when signing off on the bottom where it says

16   "Reception Housing Clearance"?

17       A    This is the form that the inmates fill out and

18   if there is an issue, custody refers them.  I sign on

19   the bottom to either retain them in reception housing,

20   to house them in special housing, or to clear them that

21   they can be moved out of reception housing.

22       Q    Okay.  Now, looking at this form, there is a

23   series of four questions.  And you're familiar with

24   those questions, correct?

25       A    There's five questions.

99

1      Q    I'm sorry.  Five questions.  I apologize.  You

2   corrected me again.

3      A    Yes.  I'm familiar with them.

4      Q    And those are the answers to the questions you

5   review in making your decision whether to clear someone

6   out of reception housing; is that correct?

7      A    This is what prompts the referral to me.

8      Q    Prompts the referral.  But you review the form

9   in evaluating whether to clear someone out of reception

10  housing or to retain in reception housing or to house in

11  special housing; is that correct?

12     A    Correct.

13     Q    Do you ultimately make that decision or -- like

14  on this form, it says "Checked, cleared to house out of

15  reception housing," and then it's signed with your name

16  and dated January 25th, 2007.

17          Is that your ultimate decision to clear him

18  out?

19     A    Yes.

20     Q    You have the authority to clear him out?

21     A    Yes.

22     Q    Okay.  So in this case you cleared

23  Daniel Hernandez out to reception housing; is that

24  correct?

25     A    Out of reception housing.

                                                      100

1     Q   Out of reception housing?

2     A   Yes.

3     Q   That means that he's not needed to be kept in

4  special housing where there's safety cells or anything

5  like that; is that correct?

6     A   He was cleared to general housing.

7     Q   Okay.  And general housing doesn't include the

8  Level 1, 2 or 3 safety cells; is that correct?

9     A   Correct.

10    Q   Now, the first answer to his first question

11 "What are your current mental problems?" he answered

12 "Depression," correct?

13    A   Correct.

14    Q   "What are your past mental health problems?"

15 It says "Depression, suicide attempt," correct?

16    A   Correct.

17    Q   And the third answer, "Dates when you tried to

18 hurt yourself," "One and a half weeks ago," correct?

19    A   Correct.

20    Q   And "How did you try to hurt yourself?" "Take

21 pills," correct?

22    A   That's what it says, yes.

23    Q   Did you follow up with any -- you read that

24 form and did you follow up with any particular

25 evaluation?

101

1    BY MR. McLANE:

2        Q    Okay.  Can you check the chart and see if you

3    filled out a particular form.

4            MR. BERTLING:  You're talking about the

5    evaluation she filled out on January 25th, correct?

6            MR. McLANE:  Yes.  About this evaluation.  I

7    was asking Nurse Moskowitz about an interview of

8    Mr. Hernandez that she said that she always does.

9    BY MR. McLANE:

10       Q    Do you see anything?

11       A    There is no other form other than this one for

12   that interaction.

13       Q    Let's mark this as 75.

14               (Deposition Exhibit No. 75

15                 was marked for identification.)

16   BY MR. McLANE:

17       Q    Do you recognize this type of document --

18       A    Yes.

19       Q    -- that's marked as 75?

20            What is it?

21       A    It's a consent for medications.

22       Q    So on this form, do you know -- do you

23   recognize this signature of the physician?

24       A    Dr. Jung.

25       Q    Okay.  And it's dated January 23rd, 2007; is

                                                      110

1  that correct?

2      A    Correct.

3      Q    And there's an indication as to

4  antidepressants.  Is that Depakote?  Do you recognize

5  that?

6      A    No.  That is not Depakote.

7      Q    What is it?

8      A    Doxepin.

9      Q    What is Doxepin?

10     A    Doxepin is an antidepressant, antianxiety

11 medication that is nonaddictive.

12     Q    Antianxiety and antidepression?

13     A    Correct.

14     Q    "Major tranquilizers," there's also a notation.

15 Do you recognize what drugs are there, if you can figure

16 out the handwriting?

17     A    Trilafon and Haldol.

18     Q    Haldol is an antipsychotic?

19     A    Correct.

20     Q    And the other one is Trilafon?

21     A    Trilafon.

22     Q    Trilafon, what's Trilafon?

23     A    An antipsychotic.

24     Q    Are they basically the same drug?

25     A    They're different drugs in the same

111

1    classification.

2        Q    As antipsychotics?

3        A    Yes.

4        Q    Those would be prescribed for someone who is

5    having hallucinations?  Or what sort of behaviors would

6    these drugs be prescribed for?

7        A    That would be one of the reasons.

8        Q    What would be the other reasons in your

9    experience?

10       A    They are also considered major tranquilizers.

11       Q    To calm someone down?

12       A    Correct.

13       Q    Anything else?

14       A    That would be the basis or the basic reasons.

15   However, many doctors prescribe medications for

16   nonlabeled reasons.

