Alan E. Wisotsky (SBN 68051)
Jeffrey Held (SBN 106991)
WISOTSKY, PROCTER & SHYER
300 Esplanade Drive, Suite 1500
Oxnard, California 93036
Tel:  (805) 278-0920
Fax:  (805) 278-0289
E-mail: jheld@wps-law.net

Attorneys for Defendants COUNTY OF VENTURA, VENTURA COUNTY SHERIFF'S DEPARTMENT, and SHERIFF BOB BROOKS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER BISELLI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF VENTURA, et al., <br><br> Defendants. | No. CV 09-8694 CAS (Ex) <br><br> **DEFENDANTS COUNTY OF VENTURA, VENTURA COUNTY SHERIFF'S DEPARTMENT AND SHERIFF BOB BROOKS' MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** <br><br> Date: June 4, 2012 <br> Time: 10:00 a.m. <br> Ctrm: 5 |

In *Clouthier v County of Contra Costa*, 591 F.3d 1232 (2010), a recent Ninth Circuit jail suicide case, the court held that even though the inmate was admittedly suicidal within a few days before his hanging, and despite evidence that a deputy saw the knotted bed sheet with which the inmate hung himself half an hour later, the inmate's refusal of meals and recreation and the jail's conceded error in transferring the inmate from a suicide prevention cell to the general population, the sheriff's defendants were not liable.  The present case is exponentially less damning.  Plaintiffs' decedent never expressed or exhibited any self-destructive behavior during the relevant incarceration (October 30, 2008, to February 16, 2009) [cf. plaintiffs'

separate statement, page 9, lines 5-8], no ligature was found in advance, and no transfer (or other) mistake occurred.

On page 9, lines 5-8 of the plaintiffs' joint statement of the genuine issues in response to the Sheriff's Department's statement of undisputed facts, it is stated:

> "It is undisputed that the records maintained by VCSD [Ventura County Sheriff's Department] and CFMG [California Forensic Medical Group] do not make reference to any suicidal statement by Mr. Hernandez during the period October 30, 2008, through February 16, 2009."

Plaintiffs further concede that "It is undisputed that for Mr. Hernandez' October 30, 2008, intake screening, he inaccurately reported that he had never thought about ending his life."  Page 9, lines 27-28, page 10, lines 1-2 of joint statement.

A telling example of plaintiffs' extremely weak evidence is the argument made on page 9, between lines 9 and 16 of the plaintiffs' joint statement of genuine issues. This is double hearsay and did not even wind up in the ears of any custody personnel.

The argument goes that another inmate, Rudy Negrete, testified in his deposition that Daniel Hernandez made a statement to Mr. Negrete along the lines of "I would rather just kill myself" during some unspecified time.  Mr. Negrete specifically testified that he did not report this to any jail personnel or custody staff. Rather, he told his clergyman, someone whose surname he cannot recall but whose first name is "George."  Plaintiffs admit that "George" was a civilian who engaged in Bible study with the inmates.  A hearsay account of an undated statement utterly uncommunicated to any custody staff is about as much as plaintiffs have in this case.

The plaintiffs have assembled facts demonstrating that their decedent was sporadically irrational, outwardly violent and occasionally missed meals, from which plaintiffs ask this Court to pronounce the existence of a clear and present danger of a

2

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

self-extinction event. Plaintiffs' facts are:

1. The court-appointed psychologist, Dr. Jimenez, found the plaintiffs' decedent incompetent to stand trial, the superior court adopted his report and referred the plaintiffs' decedent to Patton State Hospital to regain his competence to stand trial and to be treated. Plaintiffs contend that he was therefore disabled for ADA purposes [but see *Simmons v Navajo County*, 609 F.3d 1011, 1021 (2010), holding that to state a claim under the ADA, the plaintiff must allege that he was an individual with a disability otherwise qualified to participate in or receive the benefit of some public entity's services, was denied such benefits and that the exclusion or denial of benefits was by reason of his disability – plaintiffs in this case have made no such showing, as they in fact did not in the *Simmons* case – 609 F.3d at 1022].

2. Daniel Hernandez, plaintiffs' decedent, was not seen by any mental health professional to evaluate his competence after November 3, 2008, [three months and thirteen days before he committed suicide].

