DAVID S. McLANE (No. 124952)
CAITLIN S. WEISBERG (No.262779)
KAYE, McLANE & BEDNARSKI, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: dmclane@kmbllp.com
Email: cweisberg@kmbllp.com

Attorneys for K.N.H. by and through
her guardian ad litem, Amber Rodriguez

BRIAN A. VOGEL (No. 167413)
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, CA 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
E-Mail: brian@bvogel.com

Attorney for Esther Biselli and the
Estate of Daniel T. Hernandez

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| ESTHER BISELLI AND THE ESTATE OF DANIEL T. HERNANDEZ, BY AND THROUGH HIS PERSONAL REPRESENTATIVE ESTHER BISELLI; K.N.H., [NAME REDACTED] A MINOR, BY AND THROUGH HER GUARDIAN AND MOTHER, AMBER RODRIGUEZ, <br><br>Plaintiffs, <br><br>vs. <br><br>COUNTY OF VENTURA, VENTURA COUNTY SHERIFFS DEPARTMENT; SHERIFF BOB BROOKS; CALIFORNIA FORENSIC MEDICAL GROUP; TAYLOR FITHIAN, M.D., Dr. JOHN KORZELIUS, Dr. MELVIN MYUNG JUNG, MARIA BAEZLIN, DOES 1 through 10, inclusive, <br><br>Defendants. | CASE NO. CV 09-08694-CAS(Ex) <br><br>**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS; DECLARATIONS OF CAITLIN S. WEISBERG AND BRIAN A. VOGEL.** <br><br>Date:         June 4, 2012 <br>Time:         10:00 a.m. <br>Courtroom:    5 <br><br>Action Filed: 11/25/2009 <br>Trial Date: None yet assigned <br>Judge: Hon. Christina A. Snyder <br>Mag. Judge: Hon. Charles F. Eick |

Plaintiffs, by and through their counsel of record, David S. McLane and Brian A. Vogel, respectfully submit this Reply in Further Support of Plaintiffs' Motion for Spoliation Sanctions (Dkt. No. 68).

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: May 28, 2012    By    */s/ David S. McLane*
                              DAVID S. McLANE

Attorney for Plaintiff
K.N.H., A MINOR BY AND THROUGH HER GUARDIAN AND MOTHER, AMBER RODRIGUEZ


LAW OFFICES OF BRIAN A. VOGEL, PC

DATED: May 28, 2012    By    */s/ Brian A. Vogel*
                              BRIAN A. VOGEL

Attorney for Plaintiffs
ESTHER BISELLI AND THE ESTATE OF DANIEL T. HERNANDEZ

## REPLY MEMORANDUM

Defendant County of Ventura's Opposition to Plaintiffs' Motion for Spoliation Sanctions ("Opposition") fails to address, much less oppose, the law cited in Plaintiff's motion which shows that sanctions are warranted in this case. Nevertheless, Defendant relies on an argument that is squarely rejected by those cases—the notion that "a demand to produce is different from a demand to preserve and imposes no preservation obligation." (Opposition at 5:25-26). In fact, the duty to preserve attaches *before* any request for production is made and can even survive *after* a case is closed. *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1067-70 (N.D. Cal. 2006). The duty to preserve certainly and unquestionably attaches when a specific request for production has been made, and Defendant's unsupported assertion to the contrary lacks any shred of merit.

Instead of addressing matters relevant to the spoliation sanctions requested by Plaintiffs, Defendant attempts to shift blame Plaintiffs, arguing that they are responsible for the destruction of video because they did not follow up quickly enough in compelling production. Defendant acknowledges that there is no law to support its position, but fails to appreciate the logical inconsistency in such an argument. It was Defendant, not Plaintiffs, who knew that there was a two year retention policy that threatened the destruction of the video requested by Plaintiff.  It was Defendant, not Plaintiffs, who failed to produce the video before that two-year deadline, knowing that Plaintiffs requested the video. Since there was no federal rule setting a deadline for motions to compel, and because the discovery deadline had been extended to accommodate the substitution of counsel, Plaintiffs had no reason at all to suspect that valuable evidence would be destroyed if a motion to compel was not filed before February 2011.  Defendant cannot avoid spoliation sanctions by expecting Plaintiffs to act on an arbitrary *and unknown* deadline.

