1  DAVID S. McLANE (No. 124952)
   CAITLIN S. WEISBERG (No. 262779)
2  KAYE, McLANE & BEDNARSKI, LLP
   234 East Colorado Boulevard, Suite 230
3  Pasadena, California 91101
   Telephone: (626) 844-7660
4  Facsimile: (626) 844-7670
   E-Mail: dmclane@kmbllp.com
5
   Attorney for K.N.H. BY AND THROUGH
6  HER GUARDIAN AD LITEM, AMBER RODRIGUEZ
7  BRIAN A. VOGEL, SBN 167493
   brian@bvogel.com
8  THE LAW OFFICES OF BRIAN A.VOGEL, PC
   770 County Square Dr., Ste. 104
9  Ventura, CA 93003
   Telephone: (805) 654-0400
10 Facsimile: (805) 654-0326
11 Attorneys for Plaintiff
   ESTHER BISELLI AND THE
12 ESTATE OF DANIEL T. HERNANDEZ
13
                UNITED STATES DISTRICT COURT
14
                CENTRAL DISTRICT OF CALIFORNIA
15
                     WESTERN DIVISION
16
   ESTHER BISELLI AND THE          )  CASE NO. CV 09-08694-CAS(Ex)
17 ESTATE OF DANIEL T.             )
   HERNANDEZ, BY AND THROUGH       )  **SUPPLEMENTAL EXHIBIT R,**
18 HIS PERSONAL                    )  **DEPOSITION EXCERPTS FROM**
   REPRESENTATIVE                  )  **LYDIA ALANIZ, IN SUPPORT**
19 ESTHER BISELLI; K.N.H.. [NAME   )  **OF SUPPORT OF PLAINTIFF'S**
   REDACTED] A MINOR, BY AND       )  **JOINT CONSOLIDATED**
20 THROUGH HER GUARDIAN AND        )  **OPPOSITION TO VCSD AND**
   MOTHER, AMBER RODRIGUEZ,        )  **CFMG MOTIONS FOR SUMMARY**
21                                 )  **JUDGMENT**
              Plaintiffs,          )
22                                 )
              vs.                  )  Date: June 4, 2012
23                                 )  Time: 10:00 a.m.
                                   )  Courtroom: 5
24 COUNTY OF VENTURA,              )
   VENTURA COUNTY SHERIFFS         )  Action Filed: 11/25/2009
25 DEPARTMENT; SHERIFF BOB         )  Trial Date: None Yet Assigned
   BROOKS; CALIFORNIA FORENSIC)    )  Judge: Hon. Christina A. Snyder
26 MEDICAL GROUP; TAYLOR           )  Magistrate Judge: Hon. Charles F. Eick
   FITHIAN, M.D., Dr. JOHN         )
27 KORZELIUS, Dr. MELVIN JUNG,     )
   MARIA BAEZLIN, DOES 1 through   )
   10, inclusive,                  )
28                                 )
              Defendants.          )
   _____ )

The Plaintiffs, K.N.H, by and through her mother and guardian *ad litem* Amber Rodriguez, and Esther Biselli and the estate of Daniel T. Hernandez, by and through his personal representative Esther Biselli, hereby file Exhibit R, deposition excerpts from Lydia Alaniz's deposition, [exhibits A-Q are deposition excerpts filed with the declaration of Brian A. Vogel], in support of Plaintiffs' Joint Consolidated  Opposition to the Motions for Summary Judgment filed by Defendants Ventura County Sheriff's Department et al.  ("VCSD Defendants"), and Defendants California Forensic Medical Group et al. ("CFMG Defendants").

