UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| CATHERINE JEANG | LAURA ELIAS | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Caitlin Weisberg<br>David McLane<br>Brian Vogal | Jeffrey Held<br>Steve Shlens |

**Proceedings:**     **Defendants' Motions for Summary Judgment** (filed 09/14/10 and 05/07/12)

## I.     INTRODUCTION

On February 16, 2009, Daniel T. Hernandez ("Hernandez"), who suffered from a mental illness, committed suicide by hanging himself with a noose fashioned from his bed sheets and attached to the ventilation grate in his cell while he was in custody and awaiting trial on charges of robbery and possession of a deadly weapon at the Ventura County Pre-Trial Detention Facility ("VCPTDF").

On December 2, 2009, plaintiffs Esther Biselli, Hernandez's estate, K.N.H., by and through her guardian and mother, Amber Rodriguez (collectively "plaintiffs") filed the instant action in this Court against the County of Ventura (the "County"), the Ventura County Sheriff's Department ("VCSD"), former Sheriff Bob Brooks, California Forensic Medical Group, Dr. Fithian Taylor, Dr. John Korzelius, Dr. Melvin Myung Jung, Nurse Maria Baez, and does 1 through 10 inclusive (collectively "defendants"). Plaintiffs assert seven claims for relief: (1) 42 U.S.C. § 1983–violation of civil rights against Dr. Korzelius,[1] Dr. Jung, and Nurse Baez; (2) 42 U.S.C. § 1983–policy, custom and practice against the County and the VCSD; (3) 42 U.S.C. § 1983–supervisory liability against Sheriff Bob Brooks, Dr. Taylor, and Dr. Korzelius; (4) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. against the County and the VCSD; (5)

---

[1] In their opposition, plaintiffs state that they do not intend to pursue their first claim as against Dr. Korzelius.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

violation of California Government Code § 845.6 and Maria Baez; (6) negligence against all defendants; and (7) medical negligence against Dr. Korzelius, Dr. Jung, and Maria Baez.

Plaintiff Esther Biselli is the mother, a successor in interest, and an heir at law of Hernandez. She also represents Hernandez's estate, as its personal representative. K.N.H., is a minor and a successor in interest and heir at law of Hernandez. Her interests in this action are represented by and through her guardian and mother, Amber Rodriguez.

The County and the VCSD are public entities that operate the VCPTDF. Bob Brooks is the former Sheriff of the County. California Forensic Medical Group ("CFMG") was, and is, under contract with the County for the purpose of providing medical care and attention to prisoners under control of the County and VCSD. Dr. Fithian Taylor is the Medical Director for CMFG. Dr. John Korzelius is the physician charged with supervision of medical staff providers at the VCPTDF. Dr. Melvin Jung is a psychiatrist and a treating physician of Hernandez. Maria Baez is a nurse who provided medical care to Hernandez on several occasions.

The County, VCSD, and Bob Brooks (the "VCSD defendants") filed a motion for summary judgment on September 14, 2010. Dkt. No. 31. CFMG, Dr. Taylor, Dr. Jung, and Nurse Baez (the "CFMG defendants") filed a separate motion for summary judgment on May 7, 2012. Dkt. No. 67. Plaintiffs filed their consolidated opposition on May 21, 2012. The VCSD defendants and the CFMG defendants filed separate replies on May 28, 2012. The Court heard oral argument on June 4, 2012. After considering the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

At the time of his suicide, Hernandez was in the custody of the VCSD, whose employees operate the jail, and the California Forensic Medical Group, which provides medical services to pretrial detainees pursuant to a contract with the County.[2] Hernandez

---

[2] The Court will refer to VCSD employees as "custody staff" and to CFMG employees as "CFMG staff" which includes both "CFMG medical staff" and CFMG employees who comprised the CFMG psychiatric staff.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

had been in custody as a pretrial detainee since his arrest on April 12, 2008. He was housed at the VCPTDF from April 12, 2008 through August 28, 2008, and again from October 30, 2008, through his death on February 16, 2009. In the interim, he was committed to the Patton State Hospital for purposes of restoring his competency.

Hernandez had previously spent time at the VCPTDF. By the time Hernandez returned from Patton State Hospital on October 30, 2008, his mental health condition and history of incidents which resulted in safety-cell placements was well-documented. By that time, the list of jail incident reports for Hernandez contained at least fifteen references to "Medical - Suicidal . . . " as the "incident type." The same list contained at least nine references to "safety cell" or "safety precautions." Plaintiffs' Statement of Additional Material Facts ("PSMF") ¶ 14.

### A.    2007 Incarceration

On January 23, 2007, Hernandez was classified as a "psychiatric" inmate by the custody staff meaning that he exhibited signs of mental illness, and was ordered to be housed in the "Administrative Segregation Unit" ("Ad Seg").[3]  Id. ¶ 15. Hernandez was given a green armband with a yellow "tracer" indicating that he was a psychiatric inmate in Ad Seg housing. He wore the armband at all times, and it immediately informed any staff member who came into contact with him that Hernandez was housed in Ad Seg and had one or more mental health conditions. Id. ¶ 16.

Hernandez's January 23, 2007 classification, which was maintained until his death, was based on a judgment by custody staff that his assaultive and delusional behavior while in custody was consistent with that of a psychiatric inmate. Id. ¶ 22. Additionally, around that time, Hernandez filled out a medical evaluation form in which he stated that his "past mental health problems" were "depression" and "suicide attempts." Id. ¶ 23. He reported on the same form that he attempted to hurt himself ten days prior to his arrest

---

[3] Guards and inmates commonly refer to the Ad Seg Unit as "The Dungeon" because it is darker than many of the other units in the jail. Ad Seg inmates are generally locked down 23 hours per day. Id.  ¶ 63. Ad Seg inmates are also subject to "disciplinary isolation" if they receive a "major write-up for disobeying jail rules." Id. ¶ 64.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

by taking pills and that he was currently suffering from depression.  Id. ¶ 23.  This form was forwarded to the CFMG psychiatric staff, who then evaluated Hernandez. Id. ¶ 23.