17       Q    I understand.

18            Now, at the bottom here, there's like an entry.

19   There's -- a patient can sign this form saying "I

20   understand and I consent to the medication," correct?

21       A    Yes.

22       Q    But here the box is checked and it says "He

23   understands the nature and effects of the medication and

24   consents to taking such medications, but does not wish

25   to sign this form."

                                                          112

1          That speaks for itself.  Basically he's

2    agreeing to the medication, but he doesn't want to sign

3    this paper; is that right?

4          A    That's what it says.

5          Q    Okay.  Does that happen where some people

6    don't -- have you experienced this, where they are

7    willing to take the medication but they just don't like

8    to sign paperwork?

9          A    To the best of my knowledge it happens, yes.

10         Q    Okay.  Now, if you could -- okay.  I'm marking

11   Exhibit 76, a CFMG progress notes.  The first page the

12   entry is dated January 23rd, 2007 at 1300.  And there's

13   a second page that's dated later, February 7th.

14                   (Deposition Exhibit No. 76

15                    was marked for identification.)

16   BY MR. McLANE:

17         Q    Now, looking at this first page, is this your

18   handwriting?

19         A    No.

20         Q    Do you know whose handwriting it is?

21         A    Yes.

22         Q    Whose is it?

23         A    Jose Nunez.

24         Q    Who is Jose Nunez?

25         A    He was a psychiatric nurse that worked with us.

                                                        113

1     Q    Now, when it says 1/23/07 and there's an S next

2    to it on the first page, that stands for "Subjective,"

3    correct?

4     A    Correct.

5     Q    That's a terminology that you use in keeping

6    your notes.  They're either labeled subjective,

7    objective, analytical or plan.  SOAP, that's an acronym?

8     A    Not analytical, no.  And the key is on the

9    page.

10    Q    Oh, it is?  Subjective, objective, assessment,

11   plan.

12    A    Right.

13    Q    I was trying to figure this out.

14        So if you turn to the fifth line, it says, "I'm

15   feeling depressed and don't trust many people.  People

16   are really" -- do you understand what that symbol is?

17    A    Yes.

18    Q    What does that mean?

19    A    "After."

20    Q    "Really after me"?

21    A    Correct.

22    Q    "I've thought about suicide.  I've tried it a

23   week ago."  And then what does O/D mean?

24    A    Overdose.

25    Q    "Overdose on Tylenol and Advil.  Took 42

                                                              114

1  tablets.  I thought of ways, but I think I would take

2  the easy way out."  And what is that A with a slash

3  over?

4      A    It's not an A.  It's a C.  It means "with."

5      Q    "With a gun.  Right now I'm just depressed and

6  feel afraid of others.  People do want to hurt me."

7           Do you recall reviewing this note before

8  clearing him out of classification?

9      A    I don't specifically recall.

10     Q    Well, now that you see this note, what would

11 you have done -- what was your practice in dealing --

12 would you have read this note before clearing him out of

13 Classification, checked the progress notes, or would you

14 clear someone out of Classification by just talking to

15 the --

16     A    I would do both.

17     Q    Okay.  That was your practice.  So you must

18 have read this note, correct?

19     A    I would presume that.

20     Q    But you're not sure?

21     A    I don't specifically recall.

22     Q    Okay.  If you had read this note, how would you

23 react to that statement here?  What would your practice

24 be in deciding whether to clear someone out or not based

25 on this statement?

                                                      115

1           MR. McLANE:  I understand.  I understand the

2   objection.  Do you have a case cite for that?

3           MR. BERTLING:  Martinez versus the County.

4           MR. McLANE:  What year?

5           MR. BERTLING:  It's also irrelevant.  What is

6   it relevant to?  It's an incomplete hypothetical.  You

7   don't know what other information this individual may

8   have been relying on, and you need to take this person's

9   deposition.

10          THE WITNESS:  May I ask for a break.  I need to

11  use the restroom.

12                       (Recess taken.)

13          MR. McLANE:  Back on the record.

14  BY MR. McLANE:

15      Q    Ms. Moskowitz, I know that you testified

16  this morning that you never saw or interacted with

17  Daniel Hernandez after October 30th, 2008 when he came

18  back from Patton; is that correct?

19      A    Correct.

20      Q    Okay.  Do you recall any conversation with

21  Dr. Jung concerning Daniel Hernandez after October 30th,

22  up to the time of his death on February 16th?