3. On October 30, 2008, when Mr. Hernandez returned to the Ventura County jail, he displayed unusual behavior, consistent with the behavior which caused him to be sent to Patton State Hospital initially.

4. Daniel Hernandez' actions reflected what plaintiffs characterize as suicidal thoughts and an unspecified and uncommunicated plan to end his life. They contend that he periodically refused meals and acted out to the point that he was disciplined.

5. On February 11, 2009, a deputy in the segregated housing section where Mr. Hernandez was living, heard a loud noise. It sounded like an individual kicking a wall. Walking over to the area where the noise came from, the deputy saw Mr. Hernandez jumping off the table onto the floor of his cell. He asked Mr. Hernandez why he was jumping and Mr. Hernandez responded, "Fuck you, punk." The deputy told him to calm down and relax. He told him that it was not wise of him to jump from that height. He told him that he was concerned for his safety and did not want

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

him to injure himself. Mr. Hernandez assumed a fighting stance and said, "Open the fucking door you pussy! You run this jail, right? Come in and do something about it, you fucking faggot!" Mr. Hernandez punched the glass window of his cell door behind which the deputy was standing, throwing a right-left-right combination. The deputy told Mr. Hernandez to stop punching the window. He told him that if he continued to punch the window or created a disturbance, he would be sprayed with pepper spray. Mr. Hernandez stopped punching the window. The deputy told him that he would be receiving a disciplinary write up for challenging to fight, failing to obey instructions and disrespect to staff. Mr. Hernandez responded by saying, "You are a fucking pussy – go rape yourself, you fucking faggot!"

6. Mr. Hernandez acted out just before a visit and spoke irrationally about bulldogs. On February 12, 2009, at 4 p.m., four days and 53 minutes before he killed himself, Daniel Hernandez was approached by deputies about a visitor Mr. Hernandez had. Under jail classification, Mr. Hernandez is an additional precaution two-deputy move. This means that in addition to at least two deputies present when moving him in the jail, he must be handcuffed, waist-chained and shackled. As Mr. Hernandez left his cell, handcuffed but not waist-chained and shackled, he initially faced the wall. But he then turned toward one of the deputies and irrationally said, "What did you say about the bulldogs the other day?" Then Mr. Hernandez began walking toward the deputy. The deputy instructed Mr. Hernandez to stay against the wall and Mr. Hernandez repeated the question about bulldogs. He continued to walk toward the deputy. Concerned that Mr. Hernandez might try to attack or head-butt them, the deputies placed him against the wall. Mr. Hernandez tensed his arms and began squirming and moving his shoulders, resisting efforts to control him. He was placed on the ground by the deputies and controlled with their body weight. He was placed in an alternative environment cell which is a quiet area so that he could calm down. He was evaluated by medical staff and found to have no injuries.

/ / /

7.       There was an incident involving a torn towel.  A few days before he killed himself, a housing deputy found a torn towel in the segregated housing day room.  The plaintiffs contend that having seen a torn towel, the deputy ought to have questioned all of the inmates in segregated housing, demanding to see their towels to see who tore a towel.  The argument further continues that once the jail staff found out who had torn a towel, they should have periodically thoroughly searched that inmate's cell in order to determine whether he had torn any bedsheets because the tearing of the towel should have placed them on notice that he was in tearing mood. [But please see declaration of Sgt. David Lareva, appended to the defendants' opposition to the plaintiffs' motion for spoliation of evidence sanctions, especially paragraph 11 in which Sgt. Lareva says "I would also add that inmates frequently tear material for various reasons completely unrelated to suicide or harming themselves. For example, they make cleaning rags and 'ratlines' (makeshift ropes to illegally pass items from cell to cell), and they use torn cloth to cover air vents to block air flow for temperature control."]

8.       The plaintiffs' decedent frequently ranted in his cell about supernatural matters, including the devil.  He would say that he wanted to drive Satan out of his cell.

9.       Some evidence from sounds heard by an inmate in an adjoining cell, Jeremy Jackson, suggested that the plaintiffs' decedent might have been trying to kick the cap off the sprinkler in his cell several days before he killed himself.

10.      A housing deputy spoke to another cellmate of Daniel Hernandez, Rudy Negrete, about Mr. Hernandez being "weird."  The deputy also told Mr. Negrete that Mr. Hernandez was "really out of it."  The deputy asked Mr. Negrete how he could stand living with Daniel Hernandez' outbursts.  [This evidence is made inadmissible by Federal Rule of Evidence 802 prohibiting hearsay.]