The Opposition filed by Defendant and the belated production of a video-clip from February 12, 2009, see *infra* at 5-9, rather than undermining Plaintiffs' motion

for sanctions, provides further evidence of Defendant's bad faith in destroying the video requested by Plaintiffs and therefore supports the imposition of sanctions.

Indeed, the contradictory statements made by Defendant which are described in this Reply indicate that Defendant's declarants should be available for cross-examination. Under the local rules, a declarant's presence can be requested for a motions hearing, if such a request is made within 14 days of the hearing. Local Rule 7-8. Plaintiffs did not make such a request within the 14 days because they were busy preparing their summary judgment oppositions. When Plaintiffs focused on the spoliation opposition, they requested that Defendant voluntarily produce its declarants; Plaintiffs have not yet heard a response. Weisberg Decl. ¶ 15& Ex. E. Plaintiffs respectfully request that the Court require the presence of Defendant's declarants at the spoliation hearing for cross examination pursuant to Local Rules 7-6 and 7-8. Further, because Defendant now claims to keep video of "significant events," (contrary to all prior representations and their so-called policy), Defendant should be required to find and produce any and all audio/video of Mr. Hernandez since January 2007, in addition to the evidentiary sanctions requested by Plaintiffs.

## A.   The Background of the Discovery Dispute

Because Defendant's reply makes certain misleading statements regarding the background of this discovery dispute, Plaintiffs will begin by setting the record straight. In Request for Production No. 62, the request at issue in the present motion, Plaintiffs requested all video of Daniel Hernandez and his housing location during the week prior to his death. Defendant clearly understood the scope of this request, as admitted in the Opposition, because Defendant refused to produce the requested video based on the claim that it would be overly burdensome to transfer data "for a nine-day period, 24 hours per day." McLane Decl., Ex. F at 22;[1] Opp. at

---

[1] The Declaration of David S. McLane was filed with Plaintiffs' Motion as Docket No. 68-1. Exhibits A-K to the declaration were filed as Docket No. 68-2.

3:16-5:16. Defendant did not object on relevance grounds or on the grounds that the requested video did not exist. Therefore, it is absolutely incorrect for Defendant to state, in the Opposition, that "[t]he Ventura County Jail never has kept, and does not keep, audiovisual recordings per se, generally. So what the production request wanted—the nine days of video of the segregated housing hallway—never existed and does not exist in any such form." Opposition at 3:7-10. It is beyond question that the video existed in August of 2010, when Defendant demonstrated its understanding of Plaintiffs' Request and when the duty to preserve attached.[2]

Defendant appears to be making a distinction between electronically stored surveillance footage and portable video (such as DVDs); however, the format of the video in question has no bearing on whether the video should have been preserved following Plaintiffs' request.  The bottom line is that the evidence existed *in some form* when it was requested and *that form* was thereafter destroyed by Defendant.

After Plaintiffs received Defendant's Responses, including the burdensomeness objection to Request No. 62, it became necessary for Plaintiffs to obtain new counsel. Current counsel substituted in the case at the end of 2010 and spent several months reviewing documents produced during discovery, including over two hundred and fifty pages of dense medical records, and preparing to take depositions. As part of that process, Plaintiffs' counsel attempted to ascertain what discovery disputes had already been addressed and what discovery disputes remained outstanding. It was at that point that Plaintiffs realized that there was an outstanding request for video and sent a meet and confer letter to Defendant, dated

---

[2] It is likewise unfounded for Defendant to claim that the video requested by Plaintiffs was destroyed in February 2011 (Opposition at 6:8-9; Held Decl. ¶ 25). The County, through the testimony of its person most knowledgeable, Sgt. Davidson, has already confirmed that the video requested by Plaintiffs continued to exist in March 2011. McLane Decl., Ex. H at 237:21-23. As argued in Plaintiffs' motion, there is no particular reason to credit Defendant's claim that the video requested by plaintiff was destroyed pursuant to Defendant's retention policy and not because it contained unfavorable evidence to Defendant.