Exhibit R addresses the defendants' argument concerning deliberate indifference. The Plaintiffs are filing Exhibit R now since the deposition of Lydia Alaniz was taken on May 24, 2012, three days after Plaintiffs filed their summary judgment oppositions, and just received the deposition transcript on May 31, 2012.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

Dated: May 31, 2012            By  /s/ *David S. McLane*
                                    DAVID S. McLANE

                                    Attorney for Plaintiff
                                    K.N.H., A MINOR BY AND THROUGH HER
                                    GUARDIAN AND MOTHER, AMBER
                                    RODRIGUEZ


LAW OFFICES OF BRIAN A. VOGEL, PC

Dated: May 31, 2012            By  /s/ *Brian A. Vogel*
                                    BRIAN A. VOGEL

                                    Attorney for Plaintiffs
                                    ESTHER BISELLI AND THE ESTATE OF
                                    DANIEL T. HERNANDEZ

2

Exhibit R

```
 1                 UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
 2                      WESTERN DIVISION

 3

 4
    ESTHER BISELLI AND THE ESTATE   )
 5  OF DANIEL T. HERNANDEZ, BY AND  )
    THROUGH HIS PERSONAL            )
 6  REPRESENTATIVE ESTHER BISELLI;  )
    K.N.H., [NAME REDACTED] A MINOR,)
 7  BY AND THROUGH HER GUARDIAN AND )
    MOTHER, AMBER RODRIGUEZ,        )
 8                                  )
              PLAINTIFFS,           )
 9                                  ) CASE NO.
              VS.                   ) CV 09-08694-CAS(Ex)
10                                  )
    COUNTY OF VENTURA, VENTURA      )
11  COUNTY SHERIFFS DEPARTMENT;     )
    SHERIFF BOB BROOKS; CALIFORNIA  )
12  FORENSIC MEDICAL GROUP;         )
    TAYLOR FITHIAN, M.D., DR. JOHN  )
13  KORZELIUS, DR. MELVIN MYUNG     )
    JUNG, MARIA BAEZLIN, DOES 1     )
14  THROUGH 10, INCLUSIVE,          )
                                    )
15            DEFENDANTS.           )
    _____)
16

17

18

19            DEPOSITION OF DORA LYDIA ALANIZ

20                 THURSDAY, MAY 24, 2012

21

22

23  FILE NO.  8468-B

24  REPORTED BY KIM EDELEN, C.S.R. NO. 9042, CRR, RPR.

25
```

```
1    I'll see if you recall this, that you contacted the jail

2    at one point about a telephone call you got from Daniel.

3            Do you remember that?

4    A    Yeah.  I contacted the jail a lot of times.

5    Many times I contacted the jail.

6    Q    So my question is, in those jail contacts you

7    had, were any of them in response to a letter you got

8    from Daniel?

9    A    Probably.  Or a call.  Letter, call.

10   Q    I want to focus on letters.

11   A    Sure.

12   Q    Do you remember that you contacted the jail at

13   any time due to a letter?

14   A    Due to a letter?

15   Q    Yes.

16   A    I don't know.  I'm not going to tell you "yes"

17   or "no."  I don't know if it was due to the letter or if

18   it was due to a phone call or -- I don't know.  I don't

19   remember.  But most likely it was one of the two.

20   Q    How many times do you think you contacted the

21   jail about Daniel?

22   A    A lot of times, sir.

23   Q    How many?

24   A    A lot.

25   Q    More than five?
```

```
 1        A     Yes.  More than five.

 2        Q     More than ten?

 3        A     More than ten.

 4        Q     More than 20?

 5        A     Probably about -- less than 50.  No.  No.

 6   That's too much.  A lot of times.  I would randomly just

 7   call.  A lot of times, like 30 times, 20 times.

 8        Q     So your best estimate is 20 to 30 times --

 9        A     Yeah.

10        Q     -- you contacted the jail --

11        A     Sure.

12        Q     Wait until I'm done.

13        A     Sorry.

14        Q     That's okay.

15              -- you contacted the jail about Daniel,

16   correct?

17        A     (Witness nods head.)

18        Q     You have to --

19        A     Yes.

20        Q     There are -- Daniel was incarcerated a couple

21   of different times at the Ventura County jail, correct?

22        A     Yes.

23        Q     Okay.  Do you remember the first time he was

24   incarcerated there?

25        A     No.  I just -- no.
```

```
 1    know -- like I said, I didn't know if I was speaking
 2    to -- well, there was a nurse, a couple nurses, and then
 3    I didn't know if the other ones were just like the
 4    secretaries or the other ladies that would answer the
 5    phone down there.
 6        Q    Do you ever remember speaking to a psych nurse
 7    about Daniel?
 8        A    I do.
 9        Q    Tell me about that conversation, if you
10    remember.
11        A    I just expressed my concerns, once again.  If
12    they're keeping an eye on him.  I just wanted to -- I
13    just wanted to -- I just wanted to know he was okay, you
14    know, that they were keeping an eye on him.
15        Q    And what did they say to you in that regard?
16    What were their responses to you?
17        A    What I recall, they were going to keep -- check
18    on him and they were going to review his file.  He is in
19    medical, so they are keeping an eye on him.  I guess the
20    routine.
21        Q    And did you believe that that occurred at the
22    time?
23        A    Sure.  Sure, I did.  These were all nice, good
24    women.
25        Q    How about with Nicoleta, did you have any
```

```
 1    discussions with Nicoleta with information beyond what

 2    you've already told me about Daniel?

 3         A    No.

 4         Q    And any conversation that she had with you

 5    about Daniel that you remember?

 6         A    Yeah.  Just one or two conversations with her,

 7    that they were doing everything that they are supposed

 8    to do, keeping an eye on him and reassuring us to not

 9    worry so much and he's in a safe place and he has a

10    camera on him at all times.  Just trying to reassure the

11    family that they're keeping an eye on him.

12         Q    Nicoleta told you they had a camera on him at

13    all times?

14         A    Well, someone did.  It must have been her.  One

15    of them did.

16         Q    Is it your understanding that there are cameras

17    in the jail cells?

18         A    Not in all the jail cells, no.  I don't know.

19    I don't know.  Maybe there's one or two.  I don't know.

20         Q    Do you know what Segregated Housing is?

21         A    Yes.

22         Q    Did you oversee any patients in Segregated

23    Housing?

24         A    In Medical Segregation right there at -- right

25    here?
```