Hernandez was seen by Dr. Jung, the only psychiatric doctor assigned to the Ventura County Jail during the relevant period of this lawsuit, a psychiatric nurse, and several other CFMG staff members.  Id. ¶ 24.  At the time of his evaluation, Hernandez was housed in a safety cell on safety precautions[4] due to an altercation with the custody staff.  Id.  He told the psychiatric nurse that he was depressed and afraid of others.  He also told her that he had "thought about suicide [and] tried it about one week ago" by overdosing on Tylenol and Advil.  Id. ¶ 25.  Further, Hernandez told Dr. Jung that he had been treated for depression during his last incarceration.  Id.  Dr. Jung prescribed Hernandez an anti-depressant and two tranquilizers, and testified that the tranquilizers would be prescribed for someone with "schizophrenia or major mood disorder with disruptive behavior."  Id. ¶ 26.

Between January 23, 2007 and his release from custody on August 8, 2007, Hernandez was placed on safety precautions in a safety cell on four additional occasions.

On February 7, 2007, Hernandez told a CFMG nurse that he had been hearing voices, that they told him to hurt himself and others by "cutting with whatever I can find," and was placed on level II safety precautions.  He told Dr. Jung that he was "hearing a demon's voice" telling him to hurt himself and others.  Id. ¶ 29.

On May 27, 2007, Hernandez had an altercation with members of the custody staff that resulted in a referral to CFMG staff and which Dr. Jung interpreted as "acute agitation."  Hernandez was placed on level II or III safety precautions for the next two and a half weeks.  Id. ¶ 30.

---

[4]  Pursuant to the safety cell policy at the VCPTDF, inmates could be placed on three levels of safety precautions if considered to be a danger to themselves or others.  PSMF ¶ 28.  Level I is the maximum level of precautions: an inmate is placed in a safety cell with a safety smock and monitored in 15 minute intervals.  For Level II precautions, an inmate is placed in a special housing cell with restricted clothing and monitored in 30 minute intervals.  Inmates on level III safety precautions are housed in a special housing cell and monitored at 60 minute intervals.  Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

On June 9, 2008, while still on level II or III safety precautions, Hernandez told a custody staff member that he wanted to "kill" himself and stated that he planned on hanging himself with his sheets because the demons and voices in his head told him to do so. Hernandez was upgraded to level I safety precautions and was scheduled for a psychiatric evaluation. While on level I safety precautions, Hernandez denied being suicidal but admitted to hearing voices telling him to harm himself every day. On June 9, 2007, Dr. Jung prescribed medication, and on June 11, 2007, Hernandez was taken off safety precautions by CFMG psychiatric Nurse Moskowitz. Id. ¶ 31.

On July 27 and 28, 2007, Hernandez was evaluated by CFMG nurses for refusing meals, for being out of contact with his family, and for possible suicidal ideation. Hernandez told a CFMG psychiatric nurse that "there is something inside of me that is going to drive me to hurt myself and I don't want to let that happen," and demonstrated paranoia by stating that "they can get in through my window." In response, Dr. Jung ordered Hernandez to be placed on level I safety precautions, which continued until July 29, 2007. Id. ¶ 33. Dr. Jung evaluated Hernandez again on July 30, 2007. Hernandez gave vague and ambivalent answers when questioned about suicidal intent, and as a result was placed on level III safety precautions. Hernandez was thereafter evaluated by Dr. Jung or a psychiatric nurse every day from July 31 through August 7, 2007. On August 8, 2007, Hernandez was released from custody. A CFMG psychiatric nurse filled out a form stating that Hernandez "need[ed] immediate attention" upon release. Id. ¶ 33.

**B.    2008–2009 Detention**

**1.    Arrest through transfer to Patton State Hospital**

Hernandez returned to VCSD custody on April 12, 2008. During his intake health screening by a custody deputy, Hernandez denied psychiatric problems, denied ever considering suicide, and denied that he was suicidal at that time. Id. ¶ 35. The first two responses were directly contrary to Hernandez's documented medical history.

On April 16, 2008, CFMG psychiatric Nurse Rodelander received a phone call from Hernandez's aunt, who stated that Hernandez was "very suicidal." Nurse Rodelander spoke with Hernandez, who denied suicidal ideation. Id. ¶ 37. Dr. Jung, however, did not evaluate Hernandez.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

On May 5, 2008, Hernandez was placed in Ad Seg. He then engaged in conduct that resulted in four safety cell placements during this period of detention. Id. ¶¶ 39, 41.

On May 5, 2008, custody staff called CFMG psychiatric Nurse Moskowitz to attend to Hernandez. In her report Nurse Moskowitz wrote, "Patient not responding. Appears upset and is crying with long snot ropes hanging from face and makes no effort to wipe self. Refused breakfast. I observed him sitting on his bunk with head hanging down between his legs quietly screaming and weeping. . . . Rule out psychotic state." Nurse Moskowitz consulted with Dr. Jung who ordered that Hernandez be given involuntary medication to calm him down and placed on level I safety precautions.[5] Dr. Jung evaluated Hernandez later that same day, diagnosed him with a mood disorder with psychotic features, and ordered "close observation."

On June 21, 2008, Hernandez was removed from his cell in Ad Seg for a visit by custody staff. While he was being shackled, Hernandez became agitated, and the visit was cancelled. Hernandez was placed on level I safety precautions by CFMG psychiatric Nurse Moskowitz. Nurse Moskowitz stated that Hernandez "continue[d] to struggle and . . . growl like an animal" and remained non-responsive to questions. Hernandez was given involuntary medication. Nurse Moskowitz evaluated Hernandez again on June 22, 2008, and recommended that safety precautions be discontinued, which was then ordered by Dr. Jung. Id. ¶ 42.