23      A    No, I do not.

24      Q    Okay.  Do you recall any conversation with any

25  custody staff concerning Daniel Hernandez after

                                                    125

```
 1   October 30th, 2008 up to February 16th, 2009?
 2        A    No, I do not.
 3        Q    Do you recall any conversation with any of
 4   the CFMG employees, including Nurse Rodelander,
 5   Dr. Korzelius or anyone else?
 6             MR. BERTLING:  That question has been asked and
 7   answered, and I think she's given you a response at
 8   least twice before.
 9             MR. McLANE:  I just want to make sure that I
10   got it on the record.  It only takes a second to answer
11   it.
12             MR. BERTLING:  But, you know, you've asked this
13   and gotten responses twice before.  And that's what make
14   these depos go on interminably long.  You're asking the
15   same question.  So I'm going to instruct her to not
16   answer.  You can ask your next question.  You've gotten
17   the answer twice before.
18                  (Deposition Exhibit No. 77
19                   was marked for identification.)
20   BY MR. McLANE:
21        Q    So looking at Exhibit 77, do you see this?  It
22   says -- do you recognize this type of document?
23        A    Yes.
24        Q    And it's dated February 7th, 2007, correct?
25        A    Yes.
```

126

1    Q    "Inmate to kite as needed."  What does that

2  mean?

3    A    If he has an issue and requires services, he's

4  to fill out a kite.

5    Q    So then on April 5th you wrote a note?

6    A    Correct.

7         MR. BERTLING:  No.  It's May 5th.

8         MR. McLANE:  My fault.

9         THE WITNESS:  Thank you.  And I agree.

10  BY MR. McLANE:

11    Q    May 5th, 2008.  Can you read your note on

12  May 5th, 2008?

13    A    "Called by custody.  Patient not responding.

14  Appears upset and is crying with long snot ropes hanging

15  from face and makes no effort to wipe self.  Refused

16  breakfast.  I observed him sitting on his bunk with head

17  hanging down between his legs quietly screaming and

18  weeping.  Appears as described above by custody.

19  Doesn't respond to verbal commands or raps on the door.

20  Appears internally focused and very tense.  Rule out

21  psychotic state.  Dr. Jung called.  Vitals taken by

22  resource nurse.  Dr. Jung evaluated patient and orders

23  received."

24    Q    Okay.  So, again, when you write "rule out

25  psychotic state," that doesn't mean that you ruled it

163

1   out?  That means that it needs to be assessed?

2        A    That is correct.  It is not within the scope of

3   my practice to make diagnoses.

4        Q    That's Dr. Jung's job; is that right?

5        A    Correct.

6        Q    And he says -- and you saw this, correct?  Do

7   you recall this incident?

8        A    Oh, yes.

9        Q    Tell me about this incident.  What's your

10  recollection?

11       A    Pretty much exactly what I wrote.

12       Q    Okay.  Now, based on your experience and

13  practice and knowledge as a psychiatric nurse, did this

14  give you concern about that he might harm himself?

15       A    Yes.  You don't have what subsequently occurred

16  here.

17       Q    Well, let's see.  I think we -- I think if we

18  turn to Exhibit 6 we may have that.  See this incident

19  we've got here.

20            Okay.  This is the Jail Incident Report for the

21  incident that you described in your notes, correct?

22       A    Written by the deputy, yes.

23       Q    Okay.  And it says that -- if you go to the

24  second to last paragraph it says, "Psychiatric nurse

25  Linda Moskowitz, resource nurse Steve Hunter, Dr. Jung

                                                          164

1    were all present in Segregated housing and observed

2    Hernandez's behavior."

3           And that's the behavior you observed that you

4    described in your note, correct?

5        A    Correct.

6        Q    And then in the next page, do you recall that

7    Dr. Jung recommended that Hernandez be placed in the

8    safety cell and be given emergency medication?

9        A    I wrote the orders.

10       Q    You wrote the orders.  Is that -- let's see,

11   okay.  And we're looking at the page Special Housing

12   Admit Orders.

13          Is this your writing at the bottom of the page?

14       A    Yes.

15       Q    So he's placed on Safety Level 1 precautions,

16   correct?

17       A    Correct.

18       Q    What's this diagnosis?  Is that the same thing

19   you wrote in your note, "rule out psychosis"?

20       A    That's correct.  It's a Greek symbol.

21       Q    So the last -- bottom of the paragraph, this

22   was administered to him, correct?

23       A    Correct.

24       Q    Can you describe what these drugs are?  Tell me

25   the names of them and what they -- I think -- I know

165

1    what Haldol is.

2         A    Haldol is an antipsychotic.  Ativan is a

3    tranquilizer and Benadryl is an antihistamine.

4         Q.   What is this VO, colon, Dr. Jung,

5    Linda Moskowitz?

6         A    Verbal order, Dr. Jung slash written by

7    Linda Moskowitz.

8         Q    So Dr. Jung gave you this order?

9         A    He gave me the order verbally.  I wrote it

10   down, and then after my name there's another slash and

11   there's his signature.

12        Q    Dr. Jung's signature?

13        A    Correct.

14        Q    Who gave him the shot?

15        A    You have to check the medical administration

16   record.  I don't specifically recall.

17        Q    Do you give shots like this?

18        A    At times.  Sometimes.

19        Q    Was this shot given as like an emergency shot?

20        A    Yes.

21        Q    Was it done, based on your knowledge, without

22   Mr. Hernandez's consent?

23        A    This was an emergent medication.

24        Q    And under CFMG's policy, they can give emergent

25   medications if it's required under the situation without

166

1    the inmate's consent; is that right?