/ / /

/ / /

5

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

11. As a result of his misbehavior, especially on February 12, 2009, Daniel Hernandez was disciplined by jail officials. The discipline included removal of his commissary privileges, removal of his day room time and placement of a sheet of paper over his cell window.

The leading Supreme Court decision addressing jail culpability for nonfeasance is *Farmer v Brennan*, 511 U.S. 825 (1994). The *Farmer* court cited a First Circuit case, *Manarite v Springfield*, 957 F.2d 953 (1st Cir., 1992) and a Ninth Circuit decision, *Redman v County of San Diego*, 942 F.2d 1435 (9th Cir. 1991). The First Circuit believed that pretrial detainees had to prove that the jail officials acted with subjective deliberate indifference – that is, a specific intent *mens rea* to either injure or not care whether or not they injured the inmate. The Ninth Circuit decision adopted an objective, civil law approach to deliberate indifference – that is, that the jail officials knew or should have known that the inmate was in imminent jeopardy of harming himself or being harmed by other inmates. The Supreme Court chose the First Circuit approach articulated in *Manarite*, under which the jail officials must both be aware of facts indicating imminent jeopardy to the inmate and have made a subjective, conscious decision to do nothing about it.

The *Farmer* court wrote, "That said, subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment." 511 U.S. at 839-840. Stating at 837 that "We reject petitioner's invitation to adopt an objective test for deliberate indifference," the *Farmer* court held instead that jailers cannot be found liable unless they "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Finally, the *Farmer* court observed that, "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot

6

under our cases be condemned as the infliction of punishment." 511 U.S. at 838.

The *Farmer* holding comports with the *Manarite* formulation of the conduct fault standard or culpability level for county jails in nonfeasance cases:

> ". . .Deliberate indifference requires the complainant to prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. While this mental state can aptly be described as 'recklessness,' it is recklessness not in the tort law sense but in the appreciably stricter criminal law sense, requiring actual knowledge or willful blindness of impending harm, easily preventable." *Manarite*, 957 F.2d at 956.

The leading modern appellate authority in county jail suicide cases is *Clouthier v County of Contra Costa*, 591 F.3d 1232 (2010). In that case, a pretrial detainee's estate brought a federal civil rights action against a county, two sheriff's deputies and a mental health specialist, alleging that they violated the decedent's rights by failing to prevent his suicide. The Ninth Circuit affirmed the district court's grant of summary judgment in favor of the custodial defendants.

The *Clouthier* court held that the plaintiff failed to establish that the deputies knew that moving the inmate to the general population posed a substantial risk of serious harm to the decedent. The plaintiff failed to establish that the deputies knew that the inmate was suicidal and failed to establish that custody staff deliberately ignored that risk. The plaintiff failed to establish that the county had a longstanding custom or practice of moving pretrial detainees from observation cells into the general jail population without having consulted mental health staff.

In *Clouthier*, the inmate became violent following a family argument. During his destruction of numerous items in the family home, he was cut severely and was bleeding. His father signed a citizen's arrest against him. He was placed into custody for felony vandalism and misdemeanor battery. He was furious about having

7

been taken into custody. During the ambulance ride, he deliberately struck his head against the inside of the ambulance several times. At the hospital, he refused to have his wounds stitched. The next morning he was booked into county jail.

The jail requested that he complete a mental health questionnaire. Because he indicated that he wanted to kill himself, he was seen by a mental health specialist. He told her several times that he was suicidal and wanted to be unconscious forever. He was diagnosed as hopelessly suicidal and one of the most suicidal inmates the mental health worker had ever seen. The mental health worker further noted that he had made numerous past suicide attempts, including one incident just a couple of months earlier requiring hospitalization after he slashed his wrists.

The inmate was placed on level one safety precautions by the jail at the instruction of the mental health nurse. Safety cells are bereft of any furniture whatsoever, have padded rubber walls and the inmate wears only a smock. He is checked on every 15 minutes.

The mental health worker spoke with the inmate periodically throughout that same morning. Later in the day, the inmate told the mental health specialist that he no longer felt like killing himself but she did not believe him. She prevailed upon him to consider taking medicine and called for an emergency consultation with a psychiatrist. He was also placed in a housing section for unstable inmates.