1  April 11, 2011. This would have been the first step towards a motion to compel,
2  which never materialized because Defendant *had already destroyed the evidence*
3  *requested*. Plaintiffs saw no point in filing a motion to compel evidence that was no
4  longer in existence. Although the eight month delay between Defendant's
5  Responses and Plaintiff's letter was not ideal, it certainly did not give Defendant
6  license to destroy evidence.

7  Furthermore, contrary to Defendant's insinuation that Plaintiffs sat on their
8  hands with regard to the requested video and then ambushed Defendant with a
9  spoliation motion (Opposition at 5:17-6:5, 8:7-11), Plaintiffs went to great lengths to
10 explain the value of the requested video to Defendant and facilitate the production
11 of that video. As explained in detail in Plaintiffs' moving papers (Motion at 8:6-
12 10:6), Plaintiffs offered at the outset to work with Defendant to identify the relevant
13 portions of the video surveillance and reduce the burden of production. In fact,
14 following Sgt. Davidson's testimony that the requested video was still in existence,
15 Plaintiffs did undertake a very time consuming review of the records to determine
16 which portions of the video surveillance would have captured Mr. Hernandez.
17 Motion at 9:23-10:2; *see* McLane Decl., Ex. G at 5-6. It was not until after Plaintiff
18 invested hours in that project that Defendant once again changed its story, claiming
19 that the video no longer existed. *Id.* at 1.

20 Indeed, Defendant has made so many inconsistent statements on the subject
21 of the video surveillance that no further representations should be credited. First,
22 Plaintiffs were told that the video existed but that production would be overly
23 burdensome; then plaintiffs were told that there was *no* video; then Sgt. Davidson
24 testified that there was video; then Plaintiffs were again informed that *all* of the
25 video had been purged; finally, despite Plaintiffs' numerous previous requests for
26 clarification, and after the filing of the instant motion, Defendant has stated that
27 certain video of "significant events" still exists. Opposition at 7:2-8. Defendant has
28 made no effort to define what the jail considers to be "significant events" and has

made no effort to explain why this information was not provided to Plaintiff sooner.

### B.   Video of the February 12, 2009 Incident

Defendant's bad faith approach to Plaintiffs' request for video could not be clearer than in Defendant's recent production of a clip of video from February 12, 2009 relating to an altercation between the decedent and two jailers, deputies John Eisenhard and Matthew Koenig.[3] The video clip was produced on May 14, 2012 *after* the filing of Plaintiffs' motion for spoliation sanctions. In the Opposition, Defendant justifies the timing of the production by asserting that "plaintiffs never made a demand for any video of the February 12, 2009 scuffle between Mr. Hernandez and the custody deputies, nor did they ever make any production demand for any video depicting all contacts between Mr. Hernandez and jail personnel, nor did they seek audiovisual recordings described in jail incident reports." Opposition 8:7-11. This statement completely disregards the fact that Plaintiffs' request for *all video of Daniel Hernandez* would have necessarily included each of the subcategories identified by Defendant.[4]

More significantly, however, Plaintiff *explicitly identified* the February 12, 2009 video as part of Request No. 62 in the first letter to defense counsel in April 2011. Specifically, the letter stated, "Even if the surveillance video only captures the area outside of Mr. Hernandez's cell, such video would show the amount of

---

[3] The altercation is described in jail incident reports submitted to the Court as Exhibit I to the McLane Declaration (Dkt. Nos. 68-1, 68-2).