1      Q     Are there any specific conversations that you

2    remember having with providers of CFMG prior to

3    February 12th, 2009?  You've told me about general

4    recollections you have with providers.  I'm looking for

5    specifics now.  Are there any specific conversations you

6    recall before February 12th?

7      A     I can't be specific on dates.

8      Q     Okay.

9      A     But what I do know is that I did have

10   conversations with several people, even a doctor.  I was

11   trying to connect with -- I left several messages with

12   the doctor, the chaplain.  I was really concerned about

13   my nephew.  And I just kind of wanted to throw it out

14   there so someone -- someone could keep an eye on him,

15   you know.

16     Q     Can you give me any kind of time frame about

17   when you spoke with a doctor about Daniel?

18     A     It must have been the time that he was really

19   having a hard time.

20     Q     But when -- any --

21     A     I can't.  I can't tell you.

22     Q     Was it before or after Patton, if you know?

23     A     It was after.  It had to be after.  Everything

24   after Patton and before Daniel's passing was -- we were

25   just really concerned about him.

```
 1        Q    Who's "we"?

 2        A    Well, family.

 3        Q    Did anyone else tell you that they spoke with a

 4   doctor or nurse from CFMG during this time frame?

 5        A    Not that I remember.

 6        Q    Tell me what you recall telling the doctor.  I

 7   know you may not remember specifically when, but what

 8   about the conversation itself.

 9        A    I know that I was concerned about, once again,

10   not the medications that he was on at Patton, but if he

11   was on any kind of medication.  You know, and if that

12   medication was helping him through possible depression

13   or -- he was getting deep -- getting deeper -- that was

14   my concern.  I know that my conversation with them was

15   along those lines.

16        Q    Do you know which doctor it was?

17        A    No, I don't.  I don't know which doctor it was.

18        Q    And what else?

19        A    Just my concern about if he's on the right

20   medication or if he's on any medication.  You know, just

21   wanting them to keep an eye on him and making sure

22   that -- I was just concerned for many reasons, you know.

23   He's my nephew.  He's in there.  He's down.  He

24   doesn't -- he's discouraged.  I didn't know.  I just

25   wanted someone to help him.
```

1     Q     Anything else you specifically recall speaking

2   with the doctor about?