On June 30, 2008, custody staff observed Hernandez lying rigid on his bed with his fists clenched and with a "clear liquid" coming from his mouth. He was unresponsive and smelt of urine. Based on his "bizarre behavior and danger to self," Hernandez was placed on level I safety precautions by Dr. Jung, who ordered the administration of involuntary medication on June 30, and again on July 1, 2008. Id. ¶ 43.

---

[5] Defendants' policy for the involuntary administration of psychotropic medication states that "involuntary psychotropic medications will only be given when a psychiatric emergency exists." Id. ¶ 40. A psychiatric emergency is defined as "a situation in which action to impose treatment over the inmate's objection is immediately necessary for the preservation of life or prevention of serious bodily harm to the inmate or others, and it is impractical to first gain consent." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

On August 9, 2008, custody staff observed Hernandez yelling all morning. Hernandez was also observed banging on the door to his cell. He refused to respond to directions by custody staff, and was thereafter placed on level I safety precautions. He was removed from safety precautions by custody staff later that same day, and although he was monitored by CFMG medical staff, those staff members did not notify or consult with CFMG psychiatric staff. Id. ¶ 44.

In the Summer of 2008, Hernandez was evaluated for his competency to stand trial and for whether he should be placed under conservatorship. Id. ¶ 11. The competency evaluation by Dr. David Jimenez resulted in the following conclusion:

> Hernandez is not competent in that he is not presently able to understand the nature and purpose of the proceedings against him, and to conduct or assist in his own defense in a rational manner because of his acute and ongoing mental illness . . . . It is medically appropriate to treat this person's psychiatric condition with medication. This medication is likely to be effective. This person does not have the capacity to make decisions about such medication. If untreated with medication, this person probably will suffer serious harm to their physical or mental health. In consideration of this evaluation and in my professional opinion this person is a danger to others, and is a danger to self.

Declaration of David S. McLane, Ex. 16 at 5.

Based on the recommendation of Dr. Jimenez, the Ventura County Superior Court ordered that Hernandez be placed at Patton State Hospital for competency evaluation and, if appropriate, restoration pursuant to California Penal Code § 1368. PSMF ¶ 12.

### 2.    Patton State Hospital

Hernandez was treated at Patton State Hospital ("PSH") from August 28, 2008, through October 30, 2008. Id. ¶ 13. At PSH, Hernandez was diagnosed with having a psychotic disorder and possible "features of Schizophrenia, Paranoid Type, based on his high anxiety level, extreme guardedness, and refusal to acknowledge any elements of mental illness in his life, though he has been treated with medications in the past . . . and exhibits odd changes in behavior at times." Id. ¶ 47.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Hernandez was placed on a "Wellness and Recovery Plan" for restoration of competency which included: (1) weekly meetings with the psychiatrist; (2) weekly meetings with a case manager/counselor regarding compliance with PSH treatment procedures; (3) weekly meetings with psychiatric nurses to discuss competency issues; and (4) daily monitoring and treatment of his mental illness and psychotic symptoms. Hernandez was prescribed Zyprexa, a psychotropic medication used to treat schizophrenia, bipolar disorder, and other psychotic conditions. Hernandez was required to take the medication, either voluntarily or involuntarily, on a daily basis. Id. ¶ 48.

On October 23, 2008, PSH informed the Superior Court that Hernandez was competent, at that time, to stand trial. Hernandez was returned to the VCPTDF, by order of the Court, on October 30, 2008. Id. ¶ 49. PSH recommended, and the Court ordered, that Hernandez be maintained on Zyprexa. Id.

### 3.   Transfer from Patton State Hospital through Suicide

#### a.   Contacts with CFMG Psychiatric Staff

Upon his return to the VCPTDF on October 30, 2008, Hernandez again went through the health screening process.[6] Id. ¶ 50. Hernandez was evaluated by the custody staff and by the CFMG staff, resulting in three completed forms: (1) an Intake Health Screening by the custody staff; (2) a nursing assessment of psychiatric and suicidal inmate by the CFMG staff; and (3) a reception housing clearance form by the custody and CFMG staff. As he did in April 2008, Hernandez again denied both present and previous suicidal behavior and mental illness. Id. The nursing assessment reported that Hernandez "was alert and oriented and did not appear tearful, depressed, or to have a flat affect," and that "[h]e denied hallucinations or delusions, . . . [and] did not come across as

---

[6] The custody staff received the court order dated November 6, 2008 to maintain Hernandez on medication. CFMG staff received a nursing discharge summary from PSH. PSMF ¶¶ 51–52. The nursing discharge summary listed Hernandez's medication, his PSH diagnosis, and described his condition upon discharge. Id. ¶ 51. There is no indication that custody staff and CFMG staff communicated regarding the proper level of care for Hernandez or that the custody staff informed the CFMG staff of the court order that Hernandez be maintained on his medication. Id. ¶ 52.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

angry or hostile and was labile." However, the form also described Hernandez as having intermittent eye contact, having disorganized thoughts, responding to internal stimuli, being internally preoccupied, smiling to himself, and mumbling to himself.  Id.

Dr. Jung evaluated Hernandez on November 3, 2008.  Id. ¶ 54.  Although he was aware that PSH prescribed Zyprexa, there is no evidence that Dr. Jung reviewed Hernandez's medical records or sought information from PSH regarding their diagnosis and treatment of Hernandez.[7]  Id.  Dr. Jung disagreed with the diagnosis made by PSH and instead found that Hernandez was "transparently manipulative," and that he had an anti-social personality disorder.  Id. ¶¶ 55–56.  Beyond continuing Hernandez's Zyprexa prescription, Dr. Jung did not order any further treatment or monitoring.  November 3, 2008 was the last time that Hernandez was seen by a member of CFMG's psychiatric staff.  Id. ¶ 57.

On November 14, 2008, Hernandez refused his medication.  Based on Hernandez's refusal, Dr. Jung discontinued the prescription on November 18, 2008.  However, in deciding to discontinue the prescription, Dr. Jung did not observe Hernandez or review his medical records.  Id. ¶ 58.  Dr. Jung did not schedule any follow-up appointments with Hernandez or craft a new treatment plan in light of the discontinuation.  Id. ¶¶ 58–59.  As of November 18, 2008, there was individualized treatment plan in place for Hernandez.