2        A    It can be, yes.

3        Q    It can be.  Do you recall whether in this case

4    that was done?

5            MR. BERTLING:  Whether his consent was

6    obtained?

7            MR. McLANE:  No.

8            THE WITNESS:  I don't recall whether he was

9    cooperative or not.

10   BY MR. McLANE:

11       Q    Okay.  So you don't recall whether his consent

12   was given or not?

13       A    As I said, I don't recall whether he was

14   cooperative or not.

15       Q    Well, if you turn to Page 1909 of the Jail

16   Incident Report, I want to see if this refreshes your

17   recollection.  The second paragraph it says, "Booking

18   nurse Elma, Resource Nurse Hunter administered emergency

19   medications to Hernandez.  Before any medications were

20   given to Hernandez, he repeatedly said 'No meds.  I

21   refuse all meds.  I don't want them.  No meds.'  He

22   doesn't want medication."

23           So do you recall that?

24       A    I don't recall that.  I probably was not at

25   that spot at that time.

                                                    167

1      Q     Okay.

2      A     The nurses who were there were the nurses who

3   gave the injection.

4      Q     And if you turn to the next page, it says

5   "Recommended safety precautions Level 1 per

6   psychiatrist."

7            That would have been Dr. Jones' order?

8      A     Correct.

9            MR. BERTLING:  You mean Dr. Jung?

10           MR. McLANE:  Dr. Jung.  Okay.  Dr. Jung.

11           THE WITNESS:  It's Jung.

12   BY MS. WEISBERG:

13     Q     Now, going to the next note dated June 21st,

14   2008, that's your note, correct?

15     A     Correct.

16     Q     Can you read that note?

17     A     "Patient taken out of cell by custody for

18   visit.  Described as initially nonresponsive.  When

19   custody attempted to search and/or return inmate to

20   cell, he reportedly became combative and was contained

21   and controlled by custody staff.  I observed patient was

22   brought to the safety cell by custody with a spit mask

23   in place, handcuffed and controlled by multiple people.

24   Continues to struggle and fight and growl like an

25   animal.  Nonresponsive to questions from custody and

                                                      168

1    this writer."

2              "Rule out psychosis and danger to self versus

3    danger to others.  Dr. Korzelius on scene.  Orders

4    received.  Dr. Jung notified.  Emergent

5    intramuscular" -- IM, that's what that means, "given.

6    Patient placed on Level 1 safety precautions."

7         Q    Okay.  Let's go over this note.  "Emergent

8    intramuscular given," what does that mean?  Tranquilizer

9    to calm him down?

10        A    Whatever the order was, yes.  An emergent

11   medication.

12        Q    Oh, you don't know specifically what the

13   medication was?

14        A    I don't recall specifically, no.  But I would

15   assume that it's in the chart.

16        Q    Now, you say "rule out" -- again, "rule out

17   psychoses" again.

18        A    Uh-huh.

19        Q    And that means that the doctor needs to look at

20   that issue, correct?

21        A    The doctor will look at him, yes.

22        Q    And DTO and DTS, what does that stand for?

23        A    It's rule out psychosis, dash, danger to

24   self -- danger to others, danger to self.

25        Q    To see if he's going to be a danger to himself

                                                      169

1  or others, correct?

2      A    Right.  He's brought in contained and

3  controlled as the note says.

4      Q    Can you visualize him growling like an animal?

5  Can you tell us what that was like?

6      A    I have a vague recollection of it.

7      Q    What did you observe?

8      A    He was brought in, I think, being carried by

9  several deputies on each side, face down so that he was

10 perpendicular to the deputies who were upright and they

11 brought him in.  He had a spit mask on -- that they had

12 placed on his head.  That is to prevent him from

13 spitting on them.  And, as I described, he was

14 handcuffed and they put him into the safety cell.

15         I tried to assess him, get some sort of --

16 figure out what's going on, et cetera.  He was

17 nonresponsive.  He was growling like an animal when they

18 were carrying him.

19     Q    That's what you heard?

20     A    Yeah.

21     Q    So it sounded like an animal sound to you?

22     A    Uh-huh.

23     Q    What did you think about that?

24     A    I thought he was pretty pissed off.

25     Q    Okay.  And -- okay.

170

```
 1            Let's turn to -- and so --
 2      A     I called the doctor.
 3      Q     Did Dr. Korzelius place him on Level 1 safety
 4  precautions?
 5      A     Dr. Korzelius was on scene, so I got the orders
 6  from him.
 7      Q     Was he there observing the behavior, too?
 8      A     Yes.
 9      Q     So he was present when Mr. --
10      A     Yes.
11      Q     -- Hernandez was acting in this manner?
12      A     Uh-huh.
13            MR. BERTLING:  Is that "yes", Linda?
14            THE WITNESS:  Yes, it is.
15            It's just quicker if there's an M.D. on scene.
16  BY MR. McLANE:
17      Q     Okay.
18      A     And then I called Dr. Jung and notified him.
19      Q     If you turn to Exhibit 13.  I believe this is
20  the Jail Incident Report for the incident you described.
21      A     By custody.
22      Q     Okay.  If you turn to the second page -- by the
23  way, you didn't go up to his cell?  You didn't see what
24  was going on with the cell or anything like that?
25      A     My office is located in special housing.
```

171

1      Q     So they brought him down to special housing?

2      A     I don't specifically recall, but if I was there

3  they brought him in because they walk past my office.