She spoke to a deputy on duty in the housing section for unstable inmates. She told the deputy that the inmate was suicidal, had been suicidal all day long, had numerous prior suicide attempts and needed to be placed on 15 minute monitoring. The deputy did check on him every 15 minutes for five hours, when he was taken off the 15 minute observation log.

As she went off shift, the mental health worker gave a copy of her notes to another mental health worker. She told the mental health worker that the inmate had been very suicidal throughout the day and he needed to be in the observation room. She told the deputy sheriff that the inmate could be given regular prison clothes as

8

well as a blanket but that he was not to be given any utensils or personal hygiene items. She also told the deputy that the inmate could be removed from the 15 minute observation log. But she told the deputy to keep the inmate in the observation room. The deputy disputed that. He did not write down the alleged instruction in the log the deputies kept to inform one another of important events.

The inmate was kept in the observation room for another day. When the same deputy returned to work, he continued to check on the inmate every half hour. The next day, another mental health specialist observed the inmate for a few minutes. She understood that he was suicidal and asked him some questions to evaluate his mental state. He looked emotionally drained and calm. He did not seem to her to be actively suicidal at the time.

Two days later the jail log book indicated that the inmate refused recreation time, refused lunch and refused dinner. The captain of the jail testified that the deputy should have requested mental health personnel to evaluate the plaintiff under those circumstances. The deputy received a call from a sergeant who said he needed the inmate's room for another inmate. The deputy asked mental health personnel whether the inmate could be moved but no one answered because they were not on duty then. Because the inmate was no longer on the 15 minute observation log, the deputy deduced that he was no longer a danger to himself and he moved him into the general population, placing him in a cell with another inmate.

According to that inmate, the decedent sat on his bunk after dinner and then tied his bed sheet into a knot at one end. A housing deputy took the cellmate out for recreational time and told the decedent that he could not come out right then but that he would return to take him out. The cellmate testified that as he left the cell with the deputy, he could see the sheet, still knotted, on the edge of the decedent's bed, hanging over slightly. He said nothing about the sheet but he was sure that the deputy should have been able to see it. The deputy testified that he never saw the knotted sheet; he saw the decedent lying on his bunk with the sheet pulled up around

9

him.

Half an hour later, the deputy returned to take the decedent out for recreational time. He discovered him hanging by the neck from the knotted sheet. After ten days on life support, he died.

The *Clouthier* court concluded at 1246 that the evidence was insufficient to allow a reasonable jury to conclude that the deputy knew that the decedent was subject to a substantial risk of serious harm when he moved him into the general jail population. Notwithstanding the recent refusal to eat both lunch and dinner, and refusal to partake in free time, the evidence did not create an inference that a substantial risk of harm to the inmate "was so obvious that Steele must have known of it." In the absence of a risk so obvious that the deputy must have drawn an impermissible inference, the plaintiff was required to adduce evidence that the deputy was subjectively aware of the risk to the inmate. Because the plaintiffs did not do so, the evidence was insufficient to allow a jury to conclude that any constitutional right had been violated. 591 F.3d at 1247.

Regarding another deputy, the evidence adduced by the plaintiffs was insufficient to allow a jury to conclude that the deputy knew that the inmate "was suicidal and deliberately ignored that risk." 591 F.3d at 1247. The argument was that the deputy had been informed by the initial mental health specialist of the inmate's suicidality, knew of certain restrictions on him and that he must have seen the knotted sheet in the cell. Yet he did nothing to alleviate the risk of suicide. The Ninth Circuit disagreed, stating "The record does not include sufficient direct or circumstantial evidence to create a genuine issue of material fact as to whether Foley [the housing deputy] was subjectively aware of a substantial risk of harm to Clouthier and that he deliberately ignored that risk."

At 1249, the *Clouthier* court addressed the plaintiff's argument that summary judgment was improperly granted to the County of Contra Costa. Although framed in different ways, the claim amounted to the assertion that the County's procedures for

dealing with mentally ill detainees were deficient, that the County knew of these deficiencies and that the County's deliberate indifference to them resulted in the plaintiffs' decedent's death.