[4] Defendant's statement also disregards Plaintiffs' separate request for "Complete and unredacted writings containing reports of administrative investigations of the events leading up to other incidents regarding Daniel T. Hernandez (excluding the INCIDENT) and the cause and circumstances of such other incidents." McLane Decl., Ex. F at 16 (Request No. 45). As was clear from the instructions in Plaintiff's requests, the term "writing" included "any kind of . . . tape-recording, and every other means of recording upon any tangible thing, and any form of communication or representation, including letters, words, pictures, sounds, symbols, or combinations thereof." Weisberg Decl., ¶ 13. Thus, Plaintiffs did, in fact, request video relating to "incidents" at the jail involving Mr. Hernandez.

1 oversight and care Mr. Hernandez received in the week preceding his death . . .
2 Further, the video would presumably capture *the incidents on February 11 and 12,*
3 *2009* which resulted in the imposition of discipline on Mr. Hernandez . . ." McLane
4 Decl., Ex. G at 21 (emphasis added).

5     Similarly, Plaintiffs' counsel's letter of September 6, 2011, which listed the
6 times when Mr. Hernandez would have been on camera, explicitly and obviously
7 included the following description of video: "At approximately 16:00 [on February
8 12, 2009], D. Hernandez was taken from his cell for a visit and, after an incident
9 with Deputies Eisenhard and Koenig, was taken to an alternative environment in the
10 release/transfer area of men's property. He was monitored there for several hours
11 and then returned to his cell at approximately 19:57. We want any video
12 surveillance that exists, either in segregated housing, in men's property, or in the
13 hallways between them, showing Daniel Hernandez." *Id.* at 5. The September 6,
14 2011 letter began with the following statement:

> 15 I am writing in regard to video surveillance footage that Plaintiffs requested in discovery and Defendants have repeatedly failed to
> 16 provide. As you know, we've been around the block a few times on this issue. In light of our discussion at the 30(b)(6) deposition of the
> 17 Ventura County Sheriff's Department and the history of this dispute . . ., I anticipate that you will take *all necessary efforts to*
> 18 *resolve the dispute expeditiously*. [*Id.* (emphasis added).]

19     Defendant's response to both of these communications, each of which
20 explicitly requested the February 12, 2009 video, was an unequivocal statement that
21 no video existed. McLane Decl., Ex. G at 1, 15. It was not until May 13, 2012, more
22 than a year after the first letter, that Defendant informed plaintiff that it had located
23 a video clip relating to the February 12, 2009 incident. In other words, Defendant
24 blatantly and repeatedly disregarded Plaintiffs' requests, and then only produced
25 evidence in its possession after it feared that sanctions may be imposed.
26     Adding insult to injury, the brief video clip produced by Defendant fails to
27 actually depict the altercation that occurred on February 12, 2009, as explained
28 below. The clip is virtually useless, which raises significant doubt as to Defendant's

purpose in "preserving" and producing the clip. Indeed, the circumstances give rise to a strong inference that the clip was only produced in a last ditch effort to avoid sanctions, without actually providing any evidence to Plaintiff.

On February 12, 2009, Mr. Hernandez was taken out of his cell for a visit. McLane Decl., Ex. I at 3, 5. As he was being shackled in the segregated housing hallway outside of his sallyport (*i.e.*, not in his cell or in the sallyport), he apparently made a gesture that the jailers—deputies Eisenhard and Koenig—interpreted as threatening. *Id.* They grabbed him and forced him to the floor. *Id.* Once they secured Mr. Hernandez, he was "escorted" to an "alternative environment" cell in the Men's Property/Release area. *Id.* at 3-4, 6. The visiting area of Ventura County Jail is on the second level of the jail, adjacent to segregated housing unit, and the exit of the segregated housing unit can be seen from the visiting area; the Men's Property/Release area is on the first floor of the jail.[5] Vogel Decl., ¶¶ 3-6.