3     A     No.  Besides -- I might have mentioned to him

4   if he had any record on the medications he was taking at

5   Patton, to make sure that those medications weren't

6   going to be given to him.  Just stuff along those lines.

7     Q     So you didn't want him to get the ones that

8   were given to him at Patton?

9     A     Well, I'm not a professional.  I don't know

10   what medications should be given to someone in, you

11   know, his state.  I just know what I see.  What I saw,

12   what I heard.

13     Q     And it was your lay impression that whatever he

14   was getting there wasn't good for him?

15     A     At Patton?

16     Q     At Patton.

17     A     Yeah.  No.  He looked very overmedicated and

18   very thin.  I don't think -- he looked like he hadn't

19   showered for -- it's not like Dan -- it's not like

20   Teddy.  It wasn't him at all.

21     Q     And anything else -- I'm not saying there is

22   anything else, but is there anything else that you

23   specifically recall speaking to the doctor about?

24     A     Just that, sir.  That's all.

25     Q     Now, what about the chaplain, anything you

```
 1    specifically recall speaking about with him?
 2        A    Every conversation, short or long that I had
 3    with anyone that I called and was -- able to connect
 4    with was just basically the same thing, just about the
 5    same thing.  We're concerned, I'm worried, what's going
 6    on, are the medications -- is he taking any medications.
 7    It was basically the same thing.
 8        Q    And the reason I'm asking you all these
 9    questions, and trying to break all these things down,
10    because I want to know if there is something, because if
11    we go to trial and you say "I remember this one
12    conversation with so and so," suddenly I didn't ask you
13    about that.
14            So I want to make sure I keep asking you these
15    big catch alls of "is there anything else," "is there
16    anyone else."
17            Are there any other discussions you remember
18    having with anyone else at the jail about Daniel that we
19    have not reviewed?
20        A    No.  Just Nicoleta --
21            MR. McLANE:  Excuse me.  Are you talking about
22    after Patton or before?
23            MR. SHLENS:  Either.
24            MR. McLANE:  At any time at all?
25            MR. SHLENS:  Well, about Daniel.
```

```
 1              THE WITNESS:  I had conversations -- I had two
 2    with Nicoleta.  I'm almost sure about that.  And a
 3    few -- a couple nurses and a CNA or something.  And then
 4    a couple of the receptionists or secretary.  I remember
 5    speaking to one that's been there for a long, long time.
 6    An older lady.
 7    BY MR. SHLENS:
 8        Q    At CFMG or at the jail?
 9        A    I don't know if she works at the jail or she
10    works for the jail or California Forensic.  I'm not
11    sure.  But she had been there for many, many years.
12        Q    Okay.
13        A    And the chaplain and the doctor and several
14    messages to the doctor.  And that's what it is.
15        Q    Okay.  Is there anything substantively that you
16    recall discussing with any of these people that we
17    haven't reviewed --
18        A    No.
19        Q    -- that you haven't told me about?
20        A    No.  I think they were all "I'm going to look
21    into it and look into his chart."  Those were always the
22    answers that I got on their end.
23        Q    Okay.  Is there anything else -- I'm about to
24    get to February 12th, 2009 with your declaration, so I
25    just want to make sure before I get there, is there
```

```
 1    anything else you recall discussing with anyone,

 2    discussing with Daniel, seeing, reviewing, hearing,

 3    anything else about how Daniel was doing or suicidality

 4    in Daniel before February 12th, 2009 that we have now

 5    not gone over?

 6              MR. McLANE:  Objection.  Vague and ambiguous,

 7    compound.

 8              THE WITNESS:  Is there anything else?

 9    Everything that I have -- just -- I don't know.  I don't

10    know if there's anything else.  Basically all my