---

[7] Nevertheless, as of November 3, 2008, Dr. Jung was aware Hernandez's extensive history of psychotic behavior; he knew that Hernandez had expressed suicidal ideation in the past and had reported attempting suicided in the past; he had diagnosed Hernandez as having a mood disorder; he had made statements to the conservatorship evaluator in July 2008 that he did not think Hernandez's behavior was "an act" and that "something [was] wrong [with him]; he was aware that Hernandez was deemed incompetent to stand trial and spent two months at Patton State Hospital for restoration of competency; he reviewed documents showing that PSH had diagnosed Hernandez as having a psychotic disorder; and he knew that PSH had maintained Hernandez on anti-psychotic medication and recommended that the medication be continued.  Id. ¶ 55.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

**b.       Contacts with VCSD and CFMG Medical Staff**

Following the intake period, Hernandez was again housed in Ad Seg.  Id. ¶¶ 62–63.  A series of incidents documented in "Jail Incident Reports" and descriptions of his behavior by fellow inmates suggest that Hernandez began to decompensate without his medication.

Hernandez was subjected to "disciplinary isolation" at various points during the period between October 30, 2008 and February 16, 2009.  While he was in disciplinary isolation, Hernandez was not permitted to use the dayroom or recreation yard and was not allowed to receive visits from family and friends.  He was also not permitted to use the commissary.  Id. ¶ 66.  Further, a piece of paper was placed over his cell window so that he could not look out.  The paper also prevented jail staff from looking in without lifting the piece of paper.  Id. ¶ 67.

The VCPTDF disciplinary isolation logs indicate that Hernandez was on disciplinary isolation for three distinct periods after his return from Patton State Hospital: December 19 through 23, 2008; January 6 through 12, 2009; and February 13, 2009 until his death on February 16, 2009.  Id. ¶ 69.  Hernandez was scheduled to remain on disciplinary isolation until March 16, 2012.  Id.

Jeremy Jackson, the inmate housed in the cell next to Hernandez, described behavior by Hernandez that indicates he was in significant mental distress.  Mr. Jackson stated that Hernandez would moan for hours in the cell, and that at other times we would scream or kick things.  Id. ¶ 71.  Mr. Jackson stated that Hernandez made enough noise that guards from downstairs would come up to yell at him.  Id.  Mr. Jackson further stated that he remembered Hernandez yelling "get away from me, Satan," that Hernandez got worse over time, and that he frequently talked to himself and refused meals.  Id. ¶¶ 73–74.

Another inmate, Rudy Negrete, stated that he heard loud noises emanating from Hernandez's cell at nearly all times during the last week of his life.  Id. ¶ 77.  Negrete further stated that Hernandez barked like a dog and screamed for Satan to get out of his cell.  Mr. Negrete testified that it "was known" that Hernandez had problems.  Id. ¶ 78.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Documentary evidence also reflects Hernandez's bizarre behavior. Hernandez refused meals on several days throughout the period including on December 18–20, 2008, January 16, 2009, and January 24, 26, 30, and 31, 2009. Id. ¶¶ 80–81. On or about December 14, 2008, Hernandez was found in his cell with "the right side of the entire wall" covered in pencil graffiti. Id. ¶ 82. On January 17, 2009, Hernandez attempted to bite a nurse while being examined. Id. ¶ 86.

For many of the meal refusals, the custody staff referred Hernandez to Maria Baez, a nurse employed by CFMG. Id. ¶ 88. Nurse Baez knew that Hernandez was a psychiatric patient and that he was housed in Ad. Seg. Id. ¶ 89. She interacted with him in July 2008, during the period he was determined to be incompetent to stand trial, and witnessed his refusal of psychotropic medication. Id. Nurse Baez had prior experience with patients who stopped eating because they were depressed and wanted to die. Id. ¶ 91. Those patients were referred to a psychiatric doctor. Id. Despite this experience, and although CFMG policy required her to refer Hernandez to the mental health staff based on his meal refusals, Nurse Baez never referred Hernandez to the CFMG psychiatric staff.[8] Id. ¶ 92.

### c.     The Week Prior to Hernandez's Suicide

In the week before his death, Hernandez's bizarre behavior appeared to escalate resulting in two incidents with guards, a self-inflicted injury to his hands, discovery of a torn towel,[9] and placement on level II safety precautions. Id. 96. Nevertheless,

---

[8] Additionally, a notion on the hunger strike monitoring log reminded CFMG staff to "notify [the doctor] if [inmate] currently being treated" and to "line psych services at start of strike."

[9] Inmates Negrete and Jackson recalled an incident in which VCSD Deputy Anderson found a torn towel in the dayroom. Id. ¶ 114. Hernandez was apparently the last inmate in the dayroom before the towel was discovered. Id. ¶ 115. Mr. Jackson recalls that Deputy Anderson questioned Hernandez about the towel and ordered Hernandez to produce his towel. Id. Mr. Jackson stated that when he overheard Deputy Anderson say "Well, obviously, this is yours. You don't have a towel and this towel is torn in the dayroom and it was in the trash . . . Where's the rest of it?" Id. Shortly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Hernandez was not referred for treatment of his mental illness.  Id.

On February 11, 2009, Hernandez was observed by VCSD Deputy Eisenhard to be jumping from the table to the floor in his cell.  Id. ¶ 97.  When instructed to stop, Hernandez became verbally abusive, and challenged the deputy to "do something about it," and then repeatedly punched the glass window in his cell with both of his hands.  Id.

On February 12, 2009, Hernandez was handcuffed and brought into the hallway in preparation for a for a visit.  VCSD Deputy Koenig testified that Hernandez stated, "You know what they say about the bulldog," and then took a step towards Deputy Eisenhard. Id. ¶ 98.  Eisenhard reported that Hernandez turned towards him and asked "What did you say about the bulldogs the other day?"  Id.  Hernandez began to walk toward Deputy Eisenhard, who stated that "fearing that inmate Hernandez would attempt to headbutt me, I grabbed him . . . and turned him towards the wall."  Hernandez was then taken to the ground by Deputies Koenig and Eisenhard.  Id. ¶ 99.