4      Q     Now, it says here that -- in looking at the

5  second page where it starts off with the word "Because

6  of his agitated state and his unwillingness to walk on

7  his own, Dallas, Frazier, Zambroski" --

8      A     Zambroski.

9      Q     -- "and Erickson carried Hernandez to special

10  use cell in special housing where he was placed on

11  Level 1 safety precautions per Nurse Moskowitz."

12            It's really per Dr. Korzelius?

13            MR. BERTLING:  Well, was it?  Do you remember?

14  BY MR. McLANE:

15      Q     You consulted with Dr. Korzelius?

16      A     I would have been the one to tell them.

17      Q     Right.  But you told the deputies?

18      A     Yes.  For them it's per me.

19      Q     I get it.

20      A     It's always per doctor order.

21      Q     It says, "While inside the safety cell,"

22  continue on, "Hernandez continued to resist deputies by

23  clinching his fists tensely, his body making abrupt body

24  movements."

25            Did you observe that?  Do you remember that?

                                                    172

```
 1              MR. BERTLING:  In the safety cell?

 2              MR. McLANE:  While inside the safety cell.

 3              MR. BERTLING:  Lacks foundation she's even

 4   there now that he's in the safety cell.

 5   BY MR. McLANE:

 6       Q    Okay.  Were you observing him while he was in

 7   the safety cell?

 8       A    Not that I specifically recall.

 9       Q    Okay.  "Korzelius approved a cocktail to be

10   administered."  Is that a term you use, cocktail?

11       A    It's not a term we use.  It's a term custody

12   often uses.

13       Q    To describe a combination --

14       A    So some nurses will use it because custody

15   understands it.

16       Q    Okay.  But in your understanding that's the

17   drugs that were administered to calm him down that

18   Dr. Korzelius ordered, correct?

19       A    Correct.

20       Q    Do you recall whether he agreed to the

21   administration of those drugs?

22       A    No.  I do not recall.

23       Q    If you could turn to 00021 dated June 21st,

24   2008.  This is the orders, correct?

25       A    Correct.
```

173

1     Q     This is the one that you signed, correct?

2     A     These are the verbal orders I took down, yes.

3     Q     This is the same cocktail that was administered

4  on the time before on May 5th, 2008, correct?

5     A     Correct.

6     Q     Same three drugs, Haldol, Ativan?

7     A     Ativan.

8     Q     Ativan?

9     A     Correct.

10    Q     Maybe I'll learn some day.

11          And Benadryl?

12    A     Correct.

13    Q     The last line says "Noted B. Keys, L.V.N."  Did

14  he sign off on this, too?  The last line underneath your

15  signature.  Is it Keys?

16    A     I have no idea.

17    Q     Okay.  You don't know -- you don't recognize

18  that name?

19    A     I'm trying to remember her last name.  I'm not

20  certain.

21    Q     It's a she?

22    A     I believe so.  This is the verbal order from me

23  from Dr. Korzelius, written by me and then Dr. Korzelius

24  signed it.  This was the nurse that noted the order and

25  started the paperwork to put it in the computer for the

174

1  medication order and those kind of things.

2     Q   He's placed on Level 1 safety precautions,

3  which you already described.  And then it says below,

4  "Checked psychiatric admit Q day."  What does that mean?

5     A   Vital signs to be checked at least as follows.

6     Q   Okay.  And psychiatric --

7     A   Q day, minimum.  Every day.

8     Q   So Q means every day?

9     A   No.  Q means every.  Q means frequency, daily.

10  If it says frequency every shift.

11     Q   Q week would be frequency week?

12     A   Once a week.

13     Q   I got it.

14        Next page, June 22nd, 2008.  Is this your note?

15  I see your signature there.

16     A   This is my writing of an order.

17     Q   So what does that mean?

18     A   This is a note that goes with this that I

19  evaluated him, which is several pages later on.  This is

20  the order that was a result of that note.

21     Q   That note you already read to us, that was

22  attached to the other exhibit where you said he was

23  growling like an animal?

24     A   No.

25     Q   There's another entry on June 22nd?

175

1      A      There's an entry on June 22nd.

2             MR. BERTLING:  And before we do that, can we

3    take a break.  We've been going about an hour and a

4    half.  I just need to use the facilities.