The plaintiffs identified two main deficiencies in the County's procedures. First, they contended that custodial staff did not comply with the County's written policy requiring mental health staff approval for moving a detainee into the general population. Compounding this problem, plaintiffs alleged, was an inadequate system of communication between mental health staff and custodial staff regarding when a detainee could be moved from an observation cell. Finally, they alleged that the jail was understaffed, resulting in mental health staff failing to observe mentally ill detainees with sufficient frequency to ensure their safety.

The *Clouthier* court held at 1251 that a reasonable jury could conclude that custodial staff was deficient in its implementation of the County's written policy in failing to ensure that they had the approval of mental health staff before moving an inmate but that did not create a triable issue on the question of whether the County itself was liable for the deficiency. There was no evidence that the County had a long standing custom or practice of moving detainees from an observation cell into the general population without consultation of medical staff or contrary to medical recommendations. Nor was there evidence of a longstanding custom or practice of miscommunication between mental health staff and custody staff. Nor was there any evidence that the County was on actual or constructive notice that deficiencies in the implementation of its policy would likely result in a constitutional violation.

Nothing in the record indicated that improper transfers of suicidal inmates happened with such frequency that the need for corrective measures must have been plainly obvious to the policymakers. *This was true even though the record evidence showed that in the preceding five years, there were 158 suicide attempts discovered and six inmates actually succeeded in committing suicide.* 591 F.3d at 1252. Not only did the plaintiffs fail to adduce evidence of a pattern of repeated tortious conduct

11

by custody staff, they also failed to adduce evidence of even a single other suicide resulting from an improper transfer of an inmate from an observation cell into the general population. *Id*.

The plaintiffs relied upon the declaration of an expert who opined, based upon a review of the incident, that custody staff did not properly share its records and did not work with mental health staff as a team. The expert also stated that there was a disconnect between the mental health staff and custodial staff plus an inadequacy in training which appeared to be purposely deliberately indifferent to the mental health needs of the inmates. But, held the *Clouthier* court, "Such conclusory assertions are insufficient to avoid summary judgment." 591 F.3d at 1252. Conclusory, speculative testimony in declarations is insufficient to raise genuine issues of fact to defeat summary judgment. *Id*. The expert's declaration did not address the key question of whether the alleged disconnect was so obvious and the inadequacies so likely to result in the violation of constitutional rights that the policymakers of the local government acted with deliberate indifference to an obvious problem. "In sum, there is no material evidence on the issue of the County's knowledge or the obviousness of the problem." *Id*.

The plaintiffs failed to adduce evidence that the County was on actual or constructive notice of a problem with mental health understaffing. There was no evidence that this alleged understaffing problem lead to repeated violation of inmates' constitutional rights or that the County was aware of and acquiesced in a pattern of constitutional violations. The claim thus amounted to the argument that an injury or an accident could have been avoided if mental health staff had made more frequent observations of the decedent – "This is precisely the argument against which the Supreme Court cautioned . . ." 591 F.3d at 1253.

Finally, the plaintiff argued ratification by the County of the employees' allegedly unconstitutional acts. But this argument was undeveloped and merely stated that the County ratified the employees' conduct by failing to discipline the

employees who violated the decedent's constitutional right. This type of bare allegation was insufficient to create a triable issue of fact.

The entirety of the evidence demonstrated that the plaintiffs had "at most shown that County could have better implemented its policies." But the *Clouthier* court noted that the United States Supreme Court has indicated that "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, §1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." The plaintiffs did not produce sufficient evidence to create a triable issue on the question of whether the inmate's death was due to a longstanding custom or practice of the County, an omission which amounted to deliberate indifference, or actions the County adopted as policy when it failed to discipline any of its employees. "Holding the County liable for the missteps of its employees in this case would therefore amount to *de facto respondeat superior* liability, an avenue rejected in *Monell*." 591 F.3d at 1254.

A plaintiff cannot defeat summary judgment motions by having experts make conclusory condemnations of law enforcement officials. *Clouthier*, 591 F.3d 1252; *Reynolds v County of San Diego*, 84 F.3d 1162, 1165, 1168-1169 (9th Cir. 1996), overruled on another ground in *Acri v Varian*, 114 F.3d 999, 1001 (9th Cir. 1997). The *Reynolds* court held that a party may not avoid summary judgment solely on the basis of an expert opinion which is speculative, conclusory and fails to provide specific facts supporting the violation.