The altercation on February 12, 2009 was covered by the surveillance video in the segregated housing hallway. This fact is confirmed by the deposition testimony of a sheriff deputy and by the video for February 16, 2009 that was produced by Defendant. Weisberg Decl., ¶¶ 6-9. Both, particularly the video from February 16, 2009, demonstrate that there was a camera facing the door to Mr. Hernandez's sally port that would have shown *exactly* what happened during the altercation between Mr. Hernandez and deputies Eisenhard and Koenig. *Id.* ¶¶ 7, 9. Nevertheless, the video produced by Defendant shows *none of those events*. *Id.* ¶¶ 7-

---

[5] To transfer Mr. Hernandez to the alternative environment cell, Mr. Hernandez had to be taken out the only entrance/exit door to the Ad Seg Unit or through the only entrance/exit door to the Medical Unit ("Special Housing), which is on the same wall and immediately next to the door to Ad Seg. Vogel Decl., ¶¶ 4-6. These doors lead into the main room on the second floor which contain the guard control room, several visiting rooms, and three elevators. *Id.* ¶¶ 3-4. There also cameras in this room. *Id.* ¶ 6. Any visitor who is sitting in one of the three visiting rooms connected to this main room on the second floor would be able to see an inmate who was being escorted to the elevator on the wall opposite the doors to Ad Seg and Special Housing. *Id.* ¶ 5.

1  8. The clip is taken from a camera facing away from Mr. Hernandez's cell where the
2  altercation occurred. *Id.* ¶ 7. Furthermore, the clip ends *before* Mr. Hernandez was
3  escorted down the hallway and under the camera. *Id.* ¶ 8. Additionally, the cameras
4  in the main room on the second floor where the guard control room is located would
5  have captured additional images of Mr. Hernandez. Vogel Decl., ¶¶ 5-6. Thus,
6  although Mr. Hernandez would have been in range of several cameras as he was
7  taken to the alternative environment cell, that footage was not preserved.

8        That Defendant chose to preserve and produce an essentially blank video—
9  when there existed video of the altercation itself and when the same video camera
10  would have captured Mr. Hernandez if the recording were even a few seconds
11  longer—is highly suggestive of bad faith. Moreover, it is inconceivable that
12  Defendant did not recognize the significance of the February 12, 2009 incident,
13  which resulted in Mr. Hernandez's placement on safety precautions within four days
14  of his suicide, when Defendant was investigating Mr. Hernandez's death. The fact
15  that the incident was not fully documented and preserved is further evidence that the
16  documentation would have been unfavorable to Defendants. Accordingly, the
17  belated production of the February 12, 2009 video bolsters, rather than undermines,
18  Plaintiff's motion for spoliation sanctions.

19        Compounding the problem, Defendant appears to deliberately misstate the
20  record in an effort undermine the testimony of Plaintiff's declarant, Ms. Lydia
21  Alaniz. Defendant incorrectly states that "after the scuffle, [Mr. Hernandez] was
22  taken back to his cell," (Opposition at 7:27-28), implying that Mr. Hernandez was at
23  all times out of sight of the visiting area where Ms. Alaniz was waiting. This fact is
24  refuted by the jail incident reports for February 12, 2009 and other documents
25  produced in discovery, all of which show that Mr. Hernandez was moved to a
26  different area of the jail after the altercation with deputies Eisenhard and Koenig.
27  *See* McLane Decl., Ex. I at 3-4, 6. Furthermore, and contrary to Defendant's
28  assertions (*see* Opposition at 7:18-19; Lareva Decl., ¶ 7), Ms. Alaniz never testified

that she saw the altercation between Mr. Hernandez and deputies Eisenhard and Koenig. It was during Mr. Hernandez's transfer to the alternative environment cell, *i.e.*, when he was being "dragged" away by the deputies, that Ms. Alaniz observed Mr. Hernandez's appearance and behavior.  Alaniz Decl., ¶¶ 6-7 (Dkt. No. 68-3). Defendant's misrepresentations, which were designed to cast doubt on Ms. Alaniz's testimony and undermine Plaintiffs' motion, further reflect Defendant's bad faith.

Defendant's effort to impeach Ms. Alaniz's testimony is particularly unwarranted considering that if Defendant had produced a video of the full incident on February 12, 2009 (as opposed to an abbreviated clip), the video would have shown Mr. Hernandez being escorted away from his cell and towards the visiting area, and therefore would have *confirmed*, not impeached, Ms. Alaniz's testimony.