11    concerns, the letters, through conversations and what

12    happened to him at Patton, and then what was going on

13    with him over here at the jail, that's --

14    BY MR. SHLENS:

15       Q    You've told me everything?

16       A    I don't think there's anything else, no.  No.

17    I can't think of anything else.

18       Q    Okay.  And I just -- again, I'm asking all

19    these things because I just need to know all of your

20    testimony, what you recall about those things.  So

21    that's why I asked the big catch alls, because if there

22    is something then we can go into that.

23              So my question is then before February 12th,

24    2009, was there ever a time where you contacted somebody

25    at the jail, whether they be CFMG or custodial staff,
```

```
 1    saying Daniel is suicidal?

 2        A    I think I contacted -- like I said, I contacted

 3    them several -- many times.  And whether I said "He is

 4    suicidal," it's possible to know.  Or I said "We're very

 5    concerned."  "Is he okay?"  "Are you keeping an eye on

 6    him?"  "Is he on meds?"  "Is he not on meds?"  It's

 7    many, many times that I made those calls.  And there

 8    was -- yes.

 9            MR. McLANE:  Excuse me.  Let her finish her

10    answer.

11            MR. SHLENS:  She had stopped.

12            MR. McLANE:  Well, I don't think so.  She was

13    talking.

14            THE WITNESS:  There was -- there's a lot of

15    times I called over there.  There's a lot of times that

16    I talked to nurses.  There was a lot of times, you know,

17    that they asked me questions about him, you know.  They

18    were all concerned, I felt.  There was many times.  I

19    might have discussed or brought up him being suicidal

20    many times, in most of those conversations.

21            Do you think me calling the jail and speaking

22    to somebody about Daniel and his concerns -- and being

23    concerned about him and his safety and his frame of

24    mind, that doesn't -- you don't think that tells it all.

25    I mean, "He might be suicidal."  "What's he going to
```

```
 1    do?"  "Is he okay?"  "Is he going to hurt himself?"

 2    There's so many conversations that I had like that.

 3    BY MR. SHLENS:

 4        Q    Okay.  Any other specifics that you recall that

 5    we have not reviewed up to February 12th but not

 6    including?

 7        A    (Witness shakes head.)

 8        Q    You got to answer out loud.

 9        A    No.  Besides -- no.

10        Q    Is there anything else generally about these

11    subjects that for some reason we haven't discussed?  I

12    just want to make sure we're done with this now up to

13    February 12th.

14        A    I think I've said it all.

15        Q    Okay.  So let's go to February 12th, 2009.  You

16    have submitted a declaration saying you attempted to

17    visit Daniel on that day at the Ventura County jail.

18        A    Yes.

19        Q    And you state that as you were waiting for

20    Daniel to be escorted to the visiting room, you saw him

21    through the glass in the visiting area.

22             Where were you when this occurred?

23        A    I was in the visiting room that they sent me

24    to.

25        Q    So it's your testimony that you were taken to a
```

1       A    When I left there I asked the clerk what had

2   happened, and I waited a little bit and she didn't know.

3   She just said to call back to see when his next visit

4   is.

5           And I did call to find out when his next visit

6   was, and supposedly it was going to be on Saturday.  Of

7   course, I called Medical to find out if he's okay, what

8   happened.  I was there to visit him.  I didn't get to

9   visit.  You know, I just...

10      Q    Who did you speak to in Medical?

11      A    I don't know, but it was female.  It was

12  females.  Mostly all females.

13      Q    And you specifically recall that you did speak

14  to somebody in Medical about Daniel after this

15  February 12th thing?

16      A    Sure.

17      Q    "Yes"?

18      A    Yes.

19      Q    And what did that person say to you in response

20  to your questions?