Hernandez was then transferred to an "alternative environment cell" in order to calm him down.  He was placed on safety precaution level II.  Id. ¶ 110.  He was returned to his Ad Seg cell 4 hours later.  Id. ¶ 111.  Hernandez however, was not referred for assessment by mental health staff.  Id. ¶ 112.

Hernandez was then informed that he would be on "disciplinary isolation" from February 13, 2009, through March 16, 2009, and that he would not be allowed visits or commissary from February 13, 2009, through April 4, 2009.  Id. ¶ 113.

**d.    Suicide on February 16, 2009**

In the afternoon of February 16, 2009, while Hernandez was on disciplinary isolation, with a piece of paper covering his cell window, Hernandez committed suicide. He was discovered at approximately 4:39 p.m. by VCSD Deputy Valdez.  Id. ¶ 122.

---

thereafter, on February 14, 2009, Hernandez was given a "major clothing exchange" which included sheets and towels.  Id.  ¶ 117.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Although jail policy required inmates housed in administrative segregation to be observed at 60-minute intervals, Hernandez's cell scan log[10] shows that approximately 90 minutes elapsed between Deputy Valdez's penultimate cell check and his discovery of Hernandez's suicide.  Id.  ¶¶ 123–24.  Moreover, Mr. Negrete testified that he had been on disciplinary isolation several times, and that some guards, including Deputy Valdez, did not routinely lift the paper covering the window to look in during cell checks.  Id. Mr. Jackson testified that he was in the dayroom across the hall from Hernandez's cell on February 16, 2009, from 3:00 to 4:00 p.m, that he watched Deputy Valdez perform the cell scan and that Deputy Valdez did not lift up the paper to look into Hernandez's cell when he performed his cell scan at 3:01 p.m.  Id. ¶ 127.

Hernandez used strips of bedsheets to fashion a noose, which he attached to the ventilation grate above the toilet in his cell.  Id. ¶ 131.  Jail records indicate that a similar suicide attempt was made in November of 2008.  Id.

### C.    VCSD and CFMG Policies and Practices Pertaining to Mentally Ill Detainees and Detainees with Risk of Suicide

During the relevant period of this action, from January 2007, through February 16, 2009, jail operations proceeded according to the following non-exhaustive list of policies and practices which plaintiffs allege were deficient.

Beyond notifying the jail if a detainee should be classified as a psychiatric inmate, CFMG staff had no involvement in decisions regarding an inmate's classification or regular housing location.  CFMG psychiatric staff were not asked and did not advise custody staff regarding whether a housing placement, such as administrative segregation, was contra-indicated for a mental health patient due to his mental illness.  The custody staff, not the CFMG staff, made the decision as to whether an inmate was a primary or secondary psychiatric classification which affected the treatment provided to the detainee.  PSMF ¶ 132.

---

[10] Cell checks are recorded electronically by the custody staff.  As deputies walk through a housing unit, they touch a baton to an electronic square on each cell door, establishing the time they were at that cell doing the check.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

CFMG staff were not involved in decisions regarding the imposition of discipline on detainees with mental health conditions.  Prior to the imposition of discipline, CFMG staff were not asked and did not advise custody staff regarding (a) whether a detainee's actions giving rise to discipline were related to his mental health condition or (b) whether discipline, or any particular form of discipline, would be contra-indicated for a mental health patient due to his mental illness.  Id. ¶ 133.

CFMG staff were not required to and did not regularly check on the physical or mental welfare of inmates housed in administrative segregation.  VCSD did not require such checks.  Id. ¶ 134.

CFMG staff were not required to and did not regularly check on the physical or mental welfare of inmates with mental health conditions, unless those inmates were taking prescription medications, had been given a primary psychiatric classification by the jail, or were diagnosed with schizophrenia.  VCSD did not require such checks.  Id. ¶ 135.

CFMG staff were not required to and had a standard practice of not following-up on detainees after the discontinuation of psychotropic medication.  Id. ¶ 136.

VCSD had no policy addressing the handling of court orders relating to the mental health treatment of detainees, either with regard to delivery to CFMG or with regard to reporting violations of the order to the court.  Id. ¶ 137.

Although CFMG produced a written policy regarding evaluation of inmates on disciplinary isolation, CFMG staff did not, in fact, check on the physical or mental welfare of detainees on disciplinary isolation in administrative segregation, in part because they were not informed by custody staff when an inmate was placed on disciplinary isolation in administrative segregation.  Accordingly, VCSD/CFMG practice was that inmates on disciplinary isolation in administrative segregation were not monitored by CFMG staff.  Id. ¶ 138.

CFMG staff did not share any information with custody staff regarding a pretrial detainee's mental health condition, diagnosis, treatment, or medication and did not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

advise custody staff regarding proper monitoring of a pretrial detainee based on his mental health condition. Id. ¶ 139.

CFMG had an official practice of not creating individualized treatment plans for detainees with mental health conditions. Id. ¶ 140.

CFMG staff were not trained regarding jail disciplinary procedures such that they were unfamiliar with the types of discipline were imposed on inmates with mental health conditions, and therefore could not evaluate whether such discipline was deleterious to the mental health of those inmates. CFMG staff were also not trained regarding other essential jail policies and information that prevented them from providing effective monitoring and treatment to mentally ill detainees. Id. ¶ 141.

VCSD had an official policy whereby safety precautions initiated by custody staff would not require a referral to CFMG psychiatric staff and could be terminated without consultation by CFMG psychiatric staff. Id. ¶ 144.