5             MR. McLANE:  Sure.

6                          (Recess taken.)

7             MR. McLANE:  Back on the record.

8    BY MR. McLANE:

9      Q      Can you read your entries on June 22nd, 2008

10   and June 30th, 2008.

11     A      "Patient is in safety cell.  States he is good

12   and wants to return to housing.  Acknowledges events of

13   yesterday and states 'I didn't want to be frisked like

14   that.'  Patient acknowledges being frisked in the past

15   without problems and states he doesn't expect similar

16   problems in the future.  He's coherent, oriented and

17   cooperative.  No acute distress.  He avoids direct eye

18   contact.  No overt signs and symptoms of psychosis.  No

19   suicidal ideation, homicidal ideation or agitation.

20   Rule out mood disorder with psychotic features.

21   Encourage patient to reconsider accepting RX treatment,

22   but he continues to refuse this.  Recommend D/C of

23   safety precautions and re house per Classification.

24   Follow up in one week and PRN."

25     Q      So on this note you're saying that he's

                                                    176

1  basically doing better, but you're saying also you

2  should rule out -- doctor needs to rule out mood

3  disorder and what's that other?

4      A   Psychotic features.

5      Q   With psychotic features.  Okay.

6      And then you're also talking him into accepting

7  the RX; is that correct?

8      A   Uh-huh.

9      Q   So apparently he's not taking his medication?

10     A   Correct.

11     Q   Now, do you know whether that medication was

12 antipsychotic medication?

13     A   I'd have to check the record.

14     Q   But you were encouraging him to do that.  Just

15 using your common sense and understanding, he had this

16 episode so wouldn't it be something to do with his --

17 I'm not asking you to guess, but something to do with

18 mitigating against outbursts and that sort of thing,

19 psychotropic medication of some sort?

20     MR. BERTLING:  That question is vague and

21 ambiguous.

22     Do you understand it?

23     THE WITNESS:  I got lost somewhere in the

24 middle.  I'm not sure what you're asking me.

25 \\\

177

```
 1   BY MR. McLANE:
 2       Q    By RX, are you referring to psychotropic
 3   medications?
 4       A    I'm referring to his prescribed medications.
 5       Q    But you don't know whether they're psychotropic
 6   or whether --
 7       A    At the time I had his whole chart in my hand I
 8   probably did know, but at this moment I'd have to look.
 9       Q    Okay.  Go to the next note on June 30th.
10       A    On June 30th, "Patient seen for one week follow
11   up after D/C of safety precautions and rehousing.
12   Patient not verbally responding to questions.  Observed
13   laying stiffly on the bunk holding the edges of the
14   mattress on back and apparently responding to internal
15   stimuli.  Lips moving, awake but unable to hear what he
16   is saying."  And by that I mean I'm unable to hear.
17   "Does respond to one question, 'no' regarding meds.
18   Continues to lay in bunk passively resistant.  No overt
19   danger to self or danger to others at present.  Continue
20   current housing and provide education and encouragement
21   as needed regarding treatment issues."
22       Q    Did you go up to his cell to observe him?
23       A    Correct.
24       Q    Do you recall this incident?
25       A    Generally, yes.
```

178

1      Q     What do you recall?

2      A     I recall him laying on the bed appearing to be

3   responding to internal stimuli, but then when I did ask

4   him the question about medications, he indicated that

5   not only did he hear me, but he understood everything I

6   was saying.

7      Q     Okay.  What is responding to internal stimuli?

8   What does that mean to you?

9      A     I can best describe it nonverbally.

10      Q     Okay.  This is a deposition.  We rely on words.

11   But maybe you can demonstrate it and I can characterize

12   it.  If my characterization is wrong, Mr. Bertling will

13   object.

14            But what do you mean?

15      A     (Witness complies.)

16      Q     That's it.

17      A     (Witness complies.)

18      Q     That's pretty good.  I don't know if I can

19   describe it.

20      A     That's what I said.

21      Q     Is that something where you're basically --

22      A     They appear to be looking elsewhere.  Let me

23   try.  Okay.

24      Q     Go ahead.  You try.

25      A     They appear to be looking elsewhere, hearing

179

1    something and turning towards it.  You can see lips

2    moving as if they're responding to something or swatting

3    or making gestures indicating they're seeing something

4    there.  And, you know --

5         Q    Okay.

6         A    -- there's nothing that I can see.

7         Q    That would be a sign of mental illness to you?

8         A    That would be a sign of hallucinations.

9         Q    Okay.  Hallucinations are a sign of mental

10   illness?

11        A    They're one sign of mental illness, yes.

12        Q    And you were encouraging him to deal with his

13   RX issues?  Is that what you were saying?

14        A    To accept them, yes, to take medications.

15   "What is the issue?  Why won't you take it?"