One of the police practices experts in the *Reynolds* case submitted testimony in opposition to a summary judgment motion stating that the officer used reckless tactics to restrain a suspect and should have called for back-up, spoken in calmer tones and refrained from approaching the suspect who was then holding a knife. 84 F.3d at 1170. But the Ninth Circuit held that, "Reiter's findings, however, are insufficient to raise a genuine issue of material fact regarding the reasonableness of Jackson's use of force." The *Reynolds* court wrote, "The fact that an expert disagrees with an officer's

actions does not render the officer's actions unreasonable." *Id*. The inquiry is not whether an expert witness can, in hindsight, construct another reasonable or more reasonable interpretation of events after the fact, or offer conclusory condemnation of what the officer on the spot did, but whether a reasonable officer in the same or similar position might have undertaken the same course of conduct consistent with the culpability standard. *Id*.

There is no foundational evidence from which any expert, Mr. Hayes, Dr. Metzner or anyone else – can construct a realistic scenario under which there is underlying mistreatment of plaintiffs' decedent nor any indication that he intended to take his life at any time from his return from Patton State Hospital on October 30, 2008, through his suicide on February 16, 2009. Absent the commission of any constitutional tort, there is simply nothing to analyze or criticize. It is therefore not possible to find that any of the tests or standards articulated by the appellate authorities apply to create a material issue of fact which a reasonable juror could believe shows that the jail in any way mistreated Daniel Hernandez. No jail employee had any actual knowledge that Daniel Hernandez intended to kill himself either on the day he did so or for many months before that. Indeed, he had expressly disclaimed suicidal intent both in the Inmate Health Screening Questionnaire on October 30, 2008, and at the completion of the Inmate Reception Center on November 3, 2008.

There was no longstanding custom or practice to do something or not do something which facilitated or enhanced his ability to harm himself. There is no act or omission which amounted to a conscious disregard that he might harm himself or take his life. There were no actions adopted as policy by the custodial defendants in failing to discipline its employees when they had done nothing wrong.

The episodes relied upon by the opposition involve outward manifestations of sporadic anger, irrationality and a desire not to eat. Outbursts of aggression toward staff, other inmates and inanimate objects are quite common in the jail environment –

a reality recognized by the Supreme Court in *Farmer v Brennan*: "The Court today adopts the next highest level of subjective intent, actual knowledge of the type sufficient to constitute recklessness in the criminal law . . .noting that due regard is appropriate for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." 511 U.S. at 860, concurring opinion of Thomas, J.

The opposition is long on criticism, short on solutions. If jail authorities force medicine on an inmate who is refusing his medications (as Daniel Hernandez did), they are painted as an overmedicating big brother steamrolling inmates' constitutional rights under *Washington v Harper*, 494 U.S. 210, 221 (1990) not to be forcibly medicated. The incarcerating authorities are portrayed as wanting drugged zombies who cause no trouble and have no will.

But if the incarcerating authorities allow the inmate to discontinue medicine, they are characterized as uncaring caretakers who have abdicated the responsibility for the medical well-being of their wards.

If the jail officials had placed Mr. Hernandez in level one safety precautions (suicide prevention cell), they would be sued for unjustified abusive restraint in a stark, draconian world. But if they do not place him in level one safety precautions, they are sued, as here, for allowing him the freedom to harm himself.

As Chief Justice Warren once observed, an officer's lot cannot be so unhappy that his Hobson's choice is between being charged with dereliction of duty if he does not act and being mulcted in damages if he does. *Pierson v Ray*, 386 U.S. 547, 555 (1967). The County of Ventura, the Ventura County Sheriff's Department and former Sheriff Bob Brooks therefore respectfully request this Court to grant their summary judgment motion as to the federal civil rights causes of action and to

/ / /

/ / /

/ / /

dismiss the state law counts without prejudice to refiling in state court subject to whatever defenses the moving parties have in that tribunal.

Dated:  May ____, 2012

          WISOTSKY, PROCTER & SHYER


By_____
 JEFFREY HELD
 Attorneys for Defendants,
 COUNTY OF VENTURA, VENTURA
 COUNTY SHERIFF'S DEPARTMENT,
 and SHERIFF BOB BROOKS