## C. Value of the destroyed video

Defendant attempts in various other ways to minimize the value of the evidence that was destroyed. All of these attempts are misguided because they necessarily rely on an inference that Defendant is not liable in this case, an inference that runs counter to the fact-finding purpose of civil litigation and counter to the policy underlying spoliation sanctions.

For example, Defendant alleges that "whenever anything of significance occurs regarding any inmate," the incident is documented in a jail incident report and "immediately transferred to a DVD and preserved."[6] Opposition at 6:23-25, 7:2-4. Based on that assertion, defendant argues that "[i]t is therefore not possible that there was some significant behavior by the decedent which occurred in the segregated housing hallway which went unpreserved on video." *Id.* at 7:8-10. Plaintiffs are well aware that *Defendant* did not consider Mr. Hernandez's behavior

---

[6] In light of this new information regarding the jail's policy of preserving video of "significant incidents," Plaintiffs have requested that Defendant produce all video recordings of significant incidents involving Mr. Hernandez.  Defendant has not responded to that request. Weisberg Decl. ¶ 14 & Ex. D.

in the week leading to his suicide to be significant. That does not, however, prove that Mr. Hernandez's behavior *was not significant*. For example, Mr. Hernandez's inmate neighbors testified that Mr. Hernandez would yell, make nonsensical statements such as "Get away from me, Satan," and bang on his cell for hours. Weisberg Decl., ¶ 11, Ex. A at 19-26, Ex. B at 21-26. They testified that the guards heard Mr. Hernandez's racket and either ignored it or told Mr. Hernandez to shut up. *Id.* The deputies did not refer Mr. Hernandez to the jail's psychological staff. *Id.* ¶ 11. The video destroyed by Defendant, which included audio, could have confirmed this behavior and demonstrated to the jury, in stark terms, the indifference that the jail staff showed to Mr. Hernandez.

Similarly, Mr. Hernandez had several interactions with deputies during the week before his death that have either been denied by those deputies or characterized by Defendant in terms favorable to Defendant. For example, Deputy Anderson denied that he found a torn towel several days prior to Mr. Hernandez's death which belonged to Mr. Hernandez.[7] Weisberg Decl., Ex. C. Also, Defendant has described the deputies' behavior during the February 11 and 12, 2009 incidents as reflecting concern for Mr. Hernandez's well-being. (Dkt. No. 31, ¶ 17). The video recording of the administrative segregation hallway, if it had not been destroyed, could have impeached Deputy Anderson's denial and could have shown the reality of the deputies' behavior towards Mr. Hernandez and whether that behavior was deliberately indifferent to his serious mental illness and risk of suicide.

For all the foregoing reasons and all of the reasons stated in Plaintiffs motion for spoliation sanctions, Plaintiffs respectfully request that the Court grant Plaintiffs' motion.

---

[7] Inmates Jackson and Negrete have since testified that a torn towel was indeed found and that Deputy Anderson questioned Mr. Hernandez about it. Weisberg Decl., Ex. A at 38-40, Ex. B at 31-32.

1  
2                                              Respectfully submitted,  
3                                              KAYE, McLANE & BEDNARSKI, LLP  
4  
5  DATED: May 28, 2012        By    /s/ David S. McLane  
                                              DAVID S. McLANE  
6  
7                                              Attorney for Plaintiff  
                                              K.N.H., A MINOR BY AND THROUGH  
8                                              HER GUARDIAN AND MOTHER,  
                                              AMBER RODRIGUEZ  
9  
10  
                                              LAW OFFICES OF BRIAN A. VOGEL, PC  
11  
12  DATED: May 28, 2012        By    /s/ Brian A. Vogel  
                                              BRIAN A. VOGEL  
13  
14                                             Attorney for Plaintiffs  
                                              ESTHER BISELLI AND THE ESTATE OF  
15                                             DANIEL T. HERNANDEZ  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28