21      A    I don't remember.  I don't remember either.

22  Something along the line that they were going to look

23  into it or -- maybe they didn't know.  I don't know.

24      Q    Did you have any further discussions with

25  anyone from Medical before Daniel passed away?

```
 1   go to the front and ask the clerk.

 2        Q    Then I think I have it.  You're saying that

 3   after Daniel's return from Patton until the date of his

 4   death, the only communication with Sheriffs' personnel

 5   that you recall about Daniel occurred on February 12th,

 6   2009 to a Sheriffs' clerk, and the personnel in the

 7   control booth in which you asked "What's going on?"

 8   "Why are they dragging him?"  "Is he hurt?"  "When can I

 9   see him?" that kind of thing, correct?

10        A    Well, you know what, now that you brought it

11   up, I'm almost sure that I called the Sheriffs'

12   Department wanting to know why we weren't able to see

13   our nephew Theodore this whole time.  And I had -- I

14   don't know who it was, but they said something "Well,

15   he's in" -- "he's lost his privileges."

16             I would call and find out why we're not able to

17   hear from him on the phone.  We hadn't heard anything

18   from him.

19        Q    Okay.

20        A    I did make a call or two in regards to that.  I

21   wanted to know why we weren't able to see him.  What was

22   going on with Teddy that he could never have visitors.

23        Q    Approximately when, if you could give me a

24   month, did you place you said a call or two in that

25   regard?
```

```
 1        A    Well, I -- at the time -- there was a period of

 2   time that -- when he came back from Patton we were able

 3   to connect, but then there was like two or three months

 4   we couldn't -- no one heard from Ted.

 5        Q    So when approximately did you place that call?

 6        A    Well, it must have been during the holidays, I

 7   think.  Around Christmas or January.  You know, we

 8   wanted to know what happened.  Why can't we talk to him.

 9   We haven't heard anything from him.

10        Q    So that would be in late December or early

11   January of 2008 to 2009 that you placed a call or two to

12   the Sheriffs' Department asking "Why can't I see my

13   nephew?"

14        A    Yeah.  It was along -- around that time, sir.

15        Q    Okay.

16        A    There was a time, like I said, a couple months

17   we didn't hear anything from him.  We didn't know

18   anything.

19        Q    Okay.  I think we now have it all.  Let me

20   attempt to say it and see if you can follow this.  But

21   it's going to be a little lengthy, so don't worry if you

22   don't get it all.  The reporter can read it back to you.

23             My question is this then:  Are you saying that

24   after Daniel's return from Patton Hospital in October of

25   '08 up to his death in February '09, the only
```

```
 1    really down and trying to be strong and, you know,

 2    trying to -- I guess do the best that he could in this

 3    situation, but, you know.

 4         Q    So he was depressed?

 5         A    Yes.

 6         Q    You thought he was -- he showed signs of being

 7    hopeless?

 8         A    Yes.

 9              MR. SHLENS:  Lacks foundation and it's calling

10    for speculation.

11              MR. HELD:  Well, I have an objection.  The

12    question is argumentative and calls for the witness to

13    give a conclusion.

14    BY MR. VOGEL:

15         Q    And so did this cause you some concern that he

16    might engage in self-destructive behavior?

17              MR. HELD:  Objection.  Lack of foundation,

18    calls for a conclusion, speculative.

19    BY MR. VOGEL:

20         Q    But you can answer.

21         A    Yes.

22         Q    And then did you communicate those concerns to

23    jail medical staff after that first visit after he

24    returned from Patton?

25              MR. SHLENS:  I'm pretty sure this has been
```

```
 1   asked and answered and gone over.
 2           MR. McLANE:  It's his questions.  He can ask
 3   whatever.
 4           MR. SHLENS:  Well, I thought you guys wanted to
 5   be done sooner rather than later.  That's fine.