VCSD's written cell scan policy required only 60 minute checks in Administrative Segregation (and the more extreme disciplinary isolation). Title 15 and national correctional standards for suicide prevention require 30-minute checks. Furthermore, the County had an official policy of not performing 60 minute checks but rather permitting checks to vary between 20 minutes and 100 minutes. Id. ¶ 145.

Plaintiffs' experts, Dr. Jeffrey Metzner, and Lindsay Hayes, state that individually and in combination, these policies and practices resulted in Hernandez receiving no treatment for his mental health condition in the three months prior to his suicide and grossly insufficient monitoring, and thereby contributed to his death. Metzner Decl. ¶¶ 46–48; Hayes Decl. ¶¶ 19–23, 37.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

56(a).  The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

       If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

       In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

### A.   Whether Deliberate Indifference Standard Applies to Plaintiffs' Constitutional Claims

       As an initial matter, the Court finds that a disputed issue of fact exists as to whether Hernandez was incompetent to stand trial at the time of his death, meaning that the legal standard for plaintiffs' constitutional claims is also disputed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|---------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Pretrial detainees have a right to constitutionally adequate medical care while in custody under the Due Process Clause of the Fourteenth Amendment. Conn v. City of Reno, 591 F.3d 1081, 1094 (9th Cir. 2009), vacated on other grounds 658 F.3d 897 (2011). "With regard to medical needs, the due process clause, imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right not to have officials remain deliberately indifferent to their serious medical needs.'" Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation omitted). The "duty to provide medical care encompasses detainees' psychiatric needs." Id. The Ninth Circuit however, has distinguished between mentally ill pretrial detainees, whose due process claims are analyzed under the deliberate indifference standard, and pretrial detainees whose incompetency renders them unfit for trial. Clouthier v. County of Contra Costa, 591 F.3d 1232, 1243–44 (9th Cir. 2010); Jones v. Blanas, 393 F.3d 918, 933 (9th Cir. 2004) ("[The Ninth Circuit] has held . . . that the Eight Amendment's 'deliberate indifference' standard of culpability does not apply in the context of an incapacitated criminal defendant's Fourteenth Amendment challenge to conditions of confinement"). Because, "[i]ncapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment,' the determination of whether an incapacitated pretrial detainee's rights have been violated, depends on a balancing of the detainee's "liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state." Oregon Advocacy Ctr. v. Mink, 322 F.3d 1101, 1121 (9th Cir. 2003).

Here, as noted above, in July 2008, the Superior Court found Hernandez incompetent to stand trial, and ordered that he be placed at Patton State Hospital for treatment and restoration of his competency. The Court further authorized the administration of involuntary psychotropic medication to treat Hernandez. After two months of treatment and medication, Patton State Hospital certified that Hernandez was competent to stand trial. The certification noted however, that " a speedy trial is important for maintenance of trial competency," indicating that Hernandez's competency was not a permanent state but could lapse over time, which according to Dr. Jimenez's evaluation and the PSH treatment plan, would be likely without treatment and medication. Pursuant to the certification by PSH, the Court ordered Hernandez to be returned to VCSD custody and ordered that he be "maintain[ed] . . . on medication as recommended by Patton State Hospital."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

The evidence indicates that Hernandez received no treatment or medication after November 18, 2008.  Further, the evidence suggests that Hernandez's placement in administrative segregation and disciplinary isolation exacerbated his mental health condition.  Pursuant to established practice, the jail made these housing and discipline decisions without input from the CFMG staff.  Finally, there is substantial evidence that after his return to VCPTDF, Hernandez engaged in the same type of behavior that he displayed when he was found to be incompetent to stand trial including: refusing meals, refusing treatment, engaging in aggressive and bizarre conduct, yelling in his cell, and causing himself harm.

Accordingly, the Court finds that a question of fact exists as to whether Hernandez was mentally incompetent to stand trial, and therefore that a question of fact exists as to whether the deliberate indifference standard applies.  And, if Hernandez was incompetent to stand trial, balancing his interests in freedom from incarceration and in restorative treatment against the defendants' interests, the Court finds that a rational jury could find that Hernandez's constitutional rights were violated by both the CFMG defendants and the VCSD defendants.

In any event, for the reasons articulated below, the Court finds that even under the deliberate indifference standard, a triable issue of fact exists as to whether defendants violated Hernandez's constitutional rights.

### B.    Deliberate Indifference Standard

Under the deliberate indifference standard, a defendant is liable where he "fail[s] to respond to a prisoner's pain or possible medical [or psychiatric] need" or other risk of harm to the prisoner.  McGucklin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).  Indifference to a serious medical need[11] "may appear when prison

_____

[11] Defendants do not appear to dispute that Hernandez had a "serious medical need" which exists where "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted).  Nevertheless, the law is well settled that Hernandez's mental illness would qualify as a serious medical need.  See, e.g.,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. at 1059 (quoting Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988)).  Indifference to a risk of suicide exists where a defendant "knows of and disregards an excessive risk to inmate safety."  Farmer v. Brennan, 511 U.S. 825, 837 (1995).  The Farmer standard includes both an objective and a subjective requirement, but "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842 (internal citations omitted).

### C.    CFMG Defendants' Motion

#### 1.    Plaintiffs' Constitutional Claims

The CFMG defendants argue that summary judgment is appropriate as to plaintiffs' § 1983 claims against them because there is no evidence that they were deliberately indifferent to Hernandez's medical needs.  CFMG Mot. at 7–9.  Specifically, the CFMG defendants contend that there has been no showing that they knew of and disregarded an excessive risk to Hernandez's health and safety.

The Court rejects this argument, and finds that evidence in the record supports the conclusion that there is a material issue of disputed fact as to whether that Dr. Jung and Nurse Baez were deliberately indifferent to Hernandez's serious mental health needs and risk of suicide.[12]

First, as to Dr. Jung, the evidence indicates that he was well aware of Hernandez's psychotic diagnosis, suicidal tendencies, and need for mental health treatment.  Dr. Jung

_____

Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983) ("Treatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.').