16        Q    Medications to deal with these mental issues?

17        A    "You're having these problems."  He was not

18   responding.  Then all of a sudden when I started talking

19   about medications, he clearly was receiving

20   reality-based input and indicated "no."  He's not going

21   to take medications.

22        Q    Did he ever tell you why he didn't want to take

23   medications?  Did you ever have that discussion with

24   him?

25        A    Yes.  I seem to recall him making statements

                                                        180

1    that he doesn't need it, he doesn't want it, there's

2    nothing wrong with him.

3         Q    Do psychotic individuals sometimes believe they

4    don't need medications even though they do?

5         A    That would be a matter of opinion.  Yours

6    versus mine.

7         Q    Okay.  I'm asking you.  Based on your

8    understanding and practice, do you see people in the

9    jail who say "I don't need any medications" because

10   they're psychotic and they think it?

11        A    Yes.  Sometimes.

12        Q    And the world is all wrong and they're right?

13        A    Yes.  Sometimes.

14        Q    Okay.  Did you see that in Mr. Hernandez?

15        A    Mr. Hernandez, as I recall, was not really

16   forthcoming with why he didn't want medications.  Just

17   emphatic about not wanting them.

18        Q    But the signs of hallucinating, internal

19   stimuli and those sorts of indications of mental

20   illness --

21        A    I said he appeared to be doing that in this

22   note, but then he did respond.

23        Q    So what were you trying to say?  Are you saying

24   that he wasn't --

25        A    I'm not sure if he was hallucinating or if he

                                                          181

1   was just being oppositional.

2       Q    But you don't know?

3       A    There is no way for me to know that.   That's

4   why I said that we need to continue to encourage.

5       Q    Was there ever done by CFMG a full-blown

6   psychiatric or psychological evaluation, a written

7   report of Daniel Hernandez to try to get to the bottom

8   of these issues that you were observing?

9           MR. BERTLING:   Well, let me object.   Vague and

10  ambiguous as to what you mean by "full-blown

11  psychological assessment."   Is that a medical term or

12  mental health term that you're familiar with?

13          MR. McLANE:   Okay.   I'll strike that.

14  BY MR. McLANE:

15      Q    Was he ever given an MPI by -- MMPI, to your

16  knowledge, by CFMG?

17      A    Not to my knowledge.

18      Q    Was he given any sort of psychological testing

19  the entire time you were there, to your knowledge?

20      A    To...?

21      Q    To determine his mental state?

22      A    To the best of my --

23          MR. BERTLING:   You mean by the people at CFMG

24  or outside personnel?

25          MR. McLANE:   CFMG.   I'm not talking about

182

1  Patton.

2          MR. BERTLING:  Well, I'm talking about before

3  Patton.

4          THE WITNESS:  Before Patton he would have had

5  to have had an assessment ordered by the courts.

6  BY MR. McLANE:

7      Q    Okay.  I'm not talking about outside.  I'm

8  talking about CFMG doing any type of psychological

9  testing and scoring such as the MMPI intelligence test.

10     A    CFMG does not have a psychometrician.

11     Q    Did CFMG ever repair -- prepare a report

12  concerning Mr. Hernandez's psychological condition or

13  state?

14         MR. BERTLING:  Vague and ambiguous as to what

15  you mean by "report."  Are you --

16         MR. McLANE:  By report --

17         MR. BERTLING:  Are you distinguishing these

18  from multiple progress notes that have been written by

19  Dr. Jung?

20         MR. McLANE:  Yes.

21         MR. BERTLING:  Okay.

22  BY MR. McLANE:

23     Q    Besides the progress notes that are in -- that

24  have been produced by CFMG, has there ever been, to your

25  knowledge, a full psychological report assessing

183

1   Mr. Hernandez's psychological condition?

2        A    So you just changed the question.

3        Q    Well, I did change the question, but now listen

4   to that question.  Can you answer it?

5        A    Okay.  To the best of my knowledge, I know of

6   no report of that nature done by CFMG.  However, as I

7   stated before, that would have been done by court order

8   by outside people prior to his being sent to Patton.

9        Q    Did you ever see such a psychological report

10  concerning Mr. Hernandez that was issued pursuant to

11  court order?

12       A    That is not part of the CFMG medical record.

13       Q    So in the medical record for Mr. Hernandez

14  you've never seen such a report?

15       A    Correct.

16       Q    And turn to Exhibit 15 and Exhibit 16.

17  Here's a report concerning the conservatorship of

18  Daniel Hernandez done by Brian Adams, appears pursuant

19  to a court order.

20            Do you recall ever speaking to a Brian Adams?

21       A    No.

22       Q    Look at Exhibit 15.  Have you ever seen this

23  document?

24       A    No.

25       Q    Just flip through the pages just to make sure

184

1  can think of that you're aware of?

2          THE WITNESS:  I don't understand.  There's no

3  visual tag.  If there's no visual tag, there isn't any.