 6           MR. VOGEL:  We will.  I don't have too much
 7   more.
 8           THE WITNESS:  Yes.  My concern for Ted was
 9   always there.
10   BY MR. VOGEL:
11      Q    And so --
12           MR. HELD:  Well, I don't know if this objection
13   for motion is available to me, but I would move to
14   strike as nonresponsive.  You asked her if she
15   communicated something and she said I had a concern.  So
16   I think -- I don't think she answered your question.
17           MR. VOGEL:  That's fine.  We'll let the
18   question and answer speak for itself.
19   BY MR. VOGEL:
20      Q    And I'll ask whether or not you made any phone
21   calls after that time?
22      A    Yes.  Yes.  Absolutely.
23      Q    Okay.  And in --
24           MR. McLANE:  Were those phone calls to CFMG
25   medical staff?
```

```
 1        Q     Total three times?

 2        A     Yeah.  I don't...

 3        Q     Okay.  And you testified about seeing him once

 4   when he came back from Patton; is that right?  Visiting

 5   him once?

 6        A     Yes.

 7        Q     And how many months or weeks would you say that

 8   was before his death on February 16th, 2009?

 9        A     I know that I -- I believe I saw him when he

10   came back from Patton at the county jail, and then there

11   was a time where nobody heard from him.  It was a matter

12   of months.  I don't know if it was two months or three

13   months, something around there.  Then we were finally

14   able to see him and then when I did go and see him, that

15   all went down.  That's what I saw.

16        Q     Now, you testified about speaking to medical

17   staff about Daniel after he returned from Patton and

18   speaking to medical staff after the February 12th

19   incident about Daniel.

20              Can you just describe the substance of those

21   conversations?

22        A     Just my concern for Daniel and -- just to try

23   to get someone to keep an eye on him, just concerned

24   about his -- where his mind was.  And his health, too.

25   We just really didn't know.
```

```
 1        Q    So those conversations after he got back from
 2   Patton with the medical staff, did you ever tell them
 3   that you thought he might hurt himself?
 4        A    Oh, sure.  Yes.
 5        Q    You also indicated that after he died you
 6   called the jail and said that you tried to warn them?
 7        A    Yes, I did.
 8        Q    Who did you speak to?
 9        A    I don't know.
10        Q    Was it custody or medical staff?
11        A    I don't --
12             MR. HELD:  Could I just interrupt for a second.
13   I didn't hear the question.  Could I get it read back?
14             MR. McLANE:  Do you want me to rephrase it?
15             MR. HELD:  Either way.
16             MR. McLANE:  I'll restate it.
17   BY MR. McLANE:
18        Q    You had testified earlier in response to
19   Mr. Shlens' questions that after Daniel passed away, you
20   called the jail and told -- I don't know whether it's
21   medical or jail personnel, I'll ask you to clarify, but
22   you said words to the effect that you tried to warn them
23   about Daniel.
24             Do you know who you spoke to, whether it was
25   medical or jail?
```

1        A    I don't know.

2        Q    And what specifically did you say?

3        A     The same number I would always call, though.

4   Just -- I think I was upset and angry -- you know,

5   upset.  I said, "He killed himself.  This happened.  I

6   tried to warn you guys.  What happened?"  And at that

7   point they didn't know.  They weren't going to tell me

8   anything.  I did the same to the attorney and her

9   office.  "He's dead now."

10            MR. McLANE:  Steve.

11            MR. SHLENS:  Is that all?

12            MR. McLANE:  That's it.

13

14                   FURTHER EXAMINATION

15   BY MR. SHLENS:

16        Q    Did you and Tim talk about your depositions

17   here today?

18        A    No.

19        Q    Do you know why Tim can't be here for his

20   deposition?

21        A    No, I don't know.

22        Q    Did you know that he was going to have his

23   deposition taken after you?

24        A     I didn't know when, but the investigator had

25   mentioned that my nephew Tim was going to be called in.