[12] Drs. Korzelius and Fithian are sued in their supervisory capacity under 42 U.S.C. § 1983 in plaintiffs' third claim for relief.  The CFMG defendants do not specifically address this claim in their motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

was personally involved in multiple instances in which Hernandez was placed on safety precautions for being a danger to himself, he was personally apprised of Hernandez's prior suicidal statements and suicide attempt, and authorized the administration of involuntary medication on three separate occasions. Despite this knowledge, Dr. Jung discontinued all treatment when Hernandez refused his psychotropic medication and permitted Hernandez to be housed, untreated, in extreme isolation. PSMF ¶¶ 55–59.

As to Nurse Baez, the evidence viewed in the light most favorable to the plaintiffs suggests that she also failed to take steps to provide needed mental health care to Hernandez despite her knowledge of the circumstances that made his meal refusals a significant indicator of his mental state. Nurse Baez also knew of Hernandez's psychiatric problems and was aware of his administrative segregation and his bizarre conduct in January 2009. Nurse Baez was also aware of Hernandez's behavior in July 2008, the period in which Hernandez was determined to be incompetent and acutely mentally ill, and witnessed his refusal of psychotropic medication Id. ¶¶ 86–95. In these circumstances, Nurse Baez's failure to refer Hernandez to the CFMG psychiatric staff, which occurred on multiple occasions and contravened explicit CFMG policy, suggests that she was deliberately indifferent to Hernandez's serious medical need.

Accordingly, as in other cases where mental health professionals know that an inmate needs mental health treatment and fail to take steps to provide such treatment, a rational jury could find that Dr. Jung and Nurse Baez were deliberately indifferent to Hernandez's serious medical need. See, e.g., Clouthier, 591 F.3d at 1245 (reversing summary judgment for mental health staff member because she knew of the decedent's "depressive, suicidal condition and need for mental health treatment" and did not take steps to prevent "the risk of harm the he faced if denied medical treatment").

## 2.     Plaintiffs' State Law Claims

The CFMG defendants argue that they are entitled to summary judgment as to plaintiffs' state law claims. Specifically, the CFMG defendants argue that plaintiffs' claims involve allegations of negligence which are refuted by the testimony of Dr. David Paster, who testified that the defendants conformed to the applicable standard of care. Mot. at 9–11. According to the CFMG defendants, "[a]bsent countervailing evidence from a competent expert, defendants have negated an essential element of the claims

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

against them." Id. at 10.

The Court finds that a triable issue of fact exists as to whether plaintiffs' are able to establish the CFMG defendants' negligence, and therefore denies the CFMG defendants' motion for summary judgment as to plaintiffs' state law claims. Plaintiffs have submitted declarations from Dr. Jeffry Metzner, a medical expert specializing in the provision of mental health services in correctional facilities, and Lindsay Hayes, an expert in suicide prevention in correctional facilities. These experts declare that the failure to treat Hernandez in fact violated the standard of care as well as various policies and regulations.[13] See Metzner Decl. ¶¶ 45–48; Hayes Decl. ¶¶ 19, 21–22, 30. Because plaintiffs' experts reach conclusions in conflict with those of Dr. Paster, the Court finds that a triable issue of fact exists as to whether the CFMG defendants violated the applicable standard of care.[14]

### D.    VCSD Defendants' Motion

#### 1.    Plaintiffs' Constitutional Claims

The VCSD defendants argue that they are entitled to summary judgment on plaintiffs' constitutional claims because the jail took adequate steps to respond to the risk of inmate suicides and because Hernandez was not "truly suicidal" and did not present any "indications of suicidal ideation." VCSD Mot. at 7–9, 11–12. According to the VCSD defendants, "the present case does not even rise to the threshold of analytical consideration because there is really nothing to analyze." Id. at 11. The VCSD defendants argue that three Ninth Circuit opinions preclude liability: Clouthier v. County of Contra Costa, 951 F.3d 1232 (9th Cir. 2010); Simmons v. Navajo County, 609 F.3d

---

[13] The CFMG defendants object to the declarations of Dr. Metzner and Mr. Hayes on the grounds that they are conclusory and lack foundation. The Court overrules these objections.

[14] The CFMG defendants do not address plaintiffs' allegation that Nurse Baez violated California Government Code § 845.6, which imposes liability where an employee "knows or has reason to know that [a] prisoner is in need of immediate medical care, and [] fails to take reasonable action to summon such medical care.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

1011 (9th Cir. 2010); and Estate of Cartwright v. City of Concord, 856 F.2d 1437 (9th Cir. 1988).

The Court finds that a triable issue of fact exists as to whether Hernandez's constitutional rights were violated as a result of the jail policies and therefore denies the VCSD defendants' motion for summary judgment as to plaintiffs' constitutional claims.

In Clouthier, the Ninth Circuit reiterated the three ways to establish entity liability under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978) and City of Canton v. Harris, 849 U.S. 378 (1989): (1) affirmative \policies and practices; (2) failure to train or institute policies where the need for such training is so obvious as to constitute deliberate indifference; and (3) commission or ratification of the tort by an official with final policy-making authority.

Here, as noted above, plaintiffs have presented evidence that defendants' policies violated established constitutional and statutory standards, and that the constitutional harm in this case was "the result of [] longstanding practice[s] or custom[s] which constitute the standard operating procedure of the local government entity." Price v. Sery, 513 F. 3d 962, 966 (9th Cir. 2008); see e.g., Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (holding county liable for policy that resulted in death of mentally ill patient who was denied medical care); Cabrales v. County of Los Angeles, 864 F.2d 1454, 1640–61 (9th Cir. 1988) (holding county Los Angeles's practice of medical understaffing at the jail contributed to mentally ill detainee's lack of treatment and subsequent suicide, giving rise to liability).  Plaintiffs' evidence also suggests that the constitutional tort alleged in this case was the result of inadequate policies and training with regard to mental health care and suicide prevention.  See George v. Sonoma County Sheriff's Dept. 2011 WL 2975850, at *7–8 (N.D. Cal. July 22, 2011) (holding that medical center's absence of policies and training on discharge procedures for inmates was obviously deficient and deliberately indifferent).