4          MS. WEISBERG:  Okay.  Thank you.

5  BY MR. McLANE:

6      Q    So basically someone would have to review the

7  medical --

8      A    Custody has records and medical has records.

9      Q    Okay.  I understand.

10         Custody staff doesn't have access to medical

11  records; is that correct?

12     A    That is correct.

13     Q    Why is that?  You seem very firm about that.  I

14  just want to understand --

15     A    HIPAA.

16     Q    So you're saying it's against the law to

17  release medical information to the custody staff?

18     A    Correct.

19     Q    Even though the custody staff has to keep the

20  inmates safe?

21     A    Yes.

22     Q    Can you verbally tell the custody staff what's

23  in the medical file and that doesn't violate HIPAA?

24         MR. BERTLING:  Well, also lacks foundation that

25  there aren't certain exceptions to HIPAA.

                                                      236

1              But go ahead and answer the question.

2    BY MR. McLANE:

3        Q    I'm just trying to understand because if

4    they're not supposed to get access to the medical file,

5    but you basically tell them what's in the medical

6    file --

7        A    No.  I don't tell them what's in the medical

8    file.  I tell them if someone is, I believe, a danger to

9    self or danger to others and action needs to be taken.

10   But I don't tell them what their diagnosis is.  I don't

11   tell them what their treatment or medications are or any

12   of those details.

13       Q    It's just basically that simple, "I think you

14   need to watch him" or "He's a danger to himself or

15   others"?

16       A    The only other time that custody would be

17   notified of anything is under the Tarasoff laws.

18       Q    Tarasoff laws.  I know what you're saying.

19   When an inmate says "I'm going to kill someone" --

20       A    Uh-huh.

21       Q    -- and that constitutes a waiver?

22       A    That's not confidential communication.

23       Q    I understand that.

24            Okay.  Next page, suicide myths, what do you

25   mean by suicide myths?

                                                    237

1  prisons, so I wanted to focus you in on --

2      A    Okay.

3      Q    -- the PowerPoint is also talking about county

4  programs.

5          Do you see below it says Summit County program?

6          MS. WEISBERG:  I think you were asking about

7  assessments.  Not isolation.

8          MR. McLANE:  Okay.  Assessments.  Right.

9  Right.  You're correct, Caitlin.

10 BY MR. McLANE:

11     Q    And if you could turn to Page 11, there's a

12 study King County -- are you there?

13     A    Yes.

14     Q    King County study of suicide attempts.  Do you

15 agree that -- in the first line it says 77 percent had a

16 chronic mental disorder.  Do you agree that mental

17 illness is a factor?

18     A    We already went over this mental illness is a

19 risk factor.

20     Q    Okay.  I just wanted to make sure.

21          Now, is there any requirement that CFMG staff

22 participate in disciplinary hearings for psychiatric

23 patients?

24     A    No.

25     Q    And do you agree that isolation is a risk

                                                        248

```
 1  factor for suicide?
 2              MR. BERTLING:  It's an incomplete hypothetical.
 3          But if you can answer the question the way it's
 4  phrased, please do.
 5              THE WITNESS:  I think we already covered that.
 6  I think that for some people it might be.  For others it
 7  might not.
 8  BY MR. McLANE:
 9      Q    You know, at the jail that -- you know what
10  disciplinary isolation is, where they put the paper over
11  the cell?
12      A    Uh-huh.
13      Q    And the inmate can't see outside the cell
14  during the day.
15          You understand that?
16      A    Yes.
17      Q    What do you think about that as a form of
18  punishment at the jail?
19              MR. BERTLING:  It's irrelevant.  I'm going to
20  instruct her not to answer that question.  It's not a
21  decision that they make.  It has nothing to do with
22  them.  That's custody's decision.  I'm going to instruct
23  her not to answer.
24  BY MR. McLANE:
25      Q    Does CFMG, to your knowledge, have any input
```

                                                         249

1  into whether a psychiatric patient is -- whether they

2  should be placed in disciplinary isolation?

3          MR. BERTLING:  Well, it lacks foundation that

4  CFMG makes that decision.

5          MR. McLANE:  The answer I want is that they

6  don't have any input in that decision.

7          MR. BERTLING:  Okay.  So it's irrelevant then.

8          MR. McLANE:  No.

9          MR. BERTLING:  It's irrelevant.  It lacks

10  foundation that she can answer that kind of question

11  you're asking.

12          MR. McLANE:  Well, she can answer the question.

13  BY MR. McLANE:

14      Q    I'm just asking you does --

15      A    This is fun.

16          MR. BERTLING:  Do you have any input?

17          THE WITNESS:  There are occasions when I have

18  been asked for an opinion.

19  BY MR. McLANE:

20      Q    Okay.  Is it part of any CFMG policy that

21  you're aware of?

22      A    No.

23      Q    Or the Ventura County jail policy to check

24  every time they put someone in disciplinary isolation?

25      A    Not that I'm aware of.

                                                    250