Further, while the Court notes that deliberate indifference to a serious medical need is a fact-bound inquiry that is different in every case, a review of the cases upon which the VCSD defendants rely clarifies why summary judgment is inappropriate in the circumstances of this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|----------|----------------------|------|--------------|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

Cartwright involved an arrestee who was unknown to the police and committed suicide on the night of his arrest. The only evidence showing any liability was the fact that the decedent joked about suicide with his fellow arrestee. Estate of Cartwright v. City of Concord, 618 F. Supp. 722, 728 (N.D. Cal. 1985). After a three week bench trial, the district court held that plaintiffs had not met their burden of proving that the jailers were even negligent to the risk of suicide. Id. at 724–25, 727–28. Additionally, the defendants presented evidence that the county had extensive training programs and written policies in place that complied with contemporary standards. Id. at 731–32. The decedent did not have any known mental health problems or history of suicide risk, id. at 725–26, and plaintiff presented no meaningful evidence that the policies, practices, or training were deficient. Id. at 731–32.

Simmons and Clouthier arose from situations where jails responded to the decedent's mental health needs and risk of suicide but were nevertheless unsuccessful in averting the detainee's suicide. Simmons, 609 F. 3d 1014–16; Clouthier, 591 F.3d at 1237–40. By contrast, in this case, the evidence indicates that the defendants did nothing to address Hernandez's serious mental illness and risk of suicide. Further, in neither Simmons nor Clouthier did the plaintiffs argue that the failure to treat the detainee's mental illness was the result of affirmative policies or that the defendants' suicide prevention policies were flawed. Simmons 609 F.3d at 1020–21; Clouthier, 591 F.3d at 1250. These cases therefore do not compel summary adjudication for the VCSD defendants.

### 2.     Plaintiffs' Claims Under Title II of the Americans With Disabilities Act and the California Unruh Civil Rights Act

The VCSD defendants argue that Simmons compels summary judgement in their favor for plaintiffs' ADA and Unruh claims. VCSD Mot. at 17.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12131. The implementing regulations for the ADA state that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7; see Weinreich v. L.A. County Metropolitan Transp. Auth., 114 F. 3d 976 (9th Cir. 1997). "A disability discrimination claim may be brought either on the theory that the defendant failed to make reasonable accommodations or on a more conventional disparate treatment theory, or both." Dunlap v. Ass'n of Bay Area Govt's, 996 F. Supp. 962, 965 (N.D. Cal. 1998). "Unjustified isolation . . . is properly regarded as discrimination based on disability." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597.

Here, plaintiffs' have adduced evidence reflecting that Hernandez was classified by the jail to be housed in Ad Seg, the most restrictive area of the jail, based on conduct that was specifically linked to his mental illness. This decision was made without input from the mental health staff at the jail, and persisted despite indications that segregation housing was adverse to his mental health condition. Hernandez also specifically contested his classification in December 2008 by filing a grievance, which was denied. Based on Hernandez hosing in the medical unit for several weeks in 2008 and in a non-lockdown unit at Patton State Hospital for several months, a rational jury could find that Hernandez had proven he could be housed in more integrated environments without posing a security risk, and that Hernandez's placement in Ad Seg and disciplinary isolation was punishment for behavior known to be related to his mental illness.[15] Accordingly, the Court finds that a genuine issue of material fact exists as to plaintiffs' claim for disability discrimination.[16]

---

[15] In this respect Simmons is distinguishable from the instant matter because it was undisputed that the decedent was assigned to a cell in a segregated part of the jail facility because that cell was customarily assigned to juveniles.

[16] The VCSD defendants do not separately address plaintiffs' Unruh Claim, but rather state that the analysis is the same as the ADA analysis in Simmons. Because the Court denies the VCSD defendants' motion with respect to plaintiffs' claim for violation of the ADA, the Court also denies the VCSD defendants' motion as to plaintiffs' claim for violation of the Unruh Civil Rights Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

3.    **Immunity Pursuant to California Government Code § 844.6(a)(2)**

The VCSD defendants argue that plaintiffs' claim for negligence is precluded because public entities are not liable for any injury to a prisoner pursuant to California Government Code § 8444.6(a)(2).  VCSD Mot. at 18.

Although the VCSD defendants are correct that § 844.6(a)(2) provides immunity for public entities for personal injuries suffered by prisoners and that the County would be entitled to immunity under this statute on plaintiffs' negligence claim, California Government Code § 844.6(d) allows for liability against public employees who negligently cause injury.  Accordingly, summary judgment is not appropriate as to plaintiffs' claims for injuries against the public employees.  Additionally, California Government Code § 845.6 requires public entities to summon medical care for inmates whom they knew, or had reason to know, required immediate medical care, regardless of the immunity set for in § 844.6(a)(2).  Therefore, summary judgment is also inappropriate as to plaintiffs' claim for violations of California Government Code § 845.6.

4.    **Plaintiffs' Remaining State Law Claims**

The VCSD defendants argue that if the Court grants summary judgment as to plaintiffs' federal claims, it should not exercise supplemental jurisdiction over plaintiffs' state law claims.  VCSD Mot. At 18.  Because the Court finds that genuine issues of material fact preclude the entry of summary judgment as to plaintiffs' federal claims, the Court exercises supplemental jurisdiction over plaintiffs' state law claims.

## V.    CONCLUSION

In accordance with the foregoing, the Court hereby DENIES defendants' motions for summary judgment.

/ / /

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    ○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-08694 CAS (Ex) | Date | June 4, 2012 |
|---|---|---|---|
| Title | ESTHER BISELLI; ET AL. v. COUNTY OF VENTURA; ET AL. | | |

      The Court continues the Further Scheduling Conference to **July 23, 2012** at **11:00 A.M.**  An Updated Joint Report shall be filed on or before July 16, 2012, if necessary.

      IT IS SO ORDERED.

|  | 00 | : | 20 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |